» Provider will be charged a network variable rate to the Plan Sponsors that will range from **2.5% to 4.5%** for each product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

Exhibit J-608 (Caremark009212-14); Exhibit J-609 (Caremark009203-11).

m. ***Retail Network 55:*** AHF-affiliated pharmacies enrolled in Network 55 Preferred. Exhibit J-633 (Caremark004290-92). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 55, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| Network Name | AWP Discount | | Dispensing Fee | AWP Discount | | Dispensing Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail Network 55 Performance Network Program - Preferred | 16.0% | 25.0% | $0.50 | 18.75% | 25.0% | $0.00 |

*EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply)

*Id.* The NEF further provides, among other things, that:

• Provider will be charged a network variable rate to the Plan Sponsors that will range from **3.5% to 5.5%** of the total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

n. ***Retail Network 56:*** AHF-affiliated pharmacies enrolled in Network 56 Preferred. Exhibit J-634 (Caremark004293-95). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 56, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| Network Name | AWP Discount | | Dispensing Fee | AWP Discount | | Dispensing Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail Network 56 Performance Network Program - Preferred | 17.0% | 25.0% | $0.50 | 18.75% | 25.0% | $0.00 |

*EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply)

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **3.5% to 5.5%** of the total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

      *Id.*

o. ***Retail Network 41:*** AHF-affiliated pharmacies enrolled in Network 41 Preferred. Exhibit J-624 (Caremark0004387-89). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 41, effective January 1, 2019, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 41 Performance Network Program - Preferred | 16.00% | 25.0% | $0.40 |
| 1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **3.5% to 5.5%** for each brand product total ingredient cost paid or **6.5% to 8.5%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

      *Id.*

p. ***Retail Network 70:*** AHF-affiliated pharmacies enrolled in Network 70. Exhibit J-610 (Caremark009277-84). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network 70, effective January 1, 2019, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 70 Network Performance Program | 15.8% | 25.0% | $0.50 |
| 1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

* Provider will be charged a network variable rate to the Plan Sponsors that will range from 3% to 5% for each brand product total ingredient cost paid and 5% to 7% for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

> *Id.*

q. **Retail Network 75:** AHF-affiliated pharmacies enrolled in Network 75. Exhibit J-625 (Caremark004391-99). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 75 – Performance Network Program | 16.0%* | 25.0% | $0.50 |

\* In the event changes are made to the Medicare Part D rules that impact this Medicare Part D Retail Network 75 Performance Network Program, and Caremark determines in its sole discretion that such changes make the continuation of the Program infeasible, Caremark reserves the right to discontinue the Program and, unless otherwise notified, the AWP Brand Discount above (16.0%) will no longer apply and the new AWP Brand Discount will be 20.0% , and the network variable rate, the associated Retail Performance Network Program Information, the attached Specialty Drug Reimbursement Addendum (SDRA) will all no longer apply, and a replacement SDRA will be issued.

*Id.* The NEF further provides, among other things, that:

* Provider will be charged a network variable rate to the Plan Sponsors that will range from 3% to 5% for each brand product total ingredient cost paid and 14% to 16% for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy.

> *Id.*

37. The following NEFs related to the Program went into effect after AHF became a pharmacy chain:

a. **Retail Network 25:** AHF-affiliated pharmacies enrolled in Network 25. Exhibit J-637 (Caremark008906-07). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 25 as indicated in the table below, effective January 1, 2018, and agrees to accept

the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
| --- | --- | --- | --- |
| | Brand | Generic | |
| Medicare Part D Retail Network 25 Network Performance Program | 15.55% | 25.0% | $0.50 |
| 1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **3% to 5%** for each brand product total ingredient cost paid and **5% to 7%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

b. ***Retail Network 36:*** AHF-affiliated pharmacies enrolled in Network 36. Exhibit J-638 (Caremark008908). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the CVS/Caremark Medicare Part D Retail Network 36, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
| --- | --- | --- | --- |
| | Brand | Generic | |
| Medicare Part D Retail Network 36 (Network Performance Program) | 14.75 % | 25.0% | $1.00 |
| 1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from 2.5% to 4.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

c. ***Retail Network 38:*** AHF-affiliated pharmacies enrolled in Network 38. Exhibit J-639 (Caremark008909). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the CVS/Caremark Medicare Part D Retail and Extended Days' Supply (EDS) Network 38, effective January 1, 2016,

and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| | AWP Discount | | Disp Fee | AWP Discount | | Disp Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail and EDS Network 38 (Network Performance Program) | 14.25 % | 25.0% | $1.50 | 18.0% | 25.0% | $0.50 |
| *EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply) | | | | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from 1.5% to 3.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

d. ***Retail Network 50:*** AHF-affiliated pharmacies enrolled in Network 50. Exhibit J-640 (Caremark008910-11). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the CVS/Caremark Medicare Part D Retail and Extended Days' Supply (EDS) Network 50, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 50 Network Performance Program | 14.75% | 25.0% | $1.00 |
| Medicare Part D Extended Days Supply Network 50 Network Performance Program | 18.5% | 25.0% | $0.25 |
| * For participation in the Medicare Part D Extended Days Supply (EDS) Network Provider is also required to participate in the corresponding Retail Network (e.g., Medicare Part D Retail Network 50 and Medicare Part D EDS Network 50) *EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply) | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **1.5% to 3.5%** for each product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

e. ***Retail Network 51:*** AHF-affiliated pharmacies enrolled in Network 51. Exhibit J-641 (Caremark008912-13). The NEF provides, among other things, that "[t]he

undersigned hereby enrolls as a provider in the CVS/Caremark Medicare Part D Retail and Extended Days' Supply (EDS) Network 51 as indicated in the table below, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 51 Network Performance Program | 14.75% | 25.0% | $1.00 |
| Medicare Part D Extended Days Supply Network 51 Network Performance Program | 18.5% | 25.0% | $0.25 |
| * For participation in the Medicare Part D Extended Days Supply (EDS) Network Provider is also required to participate in the corresponding Retail Network (e.g., Medicare Part D Retail Network 51 and Medicare Part D EDS Network 51) | | | |
| *EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply) | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **2.5% to 4.5%** for each product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

f. ***Retail Network 52:*** AHF-affiliated pharmacies enrolled in Network 52. Exhibit J-647 (Caremark008935-42). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| | AWP Discount | | Dispensing Fee | AWP Discount | | Dispensing Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail Network 52 Performance Network Program | 14.75% | 25.00% | $1.00 | 16.50% | 25.00% | $0.25 |
| *EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply) | | | | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **4.5% to 6.5%** of the total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy.

*Id.*

g. ***Retail Network 70:*** AHF-affiliated pharmacies enrolled in Network 70. Exhibit J-636 (Caremark008914-16). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 70, effective January 1, 2019, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 70 Network Performance Program | 15.8% | 25.0% | $0.50 |
| 1-90 Days Supply | | | |

> *Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **3% to 5%** for each brand product total ingredient cost paid and **5% to 7%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

> *Id.*

h. ***Retail Network 71:*** AHF-affiliated pharmacies enrolled in Network 71. Exhibit J-649 (Caremark008943-50); Exhibit J-612 (Caremark009285-92). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." Exhibit J-649 (Caremark008943-50); Exhibit J-612 (Caremark009285-92). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 71 – Performance Network Program | 13.8%* | 25.0% | $0.50 |
| 1-90 Days Supply | | | |

Exhibit J-649 (Caremark008943-50); Exhibit J-612 (Caremark009285-92). The NEFs further provide that:

* Provider will be charged a network variable rate to the Plan Sponsors that will range from **5% to 7%** for each brand product total ingredient cost paid and **8.5% to 10.5%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy.

Exhibit J-649 (Caremark008943-50); Exhibit J-612 (Caremark009285-92).

i. ***Retail Network 72:*** AHF-affiliated pharmacies enrolled in Network 72. Exhibit J-635 (Caremark0004531-39); Exhibit J-650 (Caremark008951-58); Exhibit J-613 (Caremark009293-300). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein Exhibit J-635 (Caremark0004531-39); Exhibit J-650 (Caremark008951-58); Exhibit J-613 (Caremark009293-300). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 72 – Performance Network Program | 12.0%* | 25.0% | $0.50 |
| 1-90 Days Supply | | | |

\* In the event changes are made to the Medicare Part D rules that impact this Medicare Part D Retail Network 72 Performance Network Program, and Caremark determines in its sole discretion that such changes make the continuation of the Program infeasible, Caremark reserves the right to discontinue the Program and, unless otherwise notified, the AWP Brand Discount above (12.0%) will no longer apply and the new AWP Brand Discount will be 19.5%, and the network variable rate, the associated Retail Performance Network Program Information, the attached Specialty Drug Reimbursement Addendum (SDRA) will all no longer apply, and a replacement SDRA will be issued.

Exhibit J-635 (Caremark0004531-39); Exhibit J-650 (Caremark008951-58); Exhibit J-613 (Caremark009293-300). The NEF further provides, among other things, that:

ª Provider will be charged a network variable rate to the Plan Sponsors that will range from **7.5% to 9.5%** for each brand product total ingredient cost paid and **14% to 16%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy.

Exhibit J-635 (Caremark0004531-39); Exhibit J-650 (Caremark008951-58); Exhibit J-613 (Caremark009293-300).

j. ***Retail Network 73:*** AHF-affiliated pharmacies enrolled in Network 73. Exhibit J-644 (Caremark0004540-47). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 73 – Performance Network Program | 12.0%* | 25.0% | $0.50 |
| 1-90 Days Supply | | | |

\* In the event changes are made to the Medicare Part D rules that impact this Medicare Part D Retail Network 73 Performance Network Program, Caremark reserves the right to discontinue the Program and, unless otherwise notified, the AWP Brand Discount above (12.0%) will no longer apply and the new AWP Brand Discount will be 21.75%, and the

*Id.* The NEF further provides, among other things, that:

> Provider will be charged a network variable rate to the Plan Sponsors that will range from **10% to 12%** for each brand product total ingredient cost paid and **8% to 10%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy.

*Id.*[3]

k. ***Retail Network 75:*** AHF-affiliated pharmacies enrolled in Network 75. Exhibit J-651 (Caremark008959-66); Exhibit J-614 (Caremark009301-08). The NEFs provide, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." Exhibit J-651 (Caremark008959-66); Exhibit J-614 (Caremark009301-08). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 75 – Performance Network Program | 16.0%* | 25.0% | $0.50 |
| 1-90 Days Supply | | | |

\* In the event changes are made to the Medicare Part D rules that impact this Medicare Part D Retail Network 75 Performance Network Program, and Caremark determines in its sole discretion that such changes make the continuation of the Program infeasible, Caremark reserves the right to discontinue the Program and, unless otherwise notified, the **AWP Brand Discount above (16.0%) will no longer apply and the new AWP Brand Discount will be 20.0%,** and the network variable rate, the associated Retail Performance Network Program Information, the attached Specialty Drug Reimbursement Addendum (SDRA) will all no longer apply, and a replacement SDRA will be issued.

Exhibit J-651 (Caremark008959-66); Exhibit J-614 (Caremark009301-08). The NEF provides, among other things, that:

> Provider will be charged a network variable rate to the Plan Sponsors that will range from **3% to 5%** for each brand product total ingredient cost paid and **14% to 16%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy.

Exhibit J-651 (Caremark008959-66); Exhibit J-614 (Caremark009301-08).

l. ***Retail Network 76:*** AHF-affiliated pharmacies enrolled in Network 76. Exhibit J-616 (Caremark009309-18). The NEF provides, among other things, that "Provider

---

[3] *See also* Caremark0008917-18.

is hereby enrolled as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 76 – Performance Network Program | 12.0%* | 25.0% | $0.50 |
| 1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

---

\* Provider will be charged a network variable rate to the Plan Sponsors that will range from 8% to 10% for each brand product total ingredient cost paid and 17% to 19% for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy.

> *Id.*

m. ***Retail Network 77:*** AHF-affiliated pharmacies enrolled in Network 77. Exhibit J-643 (Caremark0004548-57). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 77 – Performance Network Program | 11.5%* | 25.0% | $0.50 |
| 1-90 Days Supply | | | |

The NEF further provides, among other things, that:

---

• Provider will be charged a network variable rate to the Plan Sponsors that will range from 10% to 12% for each brand product total ingredient cost paid and 29% to 31% for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy.

> *Id.*

n. ***AETNA2 Program:*** AHF-affiliated pharmacies enrolled in the Aetna2 Program. Exhibit J-615 (Caremark009321-24). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Network Aetna 2, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network AETNA2 Network Performance Program | 15.8% | 25.0% | $0.50 |
| Medicare Part D Retail Network AETNA2 Network Performance Program – Specialty Drug Listing* | 12.0% | N/A | $0.50 |
| 1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

Provider will be charged a network variable rate to the Plan Sponsors that will range from **3% to 5%** for each brand product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. No network variable rate will be charged for generic products.

*Id.*

o. ***AETNA3 Program:*** AHF-affiliated pharmacies enrolled in the Aetna3 Program. Exhibit J-618 (Caremark009325-28); Exhibit J-617 (Caremark009329-32). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Network Aetna3, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein." Exhibit J-618 (Caremark009325-28); Exhibit J-617 (Caremark009329-32). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brand and generics and Dispensing Fees are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network AETNA3 Network Performance Program | 12.0%* | 25.0% | $0.50 |
| Medicare Part D Retail Network AETNA3 Network Performance Program – Specialty Drug Pricing List† | †See Specialty Drug Pricing List | N/A | $0.50 |
| 1-90 day supply | | | |

Exhibit J-618 (Caremark009325-28); Exhibit J-617 (Caremark009329-32). The NEF further provides, among other things, that:

＊ Provider will be charged a network variable rate to the Plan Sponsors that will range from 7% to 9% for each brand product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. No network variable rate will be charged for generic products.

Exhibit J-618 (Caremark009325-28); Exhibit J-617 (Caremark009329-32).

## V.    AHF's Scoring Reports

38.    Included as Exhibit B is a summary of AHF's PNP Fees from January 1, 2016 through November of 2019.

39.    After November 2019, Caremark scored AHF-affiliated pharmacies in the aggregate. In other words, Caremark provides one Trimester Report for the entire chain instead of providing individual Trimester Reports.

40.    The following table reflects AHF's PNP Fees after November 2019:

*AIDS Healthcare Foundation (Chain Code 7023)*

|          | Trimester 1 | Trimester 2 | Trimester 3 |
|----------|-------------|-------------|-------------|
| 2019     | N/A         | N/A         | $1,535,453  |
| 2020     | $2,979,186  | $2,858,386  | 2,865,141   |

2019: Exhibit J-9 (Caremark004590-99)
2020: Exhibit J-10 (Caremark004568-78); Exhibit J-11 (Caremark004579-89); J-11A (Caremark009493-503)

**EXHIBIT A**

| | NCPDP | Name | PSAO | Documents Bates Stamp |
|---|---|---|---|---|
| 1 | 0557984 | AHF – Pharmacy Downtown | LeaderNet | Agency Addendum: Exhibit J-73 (Caremark002797-800) Provider Agreement: Exhibit J-72 (Caremark002801-05) |
| 2 | 0558405 | AHF-Pharmacy Hollywood | LeaderNet | Agency Addendum: Exhibit J-86 (Caremark009452-55) Provider Agreement: Exhibit J-85 (Caremark002810-14) |
| 3 | 0561426 | AHF-Healthcare Center - Westside | LeaderNet | Agency Addendum: Exhibit J-59 (Caremark002815-18) Provider Agreement: Exhibit J-60 (Caremark002819-23) |
| 4 | 0561705 | Hillcrest Pharmacy | ABDC[4] | Agency Addendum: Exhibit R-27 (Caremark002824); Exhibit R-28 (Caremark009473-76) Provider Agreement: Exhibit R-25 (Caremark002825); Exhibit R-26 (Caremark009456-72) |
| 5 | 0569496 | AHF Pharmacy – Valley | LeaderNet | Agency Addendum: Exhibit J-21 (Caremark009481-84) Provider Agreement: Exhibit J-20 (Caremark002827-31) |
| 6 | 0581985 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-47 (Caremark002832-35) Provider Agreement: Exhibit J-46 (Caremark002836-40) |
| 7 | 0904640 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-216 (Caremark002841-44) Provider Agreement: Exhibit J-215 (Caremark002845-49) |
| 8 | 1010254 | AHF Pharmacy Miami | LeaderNet | Agency Addendum: Exhibit J-99 (Caremark002850-53) Provider Agreement: Exhibit J-98 (Caremark002854-58) |
| 9 | 1016509 | AHF Pharmacy Orlando | LeaderNet | Agency Addendum: Exhibit J-112 (Caremark002859-62) Provider Agreement: Exhibit J-111 (Caremark002863-67) |
| 10 | 1016701 | AHF Pharmacy – Safety Harbor | LeaderNet | Agency Addendum: Exhibit J-125 (Caremark002868-72) Provider Agreement: Exhibit J-124 (Caremark002873-77) |
| 11 | 1022792 | AHF Pharmacy Wilton Manors | LeaderNet | Agency Addendum: Exhibit J-138 (Caremark002878-81) Provider Agreement: Exhibit J-137 (Caremark002882-86) |
| 12 | 1036830 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-164 (Caremark002887-90) Provider Agreement: Exhibit J-163 (Caremark002891-95) |
| 13 | 1046108 | AHF Pharmacy – North Point | LeaderNet | Agency Addendum: Exhibit J-203 (Caremark002896-99) Provider Agreement: Exhibit J-202 (Caremark002900-04) |
| 14 | 1047403 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-229 (Caremark002905-08) |

---

[4] Hillcrest Pharmacy's use of ABDC as a PSAO predated that pharmacy's affiliation with AHF.

| | | | | |
|---|---|---|---|---|
| | | | | Provider Agreement: Exhibit J-228 (Caremark002909-13) |
| 15 | 1099577 | AHF Healthcare Center - Jacksonville | LeaderNet | Agency Addendum: Exhibit J-34 (Caremark002914-17) Provider Agreement: Exhibit J-33 (Caremark002918-22) |
| 16 | 1162522 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-320 (Caremark002923-26) Provider Agreement: Exhibit J-319 (Caremark002927-35) |
| 17 | 1168396 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-495 (Caremark002936-39) Provider Agreement: Exhibit J-494 (Caremark002940-43) |
| 18 | 1168447 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-507 (Caremark002944-47) Provider Agreement: Exhibit J-506 (Caremark002948-51) |
| 19 | 1169007 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-530 (Caremark002952-55) Provider Agreement: Exhibit J-529 (Caremark002956-59) |
| 20 | 1172129 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-583 (Caremark004560-63) Provider Agreement: Exhibit J-582 (Caremark004564-67) |
| 21 | 1938274 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-464 (Caremark002960-64) Provider Agreement: Exhibit J-463 (Caremark002965-68) |
| 22 | 2591851 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-588 (Caremark002969-72) Provider Agreement: Exhibit J-587 (Caremark002973-76) |
| 23 | 2993928 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-482 (Caremark002977-81) Provider Agreement: Exhibit J-481 (Caremark002982-85) |
| 24 | 3349859 | City View Pharmacy | LeaderNet | Agency Addendum: Exhibit J-563 (Caremark002986-89) Provider Agreement: Exhibit J-562 (Caremark002990-3002) |
| 25 | 3680762 | AHF Pharmacy – Wilders City | LeaderNet | Agency Addendum: Exhibit J-360 (Caremark003003-06) Provider Agreement: Exhibit J-361 (Caremark003007-10) |
| 26 | 3681930 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-438(Caremark003011-15) Provider Agreement: Exhibit J-437 (Caremark003016-31) |
| 27 | 4231914 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-399 (Caremark003040-44) |

| | | | | |
|---|---|---|---|---|
| | | | | Provider Agreement: Exhibit J-398 (Caremark003045-48) |
| 28 | 4934837 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-335 (Caremark003049-52)<br>Provider Agreement: Exhibit J-334 (Caremark003053-69) |
| 29 | 4934849 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-348 (Caremark003070-73)<br>Provider Agreement: Exhibit J-347 (Caremark003074-90) |
| 30 | 5629108 | AHF Pharmacy West Hollywood | LeaderNet | Agency Addendum: Exhibit J-151 (Caremark003091-94)<br>Provider Agreement: Exhibit J-150 (Caremark003095-99) |
| 31 | 5630517 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-190 (Caremark003100-03)<br>Provider Agreement: Exhibit J-189 (Caremark003104-08) |
| 32 | 5631812 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-177 (Caremark003109-12)<br>Provider Agreement: Exhibit J-176 (Caremark003113-17) |
| 33 | 5640722 | AHF Pharmacy Long Beach | LeaderNet | Agency Addendum: Exhibit J-242 (Caremark003118-21)<br>Provider Agreement: Exhibit J-241 (Caremark003122-25) |
| 34 | 5645025 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-281 (Caremark003126-29)<br>Provider Agreement: Exhibit J-280 (Caremark003130-34) |
| 35 | 5645049 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-373 (Caremark009489-92) |
| 36 | 5655658 | Hillcrest Pharmacy North | ABDC[5] | Agency Addendum: J-477 (Caremark003143)<br>Provider Agreement: Exhibit J-476 (Caremark003144-47) |
| 37 | 05705910 | AHF Pharmacy – Sunrise | LeaderNet | Agency Addendum: Exhibit J-268 (Caremark003148-51)<br>Provider Agreement: Exhibit J-267 (Caremark003152-55) |
| 38 | 5706784 | AHF Pharmacy – South Beach | LeaderNet | Agency Addendum: Exhibit J-255 (Caremark003156-60)<br>Provider Agreement: Exhibit J-254 (Caremark003161-64) |
| 39 | 5710822 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-294 (Caremark003165-68)<br>Provider Agreement: Exhibit J-293 (Caremark003169-77) |

---

[5] Hillcrest Pharmacy's use of ABCD as a PSAO predated that pharmacy's affiliation with AHF.

| 40 | 5716026 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-412 (Caremark003178-82)<br>Provider Agreement: Exhibit J-411 (Caremark003183-86) |
|----|----------|--------------|-----------|----|
| 41 | 5735709 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-549 (Caremark003187-90)<br>Provider Agreement: Exhibit J-548 (Caremark003191-94) |
| 42 | 5736775 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-556 (Caremark003195-98)<br>Provider Agreement: Exhibit J-555 (Caremark003199-202) |
| 43 | 5739961 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-592 (Caremark003203-06)<br>Provider Agreement: Exhibit J-591 (Caremark003207-10) |
| 44 | 5805924 | MOMS Pharmacy/AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-307 (Caremark003211-14)<br>Provider Agreement: Exhibit J-306 (Caremark003215-23) |
| 45 | 5809631 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-425 (Caremark003224-29)<br>Provider Agreement: Exhibit J-424 (Caremark003230-40) |
| 46 | 5816282 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-519 (Caremark003241-44)<br>Provider Agreement: Exhibit J-518 (Caremark003245-59) |
| 47 | 5819163 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-540 (Caremark003260-63)<br>Provider Agreement: Exhibit J-539 (Caremark003264-78) |
| 48 | 5907778 | AHF Pharmacy – FT Worth | LeaderNet | Agency Addendum: Exhibit J-386 (Caremark003279-82)<br>Provider Agreement: Exhibit J-385 (Caremark003283-86) |
| 49 | 5912349 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-451 (Caremark003287-91)<br>Provider Agreement: Exhibit J-450 (Caremark003292-96) |
| 50 | 5923811 | AIDS Healthcare Foundation | LeaderNet | Agency Addendum: Exhibit J-572 (Caremark003297-300)<br>Provider Agreement: Exhibit J-571 (Caremark003301-04) |
| 51 | 6006301 | AHF Pharmacy | LeaderNet | Agency Addendum: Exhibit J-578 (Caremark003305-08)<br>Provider Agreement: Exhibit J-577 (Caremark003309-12) |

| 52 | 4029953 | AIDS Healthcare Foundation | LeaderNet | Agency Addendum: Exhibit J-595 (Caremark003032-35)<br>Provider Agreement: Exhibit J-594 (Caremark003036-39) |
|----|---------|----------------------------|-----------|---------|

## EXHIBIT B

### 1.  AHF-Pharmacy Downtown (NCPDP No. 0557984)

|       | Trimester 1 | Trimester 2 | Trimester 3 |
|-------|-------------|-------------|-------------|
| 2016  | $6,176      | $6,386      | $6,523      |
| 2017  | $13,827     | $7,048      | $8,176      |
| 2018  | $17,758     | $15,418     | $14,403     |
| 2019  | $12,025     | $17,946     | N/A         |

2016: Exhibit J-74 (Caremark004606-09); Exhibit J-75 (Caremark004640-43); J-76 (Caremark 004672-75)
2017: Exhibit J-77 (Caremark004610-14); Exhibit J-78 (Caremark004644-49); Exhibit J-79 (Caremark004676-81)
2018: Exhibit J-80 (Caremark004615-26); Exhibit J-81 (Caremark004650-58); Exhibit J-82 (Caremark004682-93)
2019: Exhibit J-83 (Caremark004627-39); Exhibit J-84 (Caremark004660-71)

### 2.  AHF-Pharmacy Hollywood (NCPDP No. 0558405)

|       | Trimester 1 | Trimester 2 | Trimester 3 |
|-------|-------------|-------------|-------------|
| 2016  | $11,649     | $11,508     | $8,348      |
| 2017  | $13,028     | $9,362      | $12,059     |
| 2018  | $14,503     | $18,175     | $18,991     |
| 2019  | $18,615     | $21,840     | N/A         |

2016: Exhibit J-87 (Caremark004694-97); Exhibit J-88 (Caremark004728-31); Exhibit J-89 (Caremark004760-63)
2017: Exhibit J-90 (Caremark004698-702); Exhibit J-91 (Caremark004732-37); Exhibit J-92 (Caremark004764-69)
2018: Exhibit J-93 (Caremark004703-14); Exhibit J-94 (Caremark004738-46); Exhibit J-95 (Caremark004770-81)
2019: Exhibit J-96 (Caremark004715-27); Exhibit J-97 (Caremark004747-59)

### 3. AHF-Healthcare Center - Westside (NCPDP No. 0561426)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $10,599 | $16,212 | $12,045 |
| 2017 | $14,185 | $17,853 | $16,789 |
| 2018 | $24,257 | $27,841 | $24,698 |
| 2019 | $30,527 | $28,171 | N/A |

2016: Exhibit J-61 (Caremark004782-85); Exhibit J-62 (Caremark004816-19); Exhibit J-63 (Caremark004848-51)
2017: Exhibit J-64 (Caremark004786-90); Exhibit J-65 (Caremark004820-25); Exhibit J-66 (Caremark004852-57)
2018: Exhibit J-67 (Caremark004791-802); Exhibit J-68 (Caremark004826-34); Exhibit J-69 (Caremark004858-69)
2019: Exhibit J-70 (Caremark004803-15); Exhibit J-71 (Caremark004835-47)

### 4. Hillcrest Pharmacy (NCPDP No. 0561705) [6]

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2019 | N/A | N/A | $68,418 |
| 2020 | $128,521 | $140,069 | N/A |

2019: Exhibit J-17 (Caremark004971-80)
2020: Exhibit J-18 (Caremark004899-09); Exhibit J-18 (Caremark004940-50)

### 5. AHF Pharmacy – Valley (NCPDP No. 0569496)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $13,732 | $9,004 | $8,885 |
| 2017 | $14,274 | $11,075 | $12,251 |
| 2018 | $16,886 | $13,701 | $10,343 |
| 2019 | $11,857 | $15,368 | N/A |

---

[6] For NCPDP 0561705, AHF does not seek damages for periods prior to AHF's affiliation with that pharmacy.

2016: Exhibit J-22 (Caremark004981-84); Exhibit J-23 (Caremark005015-18); Exhibit J-24 (Caremark005047-50)
2017: Exhibit J-25 (Caremark004985-89); Exhibit J-26 (Caremark005019-24); Exhibit J-27 (Caremark005051-56)
2018: Exhibit J-28 (Caremark004990-5001); Exhibit J-29 (Caremark005025-33); Exhibit J-30 (Caremark005057-68)
2019: Exhibit J-31 (Caremark005002-14); Exhibit J-32 (Caremark005034-46)

### 6. *AHF Pharmacy (NCPDP No. 0581985)*

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $87,275 | $99,963 | $98,970 |
| 2017 | $93,223 | $87,710 | $78,090 |
| 2018 | $101,926 | $117,917 | $106,279 |
| 2019 | $111,003 | $99,960 | N/A |

2016: Exhibit J-48 (Caremark005069-72); Exhibit J-49 (Caremark005103-06); Exhibit J-50 (Caremark005135-38)
2017: Exhibit J-51 (Caremark005073-77); Exhibit J-52 (Caremark005107-12); Exhibit J-53 (Caremark005139-44)
2018: Exhibit J-54 (Caremark005078-89); Exhibit J-55 (Caremark005113-21); Exhibit J-56 (Caremark005145-56)
2019: Exhibit J-57 (Caremark005090-102); Exhibit J-58 (Caremark005122-34)

### 7. *AHF Pharmacy (NCPDP No. 0904640)*

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $18,084 | $20,705 | $13,131 |
| 2017 | $13,637 | $18,633 | $17,971 |
| 2018 | $34,823 | $33,521 | $26,609 |
| 2019 | $34,463 | $35,678 | N/A |

2016: Exhibit J-217 (Caremark005157-60); Exhibit J-218 (Caremark005191-94); Exhibit J-219 (Caremark005223-26)
2017: Exhibit J-220 (Caremark005161-65); Exhibit J-221 (Caremark005195-200); Exhibit J-222 (Caremark005227-32)
2018: Exhibit J-223 (Caremark005166-77); Exhibit J-224 (Caremark005201-09); Exhibit J-225 (Caremark005233-44)
2019: Exhibit J-226 (Caremark005178-90); Exhibit J-227 (Caremark005210-22)

## 8. *AHF Pharmacy Miami (NCPDP No. 1010254)*

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $11,671 | $11,318 | $7,737 |
| **2017** | $13,065 | $19,455 | $20,855 |
| **2018** | $26,963 | $31,317 | $28,821 |
| **2019** | $30,078 | $24,560 | N/A |

2016: Exhibit J-100 (Caremark005245-48); Exhibit J-101 (Caremark005279-82); Exhibit J-102 (Caremark005311-14)
2017: Exhibit J-103 (Caremark005249-53); Exhibit J-104 (Caremark005283-88); Exhibit J-105 (Caremark005315-20)
2018: Exhibit J-106 (Caremark005254-65); Exhibit J-107 (Caremark005289-97); Exhibit J-108 (Caremark005321-32)
2019: Exhibit J-109 (Caremark005266-78); Exhibit J-110 (Caremark005298-3010)

## 9. *AHF Pharmacy Orlando (NCPDP No. 1016509)*

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $31,906 | $28,954 | $21,703 |
| **2017** | $24,049 | $38,002 | $35,582 |
| **2018** | $59,230 | $69,467 | $59,990 |
| **2019** | $63,268 | $64,053 | N/A |

2016: Exhibit 113 (Caremark005333-36); Exhibit 114 (Caremark005367-70); Exhibit 115 (Caremark005399-402)
2017: Exhibit 116 (Caremark005337-41); Exhibit 117 (Caremark005371-76); Exhibit 118 (Caremark005403-08)
2018: Exhibit 119 (Caremark005342-53); Exhibit 120 (Caremark005377-85); Exhibit 121 (Caremark005409-20)
2019: Exhibit 122 (Caremark005354-66); Exhibit 123 (Caremark005386-98)

## 10. *AHF Pharmacy – Safety Harbor (NCPDP No. 1016701)*

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $44,531 | $49,981 | $44,019 |
| **2017** | $47,328 | $51,054 | $49,428 |

| | | | |
|---|---|---|---|
| **2018** | $81,309 | $78,925 | $70,377 |
| **2019** | $88,287 | $79,745 | N/A |

2016: Exhibit J-126 (Caremark005421-24); Exhibit J-127 (Caremark005455-58); Exhibit J-128 (Caremark005487-90)
2017: Exhibit J-129 (Caremark005425-29); Exhibit J-130 (Caremark005459-64); Exhibit J-131 (Caremark005491-96)
2018: Exhibit J-132 (Caremark005430-41); Exhibit J-133 (Caremark005465-73); Exhibit J-134 (Caremark005497-508)
2019: Exhibit J-135 (Caremark005442-54); Exhibit J-136 (Caremark005474-86)


### 11. AHF Pharmacy Wilton Manors (NCPDP No. 1022792)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $5,777 | $3,987 | $3,963 |
| **2017** | $6,712 | $7,627 | $6,259 |
| **2018** | $19,281 | $23,072 | $18,356 |
| **2019** | $21,552 | $20,003 | N/A |

2016: Exhibit J-139 (Caremark005509-12); Exhibit J-140 (Caremark005543-46); Exhibit J-141 (Caremark005575-78)
2017: Exhibit J-142 (Caremark005513-17); Exhibit J-143 (Caremark005547-52); Exhibit J-144 (Caremark005579-84)
2018: Exhibit J-145 (Caremark005518-29); Exhibit J-146 (Caremark005553-61); Exhibit J-147 (Caremark005585-96)
2019: Exhibit J-149 (Caremark005530-42); Exhibit J-150 (Caremark005562-74)

### 12. AHF Pharmacy (NCPDP No. 1036830)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $24,158 | $26,137 | $31,027 |
| **2017** | $31,094 | $36,833 | $35,071 |
| **2018** | $66,370 | $77,316 | $66,231 |
| **2019** | $67,620 | $68,719 | N/A |

2016: Exhibit J-165 (Caremark005597-600); Exhibit J-166 (Caremark005631-34); Exhibit J-167 (Caremark005663-66)

2017: Exhibit J-168 (Caremark005601-05); Exhibit J-169 (Caremark005635-40); Exhibit J-170 (Caremark005667-72)
2018: Exhibit J-171 (Caremark005606-17); Exhibit J-172 (Caremark005641-49); Exhibit J-173 (Caremark005673-84)
2019: Exhibit J-174 (Caremark005618-30); Exhibit J-175 (Caremark005650-62)

### *13. AHF Pharmacy – North Point (NCPDP No. 1046108)*

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $9,507      | $14,462     | $16,896     |
| 2017   | $18,164     | $20,182     | $15,228     |
| 2018   | $29,648     | $30,837     | $35,679     |
| 2019   | $25,449     | $32,372     | N/A         |

2016: Exhibit J-204 (Caremark005685-88); Exhibit J-205 (Caremark005719-22); Exhibit J-206 (Caremark005751-54)
2017: Exhibit J-207 (Caremark005689-93); Exhibit J-208 (Caremark005723-28); Exhibit J-209 (Caremark005755-60)
2018: Exhibit J-210 (Caremark005694-705); Exhibit J-211 (Caremark005729-37); Exhibit J-212 (Caremark005761-72)
2019: Exhibit J-213 (Caremark005706-18); Exhibit J-214 (Caremark005738-50)

### *14. AHF Pharmacy (NCPDP No. 1047403)*

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $7,152      | $5,548      | $6,155      |
| 2017   | $8,080      | $9,976      | $10,090     |
| 2018   | $19,575     | $23,645     | $20,261     |
| 2019   | $24,313     | $26,060     | N/A         |

2016: Exhibit J-230 (Caremark005773-76); Exhibit J-231 (Caremark005805-08); Exhibit J-232 (Caremark005838-41)
2017: Exhibit J-233 (Caremark005777-81); Exhibit J-234 (Caremark005809-14); Exhibit J-235 (Caremark005842-47)
2018: Exhibit J-236 (Caremark005782-91); Exhibit J-237 (Caremark005815-24); Exhibit J-238 (Caremark005848-57)
2019: Exhibit J-239 (Caremark005792-804); Exhibit J-240 (Caremark005825-37)

## 15. AHF Healthcare Center Jacksonville (NCPDP No. 1099577)

|       | Trimester 1 | Trimester 2 | Trimester 3 |
|-------|-------------|-------------|-------------|
| 2016  | $48,372     | $53,781     | $54,154     |
| 2017  | $59,905     | $57,282     | $52,783     |
| 2018  | $101,617    | $108,319    | $99,387     |
| 2019  | $101,599    | $107,197    | N/A         |

2016: Exhibit J-35 (Caremark005858-61); Exhibit J-36 (Caremark005892-95); Exhibit J-37 (Caremark005924-27)
2017: Exhibit J-38 (Caremark005862-66); Exhibit J-39 (Caremark005896-901); Exhibit J-40 (Caremark005928-33)
2018: Exhibit J-41 (Caremark005867-78); Exhibit J-42 (Caremark005902-10); Exhibit J-43 (Caremark005934-45_
2019: Exhibit J-44 (Caremark005879-91); Exhibit J-45 (Caremark005911-23)

## 16. AHF Pharmacy (NCPDP No. 1162522)

|       | Trimester 1 | Trimester 2 | Trimester 3 |
|-------|-------------|-------------|-------------|
| 2016  | $7,213      | $10,112     | $7003       |
| 2017  | $9,443      | $7,338      | $9,694      |
| 2018  | $11,723     | $12,594     | $11,127     |
| 2019  | $12,394     | $12,146     | N/A         |

2016: Exhibit J-321 (Caremark005946-49); Exhibit J-322 (Caremark005980-83); Exhibit J-323 (Caremark006012-15)
2017: Exhibit J-324 (Caremark005950-54); Exhibit J-325 (Caremark005984-89); Exhibit J-326 (Caremark006016-21)
2018: Exhibit J-327 (Caremark005955-66); Exhibit J-328 (Caremark005990-98); Exhibit J-329 (Caremark006022-33)
2019: Exhibit J-330 (Caremark005967-79); Exhibit J-331 (Caremark005999-6011)

## 17. AHF Pharmacy (NCPDP No. 1168396)

|       | Trimester 1 | Trimester 2 | Trimester 3 |
|-------|-------------|-------------|-------------|
| 2016  | $0          | $1,331      | $4,711      |
| 2017  | $5,807      | $9,052      | $8,709      |

| 2018 | $16,996 | $14,871 | $16,297 |
|------|---------|---------|---------|
| 2019 | $18,543 | $18,075 | N/A |

2016: Exhibit J-496 (Caremark006064-67); Exhibit J-497 (Caremark006096-99)
2017: Exhibit J-498 (Caremark006034-38); Exhibit J-499 (Caremark006068-73); Exhibit J-500 (Caremark006100-05)
2018: Exhibit J-501 (Caremark006039-50); Exhibit J-502 (Caremark006074-82); Exhibit J-503 (Caremark006106-17)
2019: Exhibit J-504 (Caremark006051-63); Exhibit J-505 (Caremark006083-95)

### 18. AHF Pharmacy (NCPDP No. 1168447)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $0 | $793 | $2,947 |
| 2017 | $4,468 | $5,516 | $6,180 |
| 2018 | $13,454 | $16,051 | $11,299 |
| 2019 | $16,354 | $15,322 | N/A |

2016: Exhibit J-508 (Caremark006148-151); Exhibit J-509 (Caremark006180-83)
2017: Exhibit J-510 (Caremark006118-22); Exhibit J-511 (Caremark006152-57); Exhibit J-512 (Caremark006184-89)
2018: Exhibit J-513 (Caremark006123-34); Exhibit J-514 (Caremark006158-66); Exhibit J-515 (Caremark006190-201)
2019: Exhibit J-516 (Caremark006135-47); Exhibit J-517 (Caremark006167-79)

### 19. AHF Pharmacy (NCPDP No. 1169007)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2017 | $635 | $1,155 | $1,189 |
| 2018 | $2,715 | $3,081 | $4,215 |
| 2019 | $3,287 | $3,039 | N/A |

2017: Exhibit J-531 (Caremark006202-06); Exhibit J-532 (Caremark006232-37); Exhibit J-533 (Caremark006260-65)
2018: Exhibit J-534 (Caremark006207-18); Exhibit J-535 (Caremark006238-46); Exhibit J-536 (Caremark006266-77)
2019: Exhibit J-537 (Caremark006219-31); Exhibit J-538 (Caremark006247-59)

### 20. AHF Pharmacy (NCPDP No. 1172129)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2018 | $0 | $0 | $2,512 |
| 2019 | $12,476 | $11,720 | N/A |

2018: Exhibit J-584 (Caremark006304-15)
2019: Exhibit J-585 (Caremark006278-90); Exhibit J-586 (Caremark006291-303)

### 21. AHF Pharmacy (NCPDP No. 1938274)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $5,790 | $12,961 | $18,103 |
| 2017 | $9,906 | $12,155 | $8,871 |
| 2018 | $20,563 | $23,414 | $23,758 |
| 2019 | $33,051 | $35,004 | N/A |

2016: Exhibit J-465 (Caremark006316-19); Exhibit J-466 (Caremark006345-48); Exhibit J-467 (Caremark006374-77)
2017: Exhibit J-468 (Caremark006320-24); Exhibit J-469 (Caremark006349-54); Exhibit J-470 (Caremark006378-83)
2018: Exhibit J-471) Caremark006325-34; Exhibit J-472 (Caremark006355-63); Exhibit J-473 (Caremark006384-95)
2019: Exhibit J-474 (Caremark006335-44); Exhibit J-475 (Caremark006364-73)

### 22. AHF Pharmacy (NCPDP No. 2591851)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2019 | $4,263 | $7,916 | N/A |

2019: Exhibit J-589 (Caremark006396-408); Exhibit J-590 (Caremark006409-21)

### 23. AHF Pharmacy (NCPDP No. 2993928)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $942 | $1,791 | $2,401 |

| 2017 | $3,189 | $4,666 | $6,701 |
| 2018 | $17,479 | $18,253 | $20,041 |
| 2019 | $21,116 | $21,350 | N/A |

2016: Exhibit J-483 (Caremark006422-25); Exhibit J-484 (Caremark006456-59); Exhibit J-485
(Caremark006488-91)_
2017: Exhibit J-486 (Caremark006426-30); Exhibit J-487 (Caremark006460-65); Exhibit J-488
(Caremark006492-97)
2018: Exhibit J-489 (Caremark006431-42); Exhibit J-490 (Caremark006466-74); Exhibit J-491
(Caremark006498-509)
2019: Exhibit J-492 (Caremark006443-55); Exhibit J-493 (Caremark006475-87)

### 24. City View Pharmacy (NCPDP No. 3349859) [7]

|  | Trimester 1 | Trimester 2 | Trimester 3 |
| --- | --- | --- | --- |
| 2016 | N/A | N/A | N/A |
| 2017 | N/A | $7,568 | $7,215 |
| 2018 | $17,791 | $19,668 | $15,172 |
| 2019 | $27,481 | $32,465 | N/A |

2017: Exhibit J-564 (Caremark006543-48); Exhibit J-565 (Caremark006573-78)
2018: Exhibit J-566 (Caremark006519-28); Exhibit J-567 (Caremark006549-58); Exhibit J-568
(Caremark006579-88)
2019: Exhibit J-569 (Caremark006529-38); Exhibit J-570 (Caremark006559-68)

### 25. AHF Pharmacy – Wilders City (NCPDP No. 3680762)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
| --- | --- | --- | --- |
| 2016 | $4,711 | $9,750 | $16,107 |
| 2017 | $14,170 | $16,287 | $12,069 |
| 2018 | $21,024 | $22,065 | $27,575 |
| 2019 | $21,062 | $21,374 | N/A |

---

[7] For NCPDP 3349859, AHF does not seek damages for periods prior to AHF's affiliation with that
pharmacy.

2016: Exhibit J-362, Caremark006589-92; Exhibit J-363, Caremark006623-26; Exhibit J-364 Caremark006655-58
2017: Exhibit J-365, Caremark006593-97; Exhibit J-366, Caremark006627-32; Exhibit J-367, Caremark006659-64
2018: Exhibit J-368, Caremark006598-609; Exhibit J-369, Caremark006633-41; Exhibit J-370, Caremark006665-76
2019: Exhibit J-371, Caremark006610-22; Exhibit J-372, Caremark006642-54

### 26. AHF Pharmacy (NCPDP No. 3681930)

|       | Trimester 1 | Trimester 2 | Trimester 3 |
|-------|-------------|-------------|-------------|
| 2016  | $6,828      | $5,420      | $6,344      |
| 2017  | $10,046     | $9,484      | $7,373      |
| 2018  | $14,619     | $16,588     | $14,080     |
| 2019  | $13,291     | $12,436     | N/A         |

2016: Exhibit J-439, Caremark006677-80; Exhibit J-440, Caremark006711-14; Exhibit J-441, Caremark006743-46
2017: Exhibit J-442, Caremark006681-85; Exhibit J-443, Caremark006715-20; Exhibit J-444, Caremark006747-52
2018: Exhibit J-445, Caremark006686-97; Exhibit J-446, Caremark006721-29; Exhibit J-447, Caremark006753-64
2019: Exhibit J-448, Caremark006698-710; Exhibit J-449, Caremark006730-42

### 27. AHF Pharmacy (NCPDP No. 4231914)

|       | Trimester 1 | Trimester 2 | Trimester 3 |
|-------|-------------|-------------|-------------|
| 2016  | $1,284      | $1,085      | $809        |
| 2017  | $1,077      | $3,096      | $4,239      |
| 2018  | $3,416      | $3,630      | $4,802      |
| 2019  | $7,132      | $5,641      | N/A         |

2016: Exhibit J-400, Caremark006765-68; Exhibit J-401, Caremark006799-802; Exhibit J-402, Caremark006831-34
2017: Exhibit J-403, Caremark006769-73; Exhibit J-404, Caremark006803-08; Exhibit J-405, Caremark006835-40
2018: Exhibit J-406, Caremark006774-85; Exhibit J-407, Caremark006809-17; Exhibit J-408, Caremark006841-52
2019: Exhibit J-409, Caremark006786-98; Exhibit J-410, Caremark006818-30

## 28. AHF Pharmacy (NCPDP No. 4934837)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $23,301 | $17,760 | $22,174 |
| 2017 | $24,076 | $21,923 | $23,871 |
| 2018 | $28,248 | $23,155 | $20,790 |
| 2019 | $25,732 | $26,757 | N/A |

2016: Exhibit J-336, Caremark006853-56; Exhibit J-337, Caremark006887-90; Exhibit J-338, Caremark006919-22
2017: Exhibit J-339, Caremark006857-61; Exhibit J-340, Caremark006891-96; Exhibit J-341, Caremark006923-28
2018: Exhibit J-342, Caremark006862-73; Exhibit J-343, Caremark006897-905; Exhibit J-344, Caremark006929-40
2019: Exhibit J-345, Caremark006874-86; Exhibit J-346, Caremark006906-1822

## 29. AHF Pharmacy (NCPDP No. 4934849)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $13,242 | $19,447 | $16,568 |
| 2017 | $13,229 | $12,949 | $12,830 |
| 2018 | $15,594 | $16,266 | $14,695 |
| 2019 | $18,190 | $15,326 | N/A |

2016: Exhibit J-349, Caremark006941-44; Exhibit J-350, Caremark006975-78; Exhibit J-351, Caremark007007-10
2017: Exhibit J-352, Caremark006945-49; Exhibit J-353, Caremark006979-84; Exhibit J-354, Caremark007011-16
2018: Exhibit J-355, Caremark006950-61; Exhibit J-356, Caremark006985-93; Exhibit J-357, Caremark007017-28
2019: Exhibit J-358, Caremark006962-74; Exhibit J-359, Caremark006994-7006

## 30. AHF Pharmacy West Hollywood (NCPDP No. 5629108)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $13,344 | $9,782 | $9,382 |
| 2017 | $10,472 | $8,414 | $9,147 |

| | | | |
|---|---|---|---|
| **2018** | $14,347 | $12,510 | $9,637 |
| **2019** | $11,822 | $11,293 | N/A |

2016: Exhibit J-152, Caremark007029-32; Exhibit J-153, Caremark007063-66; Exhibit J-154, Caremark007092-95
2017: Exhibit J-155, Caremark007033-37; Exhibit J-156, Caremark007067-72; Exhibit J-157, Caremark007096-101
2018: Exhibit J-158, Caremark007038-49; Exhibit J-159, Caremark007073-81; Exhibit J-160, Caremark007102-13
2019: Exhibit J-161, Caremark007050-62; Exhibit J-162, Caremark007082-91

### 31. AHF Pharmacy (NCPDP No. 5630517)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $20,851 | $19,428 | $18,276 |
| **2017** | $26,085 | $26,674 | $24,089 |
| **2018** | $24,639 | $27,895 | $30,426 |
| **2019** | $26,613 | $30,122 | N/A |

2016: Exhibit J-191, Caremark007114-17; Exhibit J-192, Caremark007148-51; Exhibit J-193, Caremark007180-83
2017: Exhibit J-194, Caremark007118-22; Exhibit J-195, Caremark007152-57; Exhibit J-196, Caremark007184-89
2018: Exhibit J-197, Caremark007123-34; Exhibit J-198, Caremark007158-66; Exhibit J-199, Caremark007190-201
2019: Exhibit J-200, Caremark007135-47; Exhibit J-201, Caremark007167-79

### 32. AHF Pharmacy (NCPDP No. 5631812)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| **2016** | $8,972 | $9,015 | $8,810 |
| **2017** | $7,120 | $8,957 | $9,464 |
| **2018** | $13,197 | $10,873 | $9,102 |
| **2019** | $11,475 | $11,726 | N/A |

2016: Exhibit J-178, Caremark007202-05; Exhibit J-179, Caremark007236-39; Exhibit J-180, Caremark007268-71

2017:  Exhibit J-181, Caremark007206-10; Exhibit J-182, Caremark007240-45; Exhibit J-183, Caremark007272-77
2018:  Exhibit J-184, Caremark007211-22; Exhibit J-185, Caremark007246-54; Exhibit J-186, Caremark007278-89
2019:  Exhibit J-187, Caremark007223-35; Exhibit J-188, Caremark007255-67

### 33. AHF Pharmacy Long Beach (NCPDP No. 5640722)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $16,702 | $13,424 | $13,061 |
| 2017 | $14,689 | $18,033 | $12,493 |
| 2018 | $20,701 | $22,498 | $20,831 |
| 2019 | $23,050 | $21,668 | N/A |

2016:  Exhibit J-243, Caremark007290-93; Exhibit J-244, Caremark007324-27; Exhibit J-245, Caremark007356-59
2017:  Exhibit J-246, Caremark007294-98; Exhibit J-247, Caremark007328-33; Exhibit J-248, Caremark007360-65
2018:  Exhibit J-249, Caremark007299-310; Exhibit J-250, Caremark007334-42; Exhibit J-251, Caremark007366-77
2019:  Exhibit J-252, Caremark007311-23; Exhibit J-253, Caremark007343-55

### 34. AHF Pharmacy (NCPDP No. 5645025)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $54,933 | $43,758 | $44,893 |
| 2017 | $48,218 | $44,167 | $40,416 |
| 2018 | $62,252 | $58,303 | $60,718 |
| 2019 | $72,669 | $70,226 | N/A |

2016:  Exhibit J-282, Caremark007378-81; Exhibit J-283, Caremark007412-15; Exhibit J-284, Caremark007444-47
2017: Exhibit J-285, Caremark007382-86; Exhibit J-286, Caremark007416-21; Exhibit J-287, Caremark007448-53
2018: Exhibit J-288, Caremark007387-98; Exhibit J-289, Caremark007422-30; Exhibit J-290, Caremark007454-65
2019: Exhibit J-291, Caremark007399-411; Exhibit J-292, Caremark007431-43

### 35. AHF Pharmacy (NCPDP No. 5645049)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $54,044 | $46,330 | $36,655 |
| 2017 | $55,848 | $59,692 | $52,749 |
| 2018 | $85,420 | $91,614 | $86,794 |
| 2019 | $112,983 | $116,221 | N/A |

2016: Exhibit J-374, Caremark007466-69; Exhibit J-375, Caremark007495-98; Exhibit J-376, Caremark007525-28
2017: Exhibit J-377, Caremark007470-74; Exhibit J-378, Caremark007499-504; Exhibit J-379, Caremark007529-34
2018: Exhibit J-380, Caremark007475-84; Exhibit J-381, Caremark007505-14; Exhibit J-382, Caremark007535-44
2019: Exhibit J-383, Caremark007485-94; Exhibit J-384, Caremark007515-24

### 36. Hillcrest Pharmacy North (NCPDP No. 5655658) [8]

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2019 | N/A | N/A | $11,228 |
| 2020 | $18,217 | $20,407 | N/A |

2019: Exhibit J-478, Caremark007646-55
2020: Exhibit J-479, Caremark007574-84; Exhibit J-480, Caremark007615-25

### 37. AHF Pharmacy – Sunrise (NCPDP No. 05705910)

|  | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $4,786 | $5,142 | $9,251 |
| 2017 | $12,770 | $20,683 | $19,098 |
| 2018 | $28,308 | $25,786 | $19,954 |
| 2019 | $27,507 | $25,680 | N/A |

---

[8] For NCPDP 5655658, AHF does not seek damages for periods prior to AHF's affiliation with that pharmacy.

2016:  Exhibit J-269, Caremark007656-59; Exhibit J-270, Caremark007690-93; Exhibit J-271, Caremark007722-25
2017:  Exhibit J-272, Caremark007660-64; Exhibit J-273, Caremark007694-99; Exhibit J-274, Caremark007726-31
2018:  Exhibit J-275, Caremark007665-76; Exhibit J-276, Caremark007700-08; Exhibit J-277, Caremark007732-43
2019:  Exhibit J-278, Caremark007677-89; Exhibit J-279 Caremark007709-21

### 38. AHF Pharmacy – South Beach (NCPDP No. 5706784)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $10,531     | $9,444      | $9,921      |
| 2017   | $13,799     | $14,018     | $13,045     |
| 2018   | $24,566     | $27,015     | $24,766     |
| 2019   | $32,775     | $34,968     | N/A         |

2016:  Exhibit J-256, Caremark007744-47; Exhibit J-257, Caremark007778-81; Exhibit J-258, Caremark007810-13
2017:  Exhibit J-259, Caremark007748-52; Exhibit J-260, Caremark007782-87; Exhibit J-261, Caremark007814-19
2018:  Exhibit J-262, Caremark007753-64; Exhibit J-263, Caremark007788-96; Exhibit J-264, Caremark007820-31
2019:  Exhibit J-266, Caremark007765-77; Exhibit J-267, Caremark007797-809

### 39. AHF Pharmacy (NCPDP No. 5710822)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $4,415      | $6,790      | $5,270      |
| 2017   | $5,472      | $6,433      | $6,757      |
| 2018   | $17,700     | $17,642     | $16,627     |
| 2019   | $16,217     | $26,283     | N/A         |

2016:  Exhibit J-295, Caremark007832-35; Exhibit J-296, Caremark007863-66; Exhibit J-297, Caremark007895-98
2017:  Exhibit J-298, Caremark007836-40; Exhibit J-299, Caremark007867-72; Exhibit J-300, Caremark007899-904
2018:  Exhibit J-301, Caremark007841-52; Exhibit J-302, Caremark007873-81; Exhibit J-303, Caremark007905-16
2019:  Exhibit J-304, Caremark007853-62; Exhibit J-305, Caremark007882-94

### 40. AHF Pharmacy (NCPDP No. 5716026)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $4,599      | $5,743      | $5,369      |
| 2017   | $8,984      | $6,766      | $6,162      |
| 2018   | $13,940     | $12,569     | $9,114      |
| 2019   | $13,566     | $20,645     | N/A         |

2016: Exhibit J-413, Caremark007917-20; Exhibit J-414, Caremark007951-54; Exhibit J-415, Caremark007983-86
2017: Exhibit J-416, Caremark007921-25; Exhibit J-417, Caremark007955-60; Exhibit J-418, Caremark007987-92
2018: Exhibit J-419, Caremark007926-37; Exhibit J-420, Caremark007961-69; Exhibit J-421, Caremark007993-8004
2019: Exhibit J-422, Caremark007938-50; Exhibit J-423, Caremark007970-82

### 41. AHF Pharmacy (NCPDP No. 5735709)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2018   | $16,465     | $25,720     | $27,578     |
| 2019   | $19,487     | $23,139     | N/A         |

2018: Exhibit J-550, Caremark008005-16; Exhibit J-551, Caremark008030-38; Exhibit J-552, Caremark008052-63
2019: Exhibit J-553, Caremark008017-29; Exhibit J-554, Caremark008039-51

### 42. AHF Pharmacy (NCPDP No. 5736775)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2018   | $1,701      | $11,739     | $14,355     |
| 2019   | $14,889     | $11,243     | N/A         |

2018: Exhibit J-557, Caremark008064-75; Exhibit J-558, Caremark008089-97; Exhibit J-559, Caremark008108-119
2019: Exhibit J-560, Caremark008076-88; Exhibit J-561, Caremark008098-107

### 43. AHF Pharmacy (NCPDP No. 5739961)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2019   | $0          | $7,542      | N/A         |

2019: Exhibit J-593, Caremark008120-29

### 44. MOMS Pharmacy/AHF Pharmacy (NCPDP No. 5805924)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $87,417     | $99,854     | $80,930     |
| 2017   | $108,541    | $92,941     | $91,691     |
| 2018   | $102,174    | $113,125    | $90,511     |
| 2019   | $155,140    | $143,946    | N/A         |

2016: Exhibit J-308, Caremark008130-33; Exhibit J-309, Caremark008164-67; Exhibit J-310, Caremark008196-99
2017: Exhibit J-311, Caremark008134-38; Exhibit J-312, Caremark008168-73; Exhibit J-313, Caremark008200-05
2018: Exhibit J-314, Caremark008139-50; Exhibit J-315, Caremark008174-82; Exhibit J-316, Caremark008206-17
2019: Exhibit J-317, Caremark008151-63; Exhibit J-318, Caremark008183-95

### 45. AHF Pharmacy (NCPDP No. 5809631)

|        | Trimester 1 | Trimester 2 | Trimester 3 |
|--------|-------------|-------------|-------------|
| 2016   | $9,562      | $13,258     | $8,938      |
| 2017   | $11,807     | $19,539     | $18,585     |
| 2018   | $35,842     | $37,702     | $26,592     |
| 2019   | $57,134     | $52,665     | N/A         |

2016: Exhibit J-426, Caremark008218-21; Exhibit J-427, Caremark008252-55; Exhibit J-428, Caremark008284-87
2017: Exhibit J-429, Caremark008222-26; Exhibit J-430, Caremark008256-61; Exhibit J-431, Caremark008288-93
2018: Exhibit J-432, Caremark008227-38; Exhibit J-433, Caremark008262-70; Exhibit J-434, Caremark008294-305
2019: Exhibit J-435, Caremark008239-51; Exhibit J-436, Caremark008271-83

### 46. AHF Pharmacy (NCPDP No. 5816282)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $0 | $0 | $2 |
| 2017 | $523 | $1,604 | $5,102 |
| 2018 | $9,680 | $9,422 | $7,549 |
| 2019 | $14,912 | $16,491 | N/A |

2016: Exhibit J-520, Caremark008364-67
2017: Exhibit J-521, Caremark008306-10; Exhibit J-522, Caremark008336-41; Exhibit J-523, Caremark008368-73
2018: Exhibit J-524, Caremark008311-22; Exhibit J-525, Caremark008342-50; Exhibit J-526, Caremark008374-85
2019: Exhibit J-527, Caremark008323-35; Exhibit J-528, Caremark008351-63

### 47. AHF Pharmacy (NCPDP No. 5819163)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2017 | $0 | $373 | $486 |
| 2018 | $6,601 | $13,764 | $12,672 |
| 2019 | $15,588 | $25,566 | N/A |

2017: Exhibit J-541, Caremark008411-16; Exhibit J-542, Caremark008439-44
2018: Exhibit J-543, Caremark008386-97; Exhibit J-544, Caremark008417-25; Exhibit J-545, Caremark008445-56
2019: Exhibit J-546, Caremark008398-410; Exhibit J-547, Caremark008426-38

### 48. AHF Pharmacy – FT Worth (NCPDP No. 5907778)

| | Trimester 1 | Trimester 2 | Trimester 3 |
|---|---|---|---|
| 2016 | $10,751 | $23,040 | $22,739 |
| 2017 | $16,212 | $19,157 | $18,305 |
| 2018 | $27,430 | $27,504 | $24,798 |
| 2019 | $34,179 | $29,851 | N/A |

2016: Exhibit J-387, Caremark008457-60; Exhibit J-388, Caremark008491-94; Exhibit J-389, Caremark008523-26
2017: Exhibit J-390, Caremark008461-65; Exhibit J-391, Caremark008495-500; Exhibit J-392, Caremark008527-32
2018: Exhibit J-393, Caremark008466-77; Exhibit J-394, Caremark008501-09; Exhibit J-395, Caremark008533-44
2019: Exhibit J-396, Caremark008478-90; Exhibit J-397, Caremark008510-22

### 49. AHF Pharmacy (NCPDP No. 5912349)

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2016 | $6,590      | $7,646      | $9,585      |
| 2017 | $10,889     | $14,771     | $12,306     |
| 2018 | $30,872     | $33,204     | $31,245     |
| 2019 | $30,009     | $30,258     | N/A         |

2016: Exhibit J-452, Caremark008545-48; Exhibit J-453, Caremark008579-82; Exhibit J-454, Caremark008611-14
2017: Exhibit J-455, Caremark008549-53; Exhibit J-456, Caremark008583-88; Exhibit J-457, Caremark008615-20
2018: Exhibit J-458, Caremark008554-65; Exhibit J-459, Caremark008589-97; Exhibit J-460, Caremark008621-32
2019: Exhibit J-461, Caremark008566-78; Exhibit J-462, Caremark008598-610

### 50. AIDS Healthcare Foundation (NCPDP No. 5923811)

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2018 | $0          | $3,937      | $5,264      |
| 2019 | $5,649      | $4,626      | N/A         |

2018: Exhibit J-573, Caremark008646-54; Exhibit J-574, Caremark008668-79
2019: Exhibit J-575, Caremark008633-45; Exhibit J-576, Caremark008655-67

### 51. AHF Pharmacy (NCPDP No. 6006301)

|      | Trimester 1 | Trimester 2 | Trimester 3 |
|------|-------------|-------------|-------------|
| 2018 | $0          | $0          | $955        |
| 2019 | $1,874      | $1,836      | N/A         |

2018: Exhibit J-579, Caremark008706-15
2019: Exhibit J-580, Caremark008680-92; Exhibit J-581, Caremark008693-705

### *52. AIDS Healthcare Foundation (NCPDP No. 4029953)*

There are no trimester reports for this pharmacy.

### ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Arbitrator makes the following determinations as to additional facts, conclusions of law and mixed
questions of law and fact.

1. It is the NEF that constitutes the agreement to join a particular network. The NEF's
   attempt to disclose the rates and the network rebates (hereinafter "rebates" or "DIR") to
   be charged, if any. The sign-on to a network does not operate through the Provider
   Manual changes agreed to by submitting further prescription transactions for
   reimbursement. The DIR was recouped by CVS from future reimbursement payments to
   AHF.

2. Some of the networks in which AHF participates do not have rebates, some have fixed
   rebates, and some have a range of rebates. Rebates have been in place for some networks
   since 2006. NEF's are presented in the Spring before the next plan year. AHF was free
   to accept or reject participating in each particular network although the consequences of
   not signing on to a particular NEF could have a severe impact on AHF's business.

3. The movement from fixed rebates to variable range rebates was a result of some
   pharmacies efforts to differentiate themselves based on superior performance. The rebate
   ranges resulted in high scoring pharmacies paying a rebate smaller than would have been
   the case if there was just a fixed rebate. The converse was also true and pharmacies that
   received lower scores paid a rebate larger than would have been the case if there was just

55

a fixed rebate. The variable rates were introduced for the 2016 plan year. Paragraph 30 of Stipulated Facts.

4. However, CVS had considerable bargaining leverage as one of the largest PBM's. A pharmacy would lose out on large amounts of business if it did not sign up to CVS' networks. Those networks were exclusive and there was no alternative if AHF wanted to serve the members of the plans in CVS' networks. The parties did not engage on a level playing field. CVS and its health plan partners set the terms. The growth in the range of the variable DIR's demonstrates the unequal bargaining power. CVS and its plan partners had no competitive check on how much they increased the variable DIR rates. There was no valid business reason presented for the escalating growth in the percentages recouped, and this growth shows unchecked economic power.

5. Thus, the Arbitrator finds the contracts were adhesive. While the contracts were adhesive, this does not make them unenforceable or result in damages. *Longnecker v. American Exp. Co.*, 23 F. Supp. 3d 1099, 1109 (D. Ariz. 2014).

6. For the years 2006 through 2015 the DIRs were fixed rates and thus knowable at the outset and at the Point of Sale. The Arbitrator finds these contract terms were not unconscionable. Thus, the fixed rate DIRs are enforceable as agreed.

7. For the years from 2016 on the DIRs were variable using the "imputed average pharmacy" when no data was available. For these years the DIRs were unknowable when the NEF was entered into and at the Point of Sale. Thus, there was no expectation as to what the variable DIR would entail other than that it would be calculated fairly and applied in a nondiscriminatory manner. The variable DIR calculations were in the

discretion of CVS. Inherent in the contracts were the unstated expectations that CVS would not exercise this discretion to AHF's disadvantage and to AHF's detriment.

8. The calculations to determine the variable DIRs were not actuarially based. RT Vol. III, 539:11-539:24 (Justice Testimony)[9]. Nor were they based on sound statistical methodologies. Small variances had disproportionate impact for extremely small samples (e.g., three patients where the physician of one did not prescribe a statin, etc.). *E.g.*, RT Vol. II; 175:13-176:9 (Patchett Testimony). Use of these statistically insignificant sample sizes again worked to AHF's disadvantages. Moreover, for some there was no correction possible. Of course, pharmacies have no control over what physicians prescribe. RT Vol II: 176:10-178:1 (Patchett Testimony): RT Vol II: 330:25-331:12 (Redner Testimony). Some of the calculations were arbitrary, such as applying some average of other pharmacies when there was no data available for the AHF pharmacy. RT Vol. II: 181:21-183:5 (Patchett Testimony); RT Vol. III: 429;16-432:4: 453:3-18 (Redner Testimony). This practice is particularly arbitrary as perfect performance (as there was no data showing less than perfect performance) was "punished" with a recoupment across the entirety of the prescriptions filled. A neutral and fair practice would have treated lack of data situations as perfect performance. Instead, CVS applied the average score over all pharmacies participating in the network nationwide. *Id.* The calculations were unfair to AHF and served to benefit CVS disproportionately as it collected revenue for administering the variable program based

---

[9] "RT" citations refer to the Reporter's Transcript prepared herein and is followed by page and line number and witness information.

on unsound and arbitrary methods and benefited CVS in its competition to gain health plan business.

9. The upshot of the unsound methodology for the calculation of the variable DIR's was that AHF was unfairly treated to its financial disadvantage and CVS gained unfair economic advantage both in revenue to CVS and passthrough payments to plan sponsors which enhanced CVS' competitive posture.

10. The provisions of, and application of variable DIR's was contrary to the covenant of good faith and fair dealing inherent in the NEF's.

11. Substantively unconscionable contract terms are unenforceable. As stated in *Clark v. Renaissance West, LLC* (2013) 232 Ariz. 510, 512; *see also* A.R.S. Section 47-2302:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable . . . it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

The variable DIRs as implemented were substantively unconscionable as a matter of law. Having found the variable DIR provisions to be substantively unconscionable, the Arbitrator choses to limit the application of the variable DIR provisions and award damages to AHF.

12. For the years when variable DIRs were applied, the damages suffered by AHF per Claimant's Exhibit 71 were as follows:

    a. 2016: $2,164,775;

    b. 2017: $2,503,514;

    c. 2018: $4,090,475;

    d. 2019: $4,704,095;

e. 2020: $5,813,752.

f. Total: $19,276,611.

13. CVS is enjoined from using and collecting variable DIRs for 2020 and in the future that use the same methodologies as those presented in the claims in this Arbitration.

14. Further proceedings are necessary to determine the prevailing party and attorneys' fees and costs, if any, to be awarded. AHF is directed to file a submission no later than September 9, 2021, on the issue of prevailing party and including the fees and costs it seeks. CVS shall reply no later than September 30, 2021. Thereafter the Arbitrator shall determine if further briefing and/or a telephonic hearing are in order. The Arbitrator finds that the fee provision in the contract is congruent with Arizona law that would be applied in litigation under Arizona law as to these issues. The parties are directed to meet and confer to see if they can resolve the prevailing party, attorneys' fees in dispute, and costs in dispute by stipulation.

15. To the extent not specifically addressed herein, all other questions of fact, conclusions of law and mixed questions of law and fact are determined to be consistent with the findings and Award set forth herein.

## SUMMARY

1. Respondent breached the contract with its application of the PNP resulting in Aids Healthcare Foundation (hereinafter "AHF") being paid less than the contract required in the variable rate DIR years. Respondent did breach the contract for the fixed rate years.

2. Respondent breached the contract by violating the covenant of good faith and fair dealing by implementing the PNP in the variable rate DIR years.

3. It was not necessary to determine if the imposition of the PNP was procedurally unconscionable.

4. The terms of the PNP were substantively unconscionable for the variable rate DIR years.

5. While the contracts were contracts of adhesion, the Award is based on the substantive unconscionability of the variable rate DIR provisions and their operation.

6. The variable rate DIR's as set forth and applied in the years at issue are enjoined going forward. Nothing prevents CVS from moving forward with a fair and nondiscriminatory variable DIR methodology based on sound principles.

7. AHF has sustained $19,276,611 in damages.

8. The issues of prevailing party for purposes of fee and cost shifting and any fees and costs to be awarded remain to be resolved pursuant to the directions set forth above.

## CONCLUSION

Based on the foregoing, the Arbitrator holds that the variable DIR provisions are substantively unconscionable and unenforceable. AHF is entitled to damages in the amount of $19,276,611. This Award shall remain in full force and effect until such time as a final Award is rendered.

Dated: August 3, 2021

William Z. Taylor
William "Zak" Taylor, Arbitrator

# EXHIBIT H

CONFIDENTIAL AND PROPRIETARY –
FOIA EXEMPT –
DO NOT DISCLOSE

## Network Enrollment Form
## Medicare Part D Retail Network 23

The undersigned hereby enrolls as a provider in the Caremark Medicare Part D Retail Network 23 effective January 1, 2015, as indicated in the table below, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein.

For the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fees are as follows:

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| **Medicare Part D Retail Network 23** | **16.25%** | **25.0%** | **$0.50** |
| *1-90 Days Supply | | | |

- Provider will be charged a network rebate to the Plan Sponsor equal to 3.00% of the ingredient cost paid, excluding claims paid at Usual and Customary.

- Network participation is limited to a pharmacy that is a "retail pharmacy" as that term is defined by CMS under 42 C.F.R. § 423.100.

- For Caremark contracted chains and affiliations/PSAOs (Pharmacy Services Administration Organization), the above rates apply to all retail pharmacies.

- Pricing set forth in this Network Enrollment Form will not apply to Medicare Part D Claims processed through Part D Plan specific networks. Claims priced in Part D Plan-specific networks may result in applicable AWP Discounts and Dispensing Fees that differ from the rates set forth in this Network Enrollment Form

IN WITNESS WHEREOF, the parties hereto have caused this Network Enrollment Form, which constitutes an addendum to the Caremark Provider Agreement, to be executed by their respective officers or representatives duly authorized so to do. By signing below, Provider agrees to become a participant in the Caremark Network(s). Further, the parties understand and agree that all the terms and conditions established in the Caremark Provider Agreement shall apply to Pharmacy Services provided hereunder. Capitalized terms not defined herein shall have the meanings used in the Caremark Provider Agreement. This Network Enrollment Form constitutes the entire agreement of the parties with respect to the subject matter of this Network Enrollment Form, and supersedes any and all other agreements, writings, and understandings with respect to the subject matter of this Network Enrollment Form. The terms of this Network Enrollment Form supersedes any conflicting term in the Caremark Provider Agreement.

Provider Info: (Please Print)

Leader Drug Stores, Inc. d/b/a LeaderNET
Provider Name

603
Chain Code / Affiliation Code / NCPDP#                    NPI#

Myles Hoover
Name of Owner / Authorized Agent (if not owner)

VP, Reimbursement Solutions and Operations
Provider Signature                                         Title

SVP, Provider Network Services
Caremark Signature                                         Title          **RECEIVED**

2/25/2014
Date of Acceptance by Caremark                             APR 25 2014

No alterations to this Network Enrollment Form shall be binding on either party unless initialed by duly authorized representatives of Provider and Caremark.

# EXHIBIT I

 Part D Services

April 17, 2015

Dear Pharmacy Provider:

Please find the enclosed Network Enrollment Form, effective January 1, 2016, for the following network:

- Medicare Part D Retail Network 36 (Network Performance Program)

The enclosed Network Enrollment Form is for network participation in CVS/caremark's Medicare Part D Network Performance Program for 2016. Some of the more important changes to our Network Performance Program for 2016 (as compared to the programs utilized for 2014 and 2015) are summarized below:

- New performance criteria upon which each pharmacy will be measured.
- New weightings for each performance criteria. The weightings indicate how heavily that performance criterion is considered in calculating an overall average performance score for each pharmacy.
- The 2016 Network Performance Program will have 2 separate components:
  - The first component uses each pharmacy's performance score to determine the network rebate amount applicable to that pharmacy. The network rebate amount can vary from 2.5% to 4.5%. For 2016, a new performance score measurement period of 4 months will be used for the network rebate percentage component.
  - The second component is the annual performance payment that pharmacies will receive. As was the case in 2014 and 2015, the performance payment will vary depending on the number of Part D Enrollees assigned to each pharmacy and the performance score achieved for those Part D Enrollees. The measurement period for the annual performance payment remains at 12 months.
- Other requirements, such as credentialing, CVS/caremark Code of Conduct training and Medicare Part D FWA attestations, are explained as a part of the Network Enrollment Form.

You will be enrolled into this network **unless you fax written notice to CVS/caremark (at 480-314-8205) no later than May 18, 2015, of your decision not to enroll**. Please label the fax as pertaining to Medicare Part D Retail Network 36, and include the name of the pharmacy, NCPDP number, a statement that you do not wish to participate in the network indicated, and signature of the owner or authorized agent.

If you have any questions, please contact CVS/caremark Network Services at 1-866-488-4708.

Thank you,

CVS/caremark Network Services

This communication and any attachments may contain confidential information. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution, or copying of it or its contents, is prohibited. If you have received this communication in error, please notify the sender immediately by telephone and destroy all copies of this communication and any attachments. This communication is a Caremark Document within the meaning of the Provider Manual.

**CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT –**
**DO NOT DISCLOSE**

## Medicare Part D Retail Network 36
## Network Performance Program

Provider is hereby enrolled as a provider in the Medicare Part D Retail Network 36, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein.

For the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fees are as follows:

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | **Brand** | **Generic** | |
| **Medicare Part D Retail Network 36 (Network Performance Program)** | **14.75 %** | **25.0%** | **$1.00** |
| *1-90 Days Supply | | | |

- Provider will be charged a network rebate to the Plan Sponsors that will range from 2.5% to 4.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. Provider's performance score is measured annually in 4 month measurement periods starting January, 2016. Within 30 days after the end of a measurement period, Caremark will evaluate Provider's performance and determine the associated network rebate amount for that period. Network rebates are deducted from Caremark's pharmacy payments to Provider as a lump sum deduction divided proportionately over the sixteen (16) weeks following each measurement period.

- Provider may be eligible for a performance payment in 2017 based on Provider's annual performance score with respect to the performance criteria.

- In order to be eligible to receive the annual performance payment, Provider **must** complete Caremark's Code of Conduct training, and the Medicare Part D FWA Attestation by no later than December 31, annually, and complete a store-level re-credentialing process, administered using a web-based program and according to pharmacy type.

- Caremark may modify the performance criteria and/or criteria weighting to align with a change in CMS Star measures.

- Provider shall disclose to enrollees and prescribers that Provider is working with the Part D Plan Sponsor to improve enrollee adherence and compliance with current clinical guidelines, and that Provider is receiving a payment from the Plan Sponsor for Provider's performance under this program. Provider shall advise Part D Enrollees and prescribers that participation is voluntary; that this program is not intended to substitute for the judgment of the prescriber; prescribers are not obligated to prescribe any medications for enrollees; and that enrollees are not obligated to obtain the new medication.

- For Caremark contracted chains and affiliations/PSAOs (Pharmacy Services Administration Organization), the above reimbursement rates apply to all retail pharmacies. However, the network rebate amount and the annual performance payment will be calculated individually for each pharmacy.

- Pricing set forth in this Network Enrollment Form will not apply to Medicare Part D Claims processed through Part D Plan-specific networks. Claims priced in Part D Plan-specific networks may result in applicable AWP Discounts and Dispensing Fees that differ from the rates set forth in this Network Enrollment Form.

---

This Network Enrollment Form, which constitutes an addendum to the Caremark Provider Agreement, constitutes the entire agreement of the parties with respect to the subject matter of this Network Enrollment Form, and supersedes any and all other conflicting agreements, writings, and understandings with respect to the subject matter of this Network Enrollment Form. Capitalized terms not defined herein shall have the meanings used in the Caremark Provider Agreement. The parties understand and agree that all the terms and conditions established in the Provider Agreement shall apply to the Pharmacy Services provided hereunder.

No alterations to this Network Enrollment Form shall be binding on either party unless initialed by duly authorized representatives of Provider and Caremark.

Exhibit A

## Performance Criteria

| Performance criteria | criteria weight |
|---|---|
| 1. ACE/ARB Adherence | 20% |
| 2. Statin Adherence | 20% |
| 3. Diabetes Adherence | 20% |
| 4. GAP therapy (statin) | 25% |
| 5. CMR Completion Rate (MTM) | 5% |
| 6. % High Risk Meds (HRM's) | 5% |
| 7. Formulary Compliance | 5% |

## Measurement Period/Network Rebate Deductions Example

| Month Activity | Jan-16 | Feb-16 | Mar-16 | Apr-16 | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 | Mar-17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Measure | Measurement Period 1 Effective January 2016 | | | | Measurement Period 2 Effective May 2016 | | | | Measurement Period 3 Effective September 2016 | | | | Measurement Period 1 Effective January 2017 | | |
| Score | | | | | Calculate Score 1 | | | | Calculate Score 2 | | | | Calculate Score 3 | | |
| Withhold | | | | | | Withhold for Period 1 2016 | | | | Withhold for Period 2 2016 | | | | Withhold for Period 3 2016 | |
| Rebate Amount | 0% | 0% | 0% | 0% | 0% | 1/16 of network rebate of the 1st Period | | | 1/16 of network rebate of the 2nd Period | | | | 1/16 of network rebate of the 3rd Period | | |

No alterations to this Network Enrollment Form shall be binding on either party unless initialed by duly authorized representatives of Provider and Caremark.

Standard Med D Network 36

# EXHIBIT J



*For Consumer or Employment cases, please visit www.adr.org for appropriate forms.*

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

Name of Respondent: CVS Caremark, a subsidiary of CVS Health Corporation

Address: 9501 East Shea Boulevard

| City: Scottsdale | State: Arizona | Zip Code: 85260 |
|---|---|---|
| Phone No.: Unknown to Claimant | Fax No.: Unknown to Claimant | |

Email Address: Not applicable

Name of Representative (if known): General Counsel, MC080 and Michele Buchanan, Esq.

Name of Firm (if applicable): CVS Caremark, a subsidiary of CVS Health Corporation

Representative's Address: 9501 East Shea Boulevard

| City: Scottsdale | State: Arizona | Zip Code: 85260 |
|---|---|---|
| Phone No.: Unknown to Claimant | Fax No.: Unknown to Claimant | |

Email Address: Unknown to Claimant

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

See attached Demand for Arbitration. Breach of Agreement, breach of the implied covenant of good faith and fair dealing, unfair business practices pursuant to state law, violation of state "any-willing-provider" laws, and violation of Section 2 of the Robinson Patman Act, 15 U.S.C. section 13.

Dollar Amount of Claim: $ 11,630,035.69

Other Relief Sought: ☑ Attorneys Fees   ☑ Interest   ☑ Arbitration Costs   ☐ Punitive/Exemplary
☐ Other:

Amount enclosed: $ 13,913.00

In accordance with Fee Schedule: ☐ Flexible Fee Schedule   ☑ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

Claimant requests the appointment of an arbitrator with experience and knowledge concerning Pharmacy Benefits Managers and the operation of the Medicare Part D programs.

Hearing locale: Scottsdale, Arizona

*(check one)* ☐ Requested by Claimant   ☑ Locale provision included in the contract

| Estimated time needed for hearings overall: | hours   or   7 | days |
|---|---|---|


# COMMERCIAL ARBITRATION RULES
# DEMAND FOR ARBITRATION

| | | |
|---|---|---|
| Type of Business: | | |
| Claimant: Non-profit operator of pharmacies | Respondent: Pharmacy Benefits Manager | |
| Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other? | | |
| Unknown to Claimant | | |
| Signature (may be signed by a representative): | Date: November 8, 2019 | |
| Name of Claimant: AIDS Healthcare Foundation | | |
| Address (to be used in connection with this case): 6255 Sunset Boulevard, 21st Floor | | |
| City: Los Angeles | State: California | Zip Code: 90028 |
| Phone No.: 323-860-5200 | Fax No.: 323-467-8450 | |
| Email Address: Not applicable | | |
| Name of Representative: Arthi Bhimani, Jeffrey Blend -- AIDS Healthcare Foundation; Andrew F. Kim, Rebecca J. Riley -- Kim Riley Law | | |
| Name of Firm (if applicable): AIDS Healthcare Foundation and Kim Riley Law | | |
| Representative's Address: (Kim Riley Law) 9018 Balboa Boulevard, #552 | | |
| City: Northridge | State: California | Zip Code: 91325 |
| Phone No.: 818-261-5288 | Fax No.: 818 993 3012 | |
| Email Address: Bhimani/Blend-arti.bhimani@aidshealth.org; jeffrey.blend@aidshealth.org; Kim/Riley-akim@afklaw.com; rriley@afklaw.com | | |
| To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent. | | |

\* Due to the voluminous and confidential nature of the contracts at issue in this matter, Claimant attaches excerpts of the applicable contracts, containing arbitration provisions.

# AGREEMENT EXCERPTS (ARBITRATION CLAUSES)



# ADMINISTRATOR AGREEMENT

THIS AGREEMENT (the "Agreement") dated as • February 1, 2007 ___ (the "Effective Date") is entered into between   Leader Drugstores, Inc. d/b/a LeaderNET*   ("Administrator") and Caremark Inc. and CaremarkPCS (collectively, "Caremark").

# R E C I T A L S :

A.      Administrator has been appointed as attorney-in-fact for the independent pharmacies listed on Schedule "A" attached to this Agreement (the "Participating Providers") pursuant to an agency addendum each Participating Provider and Administrator signed, a sample of which is attached to this Agreement as Exhibit "A" (the "Agency Addendum").

B.      Each of Caremark, the Administrator and the Participating Providers desire the Participating Providers to participate in one or more of Caremark's Networks in accordance with the terms of the Caremark Provider Agreement (the "Provider Agreement"), a copy of which has been provided to Administrator.  Capitalized terms not defined herein shall have the meanings used in the Provider Agreement.

C.      As evidenced by the Agency Addenda, Participating Providers desire that Administrator act as their attorney-in-fact for certain purposes and perform certain functions under the Provider Agreement on their behalf as set forth in this Agreement and the Agency Addenda.

Now, therefore, the parties agree as follows:

1.      **Administrator's Agency Authority.**  Administrator represents and warrants to Caremark that it has the requisite legal authority to (i) act on the Participating Providers' behalf in the manner contemplated by this Agreement, including, without limitation, enrolling and disenrolling the Participating Providers in one or more of Caremark's Networks and (ii) each Participating Provider has signed and delivered to Caremark a Provider Agreement and an Agency Addendum. Administrator acknowledges that Caremark shall have no obligation to include a Participating Provider in any one of its Networks as part of Administrator's program until it has received a duly executed Provider Agreement and Agency Addendum.

        a)      **Central Payment.**  Administrator further represents and warrants to Caremark that it has the requisite legal authority to act on the Participating Provider's behalf to receive all payments made by Caremark for Pharmacy Services performed by Participating Provider ("Central Payment") pursuant to the Provider Agreement.  Caremark will forward payment to a central location as designated by Leader, beginning on a date established by Administrator and mutually agreed upon.  Concurrently with each payment, Caremark shall make available electronic remittance data in an industry approved format (ie: 835 file) The Central Payment is an aggregate payment representing amounts payable to all Participating Providers who have designated Administrator as their agent for Central Payment pursuant to that Agency Addendum. Caremark may offset against all or any portion of a Central Payment amounts owed by any Participating Provider(s), including without limitation, amounts owed as a result of audit recoveries, claims reversals or adjustments, or fees.  Caremark will use its best efforts to send

LeaderNet Central Pay ADMINAGR.DOC (11/22/2006)
This document contains proprietary information of Caremark and may not be used for any purpose other than to evaluate entering into a relationship with Caremark, nor may it be duplicated or disclosed to others for any purpose.  Caremark may change this document from time to time at its discretion.
Page 1

FEB 09 2007

By _____

c)   **Caremark' Rights in the Event of Termination**. In the event of a termination of this Agreement for any reason, Caremark has the right to immediate possession all documents, materials and supplies furnished by Caremark to Administrator.

d)   **Administrator Event of Default and Caremark Remedy and Other Caremark Rights**. In addition to the termination rights contained in this Section, if Administrator fails to perform under this Agreement or breaches any provision of this Agreement, Caremark shall have the right, upon written notice to Administrator (who will have the right to correct such performance or breach within 20 business days) to, (i) suspend performance of any and all of Caremark's obligations under or in connection with this Agreement, including, without limitation, enrolling new Participating Providers, (ii) impose reasonable handling and investigative fees, or (iii) set off against any amounts owing to Administrator under this Agreement if not paid by Administrator within 20 days of notification. Nothing in this Agreement shall limit, and the parties agree that in addition to the rights specified in this Section, Caremark shall retain, any and all rights Caremark may have at law, equity or under this Agreement.

e)   **Survival of Certain Provisions**. Notwithstanding the termination of this Agreement, Sections 6 and 7 and any obligations that arise prior to the termination of the Agreement shall survive such termination.

9.   **Notices**. All notices provided for in this Agreement shall be delivered in person, sent by certified mail, delivered by air courier, or transmitted by facsimile and confirmed in writing (sent by air courier or certified mail) to a party at the address or facsimile number shown in this Agreement, or such other address or facsimile number as a party may notify the other party from time to time in accordance with this Section. All notices will be deemed received on the day received unless such day is not a business day, in which case such notice will be deemed to have been received on the first business day following receipt. Notices to Caremark must be addressed to: Caremark, Attn: Network Enrollment, 9501 East Shea Boulevard, Scottsdale, Arizona 85260-6719, Fax Number: (480) 314-8205. Notices to Administrator must be addressed to the address set forth on the signature page.

10.  **Miscellaneous Provisions**.

a)   **Assignment**. This Agreement may not, without the prior written consent of Caremark, be assigned by Administrator to any other person or entity, and any attempted assignment will be void and of no force and effect.

b)   **Independent Contractor; Third Party Beneficiaries**. The parties to this Agreement are to be considered independent contractors, and they shall have no other legal relationship under or in connection with this Agreement. Except for the indemnity provisions hereof, no term or provision of this Agreement is for the benefit of any person who is not a party hereto other than the Participating Providers and the Eligible Persons entitled to receive Pharmacy Services.

c)   **Lawful Interpretation**. Whenever possible, each provision of this Agreement will be interpreted so as to be effective and valid under applicable law, but if any provision of this Agreement should be rendered unenforceable or invalid under applicable law, that provision will be ineffective to the extent of such unenforceability or invalidity without invalidating the remaining provisions of this Agreement. Any such determination shall not invalidate or render unenforceable the remaining provisions of the Agreement in any other jurisdiction or under any other circumstances.

Confidential AHF Pharmacy DO NOT ...

RECEIVED
FEB 0 ... 20...

d) **Jurisdiction.** Unless otherwise specifically provided herein or mandated by applicable law, this Agreement will be construed, governed and enforced in accordance with the laws of the State of Arizona without regard to its choice of law provisions.

e) **Arbitration.** Any and all controversies in connection with or arising out of this Agreement will be exclusively settled by arbitration before a single arbitrator in accordance with the Rules of the American Arbitration Association. The arbitrator must follow the rule of law, and may only award remedies provided in this Agreement. The award of the arbitrator will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. Arbitration under this provision will be conducted in Scottsdale, Arizona, and Administrator hereby agrees to such jurisdiction, unless otherwise agreed to by the parties in writing or mandated by Law, and the expenses of the arbitration, including attorneys' fees, will be paid for by the party against whom the award of the arbitrator is rendered. This Section 10e and the parties' rights hereunder shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

f) **Waiver.** Failure to exercise any of the rights granted under this Agreement for any one default will not be a waiver of the right to exercise any of these rights for subsequent defaults.

g) **Entire Agreement.** This Agreement, its schedules and exhibits, contain the entire agreement between Administrator and Caremark relating to the rights and the obligations of the parties. This Agreement supercedes that CaremarkPCS Health, L.P. (f/k/a PCS Health Systems, Inc.) Provider Agreement dated June 20, 1996 and any of its amendments or addenda, including but not limited to, the LeaderNet Addendum, beginning 180 days from the Effective Date or such timing as may be agreed upon by the parties. Any prior agreements, promises, negotiations, or representations, either oral or written, relating to the subject matter of the foregoing documents, not expressly set forth herein or therein are terminated and of no force and effect.

h) **Headings.** The heading contained in this Agreement are for convenience only, and do not affect in any way the meaning or interpretations of this Agreement.

[This space left intentionally blank.]

Confidential: AHF Pharmacy (NOT-COPY) (NOT for Distribution)

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

Leader Drugstores, Inc. d/b/a LeaderNET® on behalf of the Participating Pharmacies

**Administrator**

By: _____
Signature

Pamela L. Bufé
Printed Name

Director, Managed Care
Title

Administrator's address for purpose of Section 9:

Pamela L. Bufé, Director, Managed Care
_____
Name and Title of Contact Person

7000 Cardinal Place
_____
Address

Dublin, OH 43017
_____
City, State, Zip

614.652.6023
_____
Facsimile Number

614.553.3574
_____
Telephone Number

Caremark Inc.

By: _____
Gregory Madsen
SVP, Retail Services

CaremarkPCS

By: _____
Gregory Madsen
SVP, Retail Services

RECEIVED
FEB 0 9 2007
By _____

Confidential: AHF Pharmacy (NCPDP# 5737107) Not for Distribution to Third Parties

CONFIDENTIAL AND PROPRIETARY - FOIA EXEMPT - DO NOT DISCLOSE





# CVS Caremark
# Provider Manual

# Table of Contents

**General Information** 4
Proprietary Statement
Document Adherence
Pharmacy Help Desk
Contact Information
Top Questions Asked by Providers

**Credentialing and Quality Management** 7
Compliance with Laws
Standards of Operation
Drug Stock and Inventory
Licensure
Reporting of Investigations and Disciplinary Actions
Criminal Offense Related to Federal Health Care
    Programs
Federal Health Care Programs Participation
    Exclusion: Pharmacy
Federal Health Care Programs Participation
    Exclusion: Prescriber
Insurance
Quality Management
Provider Enrollment
Change in Ownership
Change in Documentation, Request for
    Documentation, Closure, and Other Information
Diverse Retail Pharmacy Program

**Pharmacy Services and Standards** 13
Verification of Eligible Persons
Identification Cards
Nondiscrimination
Collection of Patient Pay Amounts
Financial Hardship Program
Documentation
Excess Collections
Limitation on Collection
Violations
Patient Inducements
Coupons and Other Programs
Eligible Person Solicitation
Usual and Customary Price
Referral Fees
Documents and Records Maintenance
Signature Log – Hard Copy or Electronic
Hours of Operation
Performance Initiatives
Educational Materials and Efforts

Eligible Person Complaints
Dispensing Errors
Professional Judgment and Conduct
Dispensing Covered Items to Eligible Person Agent
Referrals to Non-Retail Participating Providers
Drug Stock and Inventory

**Claims Submission** 18
Electronic Submission/Reversal/Processing Windows
Transaction Fees
Transaction Submission Resolution Management
    Service Fees
Software Certification
Data Fields and Submission Requirements
National Drug Code
Prescriber Identification; Prescriptive Authority
Auto-Ship Refill Programs
Compounded Medications
Multi-Ingredient Processing
Over-the-Counter Products
Coordination of Benefits
Quantity Dispensed
Strength Dispensed
Prescription Date
Prescription Not Received; Reversal of Claim
Dispense as Written Codes
Taxes
Long-Term Care Billing
Overrides
Natural Disasters
Submission Error Codes
Schedule of Claims Systems Maintenance

**Clinical Programs, Services and Related Messages** 28
Drug Standards
Drug Utilization Review
DUR Conflict Codes and Text Messaging
Refill-Too-Soon or Excessive Utilization Reject
Drug-Drug Interaction Reject Program
Formularies
Prior Authorization
Managed Drug Limitations/Quantity vs. Time
Dose Optimization
Step Therapy
Plan Sponsor Programs
Federal Regulatory Quality Assurance Programs
Clinical Studies/Trials

Caremark
Provider Manual

**Table of Contents**

CONFIDENTIAL AND PROPRIETARY

**Network Participation and Payment** 33

Network Participation
Pharmacy Portal
Provider Payment
Maximum Allowable Cost
Eligible Person Fees and Amounts
Claims Payment and Other Fees
Directories
Corrective Action Plan
Compliance Reviews
Provider Suspension
Termination
Survival of Certain Provisions
Workers' Compensation

**Professional Audits** 39

Professional Audits Rights
Audits By Government Agencies
Types of Audits
Documents and Records Production
Documents and Records Subject to Audit
Documents and Records Requirements
Signature Log – Hard Copy or Electronic
Supply of Covered Items; Purchase Invoices
Medicare Part D Requirements
On-Site and Investigational Audit Resolution –
    Appeals Process
Other Submission Requirements
Potentially Fraudulent Activity

**Intellectual Property, Confidentiality and
    Proprietary Rights** 48

Advertising and Trademarks
Non-disparagement
Confidentiality
Non-Solicitation and Non-Interference
Proprietary Rights
Remedies

**Miscellaneous** 50

Assignment
Independent Contractors and Third-Party
    Beneficiaries
Court Orders, Subpoenas or Governmental Requests
Notices
Amendments
Enforceability
Arbitration
Force Majeure

Anti-Kickback Statute, Stark Law, and Caremark
    Compliance Program
Rebate Programs
Eligible Person Communications

**Medicaid** 53

Claims Submission Requirements for Medicaid
Compliance with State and Federal Laws
Compliance Program
Medicaid Coordination of Benefits
Medicaid Credentialing and Quality Management
Cultural Competency
Denial of Services
Directories
Enrollment with State Medicaid
Inspection and Audit of Records and Access
    to Facilities
Prescriber Identification
Prior Authorization
Medicaid Roster Identification

**Medicare Advantage** 55

**Medicare Part D** 57

A. Medicare Part D Network Standards
Part D Reference Guide for Pharmacists
Network Participation
Compliance with Laws
Plan Identification Cards
Delegated Activity
Offshore Subcontracting
Marketing
Performance Monitoring
Auto-Ship Refill Programs
Fraud, Waste and Abuse Program
Annual FWA Training and General Compliance
    Training
Pharmacy Certification for Medicare Part D
    Pharmacies
Drug Pricing
Payment of Clean Claims
Electronic Prescribing
Prescription Origin Code
Prescriber Identification for Medicare Part D Claims
Medicare Part D Calls to the Pharmacy Help Desk
Federal Health Care Programs Participation Exclusion
General Procedures for Acknowledgement Letters
Medicare Part D Claims Requiring Overrides
Dispensing Limitations
Best Available Evidence

2



Part D Enrollees Receiving CMS Notification on Status Change in LICS/LIS

Claims Submission Window for Medicare Part D

Medicare Part D Claims Adjustment

Unique RXBIN/RXPCN Requirement - Medicare Part D

General Medicare Part D Submission Requirements for COB

Formulary Transition Fill Process

Insulin Coverage

Medicare Part B and Medicare Part D Drug Coverage Determinations

End Stage Renal Disease Processing

Patient Residence and Pharmacy Service Type Requirements

**B.** Special Instructions for Participating LTC Providers

Pharmacies Serving LTC Facilities

LTC Pharmacies Timely Claim Submission

LTC Billing

LTC Days Supply Limitations

Special Package Indicator

LTC Override Requests

LTC Emergency and Transition Supplies for Current Part D Enrollees

Medicare Part A and Medicare Part D Drug Coverage Determinations

Improving Drug Utilization Review Controls

Pro-Rated Daily Cost Share

Information on CMS-10147 Pharmacy Notice

**C.** Retail Addendum to the Caremark Provider Agreement

**Medicare-Medicaid Plan**                                              **79**

Medicare-Medicaid Networks Standards

Compliance with State and Federal Laws

Qualified Health Plans

**Federal and State Laws and Regulations**                  **81**

**Appendix A - Caremark Payer Specification Sheets**                                                         **298**

**Appendix B - Submission Error Codes**               **299**

**Appendix C - Annual Medicare Part D General Compliance and FWA Training**                **300**

**Appendix D - Drug Submission Requirements**   **302**

**Appendix E - Diverse Retail Pharmacy Program 310**

**Appendix F - New York State Department of Health Standard Clauses for Managed Care Provider/IPA Contracts**                          **314**

**Appendix F-1 - Certification Regarding Lobbying**                                                          **320**

**Appendix F-2 - Standard Clauses for Managed Care Provider/IPA Contracts for the Fully-Integrated Duals Advantage Program**        **321**

**Appendix G - CMS Form No. 10147 (English)**    **327**

**Appendix G-1 - CMS Form No. 10147 (Spanish) 328**

**Appendix H - Ohio Medicaid Addendum**           **329**

**Appendix I - Appeals Process Documentation Guidelines**                                                 **335**

**Appendix J - Dispensing Practitioner**             **338**

**Glossary of Terms**                                          **340**



# General Information

This 2018 Caremark Provider Manual ("Provider Manual") supersedes all previous versions of the Provider Manual. Capitalized terms used in the Provider Manual not defined in the Glossary of Terms shall have the same meaning as in the Provider Agreement.

### Proprietary Statement

The Provider Agreement (which includes the Provider Manual) constitutes Confidential Caremark Information and is provided to Provider for business purposes only. Provider must maintain in confidence the Provider Manual, and must not disclose, sell, assign, transfer or give to any third party the Provider Manual or any of its contents without Caremark's prior written consent. Refer to the **Confidentiality** section of the Provider Manual.

### Document Adherence

The Provider Manual is a Caremark Document and is incorporated into the Provider Agreement. Provider must abide by the provisions and terms set forth in the Provider Agreement (which includes the Provider Manual and all other Caremark Documents).

### Pharmacy Help Desk

Inquiries which the Provider Manual or the claims system response do not address can be directed to the Interactive Voice Response (IVR) system or the Pharmacy Help Desk. To help expedite certain responses, the IVR is available 24 hours a day, 7 days a week, excluding downtime for maintenance and service. The Pharmacy Help Desk is open every day of the year and is staffed with representatives. Following are the phone numbers corresponding with the appropriate Bank Identification Numbers (BINs):

| Caremark System | RXBIN | Pharmacy Help Desk Number |
|---|---|---|
| Legacy ADV | 004336* | 1-800-364-6331 |
| Legacy PCS | 610415* | 1-800-345-5413 |
| FEP | 610239 | 1-800-364-6331 |
| Legacy CRK | 610029* | 1-800-421-2342 |
| Caremark | 610591 | As communicated by plan or refer to ID card |
| Aetna | 610502 | 1-800-238-6279 |

Secondary RXBINs and Plan sponsor-specific RXBINs and phone numbers may apply as specified in pharmacy notifications or the Caremark Payer Sheets found online at **www.caremark.com/pharminfo.**

*Puerto Rico Providers call toll-free 1-800-842-7331.

Pharmacy Help Desk representatives will use reasonable efforts to assist Providers. However, Pharmacy Help Desk representatives are not able to provide professional advice with respect to the provision of Pharmacy Services.

**Pharmacy Help Desk representatives do not have authority to waive or modify Agreement provisions (e.g., claim submission requirements, audit documentation, credentialing documentation, non-compliance).**

Refer to the **Medicare Part D** section of the Provider Manual for detail on Medicare Part D Calls to the Pharmacy Help Desk.

### Contact Information

Unless otherwise specified in the Provider Manual, Providers must send inquiries and grievances in writing to:

**CVS Caremark**
**Attn: Network Management, MC 080**
**9501 East Shea Boulevard**
**Scottsdale, AZ 85260**



**Miscellaneous**

## Miscellaneous

### Assignment

Neither party may assign the Agreement without the prior written consent of the other party; provided, however, that Caremark may, without consent, assign the Agreement to any direct or indirect parent, subsidiary, or affiliated company or to a successor company.

Any permitted assignee shall assume all obligations of its assignor under the Agreement. The Agreement shall inure to the benefit of and be binding upon each party, its respective successors and permitted assignees.

If Provider's proposed assignment is approved by Caremark, Provider covenants that Provider shall enter into an agreement with such permitted successor or permitted assignee assigning Provider's rights and obligations under the Agreement in form and substance acceptable to Caremark, including naming Caremark as an express third-party beneficiary thereof. Notwithstanding an approved assignment and a permitted successor's or permitted assignee's assumption of Provider's liabilities and obligations under the Agreement, Provider will remain jointly liable for any liabilities and obligations under the Agreement until such permitted successor or permitted assignee satisfies such liabilities and obligations in full.

The terms of this **Assignment** section apply notwithstanding any other provision in the Agreement.

### Independent Contractors and Third-Party Beneficiaries

Caremark and Provider are considered independent contractors, and shall have no other legal relationship under or in connection with the Provider Agreement. Neither party will act as or be deemed a representative of the other party for any reason whatsoever.

Except as otherwise provided for in the Provider Agreement, including but not limited to, the **Indemnification** and **Arbitration** sections, no term or provision in the Provider Agreement is for the benefit of any person who is not a party to the Provider Agreement, and no such party shall have any right or cause of action under the Provider Agreement.

### Court Orders, Subpoenas or Governmental Requests

If Caremark receives a court order, subpoena or governmental request relating solely to Provider, Caremark may comply with such order, subpoena or request, and Provider must indemnify and hold harmless Caremark for, from, and against any and all costs (including reasonable attorneys' fees and costs), losses, damages, or other expenses Caremark may suffer or incur in connection with the responding to such order, subpoena or request.

If Provider is requested or required to disclose any Confidential Caremark Information, whether by oral questions, interrogatories, requests for information or documents, subpoenas, or other processes, Provider must promptly provide Caremark with written notice of any such request or requirement so that Caremark may seek an appropriate protective order or other appropriate remedy. If such protective order or other remedy is not obtained, Provider will disclose only that portion of the Confidential Caremark Information as to which it has been advised by legal counsel that disclosure is required by Law; and Provider must exercise its best efforts to obtain reliable assurances that confidential treatment will be accorded to the Confidential Caremark Information that is disclosed in response to such requests or requirements.

### Notices

A notice pursuant to the Provider Agreement to Caremark must be in writing, be delivered in person by certified mail, courier, or first class mail, and be addressed to Network Management at Caremark at the address below:

**Caremark**
**Attn: Network Management, MC080**
**9501 East Shea Boulevard**
**Scottsdale, AZ 85260**

Any notice to Caremark must also be addressed and delivered to:

**Caremark**
**Attn: General Counsel, MC035**
**9501 East Shea Boulevard**
**Scottsdale, AZ 85260**

A notice pursuant to the Provider Agreement to Provider must be in writing, delivered in person by certified mail, courier, or first class mail, at the street, mailing, or check mailing address set forth in Provider's enrollment

CONFIDENTIAL AND PROPRIETARY



documentation or as otherwise indicated by Provider to Caremark and agreed to by Caremark. Notwithstanding the foregoing, Caremark may give notice to Provider (1) via the claims adjudication system; (2) by facsimile via the Provider's facsimile number, or by e-mail via the e-mail address provided by Provider in Provider's enrollment documentation or as otherwise indicated by Provider to Caremark and agreed to by Caremark; or (3) via Caremark's Pharmacy Portal.

Notices are deemed received on the date of delivery to the other party when delivered in person, by courier, by e-mail, by facsimile, by secure electronic message, by certified mail, or when posted via Caremark's Pharmacy Portal. If notice is sent by first class mail, the notice is deemed received on the third business day after the date such notice was mailed.

By participating as a provider in Caremark's networks, Provider acknowledges that it has a prior express business relationship with Caremark and consents to receive facsimile communications as well as automated messages from Caremark.

The terms of this **Notices** section apply notwithstanding any other provision in the Provider Agreement.

### Amendments

From time to time, and notwithstanding any other provision in the Provider Agreement (which includes the Provider Manual), Caremark may amend the Provider Agreement, including the Provider Manual or other Caremark Documents, by giving notice to Provider of the terms of the amendment and specifying the date the amendment becomes effective. If Provider submits claims to Caremark after the effective date of any notice or amendment, the terms of the notice or amendment is accepted by Provider and is considered part of the Provider Agreement.

### Enforceability

In the event that any provision or term set forth in the Provider Agreement is determined invalid or unenforceable, such invalidity and unenforceability will not affect the validity or enforceability of any other provision or term set forth in the Provider Agreement.

### Arbitration

Any and all disputes between Provider and Caremark [including Caremark's current, future, or former employees, parents, subsidiaries, affiliates, agents and assigns (collectively referred to in this Arbitration section as "Caremark")], including but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks or exclusion from any Caremark networks, will be exclusively settled by arbitration. This arbitration provision applies to any dispute arising from events that occurred before, on or after the effective date of this Provider Manual. Unless otherwise agreed to in writing by the parties, the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to the then applicable AAA Commercial Arbitration Rules and Mediation Procedures including the rule governing Emergency Measures of Protection (available from the AAA). In no event may the arbitrator(s) award indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business, except as required by Law. The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the agreement to arbitrate, including, but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason. The arbitrator(s) must follow the rule of Law, and the award of the arbitrator(s) will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. Any such arbitration must be conducted in Scottsdale, Arizona and Provider agrees to such jurisdiction, unless otherwise agreed to by the parties in writing. Discovery shall be limited to documents and information for which there is a direct, substantial, and demonstrable need and where such documents and information can be located and produced at a cost that is reasonable in the context of all surrounding facts and circumstances. Further, when the cost and burden of e-discovery are disproportionate to the likely importance of the requested materials, the arbitrator may deny the requests or require that the requesting party advance the reasonable cost of production to the other side. The expenses of arbitration, including reasonable attorney's fees, will be paid for by the party against whom the final award of the arbitrator(s) is rendered, except as otherwise required by Law.

Arbitration with respect to a dispute is binding and neither Provider nor Caremark will have the right to litigate that dispute through a court. In arbitration, Provider and Caremark will not have the rights that are provided in court, including the right to a trial by judge or jury. In addition, the right to discovery and the right to appeal are limited or eliminated by arbitration. All of these rights are waived and disputes must be resolved through arbitration.


**Miscellaneous**

No dispute between Provider and Caremark may be pursued or resolved as part of a class action, private attorney general or other representative action or proceeding (hereafter all included in the term "Class Action"). All disputes are subject to arbitration on an individual basis, not on a class or representative basis, or through any form of consolidated proceedings, and the arbitrator(s) will not resolve Class Action disputes and will not consolidate arbitration proceedings without the express written permission of all parties to the Provider Agreement. Provider and Caremark agree that each may pursue or resolve a dispute against the other only in its individual capacity, and not as a plaintiff or class member in any purported Class Action.

Except as may be required by Law, neither a party nor an arbitrator(s) may disclose the existence, content or results of any dispute or arbitration hereunder without the prior written consent of both parties. In the event a Provider is required by law to make such a disclosure, Provider shall notify Caremark five (5) business days in advance of such disclosure.

Prior to a party initiating an arbitration, such party shall request in writing to the other party ("Dispute Notice") a meeting of authorized representatives of the parties for the purpose of resolving the dispute. The parties agree that, within ten (10) days after issuance of the Dispute Notice, each party shall designate a representative to participate in dispute resolution discussions which will be held at a mutually acceptable time and place (or by telephone) for the purpose of resolving the dispute. Each party agrees to negotiate in good faith to resolve the dispute in a mutually acceptable manner. If despite the good faith efforts of the parties, the authorized representatives of the parties are unable to resolve the dispute within thirty (30) days after the issuance of the Dispute Notice, or if the parties fail to meet within such thirty (30) days, either party may, by written notice to the other party, submit the dispute to binding arbitration. The above notwithstanding, nothing in this provision shall prevent either party from utilizing the AAA's procedures for emergency relief to seek preliminary injunctive relief to halt or prevent a breach of this Provider Agreement.

The terms of this arbitration section apply notwithstanding any other or contrary provision in the Provider Agreement, including, but not limited to, any contrary language in any **Third Party Beneficiary** provision. This Arbitration section survives the termination of the Provider Agreement and the completion of the business relationship between Provider and Caremark. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

### Force Majeure

Caremark and Provider are excused from performance under the Provider Agreement to the extent that either Caremark or Provider is prevented from performing all or any part of the Provider Agreement as a result of causes that are beyond the affected party's reasonable control, including but not limited to, fire, flood, earthquakes, tornadoes, other acts of God, war, work strikes, civil disturbances, power or communications failure, court order, government intervention, a change in Law, a significant change in the industry, or third-party nonperformance.

### Anti-Kickback Statute, Stark Law, and Caremark Compliance Program

Each party certifies that it shall not violate the federal anti-kickback statute, set forth at 42 U.S.C § 1320a-7b(b) ("Anti-Kickback Statute"), or the federal "Stark Law," set forth at 42 U.S.C § 1395nn ("Stark Law") with respect to the performance of its obligations under this Provider Agreement. In addition, Caremark's Code of Conduct and policies and procedures on the Anti-Kickback Statute and Stark Law may be accessed at **www.caremark. com/pharminfo.**

Pursuant to Caremark's obligations under a Corporate Integrity Agreement (CIA) with the Office of Inspector General of the United States Department of Health and Human Services dated March 25, 2014, Provider agrees to access the CIA through this website **https://oig.hhs.gov/compliance/corporate-integrity-agreements/cia-documents.asp** upon enrollment, and Provider shall review the CIA in its entirety on an annual basis thereafter. Provider shall immediately notify Caremark in writing if Provider does not comply with the requirement to annually access and review the CIA in its entirety.

### Rebate Programs

Caremark has the right to submit all prescriptions relating to the Provider Agreement to pharmaceutical companies in connection with Caremark's rebate programs and any similar programs. Provider must not submit any of the prescriptions relating to the Provider Agreement to any pharmaceutical company for the purpose of receiving any rebate, discount or the like, except as authorized by Caremark in writing.

### Eligible Person Communications

Provider understands and acknowledges that Caremark may communicate with Eligible Persons as required by Plan Sponsor, applicable Law, or as Caremark determines is necessary regarding matters such as plan benefits, network design and composition, formulary and clinical issues, and manufacturer recalls.

CONFIDENTIAL AND PROPRIETARY

ARTI BHIMANI
Arti.Bhimani@aidshealth.org
JEFFREY BLEND
Jeffrey.Blend@aidshealth.org
AIDS HEALTHCARE FOUNDATION
6255 Sunset Boulevard, 21st Floor
Los Angeles, CA 90028
Telephone: (323) 860-5200
Facsimile: (323) 467-8450

ANDREW F. KIM
AKim@afklaw.com
REBECCA J. RILEY
RRiley@afklaw.com
KIM RILEY LAW
9018 Balboa Boulevard, # 552
Northridge, CA 91325
Telephone: (818) 216-5288
Facsimile: (818) 993-3012

Attorneys for Claimant
AIDS HEALTHCARE FOUNDATION

## ARBITRATION UNDER THE AUSPICES OF

## THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION, a California non-profit corporation,<br><br><br>Claimant<br><br>v.<br><br><br>CVS CAREMARK, a subsidiary of CVS HEALTH CORPORATION, a Delaware corporation,<br><br><br>Respondent. | CASE NO.: _____<br><br>**DEMAND FOR ARBITRATION BY CLAIMANT AIDS HEALTHCARE FOUNDATION AGAINST CVS CAREMARK, A SUBSIDIARY OF CVS HEALTH CORPORATION** |

Pursuant to the agreement between the parties, the Federal Arbitration Act (9. U.S.C. §§1-16) and the AAA Commercial Arbitration Rules and Mediation Procedures Including the Procedures for Large, Complex Commercial Disputes (Amended Effective October 1, 2013) and the rule governing Emergency Measures of Protection (the "AAA Rules"), Claimant AIDS Healthcare Foundation, Inc. ("AHF") files this Demand for Arbitration against Respondent CVS Caremark, a subsidiary of CVS Health Corporation ("CVS"), for (1) breach of agreement, (2) breach of the implied covenant of good faith and fair dealing; (3) violation of state unfair business practices statutes; (4) violation of state "Any-Willing-Provider" statutes; and (5) violation of Section 2 the Robinson-Patman Act of June 19, 1936, 15 U.S.C. §13.

## INTRODUCTION

1.      AHF is a non-profit company that operates 48 pharmacies in 16 states serving the needs of people living with HIV/AIDS without regard to their ability to pay, as discussed more fully below. CVS is America's largest retail pharmacy chain and Pharmacy Benefits Manager ("PBM"), managing the pharmacy benefits for many millions of Americans enrolled in Medicare Part D plans. PBMs are responsible primarily for developing and maintaining drug formularies, contracting with pharmacies, negotiating discounts and rebates with drug manufacturers, and processing and paying prescription drug claims. As a PBM, CVS employs "spread pricing," which it defines as CVS keeping for itself the difference in pricing from what it receives as payment for drugs and what it pays to network pharmacies for those drugs.[1] CVS's PBM operations have, accordingly, been astonishingly profitable.

2.      As a PBM, CVS agrees, among other things, to pay pharmacies for dispensing prescription drugs to Medicare Part D beneficiaries in a fair and timely manner consistent with its agreements and with state and federal laws. In particular, CVS agrees to pay clean claims – claims submitted by pharmacies to CVS with no defects or improprieties, including any lack of

---

[1] *We Offer PBM Clients a Variety of Pricing Options*, https://cvshealth.com/thought-leadership/cvs-caremark-facts/pbm-clients-variety-of-pricing-options

documentation substantiating the claims – according to applicable state and federal laws, and to adjudicate promptly disputed claims so that those claims also may be promptly paid. Pharmacies rely on CVS's performance of its obligation to pay quickly clean and otherwise adjudicated claims to operate their businesses and to plan for the provision of superior services to pharmacy customers. In fact, the prompt payment of clean claims and the final adjudication of disputed claims are the lifeblood of pharmacies providing services to CVS's PBM members.

3.     AHF (through a non-party entity described below) contracted with CVS pursuant to a 2007 agreement to the general effect that CVS would pay AHF pharmacies to dispense prescription drugs for individuals whose Medicare Part D plan benefits CVS managed as a PBM. Years after entering into the agreement at issue in this matter, CVS unilaterally imposed upon AHF and other pharmacies a scheme, deceptively named the "Performance Network Program," to claw-back unilaterally and retroactively millions of dollars of payments made to AHF's pharmacies for dispensing prescription drugs and to make the operation of smaller pharmacies, like AHF's non-profit pharmacy business, increasingly economically untenable (the "Claw-Back Program").[2]

4.     Although CVS dresses the Claw-Back Program with fawning language concerning its expected positive impact on pharmacy "performance," and, consequently, patient care, management, and outcomes, CVS cynically designed the Claw-Back Program to permit it to claw-back from pharmacies a portion of the funds previously paid by CVS to pharmacies as clean or otherwise fully adjudicated claims. Belying any contention that the Claw-Back Program is about pharmacy performance as related to proper patient care, the Claw-Back Program *penalizes AHF for not dispensing certain drugs even when dispensing those drugs is contrary to the advice of AHF's world renowned, HIV/AIDS expert, treating physicians.* The Claw-Back Program creates a *minimum penalty* no matter a pharmacy's "performance." The Claw-Back Program's metrics are not geared to ensuring that patients, in particular people living with

---

[2] The Claw-Back Program is also referred to as the Direct and Indirect Remuneration ("DIR") pay-for-performance network program.

HIV/AIDS, receive the proper medication as prescribed by their physicians in appropriate amounts or that it is taken as directed by those physicians.

5. ***The Claw-Back Program also has the effect of imposing on smaller pharmacies higher net prices for drugs than on giant chain pharmacies, like CVS.*** CVS boasts of the cutting-edge nature of their electronic claims processing and analyzing systems and the ability of those systems to assist CVS with bettering the quality of care and outcomes. Yet, CVS's systems and its methodology for administering the Claw-Back Program ***discriminate against smaller, specialty pharmacies like AHF*** and apparently cannot, or do not, account for the demands and challenges associated with particular, high-risk patient populations, including people living with HIV/AIDS. Ultimately, the Claw-Back Program generates absurd, illogical, and unpredictable results that wholly ignore AHF's patient care and penalize AHF for decisions made by expert treating physicians in the best interests of their patients.

6. Compounding these problems, CVS shrouds in secrecy its administration of the Claw-Back Program, even the data and methodology used to impose massive, after-the-fact penalties on pharmacies. CVS has not shown, and refuses to show, how it calculates the penalties. CVS provides its conclusions but no verifiable math. It says, essentially, "trust us and our systems, methodologies and data; you owe us millions."

7. The Claw-Back Program has wreaked havoc on AHF's ability to carry out its non-profit mission. The Claw-Back Program ultimately makes the dispensing of drugs prohibitively expensive for AHF while CVS uses its outsized market power to force contracting pharmacies to participate in the Claw-Back Program. In addition to the Claw-Back Program, CVS has for many years required more and more of its members to utilize CVS's own mail order pharmacy to fill all prescriptions thus limiting the number of patients who are even permitted to use AHF pharmacies.

8. CVS's goal of integrating its healthcare operations both vertically and horizontally, all to increase market share and margins, is no secret. In 2018, CVS acquired

Aetna, the nation's third-largest health insurer, in a transaction valued by CVS at $78 billion. CVS has multiple obvious incentives to increase its customer and dispensing market shares. Selling more drugs and servicing more PBM clients earn more revenue. Selling more drugs through its highly automated mail order system increases CVS's market share while increasing its own margins. Swallowing smaller competitors of CVS's pharmacy operations also increases CVS's volume and margins. CVS has negotiated with drug manufacturers rebates and discounts that depend on, among other things, volume and market share. CVS lines its pockets with cash through the Claw-Back Program in part to force smaller market participants out of business and to help fund the large cash component of the Aetna acquisition.

9.      CVS has used the Claw-Back Program to recoup unlawfully payments from AHF pharmacies located in California, Florida, Georgia, Louisiana, Nevada, New York, Ohio, Pennsylvania, South Carolina, Texas, Washington, and the District of Columbia. AHF, therefore, seeks damages, restitution and injunctive relief as redress for, among other things, CVS's repeated breaches of agreement and the implied covenant of good faith and fair dealing, unfair business practices, violations of numerous states' "Any-Willing-Provider" laws and violations of Section 2 of the Robinson-Patman Act of June 19, 1936, 15 U.S.C. §13.

## FACTUAL ALLEGATIONS

### The Parties

10.     Established in 1987, AHF is a California not-for-profit, tax exempt, 501(c)(3) corporation, domiciled and with its principal place of business in Los Angeles, California. AHF is the world's largest provider of health care services to people living with HIV/AIDS. AHF's mission is to provide cutting edge medical care to people living with HIV/AIDS regardless of their ability to pay, and AHF provides medical care (including prescription drugs services) and advocacy to more than 1.2 million patients in 43 countries, including the United States. In the United States, AHF operates 66 health care centers and 48 pharmacies in 16 states, the District of Columbia, and Puerto Rico. AHF pharmacies specially serve a wide range of high-risk patients

with varying types of insurance coverage, including patients enrolled in the Medicare Part D prescription drug program. AHF is an essential safety net provider for disenfranchised, high-risk populations. For every dollar earned by AHF pharmacies, 96 cents go to patient care and assisting communities affected with HIV and AIDS.

11. AHF is informed and believes and, based thereon, alleges, that: (a) CVS Caremark is a subsidiary of CVS Health Corporation, which is incorporated in the State of Delaware; (b) CVS operates more than 9,900 retail locations, over 1,000 medical clinics, the nation's largest PBM commanding over 30% of the total PBM market[3] with approximately 92 million plan members and a stand-alone Medicare Part D prescription drug plan; (c) CVS earned over $194 billion in 2018, approximately $9.8 billion more than the prior year;[4] (d) CVS in November 2018 completed its acquisition of the insurance giant, Aetna, exchanging each outstanding issue of Aetna common stock for $145.00 in cash and .8378 shares of CVS common stock, for a total transaction value of $78 billion[5]; and (e) CVS reported a net income loss in 2018 of $596 million when it had experienced a $6.632 billion net income gain the prior year.[6]

### AHF and the Unique Challenges in Treating People Living With HIV/AIDS

12. AHF pharmacies hire only individuals who are knowledgeable about HIV/AIDS, are highly sensitive to the particular challenges of AHF's patient population and understand the complex drug interactions inherent with anti-retroviral medicines. AHF pharmacists must be certified by the American Academy of HIV Medicine. Moreover, all AHF pharmacies are accredited by both the Accreditation Commission for Health Care and the Utilization Review

---

[3] *Top PBMs by Market Share*, Becker's Hospital Review, May 30, 2019 (https://www.beckershospitalreview.com/pharmacy/top-pbms-by-market-share.html); *CVS Health Completes Acquisition of Aetna, Marking the Start of Transforming the Consumer Health Experience*, CVS Press Release, November 18, 2018 (https://www.prnewswire.com/news-releases/cvs-health-completes-acquisition-of-aetna-marking-the-start-of-transforming-the-consumer-health-experience-300756904.html)
[4] CVS Health Corporation, *Annual Report, 2018*.
[5] *CVS Health Completes Acquisition of Aetna, Marking the Start of Transforming the Consumer Health Experience*, CVS Press Release, November 18, 2018.
[6] CVS Health Corporation, *Annual Report, 2018*.

Accreditation Commission. All AHF pharmacy services are provided by staff employed by AHF. AHF outsources none of its services, including after-hours calls (24/7), computer services, and clinical and dispensing services.

13.     AHF's prescribing physicians are dedicated to serving people living with HIV/AIDS and are among the most experienced providers in the country. AHF physicians are accredited by the American Academy of HIV Medicine, and many AHF physicians have been treating patients since the earliest days of the HIV epidemic in the United States. AHF's physicians have unparalleled expertise treating patients living with HIV/AIDS and treat more HIV patients daily than any other provider group in the country. Moreover, several AHF physicians are also engaged in cutting edge clinical research devoted to finding better treatment for their HIV patients.

14.     AHF's goals with respect to each of its pharmacy patients are to provide access to life-saving HIV/AIDS medications, counsel patients and promote adherence to their medication regimens, ultimately improving patients' health outcomes. Once considered a death sentence, HIV/AIDS can now be treated with sophisticated medications in combination with other medical care and support services, but these medications must be taken daily according to strictly observed regimens, for a patient's entire life. AHF has observed that there are many possible reasons why someone living with HIV might not follow regimens or might even stop taking medicines, including lack of understanding of the serious nature of the disease, fatigue, side effects, fear of stigma, and co-existing health conditions like mental health issues or social challenges, such as homelessness.

15.     AHF pharmacies combat these challenges by, among other things, providing discreet medicine delivery options, including meeting patients at a place of their choice – to protect patients' confidentiality and by calling on patients on a monthly basis to discuss the prescribed medication regimen, answer any questions or concerns, and encourage treatment adherence. AHF surveys its patients regularly to determine their level of satisfaction with AHF's

services, and AHF's pharmacists and senior management carefully review and evaluate the survey information to strive to continue improving AHF's quality of care and patient outcomes, consistent with AHF's mission.

<div align="center">

**Medicare Part D, PDPs, MA-PDs and PBMs**

</div>

16.     The Medicare Part D program provides an outpatient prescription drug benefit to older adults and people with long-term disabilities enrolled in private plans, including stand-alone prescription drug plans ("PDPs") and Medicare Advantage prescription drug plans ("MA-PDs") that include drug coverage and other Medicare-covered benefits.  AHF is informed and believes and, based thereon, alleges that a total of 45 million people with Medicare are currently enrolled in plans that provide the Medicare Part D drug benefit, representing 70 percent of all Medicare beneficiaries.[7]

17.     PDPs and MA-PDs routinely contract with PBMs to administer prescription drug programs.  As noted, CVS is America's largest PBM.  Several national and regional PDPs and MA-PDs (including, among others, Aetna (owned by CVS), SilverScript, WellCare Healthplans, and Envolve Pharmacy Solutions) contract with CVS to provide PBM services.  AHF provides prescription drug services to patients enrolled in these, and other, plans administered by CVS.

<div align="center">

**PSAOs and Participating Providers**

</div>

18.     To fulfill its role as a PBM, CVS enters into contractual relationships with, among others, pharmacy services administrative organizations ("PSAOs"), which manage network contracting and plan administration for independent pharmacies, like those operated by AHF. The PSAOs enter into contracts with independent pharmacies enabling the pharmacies to become participants in plans offered by PBMs.  The pharmacies can then dispense prescription drugs to such participants, and CVS pays for them.

19.     AHF entered into an agreement with a PSAO called Leader Drugstores, Inc.

---

[7] *10 Things to Know About Medicare Part D Coverage and Costs in 2019, Kaiser Family Foundation*, June 4, 2019 (https://www.kff.org/medicare/issue-brief/10-things-to-know-about-medicare-part-d-coverage-and-costs-in-2019/)

("LeaderNET"), and LeaderNET entered into a contract on AHF's behalf with CVS, which, in turn, enabled AHF to become a "Participating Provider" under CVS programs. These agreements, taken together, contemplate that AHF pharmacies fill prescriptions for patients and submit claims for payment to CVS, consistent with the agreements and applicable laws and regulations. CVS then pays AHF for each prescription dispensed, also consistent with the agreements and applicable laws and regulations. AHF relies on receiving prompt and fair reimbursement for prescriptions, and where applicable prompt and predictable resolution of any problems with claims so that payment can be made, to ensure timely cash-flow permitting AHF to pay salaries, purchase inventory, and cover all other costs associated with operating specialty pharmacies serving high-risk clients.

20.     Through a service offered by LeaderNET called "Central Pay," LeaderNET provides a centralized electronic payment processing center for each of its participating pharmacies, whereby the pharmacies submit all claims electronically to Central Pay. CVS receives the claims through Central Pay, and then submits payments for these claims directly into Central Pay. These payments are then credited to the pharmacy's Central Pay account. Central Pay, in essence, operates like a bank account for AHF in that Central Pay collects the outstanding claims into one ledger for each participating pharmacy, and processes and reconciles all payments and any deductions as part of one ledger.

21.     AHF became a Participating Provider with respect to CVS's plan members, and AHF has been filling prescriptions for CVS-administered plans for years, commencing prior to CVS's unilateral imposition of the Claw-Back Program.

### The Agreement, CVS's Constant, Unilateral Amendments, the Payment of Clean Claims and the Adjudication of Claim Disputes

22.     The documents and information forming the agreement at issue in this case are many, prolix and constantly subject to unilateral amendment by CVS. They are not the product of negotiation between CVS and LeaderNET or AHF. CVS drafts all such documents and

information and imposes on pharmacies the terms on which it will permit pharmacies to participate in its programs. If pharmacies need to have access to CVS's PBM members to survive or accomplish their missions, those pharmacies have no choice but to agree.

23.    As relevant to AHF and Medicare Part D providers, the agreement is comprised of a Provider Agreement (actually a series of state-specific agreements), which includes the Provider Manuals (as repeatedly amended),[8] the Medicare Network Enrollment forms, a Retail Addendum, various addenda pertaining to specific states pursuant to those states' laws, and the "Caremark Documents." Intending to sweep as many documents and as much information as possible into the agreement, CVS defines "Caremark Documents" as:

> [T]he Provider Agreement, schedules thereto, addenda, the Provider Manual and all attachments thereto including [the] Glossary of Terms, Federal Laws and Regulations, State Laws and Regulations, information transmitted by Caremark to Provider through the claims adjudication system, and information transmitted by Caremark to Provider specifically designated by Caremark as a "Caremark Document" which may include educational materials related to products, programs, services, and Plan Sponsor announcements.[9]

24.    CVS reserves the right to amend unilaterally the agreement by giving notice to contracting parties of the terms of any such amendments; providers are deemed to have agreed to any such amendments by continuing to submit claims. In practice and given the wide scope of the documents and information designated as part of the agreement, CVS frequently amends the

---

[8] "The Provider Manual is ...incorporated into the Provider Agreement. Provider must abide by the provisions and terms set forth in the Provider Agreement (which includes the Provider Manual and all other Caremark Documents)." *2018 Provider Manual*, p. 17. Each successive Provider Manual supersedes previous versions of the manual. *2018 Provider Manual*, p. 4; *2016 Provider Manual*, p. 3.

[9] *2018 Provider Manual*, p. 340 (Glossary of Terms). All of the individual Provider Agreements incorporate the Glossary of Terms.

agreement at issue, on a day by day basis, with every communication it sends.[10]

25.    The documents comprising the agreement specifically incorporate applicable state and federal laws and regulations and provide that CVS must comply with those laws, as defined in the Agreement.[11] The agreement defines "Laws" broadly, as follows:

> Law means any Federal, State, local or other constitution, charter, act, statute, law, ordinance, code, rule, regulation, sub-regulatory guidance (including but not limited to, CMS Prescription Drug Benefit Manual, model contracts between the State Medicaid Agency and managed care organizations, and other guidance from State Medicaid Agencies, such as Medicaid Manuals, Bulletins, and other issuances), order, specified standards, or objective criteria contained in or which are (by express reference or necessary implication) a condition of granting any applicable permit, license or approval required by Caremark, Provider, or a Plan Sponsor, or other legislative or administrative action of the United States of America, or state or any agency, department, authority, political subdivision or other instrumentality thereof or a decree or judgment or order of a court.[12]

26.    Specifically, the agreement expressly requires CVS, among other things, to pay clean and otherwise adjudicated claims according to time frames set forth in applicable state and federal laws.

> In accordance with 42 C.F.R. § 423.520, payment for clean claims (that have been determined to be eligible for payment) will be made to Provider within fourteen (14) days (for electronically submitted claims), or thirty (30) days (for non-electronically submitted claims) from the date the claim

---

[10] AHF would normally attach the agreement at issue; tht is not possible here as a result of the amorphous, shape-shifting nature of the agreement.

[11] *2018 Provider Manual*, p. 7.

[12] *2018 Provider Manual*, p. 339 (Glossary of Terms).

is received.... A clean claim is defined as a claim that has no defect or impropriety (including any lack of any required substantiating documentation) or particular circumstance requiring special treatment that prevents timely payment of the claim from being made.[13]

27.    With respect to Georgia, a clean claim is a claim "received by [CVS] for adjudication, in a nationally accepted format in compliance with standard coding guidelines, which requires no further information, adjudgment or alteration by the provider of the services in order to be processed and paid by [CVS]."[14]

28.    With respect to New York, a clean claim is:

[A] request for payment for a service rendered by Provider that (i) is timely submitted by Provider in accordance with claim filing requirements under Regulatory Requirements and the then Current Plan Sponsor policies and procedures (ii) is in a nationally accepted format in compliance with standard coding guidelines; (iii) includes all material information required by Plan Sponsor, including without limitation, all required substantiating documentation and information related to coordination of benefits and third-party liability; (iv) is undisputed as to the amount of the claim; and (v) includes no indication of fraudulent content or submission.[15]

29.    With respect to Louisiana, the agreement provides that:

In accordance with, and to the extent required under applicable Louisiana law, [CVS] shall pay ninety percent (90%) of all clean claims, within fifteen (15) business days of the date receipt. [CVS] shall pay ninety-nine percent (99%) of all clean claims, within thirty (30) calendar days of the

---

[13] *2018 Provider Manual*, p. 59.
[14] *2018 Provider Manual*, p. 112 (Georgia Addendum).
[15] *2018 Provider Manual*, p. 232 (New York Addendum).

date of receipt.[16]

30.     With respect to South Carolina, the agreement provides that CVS "shall pay ninety percent (90%) of all Clean Claims from practitioners.... within thirty (30) days of the date of receipt.[17]

31.     With respect to Texas, the agreement provides that "Provider shall be paid in accordance with all applicable statutes and rules pertaining to prompt payment of clean claims for covered services that are rendered to Eligible Persons.[18]

32.     The agreement contains a lengthy and detailed claims submission process and provides for the prompt resolution of claims, including disputed or otherwise "non-clean" claims and prompt payment, through its "claim adjudication system," when such claims are resolved in favor of pharmacies.[19]

33.     The agreement also prohibits CVS from discriminating with respect to reimbursement for any provider acting within the scope of its license or certification under applicable state law, including for providing services to high-risk populations.[20]

34.     The agreement provides that "[a]ll Pharmacy Services must be provided by or under the direct supervision of a Licensed Pharmacist and in accordance with Prescriber directions and applicable Law."[21] Pursuant to the agreement, AHF is required, among other things, to comply with credentialing and quality management initiatives as required by CVS, and AHF is required to maintain internal quality management standards and procedures. AHF must make available on demand its documents and information pertaining to its pharmacy services and claims made to CVS, must comply with specific and detailed document retention practices,

---

[16] *2018 Provider Manual*, p. 169 (Louisiana Addendum).

[17] *2018 Provider Manual*, p. 261 (South Carolina Addendum).

[18] *2018 Provider Manual*, p. 273 (Texas Addendum).

[19] *See, e.g., 2018 Provider Manual*, pp. 5, 6, 13, 14, 15, 17-27, 28, 33, 34, 37, 38, 42, 45, 51, 74, 75, 77 and 78.

[20] *2018 Provider Manual*, pp. 102-103 (Florida Addendum); p. 115 (Georgia Addendum); p. 171 (Louisiana Addendum).

[21] *2018 Provider Manual*, pp. 8, 17.

and also must comply with all applicable state and federal laws and regulations. If AHF takes any action or commits any omission that "may pose a risk to the health, welfare, or safety of members of the general public[,]" CVS may terminate or suspend the agreement or take other corrective action.[22]

### CVS's Prescription Management Systems and Manufacturer Rebates and Discounts

35.    On CVS's end, "[a]ll prescriptions processed by [CVS] are analyzed, processed and documented by [CVS's] proprietary prescription management systems."[23]

> These systems...streamline the process by which prescriptions are processed by staff and network pharmacists by enhancing review of various items through automation, including plan eligibility, early refills, duplicate dispensing, appropriateness of dosage, drug interactions or allergies, over-utilization and potential fraud.[24]

36.    CVS claims that the PBM industry as a whole has experienced "margin pressure as a result of competitive pressures and increased client demands for lower prices, increased revenue sharing, enhanced service offerings and/or higher service levels."[25]  To address this, CVS uses its market power to negotiate contracts with drug manufacturers providing for purchase discounts and/or rebates on drugs dispensed by participating specialty pharmacies. These "rebates often depend on a PBM's ability to meet contractual market share or other requirements, including in some cases the placement of a manufacturer's products on [CVS's] formularies."[26]

### CVS's Claw-Back Program

37.    Beginning in calendar year 2015, CVS implemented the Claw-Back Program,

---

[22] *2018 Provider Manual*, pp. 7, 8, 18, 37.
[23] *CVS's Form 10-K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2018* (the "10K"),
[24] *Id.*
[25] *Id.*
[26] *Id.*

DEMAND FOR ARBITRATION

which all contracted pharmacies are required to join to continue to have access to CVS's critical Medicare Part-D patients. AHF has no choice but to participate in the Claw-Back Program – exclusion from CVS's network of pharmacies would have catastrophic consequences for AHF and its mission given the disproportionate market share CVS wields. CVS has operated the Program continuously since 2015 and will likely continue to do so for the foreseeable future.

38. According to CVS's website, CVS intends for the Claw-Back Program to ensure optimal pharmacy performance by driving better clinical performance.[27] In practice, the Claw-Back Program is a naked, self-serving effort to upend and frustrate the payment of clean claims, and the adjudication of claims for which there are disputes, in contravention of state and federal laws and regulations, with after-the-fact, arbitrary "adjustments," whatever the consequences to patients and regardless of their treating physicians' advice. It is a cash-grab, unlawfully discriminating against smaller, specialty pharmacies serving high-risk populations, under which CVS has unlawfully recouped at least $11,630,035.69 in payments from AHF pharmacies since 2015. As shown below, the Claw-Back Program as designed and applied to AHF has nothing to do with a pharmacy's performance in the context of patient care.

<u>CVS's Flawed, Statistically Unsound, Secret Scoring Methodology</u>

39. CVS operates the Claw-Back Program by using what it refers to as a "secret algorithm" to assign an overall performance score to each individual participating pharmacy. CVS updates the final score three times each year, on a trimester basis for the periods January through April, May through August, and September through December. The final score is critical because CVS uses that number to determine how much an individual pharmacy will be penalized during a given period. Performance scores are a pretext; they discriminate against small, specialty pharmacies serving high-risk populations, penalize pharmacies for decisions made by treating physicians, and are tied largely to factors entirely outside the control of any

---

[27] *CVS Health Statement Regarding Direct and Indirect Remuneration (DIR)*, CVS Website, February 2, 2017 (https://cvshealth.com/newsroom/press-releases/cvs-health-statement-regarding-direct-and-indirect-remuneration-dir)

individual pharmacy, without regard to individual patients' actual medical needs or the quality of AHF's services.

40.    Under the Claw-Back Program, CVS establishes an arbitrary, per-prescription penalty based on a percentage of the cost for each prescription. The penalty varies from between 3.5% to 8.5% on the amount of every claim paid. Although CVS claims that improving clinical performance is the goal of the Claw-Back Program, CVS applies a "minimum penalty," whatever a pharmacy's "performance." The Claw-Back Program punishes all "performance," bad, good, great or even perfect, and rewards none. There is no mechanism in the Claw-Back Program for pharmacies to pay no penalty or to receive additional sums based on scoring.

41.    As relevant to this matter, CVS's chief criteria for determining "performance" and assigning scores appear to be the number of prescriptions filled and the volumes of pills or other forms of certain medicines dispensed (e.g. statins), the composition of drugs dispensed (e.g., percentage of generic drugs) and the percentage of patients completing a medication management process which might be inapplicable or even contraindicated depending on the treating physicians' advice. Only one of these criteria, the composition of drugs dispensed, rests within AHF's control. For those factors outside of AHF's control – the volume of prescribed and dispensed drugs and the applicability of a medication management process – the Claw-Back Program penalizes AHF for decisions taken by treating physicians in the best interest of AHF's high-risk pharmacy customers.

42.    For example, CVS bases its "performance" score, in part, on whether patients using hypertension, cholesterol, and diabetes medications have received sufficient amounts of their medications during a particular trimester. However, a pharmacy has no control over whether a physician has prescribed a certain type of medications; nor can pharmacies force patients to fill prescriptions or to pick up their prescriptions once filled. Yet failure to meet CVS's arbitrary standard in this regard results in huge financial penalties for AHF. Perhaps most egregiously, CVS's "performance" scoring penalizes AHF for decisions taken by treating

physicians based on those physicians' deep expertise in treating people taking powerful HIV mediations. As an example, CVS uses its vaunted proprietary, cutting-edge systems to measure the percentage of diabetic patients, over age 65, who are receiving cholesterol-lowering medication (i.e., statins) based on the assumption that 100% of such patients should be prescribed the medication. *However, statins can be hazardous for patients taking HIV medications, and AHF physicians often affirmatively decide that patients not take statins.* Nonetheless, CVS and its much-touted systems refuse, or are unable, to account for these facts. Instead, they penalize AHF's pharmacies for the medically appropriate decisions physicians make, in the (ironic) name of "performance" and "quality."

43.      The Claw-Back Program discriminates against smaller pharmacies, like AHF, and their high-risk patient populations. Certain aspects of CVS's indisputably statistically unsound scoring methodology and its "secret algorithm" drive this discrimination. The small sample sizes presented by smaller pharmacies, like AHF, work to discriminate unfairly against smaller pharmacies because instances of "non-compliance" (meaning instances of AHF's inability to control what is prescribed and what is not prescribed, what prescriptions are filled and its "failure" to dispense drugs against doctor's orders) disproportionately impact and distort performance measurement. When measuring medication adherence, CVS's state-of-the-art systems and "secret algorithm" refuse to account for instances when the number of actual patients in a particular category is insignificantly small. During one reporting period for an AHF pharmacy, one of only six patients receiving hypertension medication failed to receive a sufficient supply, but AHF's compliance score in this category dropped nearly 17% because of a single patient. CVS refuses to account for the disproportionate impact a single patient can have on a smaller, specialty pharmacy serving high-risk patients, and AHF is unfairly penalized as a result. A larger pharmacy with dozens or hundreds of patients receiving hypertension medication will not be similarly affected by a single patient.

### CVS's Secret Data and Methodology and Refusal to Explain How "Performance" Scores Tie to the Penalties Charged

44.     CVS refuses to reveal any meaningful information concerning the operation of the Claw-Back Program. CVS conceals even general information about how its "secret algorithm" and its scoring system improve clinical performance or anything other than CVS's market share and margins. CVS keeps secret the specific patient and prescription information fed into its "secret algorithm" to calculate performance scores. To be clear, AHF has complete data concerning the prescriptions it has filled. AHF provided all of that data to CVS when AHF submitted claims for payment. *CVS will not share with AHF how that data results in scores or which data CVS uses to score.* Rather, CVS provides only summary level data, and AHF cannot verify, confirm or even understand CVS's calculations or the scores.

45.     Further putting the lie to any suggestion that the Claw-Back Program is about "performance," CVS refuses to explain the relationship between a pharmacy's final score and the financial penalty tied to a particular score. For example, during Trimester 1, 2018, CVS awarded one AHF pharmacy a final score of 91.06% for the Aetna health plan administered by CVS. CVS informed AHF that the final score resulted in a financial penalty of 3.3% on every brand-name prescription filled during the trimester. Yet, CVS will not explain the link between the score and the penalty. AHF cannot determine whether CVS imposed the "correct" penalty associated with the score because CVS refuses to reveal how final scores tie to such rates. AHF, therefore, has no idea how to improve its final score, how significant the factors outside of AHF's control are in CVS's "secret algorithm" in terms of impact on AHF's scores, or how improving its final score would relate to a lowered penalty rate. AHF operates blindly in regard to the risks and rewards associated with performance under the Claw-Back Program.

### CVS's Improper Retroactive Application of the Scoring System

46.     CVS applies the financial penalties retroactively, meaning CVS recoups funds from AHF at least five months after claims are initially paid. Although CVS boasts of state-of-

the-art prescription management systems that "streamline' the processing of prescriptions, that system and the "secret algorithm" take five months after claims are paid to determine the claw-back. Retroactive claw-backs create havoc and uncertainty for AHF's operations and deny AHF the benefit of the bargain at the heart of the contractual relationship.

## CVS Used the Claw-Back to Help Finance the Aetna Acquisition

47.     CVS paid in cash a large component of the $78 billion price for acquiring Aetna. CVS had reduced reimbursement rates since the inception of the Claw-Back Program to increase its margins, and it reduced those rates yet again around the time of the acquisition to help fund the cash component of the acquisition price.[28] As noted, CVS reported earning nearly $10 billion more in revenues in 2018 than the prior year.[29] AHF is informed and believes and, based thereon, alleges that CVS will continue to reduce its reimbursement rates to pay down the debt it incurred in financing the Aetna acquisition as well as the debt it assumed from Aetna as part of the acquisition.

## CVS's Imposition and Operation of the Claw-Back Program

48.     As discussed above, CVS operates the Claw-Back Program with no transparency and provides no meaningful way for AHF to verify the accuracy of the performance scores. CVS hides the financial impact until well after patients have been served. The Claw-Back Program is a canard; it seeks to upend the agreement and to pay to AHF less than CVS has agreed to pay and has already paid on clean and otherwise fully adjudicated claims. It seeks to co-opt participating, smaller pharmacies in its efforts to grow CVS's margins and market share, while helping to finance CVS's efforts to integrate health care industry participants horizontally and vertically. It has nothing to do with enhancing pharmacy "performance" in the context of patient care, particularly as applied to smaller, specialty pharmacies serving high-risk clientele.

---

[28] *CVS Caremark cut payments to pharmacies amid $70 billion deal to buy Aetna*, Columbus Dispatch, June 24, 2018 (https://www.dispatch.com/news/20180624/cvs-caremark-cut-payments-to-pharmacies-amid-70-billion-deal-to-buy-aetna)
[29] *2018 Annual Report*

Independent, small pharmacies in several states have reported that, while CVS cut payments to pharmacies using the Claw-Back Program, CVS sent letters to small pharmacy owners purporting to sympathize with their financial woes and offering to buy them out.[30]

49.　As noted, after the claw-back, the amount paid to AHF for some prescriptions *is less than* AHF's actual cost for acquiring these medications. AHF is losing money on some transactions without any way to know which prescriptions will lose money until five months or more after AHF dispensed medications in good faith to CVS members. Indeed, the terms and conditions of the Claw-Back Program imposed by CVS force pharmacies like AHF to lose money on transactions to continue treating high-risk patients in dire need of its services as a safety net provider.

50.　Moreover, the Claw-Back Program inherently harms small specialty pharmacies disproportionately compared to larger pharmacies. Prescriptions filled by specialty pharmacies like AHF constitute a significant portion of high-cost, sole-sourced brand name drugs. Because the Claw-Back Program recoups a *percentage* of every prescription filled, rather than a flat amount per prescription, the Program guarantees that specialty pharmacies will be unfairly penalized and damaged.

51.　CVS has unlawfully recouped at least $11,630,035.69 from January 1, 2015 through October 31, 2019 and continues to recoup funds pursuant to its Claw-Back Program. As a result of these unlawful recoupments, AHF is forced to curtail the breadth of services offered to patients seeking to fill prescriptions at AHF pharmacies. AHF has long-standing relationships with pharmacy patients who rely on AHF's extensive, highly specialized services provided by highly trained professionals, yet the claw-backs imposed by CVS harm AHF's financial ability to provide such services. The mounting financial harm imposed by CVS diminishes AHF's ability to provide these services, and patients are increasingly incentivized and even required to fill prescriptions at competing pharmacies, including through CVS's mail order pharmacy business,

[30] *CVS Caremark Cut Payments To Pharmacies Amid $70 Billion Deal To Buy Aetna*, Columbus Dispatch, June 24, 2018.

further compounding the financial damage as CVS's margins grow.

52.     The onerous, arbitrary terms of the Claw-Back Program and CVS's administration of it are patently unlawful, unreasonable and in bad faith and pose serious risk of patient harm by making continuing as a participating pharmacy increasingly untenable for small, specialty pharmacies treating high-risk patients, like AHF.

## FIRST CLAIM

### For Breach of Agreement

53.     AHF incorporates herein as if set forth fully all the preceding allegations of the Demand.

54.     AHF agreed to provide prescription drug services to patients in health plans administered by CVS and with the full expectation that CVS would adhere to the terms of the applicable agreement and state and federal laws and regulations. Pursuant to the agreement, CVS is obligated to reimburse AHF in a timely fashion and according to a determinable formula for drugs dispensed to patients whose prescription benefits CVS administers. The agreement does not permit CVS to hide from AHF the true, net amounts CVS reimburses to AHF for drugs AHF dispenses. Nor does the agreement permit CVS to reimburse less money per prescription to smaller, specialty pharmacies treating high-risk patients than reimbursed to very large pharmacy chains. The agreement requires CVS to pay clean claims promptly pursuant to applicable law. The agreement provides for the prompt resolution of disputes as to claims so that those claims may also be paid promptly  When CVS pays claims in full (whether those claims were clean or not or subject to disputes that were resolved), there is no need or basis for AHF to challenge those payments through the established procedures for disputing CVS's actions on claims. Once AHF receives CVS's claw-back demand, there is no basis or means for challenging that claw-back and no way to confirm that CVS's secret algorithm is designed for anything other than grabbing money from Providers. Every 4 months AHF receives from CVS bills, the amount of which AHF cannot predict and the calculation of which is cloaked in secrecy, playing havoc with

AHF's ability to cash flow its business or to plan or control its finances. Those bills are not subject to challenge, question or appeal.

55.    AHF fully performed all its obligations under the agreement, including dispensing medications to eligible patients and timely submitting claims for reimbursement in compliance with CVS's requirements.

## CVS's Breaches

### The Claw-Back Program's Implementation, Design and Operation

56.    As described above, CVS unilaterally implemented and operates the Claw-Back Program for the purpose of increasing its margins by taking back from AHF funds already paid to AHF on clean and otherwise fully adjudicated claims for reimbursement long after AHF rendered services. The Claw-Back Program retroactively penalizes AHF's pharmacies by clawing back millions of dollars of funds paid by CVS to AHF's pharmacies without regard to AHF's delivery of top-flight patient care or with its "performance," thereby making increasingly untenable AHF's realizing of its mission of serving its high-risk clientele – people living with HIV/AIDS without regard to their ability to pay – as a safety net provider. The Claw-Back Program has nothing to do with enhancing or improving the "performance" of pharmacies in the context of patient care. As administered, the Claw-Back Program permits CVS to penalize AHF for acts and decisions not subject to AHF's control. The Claw-Back Program also permits CVS to penalize AHF for medical decisions taken by expert treating physicians. As shown, the Claw-Back Program also permits CVS to discriminate against small pharmacies; the Claw-Back Program results in smaller, specialty pharmacies serving high-risk patients receiving smaller net reimbursements than received by large chain pharmacies participating in CVS' PBM programs.

57.    In its implementation, administration, and operation of the Claw-Back Program, CVS breaches the agreement and violates various federal and state laws and regulations, all of which CVS incorporated into the agreement and is obligated to follow. These violations, described more fully below, are, therefore, breaches of the agreement.

## CVS's Violation of Federal Medicare Reasonable and Relevant Terms Law 42 C.F.R. § 423.505(b)(18)

58.     Federal Medicare law, 42 C.F.R. § 423.505(b)(18), requires that all Medicare Part D plan sponsors agree to offer participating pharmacies a contract with "reasonable and relevant terms and conditions of participation." Such requirements have been uniformly and repeatedly emphasized by the Centers for Medicare and Medicaid Services. CVS's actions violate 42 C.F.R. § 435.505(b)(18).

59.     CVS secretly employs and manipulates the Claw-Back Program to reduce greatly without rational, performance-related justification the reimbursements paid to AHF and to make providing services to CVS's members financially precarious for AHF.

60.     There is nothing reasonable about the Claw-Back Program or its administration, and it has no relevance to pharmacy "performance." As a result of the reduced reimbursement, AHF is not able to provide the depth of services to treat its patients and is dissuaded from providing services at all.

## CVS's Breach of Obligation to Pay Claims Promptly and Finally – Violation of Federal Medicare Prompt Payment Law 42 U.S.C. § 1395w-112

61.     Federal law, 42 U.S.C. § 1395w-112, requires prompt payment of clean claims submitted by a pharmacy within 14 days after the clean claim has been received or within 30 days of receiving any other claim. The agreement contains some state-specific provisions requiring the prompt payment of clean claims. The Claw-Back Program violates 42 U.S.C. § 1395w-112 and the agreement.

62.     The Claw-Back Program is predicated on retroactively assessing payment reductions on individual clean or otherwise fully adjudicated claims at least five months (and up to one year) after the claims have been submitted electronically. CVS designed the Claw-Back Program not to enhance or improve "performance," but so that clean and otherwise adjudicated claims would not be timely paid, in violation of 42 U.S.C. §1395w-11.

## CVS's Breaches of Obligation to Promptly Adjudicate and Pay Disputed Claims

63.    The agreement requires providers to submit and process claims using CVS's "claims adjudication system." Clean claims, non-clean claims and otherwise disputed claims are processed through this system, which is required to adjudicate disputed claims promptly and then to pay those claims promptly after any disputes are resolved.

64.    The Claw-Back Program is predicated on retroactively assessing payment reductions on individual fully adjudicated claims at least five months (and up to one year) after the claims have been submitted electronically and resolved. CVS designed the Claw-Back Program not to enhance or improve "performance," but so that adjudicated claims would not be timely paid, in violation of the agreement.

## CVS's Violations of State Law Unfair Business Practice Laws
### [Cal. Bus. & Prof. Code, § 17200, et. seq.]

65.    The California Business and Professions Code provides that unfair competition includes any unlawful, unfair or fraudulent business act or practice.

66.    As shown above, CVS engaged in unlawful, unfair and fraudulent business practices by, among other things, breaching its agreement with AHF and violating federal and state laws and applicable regulations. CVS's conduct was unethical, oppressive, unscrupulous and unjustly enriched CVS, to the detriment of AHF and its patients.

67.    CVS's repeated unfair business practices in California caused damages to AHF, and unjustly enriched CVS, in an amount in excess of $442,639.44, not including attorneys' fees and costs, to be proved at arbitration.

## [Florida Deceptive and Unfair Trade Practices Act,
### Sections 501.201-.213, Florida Statutes]

68.    Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) protects the consuming public and legitimate business enterprises from unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

The FDUTPA declares unlawful all unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. The FDUTPA defines a violation of the FDUTPA as violation of any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

69.    As shown above, CVS engaged in unlawful, unfair and fraudulent business practices by, among other things, breaching its agreement with AHF and violating federal and state laws and applicable regulations. CVS's conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

70.    CVS's repeated unfair business practices in Florida caused damages to AHF, and unjustly enriched CVS, in an amount in excess of $546,609.82, not including attorneys' fees and costs, to be proved at arbitration.

71.    AHF is also entitled to receive a civil penalty in the amount of $10,000 per violation of the FDUTPA.

### [Louisiana Unfair Trade Practices, La. Rev. Stat. Ann. § 22:1964]

72.    Louisiana statutes prohibit unfair methods of competition and unfair or deceptive acts or practices in the business of insurance. Unfair discrimination in the context of this case is defined as making or permitting any unfair discrimination between individuals of the same class involving essentially the same hazards in the benefits payable pursuant to a health care plan, or in any of the terms or conditions of such a plan, or in any other manner whatever.

73.    As shown above, CVS engaged in unlawful, unfair, deceptive and fraudulent business practices by, among other things, breaching its agreement with AHF and violating federal and state laws and applicable regulations. CVS's conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

74.    CVS's repeated unfair business practices in Louisiana caused damages to AHF,

and unjustly enriched CVS, in an amount in excess of $33,051.01, not including attorneys' fees
and costs, to be proved at arbitration.

<u>New York Deceptive Trade Practices, NYGBL, Section 349</u>

75.      New York General Business Law, §349 prohibits any business or person from
engaging in deceptive business practices in the conduct of any business, trade or commerce or in
the furnishing of any service in New York State.

76.      As shown above, CVS engaged in unlawful, unfair, deceptive and fraudulent
business practices by, among other things, breaching its agreement with AHF, and violating
federal and state laws and applicable regulations.  CVS's conduct offends established public
policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to
consumers.

77.      CVS's repeated unfair business practices in New York caused damages to AHF,
and unjustly enriched CVS, in an amount in excess of $270,243.42, not including attorneys' fees
and costs, to be proved at arbitration.

<u>[Washington State Consumer Protection Act, ARCW Section 19.86 et. seq.]</u>

78.      Washington State's Consumer Protection Act declares unfair methods of
competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as
unlawful.  Any person injured in his or her business property by a violation of the Consumer
Protection Act may bring a civil action to enjoin further violations, to recover actual damages, or
both, together with costs of suit, including reasonable attorneys' fees.

79.      As shown above, CVS engaged in unlawful, unfair, deceptive and fraudulent
business practices by, among other things, breaching its agreement with AHF, and violating
federal and state laws and applicable regulations.  CVS's conduct offends established public
policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to
consumers.

80.      CVS's repeated unfair business practices in Washington caused damages to AHF,

and unjustly enriched CVS, in an amount in excess of $43,921.65, not including attorneys' fees and costs, to be proved at arbitration.

## CVS's Violations of State "Any-Willing-Provider" Laws

81.    AHF operates pharmacies in six states – Georgia, Illinois, Louisiana, Mississippi, South Carolina, and Texas – with Any-Willing-Provider Laws ("AWP Laws").

82.    AWP Laws require PBMs like CVS to allow participation by any pharmacy willing to meet the terms and conditions generally offered to pharmacies in each respective state. However, the terms and conditions imposed on pharmacies must be reasonable and non-discriminatory and may not work to disqualify or exclude any pharmacy from participating in CVS's network of pharmacies.

## [O.C.G.A. § 33-20-16 (Georgia)]

83.    Georgia law requires that every health care provider, including pharmacies, has the right to become a participating provider under such terms or conditions offered to other approved health care providers under similar circumstances.

## [215 ILCS 134/72(a) (Illinois)]

84.    The Illinois Managed Care Reform and Patient Rights Act states that plans may not refuse to contract with pharmacy providers that can meet the plan's contractual terms. The terms and conditions in an agreement between health care plans and pharmacy providers "shall not discriminate against a pharmacy provider."

## [La. Rev. Stat. 22:1964(15) (Louisiana)]

85.    Louisiana insurance laws prohibit pharmacy plans from limiting beneficiaries from selecting a pharmacy of the beneficiaries' choice for pharmaceutical services. Plans may not interfere with plan participants' selections of a pharmacy. Louisiana law defines "interfere" as including plan terms that have the effect of charging to or imposing on an insured or other beneficiary who does not utilize a specified or designated pharmacy or pharmacist, a copayment fee or other condition not equally charged to or imposed on all insureds or other beneficiaries in

or under the same program or policy or plan.

## [Miss. Code Ann. § 83-9-6 (Mississippi)]

86.    The Mississippi Code requires plans to allow participants their choice of pharmacies that have agreed to participate in plans according to the terms offered by the insurer. Also, a plan may not deny such pharmacies the right to participate as a contract provider. A plan may not impose a monetary advantage or penalty under a health benefit plan that would affect a participant's choice among those pharmacies that have agreed to participate in the plan according to the terms offered by the insurer. Monetary advantages or penalties are defined as including higher copayments, reductions in reimbursement for services, or promotion of one participating pharmacy over another by these methods.

## [S.C. Code § 38-71-147 (South Carolina)]

87.    The South Carolina Codes provide that plans may not prohibit or limit a participant in a plan from having the choice of pharmacies that have agreed to participate in the plan according to the terms offered by the insurer. In addition, a plan may not deny a pharmacy the right to participate as a contract provider under the plan.

## [Tex. Insurance Code § 21.52B (Texas)]

88.    The Texas Insurance Code forbids the limiting of a plan participant's choice of pharmacies and the denial of a pharmacy's right to participate as a contract provider under the policy or plan if the pharmacy agrees to provide pharmaceutical services that meet all terms and requirements. Also, plans are forbidden from requiring a participant to obtain or request a specific quantity or dosage supply of pharmaceutical products.

## CVS's Violations of the AWP Laws

89.    As shown above, CVS violated AWP Laws by forcing AHF to participate in the Claw-Back Program, operating the Claw-Back Program in a discriminatory manner and forcing AHF to provide prescription medications to patients below AHF's cost.

90.    CVS understands that recouping funds pursuant to the Claw-Back Program means

substantially reduced reimbursement for AHF and that AHF will lose money on many prescriptions. CVS further understands that the Claw-Back Program makes continued participation in PDP and MA-PD plans administered by CVS increasingly untenable. CVS is intentionally driving AHF out of its networks in direct contravention of AWP Laws.

91.    AHF is, therefore, entitled to preliminary and permanent injunctive relief, prohibiting CVS from operating the Claw-Back Program in Georgia, Illinois, Louisiana Mississippi, South Carolina, and Texas in a manner that forces AHF to lose money filling prescriptions and/or drives AHF out of CVS's network.

### CVS's Violations of Section 2 of the Robinson-Patman Act, 15 U.S.C. §13

92.    For purposes of CVS's antitrust violations, the relevant service market affected by CVS's unlawful conduct is pharmacy services provided by smaller, specialty safety net pharmacies to high-risk patients and reimbursed by or through the Medicare Part D program. The relevant geographic market for that activity is nationwide.

93.    As shown above, by operation of the Claw-Back Program, CVS unlawfully discriminates in commerce against small pharmacies in that the net amounts reimbursed through the Medicare Part D program to small, specialty, safety net pharmacies, serving high-risk populations and participating in CVS's PBM programs *are lower than* the amounts reimbursed by CVS to large retail chain pharmacies with far larger customer bases. Ultimately, large and even giant pharmacy chains, like CVS, dispense drugs of like grade and quality as those dispensed by smaller pharmacy chains but receive *substantially higher* net reimbursements from CVS's PBM operations than smaller pharmacies.

94.    The impact of this discriminatory pricing is to substantially lessen competition and to tend to create a monopoly and/or to injure, destroy, or prevent competition with CVS's own retail and mail order pharmacy operations in violation of Section 2 of the Robinson-Patman Act, 15 U.S.C. §13.

95.    AHF is, therefore, entitled to preliminary and permanent injunctive relief,

pursuant to Section 16 of the Robinson-Patman Act, 15 U.S.C. §26, prohibiting CVS from demanding payment from AHF as a result of the operation of the Claw-Back Program in a fashion that violates Section 2 of the Robinson-Patman Act, 15 U.S.C. §13.

96.     CVS's repeated violations of Section 2 of the Robinson-Patman Act, 15 U.S.C. §13, in connection with the Claw-Back Program caused damages to AHF, and unjustly enriched CVS, in an amount to be proved at arbitration.

97.     CVS's repeated breaches of the agreement in connection with the Claw-Back Program, described above, caused harm to AHF in an amount in excess of $11,630,035.69, not including attorneys' fees and costs, to be proved at arbitration.

## SECOND CLAIM

### For Breach of the Implied Covenant of Good Faith and Fair Dealing

98.     AHF incorporates herein as if set forth fully all the preceding allegations of the Demand.

99.     Arizona law implies in every agreement, including the agreement at issue here, a covenant of good faith and fair dealing which can be breached even where the express terms are not violated. The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent the other contracting parties from receiving the benefits of the agreement.

100.     AHF agreed to provide prescription drug services to patients in health plans administered by CVS in good faith and with the full expectation that CVS would adhere to the terms of the applicable agreement and applicable law and regulations. Pursuant to the applicable agreement, CVS is obligated to reimburse AHF in a timely fashion and according to a determinable formula for drugs dispensed to patients whose prescription benefits CVS administers. The agreement does not permit CVS to hide from AHF the true, net amounts CVS reimburses to AHF for drugs AHF dispenses. Nor does the agreement permit CVS to discriminate in pricing against smaller pharmacies.

101.     AHF fully performed all its obligations under the agreement, including dispensing

medications to eligible patients and timely submitting claims for reimbursement in compliance with CVS's requirements.

102.  CVS acted in bad faith and breached the implied covenant of good faith and fair dealing in the unilateral imposition and operation of the Claw-Back Program without regard to improving the quality of patient care. The Claw-Back Program has nothing to do with enhancing or improving the "performance" of pharmacies in the context of patient care. As administered, the Claw-Back Program permits CVS to penalize AHF for acts and decisions not subject to AHF's control. The Claw-Back Program also permits CVS to penalize AHF for medical decisions taken by expert treating physicians. The Claw-Back Program also discriminates against smaller, specialty, safety-net pharmacies serving high risk customers. CVS has used the Claw-Back Program to its own pecuniary benefit to deprive AHF of the benefit of its bargain.

103.  CVS's repeated breaches of the implied covenant in connection with the Claw-Back Program caused harm to AHF in an amount in excess of $11,630,035.69, not including attorneys' fees and costs, to be proved at arbitration.

## THIRD CLAIM

### For State Law Unfair Business Practices

### [Cal. Bus. & Prof. Code, § 17200, *et. seq.*]

104.  AHF incorporates herein as if set forth fully all the preceding allegations of the Demand.

105.  As shown above, CVS's repeated unfair business practices in California unjustly enriched CVS in an amount in excess of $442,639.44, not including attorneys' fees and costs, to be proved at arbitration.

106.  AHF's business was substantially harmed, and continues to be harmed, by CVS's unfair and deceptive practices. AHF is entitled to preliminary and permanent injunctive relief, forbidding and enjoining CVS from engaging in California in the unlawful, unfair business practices described herein.

## [Florida Deceptive and Unfair Trade Practices Act,

### Sections 501.201-.213, Florida Statutes]

107.    As shown above, CVS's repeated unfair business practices in Florida unjustly enriched CVS in an amount in excess of $546,609.82, not including attorneys' fees and costs, to be proved at arbitration.

108.    AHF's business was substantially harmed, and continues to be harmed, by CVS's unfair and deceptive practices. AHF is entitled to preliminary and permanent injunctive relief, forbidding and enjoining CVS from engaging in Florida in the unlawful, unfair business practices described herein.

109.    AHF is also entitled to receive a civil penalty in the amount of $10,000 per violation of the FDUTPA.

### [Louisiana Unfair Trade Practices, La. Rev. Stat. Ann. § 22:1964]

110.    As shown above, CVS's repeated unfair business practices in Louisiana damaged AHF in an amount in excess of $33,051.01, not including attorneys' fees and costs, to be proved at arbitration.

111.    AHF's business was substantially harmed, and continues to be harmed, by CVS's unfair and deceptive practices. AHF is entitled to preliminary and permanent injunctive relief, forbidding and enjoining CVS from engaging in Louisiana in the unlawful, unfair business practices described herein.

### [Washington State Consumer Protection Act, ARCW Section 19.86 *et. seq.*]

112.    As shown above, CVS's repeated unfair business practices in Washington State caused damages to AHF in an amount in excess of $43,921.65, not including attorneys' fees and costs, to be proved at arbitration.

113.    AHF's business was substantially harmed, and continues to be harmed, by CVS's unfair and deceptive practices. AHF is entitled to preliminary and permanent injunctive relief, forbidding and enjoining CVS from engaging in Washington State in the unlawful, unfair

business practices described herein.

## FOURTH CLAIM

### For Violation of State "Any-Willing-Provider" Laws

114.    AHF incorporates herein as if set forth fully all the preceding allegations of the
Demand.

### [O.C.G.A. § 33-20-16 (Georgia)]

115.    As shown above, CVS has violated the Georgia AWP Law.

### [215 ILCS 134/72(a) (Illinois)]

116.    As shown above, CVS has violated the Illinois AWP Law.

### [La. Rev. Stat. 22:1964(15) (Louisiana)]

117.    As shown above, CVS has violated the Illinois AWP Law.

### [Miss. Code Ann. § 83-9-6 (Mississippi)]

118.    As shown above, CVS has violated the Illinois AWP Law.

### [S.C. Code § 38-71-147 (South Carolina)]

119.    As shown above, CVS has violated the Illinois AWP Law.

### [Tex. Insurance Code § 21.52B (Texas)]

120.    As shown above, CVS has violated the Illinois AWP Law.

121.    AHF is, therefore, entitled to preliminary and permanent injunctive relief,
prohibiting CVS from operating the Claw-Back Program in Georgia, Illinois, Louisiana
Mississippi, South Carolina, and Texas in a manner that forces AHF to lose money filling
prescriptions and/or drives AHF out of CVS's network.

## FIFTH CLAIM

### For Violation of the Section 2 of the Robinson-Patman Act, 15 U.S.C. §13

122.    AHF incorporates herein as if set forth fully all the preceding allegations of the
Demand.

123.    As shown above, in its unilateral implementation, administration and operation of

the Claw-Back Program, CVS has violated Section 2 of the Robinson-Patman Act, 15 U.S.C. §13.

124.   AHF is, therefore, entitled, pursuant to Section 4 of the Robinson-Patman Act, 15 U.S.C. §15, to an award of damages in an amount to be proved at arbitration and to preliminary and permanent injunctive relief, pursuant to Section 16 of the Robinson-Patman Act, 15 U.S.C. §26.

### PRAYER FOR RELIEF

**WHEREFORE,** AHF prays for an Award against CVS on all of its claims herein, in an amount sufficient to compensate AHF for its losses and respectfully requests that the Arbitrator grant the following relief:

1.   On the First Claim for Breach of Agreement:

   a.   For general damages, according to proof at arbitration, in excess of $11,630,035.69; and

   b.   For pre-award and post-award interest at the applicable legal rate; and

   c.   For expenses and costs of suit, including arbitration costs and fees and attorneys' fees; and

   d.   For preliminary and permanent injunctions prohibiting CVS from demanding payment from AHF as a result of the operation of the Claw-Back Program and from breaching the agreement in the manners proved at arbitration; and

   e.   For specific performance by CVS of all its obligations pursuant to the agreement, including refraining in the future from demanding payment from AHF as a result of the operation of the Claw-Back Program.

2.   On the Second Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing:

   a.   For general damages, according to proof at arbitration, in excess of $11,630,035.69; and

b.     For pre-award and post-award interest at the applicable legal rate; and

c.     For expenses and costs of suit, including arbitration costs and fees and attorneys' fees; and

d.     For preliminary and permanent injunctions prohibiting CVS from demanding payment from AHF as a result of the operation of the Claw-Back Program and from breaching the implied covenant of good faith and fair dealing in the manners proved at arbitration.

3.     On the Third Claim for State Law Unfair Business Practices:

a.     For restitution of all amounts by which CVS was unjustly enriched at AHF's expense and/or damages (as applicable), according to proof at arbitration, in excess of $442,639.44 in California, $43,921.65 in Washington State, $546,609.82 in Florida and $33,051.01 in Louisiana; and

b.     For pre-award and post-award interest at the applicable legal rate; and

c.     For expenses and costs of suit, including arbitration costs and fees and attorneys' fees; and

d.     For preliminary and permanent injunctions, pursuant to the applicable unfair business practices statutes, in California, Florida, Washington State, and Louisiana prohibiting CVS from engaging in the unfair business practices proved at arbitration.

4.     On the Fourth Claim for Violation of State Any Willing Provider Laws:

a.     For preliminary and permanent injunctions, pursuant to the applicable AWP Laws, in Georgia, Illinois, Louisiana, Mississippi, South Carolina, and Texas prohibiting CVS from violating the AWP Laws in those states through the operation of the Claw-Back Program.

5.     On the Fifth Claim for Violation of Section 2 of the Robinson-Patman Act, 15 U.S.C. §13:

a.     For general damages pursuant to Section 4 of the Robinson-Patman Act, 15 U.S.C. §15, according to proof at arbitration; and

b.     For pre-award and post-award interest at the applicable legal rate; and

c.     For expenses and costs of suit, including arbitration costs and fees and attorneys' fees; and

d.     For preliminary and permanent injunctions, pursuant to Section 16 of the Robinson-Patman Act, 15 U.S.C. §26, prohibiting CVS from demanding payment from AHF as a result of the operation of the Claw-Back Program in a fashion that violates Section 2 of the Robinson-Patman Act, 15 U.S.C. §13.

6.     On all Claims, for such other and further relief as the Arbitrator may deem just, proper, and equitable.

DATE:  November 12, 2019

AIDS HEALTHCARE FOUNDATION
Arti Bhimani
Jeffrey Blend
KIM RILEY LAW
Andrew F. Kim
Rebecca J. Riley

By: _____
       ANDREW F. KIM
       Attorneys for Claimant
       AIDS HEALTHCARE FOUNDATION

# EXHIBIT K