# EXHIBIT B

# EXHIBIT B-1

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

**CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT – DO NOT DISCLOSE**

# CAREMARK PROVIDER AGREEMENT

This Provider Agreement (the "Provider Agreement" or "Agreement") is entered into between Caremark, L.L.C., a California limited liability company and CaremarkPCS, L.L.C., a Delaware limited liability company (collectively "Caremark"), and the undersigned provider ("Provider"). Caremark and Provider agree as follows:

1. **Definitions.** Unless otherwise defined herein, capitalized terms used in the Agreement shall have the meanings set forth in the Glossary of Terms contained in the Provider Manual.

2. **Credentialing.** Provider represents, warrants, and agrees that as of the date of execution of the Agreement, Provider is and shall maintain in good standing, all federal, state and local licenses and certifications as required by Law. Provider will provide Caremark with the information required from time to time regarding Provider's credentials, including, but not limited to Provider's licensure, accreditation, certification, and insurance, and will comply with and maintain Caremark credentialing standards and requirements.

3. **Provider Services and Standards.** Unless Provider's professional judgment dictates otherwise, Provider will render to all Eligible Persons the Pharmacy Services to which the Eligible Person is entitled in accordance with the Agreement, the prescriber's directions, the applicable Plan, and applicable Law. Provider will submit all Claims for such Pharmacy Services electronically to Caremark in accordance with the Caremark Documents. Caremark may inspect all records of Provider relating to the Agreement.

4. **Eligible Person Identification and Cost Share.** Provider will require each person requesting Pharmacy Services to verify that he or she is an Eligible Person. With respect to each Covered Item dispensed to an Eligible Person, Provider will collect from the Eligible Person the applicable Patient Pay Amount communicated to Provider through the Caremark claims adjudication system or other method established by Caremark. Provider will not waive, discount, reduce, or increase the Patient Pay Amount indicated in the Caremark claims adjudication system unless otherwise authorized in writing by Caremark. Except for the collection of the applicable Patient Pay Amount, in no event will Provider seek compensation in any manner from an Eligible Person for Pharmacy Services with respect to a Covered Item.

5. **Network Participation and Payment.** Provider agrees to participate in the networks identified on the attached Schedule A according to the terms set forth therein. Caremark will pay Provider for Covered Items dispensed to Eligible Persons pursuant to the Agreement in accordance with Schedule A. Any overpayments made to Provider by Caremark may be deducted from amounts otherwise payable to Provider.

6. **Compliance with Law.** Provider will comply with all applicable Laws, including but not limited to those Laws referenced in the Federal and State Laws and Regulations section (and attached Addendums thereto) set forth in the Provider Manual.

   **New York State Medicaid:** If Provider furnishes items and services to, or orders, prescribes, refers, or certifies eligibility for, services for individuals eligible to receive Medicaid or Child Health Plus, Provider agrees to enroll in the New York State Medicaid Program by completing and filing the designated enrollment application and providing the required information necessary for enrollment. In the event Provider is terminated from, not accepted to, or fails to submit a designated enrollment application to, the New York State Medicaid Program, Provider agrees that it shall be terminated from participating as a provider in any network of the Plan Sponsor (managed care organization) that serves individuals eligible to receive Medicaid or Child Health Plus.

7. **Indemnification.** Provider acknowledges that Provider bears sole responsibility for any liability arising (i) from any actual or alleged malpractice, negligence, misconduct, or breach by Provider in the performance or omission of any act or responsibility assumed by Provider or (ii) in the provision of Pharmacy Services or the sale, compounding,

SC

Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

dispensing, manufacturing, or use of a drug or device dispensed by Provider. Provider will indemnify and hold harmless Caremark and Plan Sponsors and their respective shareholders, directors, employees, agents, and representatives from and against any and all liabilities, losses, settlements, claims, injuries, damages, expenses, demands, or judgments of any kind (including reasonable expenses and attorneys' fees) that may result or arise out of (i) any actual or alleged malpractice, negligence, misconduct, or breach by Provider in the performance or omission of any act or responsibility assumed by Provider or (ii) in the provision of Pharmacy Services or the sale, compounding, dispensing, manufacturing, or use of a drug or device dispensed by Provider.

8.     **Limitation on Liability.** In no event will Caremark be liable to Provider for indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business.

9.     **Term.** The Agreement will begin on the date of acceptance by Caremark and will remain in effect until terminated in accordance with the Provider Manual.

10.     **Assignment.** Neither party may assign this Agreement without the prior written consent of the other party; provided, however, that Caremark may, without consent, assign this Agreement to any direct or indirect parent, subsidiary, or affiliated company or to a successor company. Any permitted assignee shall assume all obligations of its assignor under this Agreement. This Agreement shall inure to the benefit of and be binding upon each party, its respective successors and permitted assignees.

11.     **Entire Agreement.** This Agreement, the Provider Manual, and all other Caremark Documents constitute the entire agreement between Provider and Caremark, all of which are incorporated by this reference as if fully set forth herein and referred to collectively as the "Provider Agreement" or "Agreement". Any prior agreements, promises, negotiations, or representations concerning the subject matter covered by the Agreement are terminated and of no force and effect. Provider's non-compliance with any of the provisions of this Agreement, including the Provider Manual and other Caremark Documents will be a breach of the Provider Agreement. In the event there is a conflict between any of the provisions in this Provider Agreement, the Provider Manual, other Caremark Documents and a provision in an applicable State specific addendum attached to the Federal and State Laws and Regulations section of the Provider Manual, the terms of the applicable State specific addendum shall govern.

12.     **Waiver.** Failure to exercise any of the rights granted under the Agreement for any one default will not be a waiver of any other or subsequent default. No act or delay shall be deemed to impair any of the rights, remedies, or powers granted in the Agreement.

13.     **Lawful Interpretation and Jurisdiction.** Whenever possible, each provision of the Agreement shall be interpreted so as to be effective and valid under applicable Law. Should any provision of this Agreement be held unenforceable or invalid under applicable Law, the remaining provisions shall remain in full force and effect. Unless otherwise mandated by applicable Law, the Agreement will be construed, governed, and enforced in accordance with the laws of the State of Arizona without regard to choice of law provisions.

14.     **Headings.** The headings of Sections contained in the Agreement are for convenience only and do not affect in any way the meaning or interpretations of the Agreement.



Initial

**CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT –
DO NOT DISCLOSE**

By signing below, Provider agrees to the terms set forth above and acknowledges receipt of the Provider Manual.

Chain Name: AIDS Healthcare Foundation

NCPDP Chain Code: A23          Store Count: 51

By: _Scott Carruthers_
 3302F8BD924042B...
(Signature of authorized agent)

Scott Carruthers
(Print name of authorized agent)

Date: 10/05/2018

---

**\*\*\*\*\*\*ATTENTION\*\*\*\*\*\*\*\***

PAGES **1**, **2**, AND **4** MUST BE INITIALED
BY AUTHORIZED AGENT BEFORE
CONTRACT WILL BE ACCEPTED

---

Caremark, L.L.C.

(Signature of authorized agent)

Todd Guinn
VP, Pharmacy Business Relations

By: _____

Date: NOV 0 4 2019

CaremarkPCS, L.L.C.

(Signature of authorized agent)
Todd Guinn

By: VP, Pharmacy Business Relations

Date: NOV 0 4 2019

SC
Initial

**CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT –
DO NOT DISCLOSE**

# SCHEDULE A
# NETWORK PARTICIPATION AND PAYMENT

This Schedule A is comprised of this Schedule A and all prior and subsequent network addendums and network enrollment forms, all of which are incorporated herein by this reference and referred to collectively as "Schedule A". Provider agrees that it will participate in all Caremark and Plan Sponsor pharmacy networks in which: (1) Provider participates in as of the date of this Agreement; (2) Provider and Caremark have executed a network addendum or network enrollment form as of the date of this Agreement; (3) Provider and Caremark subsequently execute a network addendum or network enrollment form; and (4) Provider agrees to participate as evidenced by its provision of Pharmacy Services to an Eligible Person of a Plan Sponsor utilizing such pharmacy network(s).

Unless otherwise set forth in a network addendum or network enrollment form signed by both parties, claims submitted for a Plan Sponsor participating in an Caremark or Plan Sponsor network will be reimbursed at the lower of: (i) AWP less the applicable AWP Discount plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) gross amount due less the applicable Patient Pay Amount. The applicable AWP Discount and Dispensing Fee will be set forth in the applicable network addendum or network enrollment form. If Provider has not executed and delivered to Caremark a network addendum or network enrollment form, the applicable AWP Discount and Dispensing Fee will be the reimbursement rate as indicated in the adjudication claims system as to such claim. AWP Discounts and Dispensing Fees may be amended in accordance with the terms of the Agreement.

Notwithstanding any other provision in the Provider Agreement, claims (excluding compounded medications) submitted for a Plan Sponsor participating in a Caremark or Plan Sponsor network may be reimbursed at the lower of: (i) Price Type plus an applicable percentage of the Price Type, or minus the applicable percentage of the Price Type, plus the applicable Dispensing Fee less the applicable Patient Pay Amount (or if applicable Price Type is unavailable for a given drug, Caremark will pay Provider based upon AWP minus the applicable AWP Discount plus the applicable Dispensing Fee minus the applicable Patient Pay Amount); (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) Provider's submitted Gross Amount Due less the applicable Patient Pay Amount.

SC

Initial

# EXHIBIT B-2

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT –
DO NOT DISCLOSE

# CAREMARK PROVIDER AGREEMENT

This Provider Agreement (the "Provider Agreement" or "Agreement") is entered into between Caremark, L.L.C., a California limited liability company and CaremarkPCS, L.L.C., a Delaware limited liability company (collectively "Caremark"), and the undersigned provider ("Provider") for Pharmacy Services provided by Provider to New Jersey Medicaid or NJ FamilyCare Eligible Persons enrolled with a managed care organization ("Plan Sponsor") contracting with the New Jersey Division of Medical Assistance and Health Services ("DMAHS"). The parties agree that the terms of this Agreement are only applicable to the extent Provider provides Pharmacy Services to New Jersey Medicaid or NJ FamilyCare Eligible Persons enrolled with a Plan Sponsor contracting with DMAHS. Accordingly, Caremark and Provider agree as follows:

1.  **Definitions.** Unless otherwise defined herein, capitalized terms used in the Agreement shall have the meanings set forth in the Glossary of Terms contained in the Provider Manual.

2.  **Credentialing.** Provider represents, warrants, and agrees that as of the date of execution of the Agreement, Provider is and shall maintain in good standing, all federal, state and local licenses and certifications as required by Law. Provider will provide Caremark with the information required from time to time regarding Provider's credentials, including, but not limited to Provider's licensure, accreditation, certification, and insurance, and will comply with and maintain Caremark credentialing standards and requirements.

3.  **Provider Services and Standards.** Unless Provider's professional judgment dictates otherwise, Provider will render to all Eligible Persons the Pharmacy Services to which the Eligible Person is entitled in accordance with the Agreement, the prescriber's directions, the applicable Plan, and applicable Law. Provider will submit all Claims for such Pharmacy Services electronically to Caremark in accordance with the Caremark Documents. Caremark may inspect all records of Provider relating to the Agreement.

4.  **Eligible Person Identification and Cost Share.** Provider will require each person requesting Pharmacy Services to verify that he or she is an Eligible Person. With respect to each Covered Item dispensed to an Eligible Person, Provider will collect from the Eligible Person the applicable Patient Pay Amount communicated to Provider through the Caremark claims adjudication system or other method established by Caremark. Provider will not waive, discount, reduce, or increase the Patient Pay Amount indicated in the Caremark claims adjudication system unless otherwise authorized in writing by Caremark. Except for the collection of the applicable Patient Pay Amount, in no event will Provider seek compensation in any manner from an Eligible Person for Pharmacy Services with respect to a Covered Item.

5.  **Network Participation and Payment.** Provider agrees to participate in the networks identified on the attached Schedule A according to the terms set forth therein. Caremark will pay Provider for Covered Items dispensed to Eligible Persons pursuant to the Agreement in accordance with Schedule A. Any overpayments made to Provider by Caremark may be deducted from amounts otherwise payable to Provider.

6.  **Compliance with Law.** Provider will comply with all applicable Laws, including but not limited to those Laws referenced in the Federal and State Laws and Regulations section (and attached Addendums thereto) set forth in the Provider Manual. Provider shall comply with the requirements of Attachment A (New Jersey Medicaid-Specific Requirements)

7.  **Indemnification.** Provider acknowledges that Provider bears sole responsibility for any liability arising (i) from any actual or alleged malpractice, negligence, misconduct, or breach by Provider in the performance or omission of any act or responsibility assumed by Provider or (ii) in the provision of Pharmacy Services or the sale, compounding, dispensing, manufacturing, or use of a drug or device dispensed by Provider. Provider will indemnify and hold harmless Caremark and Plan Sponsors and their respective shareholders, directors, employees, agents, and representatives from and against any and all liabilities, losses, settlements, claims, injuries, damages, expenses, demands, or judgments of any

*SC*

Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

kind (including reasonable expenses and attorneys' fees) that may result or arise out of (i) any actual or alleged malpractice, negligence, misconduct, or breach by Provider in the performance or omission of any act or responsibility assumed by Provider or (ii) in the provision of Pharmacy Services or the sale, compounding, dispensing, manufacturing, or use of a drug or device dispensed by Provider.

8.  **Limitation on Liability.** In no event will Caremark be liable to Provider for indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business.

9.  **Term.** The Agreement will begin on the date of acceptance by Caremark and will remain in effect until terminated in accordance with the Provider Manual.

10. **Assignment.** Neither party may assign this Agreement without the prior written consent of the other party; provided, however, that Caremark may, without consent, assign this Agreement to any direct or indirect parent, subsidiary, or affiliated company or to a successor company. Any permitted assignee shall assume all obligations of its assignor under this Agreement. This Agreement shall inure to the benefit of and be binding upon each party, its respective successors and permitted assignees.

11. **Entire Agreement.** This Agreement, the Provider Manual, and all other Caremark Documents constitute the entire agreement between Provider and Caremark, all of which are incorporated by this reference as if fully set forth herein and referred to collectively as the "Provider Agreement" or "Agreement". Any prior agreements, promises, negotiations, or representations concerning the subject matter covered by the Agreement are terminated and of no force and effect. Provider's non-compliance with any of the provisions of this Agreement, including the Provider Manual and other Caremark Documents will be a breach of the Provider Agreement. In the event there is a conflict between any of the provisions in this Provider Agreement, the Provider Manual, other Caremark Documents and a provision in an applicable State specific addendum attached to the Federal and State Laws and Regulations section of the Provider Manual, the terms of the applicable State specific addendum shall govern.

12. **Waiver.** Failure to exercise any of the rights granted under the Agreement for any one default will not be a waiver of any other or subsequent default. No act or delay shall be deemed to impair any of the rights, remedies, or powers granted in the Agreement.

13. **Lawful Interpretation and Jurisdiction.** Whenever possible, each provision of the Agreement shall be interpreted so as to be effective and valid under applicable Law. Should any provision of this Agreement be held unenforceable or invalid under applicable Law, the remaining provisions shall remain in full force and effect. With respect to Pharmacy Services provided to New Jersey Medicaid or NJ FamilyCare Eligible Persons enrolled with a Plan Sponsor contracting with DMAHS, and to the extent that state law, rather than federal law, applies, New Jersey state law shall apply and the venue for the resolution of any dispute between Caremark and Provider shall be in New Jersey.

14. **Headings.** The headings of Sections contained in the Agreement are for convenience only and do not affect in any way the meaning or interpretations of the Agreement.



Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

**CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT –
DO NOT DISCLOSE**

By signing below, Provider agrees to the terms set forth above and acknowledges receipt of the Provider Manual.

Chain Name: __AIDS Healthcare Foundation__

NCPDP Chain Code: __A23__     Store

Count: __51__

┌─DocuSigned by:
By: | Scott Carruthers
(Signature of authorized agent)

Scott Carruthers

(Print name of authorized agent)

Date: __10/05/2018__

---

```
******ATTENTION********

PAGES 1, 2, AND 4-14 MUST BE
INITIALED BY AUTHORIZED AGENT
BEFORE CONTRACT WILL BE
ACCEPTED
```

Caremark, L.L.C.

(Signature of authorized agent)

Todd Guinn
By: __VP, Pharmacy Business Relations__

Todd Guinn
Date __VP, Pharmacy Business Relations__

NOV 0 4 2019

CaremarkPCS, L.L.C.

(Signature of authorized agent)

By: __VP, Pharmacy Business Relations__

Todd Guinn
Date __VP, Pharmacy Business Rela__

**NOV 0 4 2019**

┌─DS
| SC

Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

**CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT –
DO NOT DISCLOSE**

# SCHEDULE A
# NETWORK PARTICIPATION AND PAYMENT

This Schedule A is comprised of this Schedule A and all prior and subsequent network addendums and network enrollment forms, all of which are incorporated herein by this reference and referred to collectively as "Schedule A". Provider agrees that it will participate in all Caremark and Plan Sponsor pharmacy networks in which: (1) Provider participates in as of the date of this Agreement; (2) Provider and Caremark have executed a network addendum or network enrollment form as of the date of this Agreement; (3) Provider and Caremark subsequently execute a network addendum or network enrollment form; and (4) Provider agrees to participate as evidenced by its provision of Pharmacy Services to an Eligible Person of a Plan Sponsor utilizing such pharmacy network(s).

Unless otherwise set forth in a network addendum or network enrollment form signed by both parties, claims submitted for a Plan Sponsor participating in an Caremark or Plan Sponsor network will be reimbursed at the lower of: (i) AWP less the applicable AWP Discount plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) gross amount due less the applicable Patient Pay Amount. The applicable AWP Discount and Dispensing Fee will be set forth in the applicable network addendum or network enrollment form. If Provider has not executed and delivered to Caremark a network addendum or network enrollment form, the applicable AWP Discount and Dispensing Fee will be the reimbursement rate as indicated in the adjudication claims system as to such claim. AWP Discounts and Dispensing Fees may be amended in accordance with the terms of the Agreement.

Notwithstanding any other provision in the Provider Agreement, claims (excluding compounded medications) submitted for a Plan Sponsor participating in a Caremark or Plan Sponsor network may be reimbursed at the lower of: (i) Price Type plus an applicable percentage of the Price Type, or minus the applicable percentage of the Price Type, plus the applicable Dispensing Fee less the applicable Patient Pay Amount (or if applicable Price Type is unavailable for a given drug, Caremark will pay Provider based upon AWP minus the applicable AWP Discount plus the applicable Dispensing Fee minus the applicable Patient Pay Amount); (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) Provider's submitted Gross Amount Due less the applicable Patient Pay Amount.



Initial

New Jersey Medicaid Provider Agreement
9-21-2015

# EXHIBIT B-3

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

**CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT –
DO NOT DISCLOSE**

# PROVIDER AGREEMENT

This Provider Agreement (the "Provider Agreement" or "Agreement") is entered into between Caremark IPA, L.L.C., a New York limited liability company ("Caremark"), and the undersigned provider ("Provider") for Pharmacy Services provided by Provider to Eligible Persons enrolled with a health maintenance organization licensed under New York Public Health Law. The parties agree that the terms of this Agreement are only applicable to the extent Provider provides Pharmacy Services to Eligible Persons enrolled with a health maintenance organization licensed under New York Public Health Law. Accordingly, Caremark and Provider agree as follows:

1. **Definitions.** Unless otherwise defined herein, capitalized terms used in the Agreement shall have the meanings set forth in the Glossary of Terms contained in the Provider Manual.

2. **Credentialing.** Provider represents, warrants, and agrees that as of the date of execution of the Agreement, Provider is and shall maintain in good standing, all federal, state and local licenses and certifications as required by Law. Provider will provide Caremark with the information required from time to time regarding Provider's credentials, including, but not limited to Provider's licensure, accreditation, certification, and insurance, and will comply with and maintain Caremark credentialing standards and requirements.

3. **Provider Services and Standards.** Unless Provider's professional judgment dictates otherwise, Provider will render to all Eligible Persons the Pharmacy Services to which the Eligible Person is entitled in accordance with the Agreement, the prescriber's directions, the applicable Plan, and applicable Law. Provider will submit all Claims for such Pharmacy Services electronically to Caremark in accordance with the Caremark Documents. Caremark may inspect all records of Provider relating to the Agreement.

4. **Eligible Person Identification and Cost Share.** Provider will require each person requesting Pharmacy Services to verify that he or she is an Eligible Person. With respect to each Covered Item dispensed to an Eligible Person, Provider will collect from the Eligible Person the applicable Patient Pay Amount communicated to Provider through the Caremark claims adjudication system or other method established by Caremark. Provider will not waive, discount, reduce, or increase the Patient Pay Amount indicated in the Caremark claims adjudication system unless otherwise authorized in writing by Caremark. Except for the collection of the applicable Patient Pay Amount, in no event will Provider seek compensation in any manner from an Eligible Person for Pharmacy Services with respect to a Covered Item.

5. **Network Participation and Payment.** Provider agrees to participate in the networks identified on the attached Schedule A according to the terms set forth therein. Caremark will pay Provider for Covered Items dispensed to Eligible Persons pursuant to the Agreement in accordance with **Schedule A.** Any overpayments made to Provider by Caremark may be deducted from amounts otherwise payable to Provider. Caremark shall handle with Provider any Provider complaints regarding payment issues and concerns.

6. **Compliance with Law.** Provider will comply with all applicable Laws, including but not limited to those Laws referenced in the Federal and State Laws and Regulations section (and attached Addendums thereto) set forth in the Provider Manual.

   **New York State Department of Health Standard Clauses:** "The "New York State Department of Health Standard Clauses for Managed Care Provider/IPA/ACO Contracts", attached to the Agreement as **Appendix A,** are expressly incorporated into this Agreement and are binding upon the Article 44 plans and Providers that contract with such plans, and who are a party to this Agreement. In the event of any inconsistent or contrary language between the Standard Clauses and any other part of the Agreement, including but not limited to, appendices, amendments, and exhibits, the parties agree that the provisions of the Standard Clauses shall prevail, except to the extent applicable law requires otherwise and/or to the extent a provision of the Agreement exceeds the minimum requirements of the Standard Clauses.



Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

**New York State Medicaid**: If Provider furnishes items and services to, or orders, prescribes, refers, or certifies eligibility for, services for individuals eligible to receive Medicaid or Child Health Plus, Provider agrees to enroll in the New York State Medicaid Program by completing and filing the designated enrollment application and providing the required information necessary for enrollment. In the event Provider is terminated from, not accepted to, or fails to submit a designated enrollment application to, the New York State Medicaid Program, Provider agrees that it shall be terminated from participating as a provider in any network of the Plan Sponsor (managed care organization) that serves individuals eligible to receive Medicaid or Child Health Plus.

7. **Indemnification.** Provider acknowledges that Provider bears sole responsibility for any liability arising (i) from any actual or alleged malpractice, negligence, misconduct, or breach by Provider in the performance or omission of any act or responsibility assumed by Provider or (ii) in the provision of Pharmacy Services or the sale, compounding, dispensing, manufacturing, or use of a drug or device dispensed by Provider. Provider will indemnify and hold harmless Caremark and Plan Sponsors and their respective shareholders, directors, employees, agents, and representatives from and against any and all liabilities, losses, settlements, claims, injuries, damages, expenses, demands, or judgments of any kind (including reasonable expenses and attorneys' fees) that may result or arise out of (i) any actual or alleged malpractice, negligence, misconduct, or breach by Provider in the performance or omission of any act or responsibility assumed by Provider or (ii) in the provision of Pharmacy Services or the sale, compounding, dispensing, manufacturing, or use of a drug or device dispensed by Provider.

8. **Limitation on Liability.** In no event will Caremark be liable to Provider for indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business.

9. **Term.** The Agreement will begin on the date of acceptance by Caremark and will remain in effect until terminated in accordance with the Provider Manual.

10. **Assignment.** Neither party may assign this Agreement without the prior written consent of the other party; provided, however, that Caremark may, without consent, assign this Agreement to any direct or indirect parent, subsidiary, or affiliated company or to a successor company. Any permitted assignee shall assume all obligations of its assignor under this Agreement. This Agreement shall inure to the benefit of and be binding upon each party, its respective successors and permitted assignees.

11. **Entire Agreement.** This Agreement, the Provider Manual, and all other Caremark Documents constitute the entire agreement between Provider and Caremark, all of which are incorporated by this reference as if fully set forth herein and referred to collectively as the "Provider Agreement" or "Agreement". Any prior agreements, promises, negotiations, or representations concerning the subject matter covered by the Agreement are terminated and of no force and effect. Provider's non-compliance with any of the provisions of this Agreement, including the Provider Manual and other Caremark Documents will be a breach of the Provider Agreement. In the event there is a conflict between any of the provisions in this Provider Agreement, the Provider Manual, other Caremark Documents and a provision in an applicable State specific addendum attached to the Federal and State Laws and Regulations section of the Provider Manual, the terms of the applicable State specific addendum shall govern.

12. **Waiver.** Failure to exercise any of the rights granted under the Agreement for any one default will not be a waiver of any other or subsequent default. No act or delay shall be deemed to impair any of the rights, remedies, or powers granted in the Agreement.

13. **Lawful Interpretation and Jurisdiction.** Whenever possible, each provision of the Agreement shall be interpreted so as to be effective and valid under applicable Law. Should any provision of this Agreement be held unenforceable or invalid under applicable Law, the remaining provisions shall remain in full force and effect. Unless otherwise mandated by applicable Law, the Agreement will be construed, governed, and enforced in accordance with the laws of the State of New York without regard to choice of law provisions.


Initial

**CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT – DO NOT DISCLOSE**

14.    **Headings.** The headings of Sections contained in the Agreement are for convenience only and do not affect in any way the meaning or interpretations of the Agreement.


By signing below, Provider agrees to the terms set forth above and acknowledges receipt of the Provider Manual.

Chain Name: AIDS Healthcare Foundation

NCPDP Chain Code: A23    Store Count: 51

DocuSigned by:

Scott Carruthers

By: _____3302F8BD924042B..._____
(Signature of authorized agent)

Scott Carruthers

(Print name of authorized agent)

Date: 10/05/2018


Caremark IPA, L.L.C.

_____
(Signature of authorized agent)

Tedd Guinn

By: VP, Pharmacy Business Relations
(Print name of authorized agent)

Date NOV 0 4 2019


************ATTENTION*********

PAGES **1-12** MUST BE INITIALED BY
AUTHORIZED AGENT BEFORE
CONTRACT WILL BE ACCEPTED


DS
SC

Initial

**CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT –
DO NOT DISCLOSE**

# SCHEDULE A
# NETWORK PARTICIPATION AND PAYMENT

This Schedule A is comprised of this Schedule A and all prior and subsequent network addendums and network enrollment forms, all of which are incorporated herein by this reference and referred to collectively as "Schedule A". Provider agrees that it will participate in all Caremark and Plan Sponsor pharmacy networks in which: (1) Provider participates in as of the date of this Agreement; (2) Provider and Caremark have executed a network addendum or network enrollment form as of the date of this Agreement; (3) Provider and Caremark subsequently execute a network addendum or network enrollment form; and (4) Provider agrees to participate as evidenced by its provision of Pharmacy Services to an Eligible Person of a Plan Sponsor utilizing such pharmacy network(s).

Unless otherwise set forth in a network addendum or network enrollment form signed by both parties, claims submitted for a Plan Sponsor participating in an Caremark or Plan Sponsor network will be reimbursed at the lower of: (i) AWP less the applicable AWP Discount and Dispensing Fee less the applicable Patient Pay Amount; (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) gross amount due less the applicable Patient Pay Amount. The applicable AWP Discount and Dispensing Fee will be set forth in the applicable network addendum or network enrollment form. If Provider has not executed and delivered to Caremark a network addendum or network enrollment form, the applicable AWP Discount and Dispensing Fee will be the reimbursement rate as indicated in the adjudication claims system as to such claim. AWP Discounts and Dispensing Fees may be amended in accordance with the terms of the Agreement.

Notwithstanding any other provision in the Provider Agreement, claims (excluding compounded medications) submitted for a Plan Sponsor participating in a Caremark or Plan Sponsor network may be reimbursed at the lower of: (i) Price Type plus an applicable percentage of the Price Type, or minus the applicable percentage of the Price Type, plus the applicable Dispensing Fee less the applicable Patient Pay Amount (or if applicable Price Type is unavailable for a given drug, Caremark will pay Provider based upon AWP minus the applicable AWP Discount plus the applicable Dispensing Fee minus the applicable Patient Pay Amount); (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) gross amount due less the applicable Patient Pay Amount.



Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

# Appendix A

**New York State Department of Health Standard Clauses
For Managed Care Provider/IPA/ACO Contracts**

(Revised April 1, 2017)

Notwithstanding any other provision of this agreement, contract, or amendment (hereinafter "the Agreement" or "this Agreement") the Article 44 plans and Providers that contract with such plans, and who are a party agree to be bound by the following clauses which are hereby made a part of the Agreement. Further, if this Agreement is between a Managed Care Organization and an IPA/ACO, or between an IPA/ACO and an IPA/ACO, such clauses must be included in IPA/ACO contracts with Providers, and Providers must agree to such clauses.

### A.    Definitions for Purposes of this Appendix

"Managed Care Organization" or "MCO" shall mean the person, natural or corporate, or any groups of such persons, certified under Public Health Law Article 44, who enter into an arrangement, agreement or plan or any combination of arrangements or plans which provide or offer a comprehensive health services plan, or a health and long-term care services plan.

"Independent Practice Association" or "IPA" shall mean an entity formed for the limited purpose of contracting for the delivery or provision of health services by individuals, entities and facilities licensed and/or certified to practice medicine and other health professions, and, as appropriate, ancillary medical services and equipment. Under these arrangements, such health care Providers and suppliers will provide their service in accordance with and for such compensation as may be established by a contract between such entity and one or more MCOs. "IPA" may also include, for purposes of this Agreement, a pharmacy or laboratory with the legal authority to contract with other pharmacies or laboratories to arrange for or provide services to enrollees of a New York State MCO.

"Provider" shall mean physicians, dentists, nurses, pharmacists and other health care professionals, pharmacies, hospitals and other entities engaged in the delivery of Health Care Services which are licensed, registered and/or certified as required by applicable federal and state law.

### B.    General Terms and Conditions

1.    This agreement is subject to the approval of the New York State Department of Health (DOH) and if implemented prior to such approval, the parties agree to incorporate into this Agreement any and all modifications required by DOH for approval or, alternatively, to terminate this Agreement if so directed by DOH, effective sixty (60) days subsequent to notice, subject to Public Health Law §4403 (6)(e). This Agreement is the sole agreement between the parties regarding the arrangement established herein.

2.    Any material amendment to this Agreement is subject to the prior approval of DOH, and any such amendment shall be submitted for approval in accordance with the appropriate procedures and timelines described in Sections III and VII of the New York State Department of Health Provider Contract Guidelines for MCOs and IPA/ACOs. To the extent the MCO provides and arranges for the provision of comprehensive Health Care Services to enrollees served by the Medical Assistance Program, the MCO shall notify and/or submit a copy of such material amendment to DOH, as may be required by the Medicaid Managed Care contract between the MCO and DOH.

3.    Assignment of an agreement between an MCO and (1) an IPA/ACO, (2) an institutional network Provider, or (3) a medical group Provider that serves five percent (5%) or more of the enrolled population in a county, or the assignment of an agreement between an IPA/ACO and (1) an institutional Provider or (2) a medical group Provider that serves five percent (5%) or more of the enrolled population in a county, requires the prior approval of the Commissioner of Health.

4.    The Provider agrees, or if the Agreement is between the MCO and an IPA/ACO or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees and shall require the IPA/ACO's Providers to agree, to comply fully and abide by the rules, policies and procedures that the MCO (a) has established or will establish to meet general or specific obligations

SC

Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

placed on the MCO by statute, regulation, contract, or DOH or DFS guidelines or policies and (b) has provided to the Provider at least thirty (30) days in advance of implementation, including but not limited to:

- quality improvement/management;
- utilization management, including but not limited to, precertification procedures, referral process or protocols, and reporting of clinical encounter data;
- member grievances; and
- Provider credentialing.

5. The Provider or, if the Agreement is between the MCO and an IPA/ACO, or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees, and shall require its Providers to agree, to not discriminate against an enrollee based on color, race, creed, age, gender, sexual orientation, disability, place of origin, source of payment or type of illness or condition.

6. If the Provider is a primary care practitioner, the Provider agrees to provide twenty–four (24) hour coverage and back–up coverage when the Provider is unavailable. The Provider may use a twenty–four (24) hour back–up call service provided appropriate personnel receive and respond to calls in a manner consistent with the scope of their practice.

7. The MCO or IPA/ACO that is a party to this Agreement agrees that nothing within this Agreement is intended to, or shall be deemed to, transfer liability for the MCO's or IPA/ACO's own acts or omissions, by indemnification or otherwise, to a Provider.

8. Notwithstanding any other provision of this Agreement, the parties shall comply with the provisions of the Managed Care Reform Act of 1996 (Chapter 705 of the Laws of 1996) Chapter 551 of the Laws of 2006, Chapter 451 of the Laws of 2007, Chapter 237 of the Laws of 2009, Chapter 297 of the Laws of 2012, Chapter 199 of the Laws of 2014, Part H, Chapter 60, of the Laws of 2014 and Chapter 6 of the Laws of 2015 with all amendments thereto.

9. To the extent the MCO enrolls individuals covered by the Medical Assistance Program, this Agreement incorporates the pertinent MCO obligations under the Medicaid Managed Care contract between the MCO and DOH as set forth fully herein, including:

   a. The MCO will monitor the performance of the Provider or IPA/ACO under the Agreement and will terminate the Agreement and/or impose other sanctions if the Provider's or IPA/ACO's performance does not satisfy the standards set forth in the Medicaid Managed Care contract.

   b. The Provider or IPA/ACO agrees that the work it performs under the Agreement will conform to the terms of the Medicaid managed care contract between the MCO and DOH and that it will take corrective action if the MCO identifies deficiencies or areas of needed improvement in the Provider's or IPA/ACO's performance.

   c. The Provider or IPA/ACO agrees to be bound by the confidentiality requirements set forth in the Medicaid Managed Care contract between the MCO and DOH.

   d. The MCO and the Provider or IPA/ACO agree that a woman's enrollment in the MCO's Medicaid Managed Care product is sufficient to provide services to her newborn, unless the newborn is excluded from the enrollment in Medicaid Managed Care or the MCO does not offer a Medicaid Managed Care product in the mother's county of fiscal responsibility.

   e. The MCO shall not impose obligations and duties on the Provider or IPA/ACO that are inconsistent with the Medicaid Managed Care contract or that impair any rights accorded to DOH, the local Department of Social Services, or the United States Department of Health and Human Services.

   f. The Provider or IPA/ACO agrees to provide medical records to the MCO for purposes of determining newborn eligibility for Supplemental Security Income where the mother is a member of the MCO and for quality purposes at no cost to the MCO.

   g. The Provider or IPA/ACO agrees, pursuant to 31 U.S.C. §1352 and CFR Part 93, that no federally appropriated funds have been paid or will be paid to any person by or on behalf of the Provider/IPA/ACO for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of any Member of Congress in connection with the award of any federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative agreement. The Provider or IPA/ACO agrees to complete and submit the "Certification Regarding Lobbying," Appendix attached hereto and incorporated herein, if this Agreement exceeds $100,000. If any funds other than federally appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of a member of Congress, in connection with the award of any federal contract, the making of any federal grant, the making of any federal loan, the entering of any cooperative agreement, or the extension,

_SC_
Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

continuation, renewal, amendment, or modification of any federal contract, grant loan, or cooperative agreement, and the Agreement exceeds $100,000 the Provider or IPA/ACO shall complete and submit Standard Form–LLL "Disclosure Form to Report Lobbying," in accordance with its instructions.

h. The Provider or IPA/ACO agrees to disclose to the MCO, on an ongoing basis, any managing employee who has been convicted of a misdemeanor or felony in relation to the employee's involvement in any program under Medicare, Medicaid or a Title XX services program (block grant programs).

i. The Provider or IPA/ACO agrees to monitor its employees and staff against the List of Excluded Individuals and Entities (LEIE), the Social Security Administration Death Master List, and the National Plan Provider Enumeration System (NPPES).

j. The Provider or IPA/ACO agrees to disclose to the MCO complete ownership, control, and relationship information.

k. The Provider or IPA/ACO agrees to obtain for the MCO ownership information from any subcontractor with whom the Provider has had a business transaction totaling more than $25,000 during the 12–month period ending on the date of the request made by DOH, Office of the Medicaid Inspector General (OMIG) or the United States Department of Health and Human Services (DHHS). The information requested shall be provided to the MCO within thirty-five (35) days of such request.

l. The Provider or IPA/ACO agrees to have an officer, director or partner of the Provider execute and deliver to DOH a certification, using a form provided by DOH through OMIG's website, within five (5) days of executing this agreement, stating that:

　i. The Provider or IPA/ACO is subject to the statutes, rules, regulations, and applicable Medicaid Updates of the Medicaid program and of DOH related to the furnishing of care, services or supplies provided directly by, or under the supervision of, or ordered, referred or prescribed by the Provider. This includes 18 NYCRR 515.2 except to the extent that any reference in the regulation establishing rates, fees, and claiming instructions will refer to the rates, fees and claiming instructions set by the MCO.

　ii. All claims submitted for payment by the Provider/IPA/ACO are for care, services or medical supplies that have been provided.

　iii. Payment requests are submitted in accordance with applicable law.

m. The Provider or IPA/ACO agrees to require that an officer, director or partner of all subcontractors if they are not natural persons, or the subcontractor itself if it is a natural person, execute a certification, using a form provided by DOH through OMIG's website, before the subcontractor requests payment under the subcontract, acknowledging that:

　i. The subcontractor is subject to the statutes, rules, regulations, and applicable Medicaid Updates of the Medicaid program and of DOH related to the furnishing of care, services or supplies provided directly by, or under the supervision of, or ordered, referred or prescribed by the subcontractor. This includes 18 NYCRR 515.2 except to the extent that any reference in the regulation establishing rates, fees, and claiming instructions will refer to the rates, fees and claiming instructions set by the MCO.

　ii. All claims submitted for payment by the subcontractor are for care, services or medical supplies that have been provided.

　iii. Payment requests are submitted in accordance with applicable law.

10. The parties to this Agreement agree to comply with all applicable requirements of the federal Americans with Disabilities Act.

11. The Provider agrees, or if the Agreement is between the MCO and an IPA/ACO or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees and shall require the IPA's Providers to agree, to comply with all applicable requirements of the Health Insurance Portability and Accountability Act, the HIV confidentiality requirements of Article 27–F of the Public Health Law, and Mental Hygiene Law § 33.13.

12. Compliance Program. The Provider agrees that if it claims, orders, or is paid $500,000 or more per year from the Medical Assistance Program, including, in the aggregate, claims submitted to or paid directly by the Medical Assistance Program and/or claims submitted to or paid by any MCO under the Medicaid Managed Care Program, that it shall adopt and implement a compliance program which meets the requirements of New York State Social Services Law § 363–d(2) and 18 NYCRR § 521.3.

13. Compliance Program Certification. The Provider agrees that if it is subject to the requirements of Section B (12) of this Appendix, it shall certify to DOH, using a form provided by OMIG on its website, within thirty (30) days of entering into a Provider Agreement with the MCO, if they have not so certified within the past year that a compliance program

SC

Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

meeting the requirements of 18 NYCRR §521.3 and Social Services Law § 363–d(2) is in place. The Provider shall recertify during the month of December each year thereafter using a form provided by OMIG on OMIG's website.

**C.  Payment and Risk Arrangements**

1.  Enrollee Non–liability. Provider agrees that in no event, including but not limited to, nonpayment by the MCO or IPA/ACO, insolvency of the MCO or IPA/ACO, or breach of this Agreement, shall Provider bill; charge; collect a deposit from; seek compensation, remuneration or reimbursement from; or have any recourse against a subscriber, an enrollee or person (other than the MCO or IPA/ACO) acting on his/her/their behalf, for services provided pursuant to the subscriber contract or Medicaid Managed Care contract and this Agreement, for the period covered by the paid enrollee premium. In addition, in the case of Medicaid Managed Care, Provider agrees that, during the time an enrollee is enrolled in the MCO, Provider will not bill DOH or the City of New York for covered services within the Medicaid Managed Care benefit package as set forth in the Agreement between the MCO and DOH. This provision shall not prohibit the Provider, unless the MCO is a Managed Long–Term Care plan designated as a Program of All–Inclusive Care for the Elderly (PACE), from collecting copayments, coinsurance amounts, or permitted deductibles, as specifically provided in the evidence of coverage, or fees for uncovered services delivered on a fee–for–service basis to a covered person, provided that Provider shall have advised the enrollee in writing that the service is uncovered and of the enrollee's liability therefore prior to providing the service. Where the Provider has not been given a list of services covered by the MCO, and/or Provider is uncertain as to whether a service is covered, the Provider shall make reasonable efforts to contact the MCO and obtain a coverage determination prior to advising an enrollee as to coverage and liability for payment and prior to providing the service. This provision shall survive termination of this Agreement for any reason and shall supersede any oral or written agreement now existing or hereafter entered into between Provider and enrollee or person acting on his or her behalf.

2.  Coordination of Benefits (COB). To the extent otherwise permitted in this Agreement, the Provider may participate in collection of COB on behalf of the MCO, with COB collectibles accruing to the MCO or to the Provider. However, with respect to enrollees eligible for medical assistance or participating in Child Health Plus, the Provider shall maintain and make available to the MCO records reflecting COB proceeds collected by the Provider or paid directly to enrollees by third-party payers, and amounts thereof, and the MCO shall maintain or have immediate access to records concerning collection of COB proceeds.

3.  If the Provider is a health care professional licensed, registered or certified under Title 8 of the Education Law, the MCO or the IPA/ACO must provide notice to the Provider at least ninety (90) days prior to the effective date of any adverse reimbursement arrangement as required by Public Health Law §4406–c(5–c). Adverse reimbursement change shall mean a proposed change that could reasonably be expected to have a material adverse impact on the aggregate level of payment to a health care professional. This provision does not apply if the reimbursement change is required by law, regulation or applicable regulatory authority; is required as a result of changes in fee schedules, reimbursement methodology or payment policies established by the American Medical Association current procedural terminology (CPT) codes, reporting guidelines and conventions; or such change is expressly provided for under the terms of this Agreement by the inclusion or reference to a specific fee or fee schedule, reimbursement methodology, or payment policy indexing scheme.

4.  The parties agree to comply with and incorporate the requirements of Physician Incentive Plan (PIP) Regulations contained in 42 CFR §438.6(h), 42 CFR §422.208, and 42 CFR §422.210 into any contracts between the contracting entity (Provider, IPA/ACO, hospital, etc.) and other persons/entities for the provision of services under this Agreement. No specific payment will be made directly or indirectly under the plan to a physician or physician group as an inducement to reduce or limit medically necessary services furnished to an enrollee.

5.  The parties agree that, where required by Public Health Law §4903, a claim for certain continued, extended, or additional health care services cannot be denied on the basis of medical necessity or a lack of prior authorization while a utilization review determination is pending if all necessary information was provided within the required timeframes and under the circumstances described in Public Health Law §4903.

6.  The parties agree to follow Section 3224–a of the Insurance Law providing timeframes for the submission and payment of Provider claims to the MCO.

7.  The parties agree to follow Section 3224–b(a) of the Insurance Law requiring an MCO to accept and initiate the processing of all claims submitted by physicians that conform to the American Medical Association's Current Procedural Technology (CPT) codes, reporting guidelines and conventions, or to the Centers for Medicare and Medicaid Services' Healthcare Common Procedure Coding System (HCPCS).


Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

8. The parties agree to follow Section 3224–b(b) of the Insurance Law prohibiting an MCO from initiating overpayment recovery efforts more than twenty-four (24) months after the original payment was received by a health care Provider, except where: (1) the plan makes overpayment recovery efforts that are based on a reasonable belief of fraud or other intentional misconduct or abusive billing; (2) for the Medicaid Managed Care and Family Health Plus programs, the overpayment recovery period for such programs is six (6) years from date payment was received by the health care Provider with written notice thirty (30) days prior to engaging in overpayment recovery efforts. Such notice must state the patient's name, service date, payment amount, proposed adjustment, and a reasonably specific explanation of the proposed adjustment.

9. The parties agree to follow Section 3224–c of the Insurance Law providing that claims cannot be denied solely on the basis that the MCO has not received from the member information concerning other insurance coverage.

10. The parties agree that this contract does not waive, limit, disclaim, or in any way diminish the rights that any Provider may have pursuant to Section 3238 of the Insurance Law to the receipt of claims payment for services where preauthorization was required and received from the appropriate person or entity prior to the rendering of the service.

11. The parties agree that for a contract involving Tier 2 or 3 arrangements as described in Section VII.B of the Guidelines, the contract must:
    a. Provide for the MCO's ongoing monitoring of Provider financial capacity and/or periodic Provider financial reporting to the MCO to support the transfer of risk to the Provider; and
    b. Include a provision to address circumstance where the Provider's financial condition indicates an inability to continue accepting such risk; and
    c. Address MCO monitoring of the financial security deposit, describing the method and frequency of monitoring and recourse for correcting underfunding of the deposit to be maintained by the MCO; and
    d. Include a provision that the Provider will submit any additional documents or information related to its financial condition to the MCO, if requested by DOH.

12. The parties agree that for any contract involving an MCO and IPA/ACO, the contract must include provisions whereby:
    a. The parties expressly agree to amend or terminate the contract at the direction of DOH (applies to Tier 1, Tier 2, and Tier 3);
    b. The IPA/ACO will submit annual financial statements to the MCO, as well as any additional documents required by the MCO as necessary to assess the IPA/ACO's progress towards achieving value based payment goals as specified in the Roadmap, and the MCO will notify DOH of any substantial change in the financial condition of the IPA/ACO (applies to Tier 2 and Tier 3); and
    c. The IPA/ACO will submit any additional documents or information related to its financial condition to the MCO, if requested by DOH (applies to Tier 2 and Tier 3); and
    d. The parties agree that all Provider contracts will contain provision prohibiting Providers, in the event of a default by the IPA/ACO, from demanding payment from the MCO for any covered services rendered to the MCO's enrollees for which payment was made by the MCO to the IPA/ACO pursuant to the risk agreement (applies to Tier 2 and Tier 3).

## D. Records and Access

1. Pursuant to appropriate consent/authorization by the enrollee, the Provider will make the enrollee's medical records and other personally identifiable information (including encounter data for government–sponsored programs) available to the MCO (and IPA/ACO if applicable) for purposes including preauthorization, concurrent review, quality assurance, (including Quality Assurance Reporting Requirements (QARR)), payment processing, and qualification for government programs, including but not limited to, newborn eligibility for Supplemental Security Income (SSI) and for MCO/Manager analysis and recovery of overpayments due to fraud and abuse. The Provider will also make enrollee's medical records available to the State for management audits, financial audits, program monitoring and evaluation, licensure or certification of facilities or individuals, and as otherwise required by state law. The Provider shall provide copies of such records to DOH at no cost. The Provider (or IPA/ACO if applicable) expressly acknowledges that the Provider shall also provide to the MCO and the State (at no expense to the State), on request, all financial data and reports, and information concerning the appropriateness and quality of services provided, as required by law. These provisions shall survive termination of the contract for any reason.

2. When such records pertain to Medicaid reimbursable services, the Provider agrees to disclose the nature and extent of services provided and to furnish records to DOH and/or the United States Department of Health and Human Services, the

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

**CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT –
DO NOT DISCLOSE**

County Department of Social Services, the Comptroller of the State of New York, the Office of the Medicaid Inspector General, the New York State Attorney General, and the Comptroller General of the United States and their authorized representatives upon request. This provision shall survive the termination of this Agreement regardless of the reason.

3.  The parties agree that medical records shall be retained for a period of six (6) years after the date of service, and in the case of a minor, for three (3) years after majority or six (6) years after the date of service, whichever is later, or for such longer period as specified elsewhere within this Agreement. This provision shall survive the termination of this Agreement regardless of the reason.

4.  The MCO and the Provider agree that the MCO will obtain consent directly from enrollees at the time of enrollment or at the earliest opportunity, or that the Provider will obtain consent from enrollees at the time of service is rendered or at the earliest opportunity, for disclosure of medical records to the MCO, to an IPA/ACO or to third parties. If the Agreement is between an MCO and an IPA/ACO, or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees to require the Providers with which it contracts to agree as provided above. If the Agreement is between an IPA/ACO and a Provider, the Provider agrees to obtain consent from the enrollee if the enrollee has not previously signed consent for disclosure of medical records.

**E.  Termination and Transition**

1.  Termination or non–renewal of an agreement between an MCO and an IPA/ACO, institutional network Provider, or medical group Provider that serves five percent (5%) or more of the enrolled population in a county, or the termination or non–renewal of an agreement between an IPA/ACO and an institutional Provider or medical group Provider that serves five percent (5%) or more of the enrolled population in a county, requires notice to the Commissioner of Health. Unless otherwise provided by statute or regulation, the effective date of termination shall not be less than forty-five (45) days after receipt of notice by either party, provided, however, that termination by the MCO may be effected on less than forty-five (45) days' notice provided the MCO demonstrates to the satisfaction of DOH, prior to termination, that circumstances exist which threaten imminent harm to enrollees or which result in Provider being legally unable to deliver the covered services and, therefore, justify or require immediate termination.

2.  If this Agreement is between the MCO and a health care professional, the MCO shall provide to such health care professional a written explanation of the reasons for the proposed contract termination, other than non–renewal, and an opportunity for a review as required by state law. The MCO shall provide the health care professional sixty (60) days' notice of its decision to not renew this Agreement.

3.  If this Agreement is between an MCO and an IPA/ACO, and the Agreement does not provide for automatic assignment of the IPA/ACO's Provider contracts to the MCO upon termination of the MCO/IPA/ACO contract, in the event either party gives notice of termination of the Agreement, the parties agree, and the IPA/ACO's Providers agree, that the IPA/ACO Providers shall continue to provide care to the MCO's enrollees pursuant to the terms of this Agreement for 180 days following the effective date of termination, or until such time as the MCO makes other arrangements, whichever occurs first. This provision shall survive termination of this Agreement regardless of the reason for the termination.

4.  Continuation of Treatment. The Provider agrees that in the event of MCO or IPA/ACO insolvency or termination of this contract for any reason, the Provider shall continue, until medically appropriate discharge or transfer, or completion of a course of treatment, whichever occurs first, to provide services pursuant to the subscriber contract or Medicaid Managed Care contract, to an enrollee confined in an inpatient facility, provided the confinement or course of treatment was commenced during the paid premium period. **For purposes of this clause, the term "Provider" shall include the IPA/ACO and the IPA/ACO's contracted Providers if this Agreement is between the MCO and an IPA/ACO.** This provision shall survive termination of this Agreement.

5.  Notwithstanding any other provision herein, to the extent that the Provider is providing Health Care Services to enrollees under the Medicaid Program, the MCO or IPA/ACO retains the option to immediately terminate the Agreement when the Provider has been terminated or suspended from the Medicaid Program.

6.  In the event of termination of this Agreement, the Provider agrees, and, where applicable, the IPA/ACO agrees to require all participating Providers of its network to assist in the orderly transfer of enrollees to another Provider.

**F.  Arbitration**

1.  To the extent that arbitration or alternative dispute resolution is authorized elsewhere in this Agreement, the parties to this Agreement acknowledge that the Commissioner of Health is not bound by arbitration or mediation decisions. Arbitration or



DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

**CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT –
DO NOT DISCLOSE**

mediation shall occur within New York State, and the Commissioner of Health will be given notice of all issues going to arbitration or mediation and copies of all decisions.

G.  **IPA/ACO–Specific Provisions**
1.  Any reference to IPA/ACO Quality Assurance (QA) activities within this Agreement is limited to the IPA/ACO's analysis of utilization patterns and quality of care on its own behalf and as a service to its contractual Providers.



Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

**CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT – DO NOT DISCLOSE**

# Appendix A-1

## CERTIFICATION REGARDING LOBBYING

The undersigned certifies, to the best of his or her knowledge, that:

1. No Federal appropriated funds have been paid or will be paid to any person by or on behalf of the Provider for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of a Member of Congress in connection with the award of any Federal loan, the entering into any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

2. If any funds other than Federal appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress in connection with the award of this Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into any cooperative agreement, or the extension, continuation, renewal, amendment or modification of any Federal contract, grant, loan, or cooperative agreement, and the Agreement exceeds $100,000, the Provider shall complete and submit Standard Form-LLL "Disclosure Form to Reporting Lobby," in accordance with its instructions.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction pursuant to U.S.C. Section 1352. The failure to file the required certification shall subject the violator to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

| | |
|---|---|
| **DATE:** | 10/05/2018 |
| **TITLE:** | Sr. Mgr./Chief Pharmacy Director |
| **PHARMACY; ORGANIZATION:** | AIDS Healthcare Foundation |
| **NCPCP CHAIN CODE(S):** | A23 |
| **NAME:** (PLEASE PRINT) | Scott Carruthers |
| **SIGNATURE:** | *Scott Carruthers* — DocuSigned by: 3302F8BD924042B... |

\*\*\* Please FAX the completed Appendix A-1 page back to Caremark Network Services at 1-866-316-4336. \*\*\*



Initial

# EXHIBIT B-4

# CAREMARK PROVIDER AGREEMENT

This Provider Agreement (the "Provider Agreement" or "Agreement") is entered into between Caremark, L.L.C., a California limited liability company and CaremarkPCS, L.L.C., a Delaware limited liability company (collectively "Caremark"), and the undersigned provider ("Provider"). Caremark and Provider agree as follows:

1. **Definitions.** Unless otherwise defined herein, capitalized terms used in the Agreement shall have the meanings set forth in the Glossary of Terms attached hereto as Appendix A.

2. **Credentialing.** Provider represents, warrants, and agrees that as of the date of execution of the Agreement, Provider is and shall maintain in good standing, all federal, state and local licenses and certifications as required by Law. Provider will provide Caremark with the information required from time to time regarding Provider's credentials, including, but not limited to Provider's licensure, accreditation, certification, and insurance, and will comply with and maintain Caremark credentialing standards and requirements.

3. **Provider Services and Standards.** Unless Provider's professional judgment dictates otherwise, Provider will render to all Eligible Persons the Pharmacy Services to which the Eligible Person is entitled in accordance with the Agreement, the prescriber's directions, the applicable Plan, and applicable Law. Provider will submit all Claims for such Pharmacy Services electronically to Caremark in accordance with the Caremark Documents. Caremark may inspect all records of Provider relating to the Agreement.

4. **Eligible Person Identification and Cost Share.** Provider will require each person requesting Pharmacy Services to verify that he or she is an Eligible Person. With respect to each Covered Item dispensed to an Eligible Person, Provider will collect from the Eligible Person the applicable Patient Pay Amount communicated to Provider through the Caremark claims adjudication system or other method established by Caremark. Provider will not waive, discount, reduce, or increase the Patient Pay Amount indicated in the Caremark claims adjudication system unless otherwise authorized in writing by Caremark. Except for the collection of the applicable Patient Pay Amount, in no event will Provider seek compensation in any manner from an Eligible Person for Pharmacy Services with respect to a Covered Item.

5. **Network Participation and Payment.** Provider agrees to participate in the networks identified on the attached Schedule A according to the terms set forth therein. Caremark will pay Provider for Covered Items dispensed to Eligible Persons pursuant to the Agreement in accordance with Schedule A. Any overpayments made to Provider by Caremark may be deducted from amounts otherwise payable to Provider.

6. **Compliance with Law.** Provider will comply with all applicable Laws, including but not limited to those Laws referenced in Appendix B attached hereto.

7. **Indemnification.** Provider acknowledges that Provider bears sole responsibility for any liability arising (i) from any actual or alleged malpractice, negligence, misconduct, or breach by Provider in the performance or omission of any act or responsibility assumed by Provider or (ii) in the provision of Pharmacy Services or the sale, compounding, dispensing, manufacturing, or use of a drug or device dispensed by Provider. Provider will indemnify and hold harmless Caremark and Plan Sponsors and their respective shareholders, directors, employees, agents, and representatives from and against any and all liabilities, losses, settlements, claims, injuries, damages, expenses, demands, or judgments of any kind (including reasonable expenses and attorneys' fees) that may result or arise out of (i) any actual or alleged malpractice, negligence, misconduct, or breach by Provider in the performance or omission of any act or responsibility assumed by Provider or (ii) in the provision of Pharmacy Services or the sale, compounding, dispensing, manufacturing, or use of a drug or device dispensed by Provider.

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

8.      **Limitation on Liability.** In no event will Caremark be liable to Provider for indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business.

9.      **Term.** The Agreement will begin on the date of acceptance by Caremark and will remain in effect until terminated in accordance with the Provider Manual.

10.     **Assignment.** Neither party may assign this Agreement without the prior written consent of the other party; provided, however, that Caremark may, without consent, assign this Agreement to any direct or indirect parent, subsidiary, or affiliated company or to a successor company. Any permitted assignee shall assume all obligations of its assignor under this Agreement. This Agreement shall inure to the benefit of and be binding upon each party, its respective successors and permitted assignees.

11.     **Entire Agreement.** This Agreement, the Provider Manual, and all other Caremark Documents constitute the entire agreement between Provider and Caremark, all of which are incorporated by this reference as if fully set forth herein and referred to collectively as the "Provider Agreement" or "Agreement". Any prior agreements, promises, negotiations, or representations concerning the subject matter covered by the Agreement are terminated and of no force and effect. Provider's non-compliance with any of the provisions of this Agreement, including the Provider Manual and other Caremark Documents will be a breach of the Provider Agreement. In the event there is a conflict between any of the provisions in this Provider Agreement, the Provider Manual, other Caremark Documents and a provision in an applicable State specific addendum attached to the Federal and State Laws and Regulations section of the Provider Manual, the terms of the applicable State specific addendum shall govern.

12.     **Waiver.** Failure to exercise any of the rights granted under the Agreement for any one default will not be a waiver of any other or subsequent default. No act or delay shall be deemed to impair any of the rights, remedies, or powers granted in the Agreement.

13.     **Lawful Interpretation and Jurisdiction.** Whenever possible, each provision of the Agreement shall be interpreted so as to be effective and valid under applicable Law. Should any provision of this Agreement be held unenforceable or invalid under applicable Law, the remaining provisions shall remain in full force and effect. Unless otherwise mandated by applicable Law, the Agreement will be construed, governed, and enforced in accordance with the laws of the State of Arizona without regard to choice of law provisions.

14.     **Headings.** The headings of Sections contained in the Agreement are for convenience only and do not affect in any way the meaning or interpretations of the Agreement.



Initial

Any changes to this agreement must be initialed.
By signing below, Provider agrees to the terms set forth above and acknowledges receipt of the Provider Manual.

Chain Name: AIDS Healthcare Foundation

NCPDP Chain Code: A23      Store Count: 51

By: _____
    (Signature of authorized agent)
    Scott Carruthers

Scott Carruthers
(Print name of authorized agent)

Date: 10/05/2018

```
******ATTENTION********

PAGES 1, 2, AND 4-14 MUST BE
INITIALED BY AUTHORIZED AGENT
BEFORE CONTRACT WILL BE
ACCEPTED
```

Caremark, L.L.C.

_____
(Signature of authorized agent)

Todd Guinn
By: VP, Pharmacy Business Relations

Date      NOV 0 4 2019

CaremarkPCS, L.L.C.

_____
(Signature of authorized agent)
Todd Guinn
By: VP, Pharmacy Business Relatic

Date      NOV 0 4 2019

SC
Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

# SCHEDULE A
# NETWORK PARTICIPATION AND PAYMENT

This Schedule A is comprised of this Schedule A and all network addendums and network enrollment forms, all of which are incorporated herein by this reference and referred to collectively as "Schedule A". Provider agrees that it will participate in all Caremark and Plan Sponsor pharmacy networks in which: (i) Provider participates in as of the date of this Agreement; (ii) Provider and Caremark have executed a network addendum or network enrollment form as of the date of this Agreement; (iii) Provider and Caremark subsequently execute a network addendum or network enrollment form; and (iv) Provider agrees to participate as evidenced by its provision of Pharmacy Services to an Eligible Person of a Plan Sponsor utilizing such pharmacy network(s).

Unless otherwise set forth in a network addendum or network enrollment form signed by both parties, claims submitted for a Plan Sponsor participating in an Caremark or Plan Sponsor network will be reimbursed at the lower of: (i) AWP less the applicable AWP Discount plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; or (iv) Provider's U&C price less the applicable Patient Pay Amount. The applicable AWP Discount and Dispensing Fee will be set forth in the applicable network addendum or network enrollment form. If Provider has not executed and delivered to Caremark a network addendum or network enrollment form, the applicable AWP Discount and Dispensing Fee will be the reimbursement rate as indicated in the adjudication claims system as to such claim. AWP Discounts and Dispensing Fees may be amended in accordance with the terms of the Agreement.

Notwithstanding any other provision in the Provider Agreement, claims (excluding compounded medications) submitted for a Plan Sponsor participating in a Caremark or Plan Sponsor network may be reimbursed at the lower of: (i) Price Type plus an applicable percentage of the Price Type, or minus the applicable percentage of the Price Type, plus the applicable Dispensing Fee less the applicable Patient Pay Amount (or if applicable Price Type is unavailable for a given drug, Caremark will pay Provider based upon AWP minus the applicable AWP Discount plus the applicable Dispensing Fee minus the applicable Patient Pay Amount); (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) gross amount due less the applicable Patient Pay Amount.



Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

# APPENDIX A

# GLOSSARY OF TERMS

**AWP or Average Wholesale Price** means the current wholesale cost of a given drug as defined in the latest edition of the First DataBank Blue Book, Medi-Span (with supplements), MICROMEDEX, or any other similar nationally recognized reference which Caremark may reasonably select from time to time.

**Confidential Caremark Information** means any nonpublic information or data (including but not limited to products, programs, services, business practices, procedures, MAC lists, reimbursement pricing information, prices paid to Provider for individual claims, or other information acquired from the contents of the Provider Agreement) obtained from or provided by Caremark or any Plan Sponsor to Provider through or in connection with the Provider Agreement that is confidential and proprietary to Caremark.

**Covered Item** means any drug or device covered, in whole or in part, in accordance with and subject to the terms of a Plan covering an Eligible Person.

**Dispensing Pharmacy** means the pharmacy identified by the NCPDP/NPI number under which the claim was submitted to and adjudicated by Caremark and where the Pharmacy Services were provided to the Eligible Person.

**Eligible Person** means a person or animal entitled to a Covered Item pursuant to a Plan.

**Law** means any Federal, State, local or other constitution, charter, act, statute, Law, ordinance, code, rule, regulation, order, specified standards, or objective criteria contained in or which are (by express reference or necessary implication) a condition of granting any applicable permit, license or approval required by Caremark, Provider, or a Plan Sponsor, or other legislative or administrative action of the United States of America, or state or any agency, department, authority, political subdivision or other instrumentality thereof or a decree or judgment or order of a court.

**MAC or Maximum Allowable Cost** means a unit price that has been established as the reimbursement amount to Provider for certain multiple-source drugs without regard to the specific manufacturer whose drug is dispensed.

**Patient Pay Amount** means the amount an Eligible Person must pay to Provider at the time a Covered Item is dispensed as indicated by the claims system, which may include but is not limited to copayments, coinsurance, deductibles, transaction fees, access fees, and/or taxes.

**Pharmacy Services/Provider Services** means all services including the provision of prescription drugs usually and customarily rendered by a Provider licensed to provide pharmacy services in the normal course of business, including services mandated by applicable Law. Pharmacy Services may include, but not be limited to: the maintenance of Eligible Person profiles; the interpretation of prescriptions; the selection of medications and medical devices; the sale of compounding or dispensing of medications and medical devices (also includes over-the-counter medications [OTCs] and supplies covered by or used in conjunction with a pharmacy benefit); the counseling of Eligible Persons, which may consist of information about the proper storage, dosing, side effects, potential interactions and use of the medication dispensed; the monitoring of appropriate drug use; and the implementation of drug utilization review programs and other clinical programs and services.

**Plan** means that portion of Plan Sponsor's pharmacy benefit plan that relates to Covered Items with respect to a group of Eligible Persons.

**Plan Sponsor** means the entity that contracts with Caremark or any of Caremark Rx, L.L.C.'s affiliates for pharmacy benefit management services, which entity could be, among other things, an insurance company, self-insured group, health maintenance organization, preferred provider organization, multi-employer trust or third party administrator.

SC

Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

**Prescriber** means a physician, dentist, physician's assistant, optometrist or other health care professional authorized by law to write prescriptions for prescription drugs.

**Price Type** means a current price of a given drug as defined by a nationally recognized reference that Caremark may reasonably select from time to time, which may include, but is not limited to: AWP (Average Wholesale Price), WAC (Wholesale Acquisition Cost), AMP (Average Manufacturer Price), ASP (Average Sales Price) or DP (Direct Price).

**Third-Party Agreement** means an agreement between Caremark and a Caremark client in which Caremark serves as an auditor for that client's participating network pharmacies.

**Usual and Customary Price or U&C** means the lowest price Provider would charge to a particular customer if such customer were paying cash for an identical prescription on that particular day at that particular location. This price must include any applicable discounts offered to attract customers.

DS
SC
_____
Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

# APPENDIX B

# WASHINGTON-SPECIFIC REQUIREMENTS

In the event any provision in this Agreement conflicts with the terms of this Appendix B, the terms of this Appendix B shall govern. To the extent that Provider provides Pharmacy Services to Eligible Persons enrolled with a health maintenance organization , insurer, carrier, or health care services contractor licensed and regulated under Washington law (collectively and/or individually, "Regulated Entity"), Provider agrees to comply with all requirements for participation as a provider in Washington and all applicable laws relating thereto. Without limiting the generality of the foregoing, and notwithstanding anything in the Provider Agreement to the contrary, Provider agrees as follows:

**Section 3      Provider Services and Standards**

Section 3 **Provider Services and Standards** of the Provider Agreement shall be deleted and replaced with the following:

(a)  Provider agrees to provide Pharmacy Services in accordance with the terms of this Agreement. Provider further agrees to comply with and follow the requirements set forth in the Provider Manual received by Provider from Caremark. Unless Provider's professional judgment dictates otherwise, Provider will render to all Eligible Persons the Pharmacy Services to which the Eligible Person is entitled in accordance with the Agreement, the Prescriber's directions, the applicable Plan, and applicable Law. Provider will submit all claims for such Pharmacy Services electronically to Caremark in accordance with the written directions provided by Caremark.

(b)  Caremark agrees to provide reasonable notice of not less than sixty (60) days of changes to the Agreement and/or Provider Manual that affect Provider's reimbursement and that affect health care service delivery unless changes to federal or state law or regulations make such advance notice impossible, in which case notice shall be provided as soon as possible. Provider may terminate this Agreement without cause pursuant to Section 15(b) of the Agreement if Provider does not agree with the said changes. .

(c)  Provider shall furnish services to Eligible Persons without regard to an Eligible Person's enrollment in a Plan as a private purchaser of the Plan or as a participant in publicly financed programs of health care services.

(d)  Caremark may inspect all records of Provider relating to the Agreement.

(e)  Caremark shall, promptly upon execution of this Agreement, notify Provider of its responsibilities with respect to applicable administrative policies and programs, including, but not limited to, payment terms, utilization review, quality assessment and improvement programs, credentialing, grievance procedures, data reporting requirements, confidentiality requirements and any applicable federal or state requirements, in each case, to the extent not provided in this Agreement.

(f)  Provider agrees to make available its books, records (including health records) to appropriate state and federal governmental authorities involved in assessing the quality of care or investigating the grievances or complaints of Eligible Persons, subject to applicable state and federal Laws related to the confidentiality of medical or health records.

[Wash. Rev. Code § 48.43.505; Wash. Admin. Code § 284-43-320(4), (6) & (8)].

**Section 4      Eligible Person Identification and Cost Share**

Section 4 **Eligible Person Identification and Cost Share** of the Provider Agreement, shall be deleted and replaced with the following:

SĆ

Initial

(a) Provider will require each person requesting Pharmacy Services to verify that he or she is an Eligible Person. The Provider Manual shall contain information for Provider to obtain timely information on the eligibility of Eligible Persons, including any limitations or conditions on services or benefits under the Plans. With respect to each Covered Item dispensed to an Eligible Person, Provider will collect from the Eligible Person the applicable Patient Pay Amount communicated to Provider through the Caremark claims adjudication system or other method established by Caremark. Provider will not waive, discount, reduce, or increase the Patient Pay Amount indicated in the Caremark claims adjudication system unless otherwise authorized in writing by Caremark.

(b) Notwithstanding any provision of the Provider Agreement to the contrary, including the definition of "Patient Pay Amount" in Appendix A, Provider agrees that in no event, including, but not limited to nonpayment by Caremark or Regulated Entity, Caremark's or Regulated Entity's insolvency, or breach of the Provider Agreement shall Provider bill, charge, collect a deposit from, seek compensation, remuneration, or reimbursement from, or have any recourse against an Eligible Person or person acting on their behalf, other than Caremark or Regulated Entity, for services provided pursuant to the Provider Agreement. This provision shall not prohibit collection of deductibles, copayments, coinsurance, and/or noncovered services, which have not otherwise been paid by a primary or secondary carrier in accordance with regulatory standards for coordination of benefits from Eligible Persons in accordance with the terms of the Eligible Person's Plan. Wash. Admin. Code § 284-43-320(2); Wash. Rev. Code §§ 48.44.020(4)(a), (b); 48.46.243(1),(4).

(c) A Provider's willful collection or attempt to collect an amount from an Eligible Person, knowing that collection to be in violation of the Provider Agreement constitutes a class C felony under Wash. Rev. Code § 48.80.030(5). Wash. Admin. Code § 284-43-320(3).

(d) Provider agrees, in the event of Caremark's or Regulated Entity's insolvency, to continue to provide the services promised in the Provider Agreement to Eligible Persons for the duration of the period for which premiums on behalf of the Eligible Person were paid to Regulated Entity or until the Eligible Person's discharge from an inpatient facility, whichever time is greater. Wash. Admin. Code § 284-43-320(2)(b).

(e) Notwithstanding any other provision of the Provider Agreement to the contrary, nothing in this Agreement shall be construed to modify the rights and benefits contained in an Eligible Person's Plan. In the event of any conflict between the Provider Agreement and an Eligible Person's Plan, the benefits, terms, and conditions of the Plan shall govern with respect to coverage provided to Eligible Persons. Wash. Admin. Code § 284-43-320(1), (2)(c).

(f) Provider may not bill an Eligible Person for Covered Item (except for deductibles, copayments, or coinsurance) where Caremark or Regulated Entity deny payments because Provider has failed to comply with the terms or conditions of the Provider Agreement. Wash. Admin. Code § 284-43-320(2)(d).

(g) Provider further agrees that the provisions of paragraphs (b), (d)-(f) of this Section 4 shall survive termination of the Provider Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of the Eligible Person. Provider further agrees that this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and Eligible Persons or persons acting on their behalf. Wash. Admin. Code § 284-43-320(2)(e); Wash. Rev. Code §§ 48.44.020(4)(a); 48.46.243(1).

(h) If Provider contracts with other providers or facilities who agree to provide covered services to Eligible Persons with the expectation of receiving payment directly or indirectly from Caremark or Regulated Entity, such providers or facilities must agree to abide by the provisions of paragraphs (b), (d)-(g) of this Section 4. Wash. Admin. Code § 284-43-320(2)(f).

## Section 5        Network Participation and Payment

Section 5 Network Participation and Payment of the Provider Agreement, shall be deleted and replaced with the following:

(a) Provider agrees to participate in the networks referenced on the attached Schedule A according to the terms set forth therein. Caremark will pay Provider for Covered Items dispensed to Eligible Persons pursuant to the Agreement in accordance with

SC
Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

Schedule A as applicable.

(b) Caremark and Provider agree to satisfy and comply with the provider contract and payment requirements set forth under Chapter 284-43, Sub-Chapter C of the Washington Administrative Code.

(c) Except in cases of fraud or misrepresentation or instances in which Caremark has not been provided reasonable access to information under Provider's control, Caremark shall pay Provider consistent with the following minimum standards: (i) 95% of clean claims received during a month, shall be paid within thirty (30) days of receipt by Caremark; and (ii) 95% of all claims received during a month shall be paid or denied within sixty (60) days of receipt by Caremark, unless otherwise agreed in writing by the parties on a claim-by-claim basis. Caremark shall pay Provider interest at the rate of 1% per month on all undenied and unpaid clean claims more than sixty-one (61) days old and which are not paid in accordance with (i) and (ii) above. For purposes of this Section 5(c), "clean claim" shall mean a claim that has no defect or impropriety, including any lack of required substantiating documentation, or particular circumstances requiring special treatment that prevents timely payments from being made on the claim. Claim denials will include the specific reason for the denial. If the denial is for the failure to meet medical necessity criteria or similar grounds, then upon Provider's request, Caremark will promptly disclose the supporting basis for the decision. Provider has the right to audit Caremark's denial of claims. Wash. Admin. Code § 284-43-321(2)(a).

(d) Except in the case of fraud, or as provided in subsections (1) and (2) below, Caremark may not (i) request a refund from Provider of a payment previously made to satisfy a claim unless it does so in writing within twenty-four (24) months after the date that the payment was made, or (ii) request that a contested refund be paid any sooner than six (6) months after receipt of the request. If Provider fails to contest, in writing, a request made under (i) or (ii) above within thirty (30) days of its receipt, the request shall be deemed accepted and the refund must be paid.

   (1) Caremark shall not, if doing so for reasons related to coordination of benefits with another entity responsible for payment of a claim (i) request a refund from Provider of a payment previously made to satisfy a claim unless it does so in writing within thirty (30) months after the date that the payment was made, or (ii) request that a contested refund be paid any sooner than six (6) months after receipt of the request. If Provider fails to contest, in writing, a request made under (i) or (ii) above within thirty (30) days of its receipt, the request shall be deemed accepted and the refund must be paid.

   (2) Caremark may, at any time, request a refund from Provider of a payment previously made to satisfy a claim if (i) a third party, including a government entity is found responsible for satisfaction of the claim as a consequence of liability imposed by law, and (ii) Caremark is unable to recover directly from the third party because the third party has either already paid or will pay Provider for the services covered by the claim.

   (3) This Section 5(d) does not prohibit Provider from choosing at any time to refund to Caremark any payment previously made to satisfy a claim.

   (4) This Section 5(d) does not apply to claims for services provided under Medicare.

   [Wash. Rev. Code §§ 48.43.005(16); 48.43.600; Chapter 70.127.]

(e) Except in the case of fraud, or as provided in subsection (1) below, Provider may not (i) request additional payment from Caremark to satisfy a claim unless it does so in writing to Caremark within twenty-four (24) months after the date the claim was denied or payment intended to satisfy the claim was made, or (B) request that the additional payment be made any sooner than six (6) months after receipt of the request. Any such request must specify why Provider believes Caremark owes the additional payment.

   (1) Provider may not, if doing so for reasons related to coordination of benefits with another entity responsible for payment of a claim (i) request additional payment from Caremark to satisfy a claim unless it does so in writing to Caremark within thirty (30) months after the date the claim was denied or payment intended to satisfy the Claim was made, or (ii) request that the additional payment be made any sooner than six (6) months after receipt of the request. Any such request must specify why Provider believes Caremark owes the additional payment, and include the name and mailing address of any entity that has disclaimed responsibility for payment of the claim.



Initial

(2) This Section 5(e) does not prohibit Caremark from choosing at any time to make additional payments to Provider to satisfy a claim.

(3) This Section 5(e) does not apply to claims for services provided under Medicare.

[Wash. Rev. Code § 48.43.605]

### Section 11      Entire Agreement

Section 11 **Entire Agreement** of the Provider Agreement is hereby deleted and replaced with the following:

This Agreement constitutes the entire agreement between Provider and Caremark. Provider's non-compliance with any of the provisions in this Agreement will be a breach of the Agreement. In the event there is a conflict between any of the provisions in this Agreement or Provider Manual and a provision in Appendix B of this Agreement, the terms of Appendix B shall govern.

### Section 13      Lawful Interpretation and Jurisdiction

Section 13 **Lawful Interpretation and Jurisdiction** of the Provider Agreement is hereby deleted and replaced with the following:

Whenever possible, each provision of this Agreement shall be interpreted so as to be effective and valid under applicable Law. Should any provision of this Agreement be held unenforceable or invalid under applicable Law, the remaining provisions shall remain in full force and effect. Unless otherwise mandated by applicable law, this Agreement will be construed, governed and enforced in accordance with the laws of the State of Washington without regard to choice of law provisions.

### Section 15      Term and Termination

A new Section 15 **Term and Termination** of the Provider Agreement is hereby added to the Agreement:

(a) Termination for Cause

(1) If Provider fails to meet any of the credentialing requirements or breaches any of the terms set forth in the Provider Agreement, Caremark may immediately terminate the Provider Agreement.

(2) Provider must abide by the provisions and terms set forth in the Provider Agreement. Nonadherence to any of the provisions set forth in the Provider Agreement, is a breach of the Provider Agreement and subject to immediate termination and other remedies.

(3) Caremark may immediately terminate the Provider Agreement if: (i) unless otherwise precluded by Law, Provider makes an assignment for the benefit of creditors, files a petition in bankruptcy (whether voluntary or involuntary), is adjudicated insolvent or bankrupt, a receiver or trustee is appointed with respect to a substantial part of its property or a proceeding is commenced against it which will substantially impair its ability to perform the Provider Agreement; (ii) any court, governmental, or regulatory agency issues to Provider an order to cease and desist from providing Pharmacy Services; (iii) ownership of Provider is transferred to a new owner, or if the right to control the operation of the business of Provider is transferred to a different person or entity; or (iv) a levy, writ of garnishment, attachment, execution or similar item is served upon Provider and not removed within ten (10) days from the date of service.

(4) Caremark may in its sole and absolute discretion terminate the Provider Agreement if Caremark has reason to believe that Provider has engaged in, or is engaging in, any behavior which (1) appears to pose a significant risk to the health, welfare, or safety of Eligible Persons or general public; (2) implies a failure to maintain proper licensure and related requirements for licensure; or (3) otherwise reflects negatively upon the Provider's ability to fulfill the requirements of the Provider Agreement.



Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

(5) These termination rights are in addition to any and all other rights and remedies that may be available to Caremark under the Provider Agreement or at Law or equity.

(6) The terms of this Termination for Cause section apply notwithstanding any other provision in the Provider Agreement.

(b) Termination without Cause

(1) Caremark may at any time terminate the Provider Agreement without cause upon sixty (60) days notice to Provider or such longer time as required by Law.

(2) Caremark may terminate Provider from participating in providing Pharmacy Services to specific Plans without cause upon sixty (60) days (or such longer time as required by Law ) notice to Provider, regardless of the network(s) in which Provider participates.

(3) Provider may terminate the Provider Agreement without cause upon sixty (60) days' (or such longer time as required by Law) prior written notice to Caremark. Except as otherwise may be required with respect to any Caremark national network, Regulated Entity-specific network, or applicable Law, Provider may terminate participation in any Caremark national network or Regulated Entity-specific network by giving Caremark sixty (60) days' prior written notice specifying the date of termination and the name(s) of the national network(s) or Regulated Entity-specific network(s) in which Provider will no longer participate. Absent the prior written consent of Caremark, Provider may not elect to participate in a Caremark national network or Regulated Entity-specific network for thirty (30) days following Provider's termination of participation in such network.

(4) The terms of this Termination without Cause section apply notwithstanding any other provision in the Provider Agreement.

(c) Rights and Remedies in the Event of Termination or Breach

(1) In the event of a termination of the Provider Agreement with Caremark for any reason, Provider must surrender the Provider Agreement, Provider Manual, other materials related to products, programs, services, and Plan Sponsor announcements provided by Caremark to Provider or in Provider's possession or control.

(2) In the event Provider breaches any provision of the Provider Agreement, in addition to all other termination rights, Caremark shall have the right to (i) suspend any and all obligations of Caremark under and in connection with the Provider Agreement, (ii) impose reasonable handling, investigation and/or improper use fees, and/or (iii) offset against any amounts owed to Provider under the Provider Agreement (including amounts that are paid to Caremark on behalf of a Plan Sponsor) or under any other agreement between Caremark and Provider, any amounts required to be paid by Provider to Caremark. These rights and remedies are in addition to any other rights and remedies that may be available to Caremark under the Provider Agreement or at Law or equity.

(3) In the event that this Agreement is terminated, Caremark shall make a good faith effort to assure that written notice of termination is provided to all Eligible Persons seen by Provider on a regular basis within fifteen (15) business days of receipt or issuance of the notice of termination.

[Wash. Admin. Code § 284-43-320(7)]

Initial

DocuSign Envelope ID: A860D0A9-7F47-4037-B751-E602B356CB0F

**Section 16        Dispute Resolution**

A new Section 16 **Dispute Resolution,** is hereby added to the Agreement:

In the event of a dispute between Caremark and Provider, a fair, prompt and mutual dispute resolution process shall be used consisting of the following: (A) the parties shall hold an initial meeting at which all parties are present or represented by individuals with authority regarding the matters in dispute; the meeting shall be held within thirty (30) days after the issuance by a party of a notice of dispute, unless the parties otherwise agree in writing to a different schedule; (B) if, within thirty (30) days following the initial meeting, the parties have not resolved the dispute, the dispute shall be submitted to non-binding mediation directed by a mediator who is mutually agreeable to the parties and who is not regularly under contract to or employed by either of the parties; (C) if, after a period of 60 days following commencement of mediation, the parties are unable to resolve the dispute, either party may initiate non-binding arbitration or pursue any other remedy available at law. Wash. Rev. Code § 48.43.055; Wash. Admin. Code §§ 284-43-320(11); 284-43-322.

SC

_____
Initial

# EXHIBIT C





kwiktag®   012 533 172

## AGENCY ADDENDUM TO
## Caremark PROVIDER AGREEMENT

This agency addendum to the Caremark Provider Agreement (the "Addendum") is entered into between Caremark, and the undersigned provider ("Provider") and shall become effective, and binding on the Provider as of ___3-1_____, 20_07_ (the "Effective Date").

## RECITALS:

A.   Caremark and Provider have previously entered in that certain Caremark Provider Agreement (the "Provider Agreement"), Capitalized terms not defined herein shall have the meanings used in the Provider Agreement.

B.   Caremark and the administrator identified on the signature page of this Addendum ("Administrator") have entered into an administrator agreement (the "Administrator Agreement") whereby Administrator, pursuant to various agency addenda, has been designated an attorney-in-fact for certain providers to perform certain functions under the Provider Agreement on providers' behalf as set forth in the Administrator Agreement and the agency addenda. A copy of the Administrator Agreement is attached as Exhibit "A."

C.   Caremark and Provider wish to amend the Provider Agreement so as to designate Administrator as its attorney-in-fact to perform certain functions under the Provider Agreement on Provider's behalf as set forth in the Administrator Agreement and this Addendum.

Now, therefore, Caremark and Provider agree as follows:

1.   **Appointment of Attorney-in-Fact.** Provider hereby appoints and designates Administrator as its attorney-in-fact to perform those functions set forth in the Administrator Agreement, including, without limitation, (i) enrolling and disenrolling Provider in one or more Caremark Networks, (ii) receiving certain notices, documents, information and materials required by or related to the Provider Agreement, including, without limitation, any amendments contemplated by the Provider Agreement (collectively, the "Caremark Information") and (iii) entering into amendments to the Provider Agreement on Provider's behalf. Provider acknowledges that, while this Addendum is in effect, (i) Administrator shall have the sole authority to enroll or disenroll Provider in a Caremark Network and (ii) Provider's enrollment or nonenrollment in a Caremark Network is subject to the terms of the Administrator Agreement.

(a)   **Central Payment:** Provider hereby appoints Administrator as its agent to receive all payments that Caremark may make from time to time for the Pharmacy Services performed by Provider pursuant to the Provider Agreement ("Central Payment"). The Central Payment is an aggregate payment representing amounts payable to all providers, including the undersigned Provider, who are participating in a Central Payment arrangement with Administrator. Caremark may offset against all or any portion of a Central Payment amounts owed by a provider other than the undersigned Provider, including without limitation, amounts owed as a result of audit recoveries, claims reversals or adjustments, or fees. Provider acknowledges that reconciliation of amounts paid under a Central Payment will be the sole responsibility of Administrator as Provider's agent.

LeaderNet Central-Pay AGENCYADD.DOC   07-21-06                                                                Page 1
This document contains proprietary information of Caremark and may not be used for any purpose other than to evaluate entering into a relationship with Caremark, nor may it be duplicated or disclosed to others for any purpose. Caremark may change this document from time to time at its discretion.



RECEIVED
MAR – 6 2007
By_____

2. **Delivery of Caremark Information to Administrator.** Provider acknowledges that Caremark may deliver any and all Caremark Information directly to Administrator on Provider's behalf. To the extent applicable to certain Caremark Information, Caremark shall deliver such Caremark Information to Administrator in the manner and within the time frame required by the Provider Agreement. Provider hereby waives the requirements in the Provider Agreement that Caremark shall deliver such Caremark Information to Provider in the manner and within the time frame required by the Provider Agreement. Provider acknowledges that, in accordance with the Administrator Agreement, Administrator has undertaken to promptly furnish to Provider all Caremark Information furnished to Administrator by Caremark for distribution to Provider. Nothing in this Section 2 shall limit Caremark's right communicate with, or provide the Caremark Information directly to, Provider.

3. **Termination of Appointment of Attorney-in-Fact.** Commencing with the Effective Date, the above appointment and designation shall remain in effect until ten (10) days after Provider notifies Administrator of Provider's wish to terminate this Addendum pursuant to the notice procedures set forth in the Caremark Agreement. Caremark shall not accept notice to terminate this Addendum from Provider and will only accept notice of termination from the Administrator. Additionally, at the same time Provider notifies Administrator of Provider's wish to terminate this Addendum, Administrator shall notify Caremark pursuant to the notice procedures set forth in the Administrator Agreement.

4. **Disclosure of Information.** While this Addendum is in effect, Provider authorizes both Caremark and Administrator to make available any and all information regarding Provider to Caremark or Administrator, as the case may be, to the extent necessary for Caremark or Administrator to perform its obligations under the Administrator Agreement.

5. **Fees Charged to Participating Providers.** Caremark shall assess Provider a charge of thirty-five dollars ($35.00) to enroll in Administrator's program. Enrollment fees shall be setoff against the Central Payment.

6. **Indemnification.** Provider agrees to indemnify and hold Caremark, its shareholders, directors, employees, agents and representatives free and harmless for, from and against any and all liabilities, losses, settlements, claims, demands, and expenses of any kind (including attorneys' fees and costs), that may result or arise out of any breach of, any negligence or misconduct of Administrator in the performance of, or omission of, any act or responsibility assumed by Administrator under the Administrator Agreement.

7. **Other Provider Agreement Provisions.** Except as expressly amended by this Addendum, all other provisions of the Provider Agreement shall continue in full force and effect.

8. Entire Agreement. This Addendum, its schedules and exhibits, contain the entire agreement between Provider and Caremark with respect to the subject matter contained in this Addendum. This Addendum supersedes that Acknowledgment and Agreement entered into by and between Provider and Caremark.

[This space left intentionally blank.]

LeaderNet Central-Pay AGENCYADD.DOC 07-21-06            Page 2

This document contains proprietary information of Caremark and may not be used for any purpose other than to evaluate entering into a relationship with Caremark, nor may it be duplicated or disclosed to others for any purpose. Caremark may change this document from time to time at its discretion.

RECEIVED

MAR – 6 2007

By

IN WITNESS WHEREOF, the parties have caused this Addendum to be executed by their respective officers or representatives duly authorized so to do effective as of the date set forth above.

**Provider Info: (Please Print)**                    **Caremark Inc.**

Date:          _2-28-07_

Provider Name: _AIDS HEALTHCARE FOUNDATION_    ~~GREGORY MADSEN, SVP RETAIL SERVICES~~
_dba AHF PHARMACY_                              Gregory Madsen, SVP Retail Services

NCPDP #:       _0569496_                         **Caremark PCS**

Address:       _4835 Van Nuys Blvd. #200_
               _Sherman Oaks, CA 91403_          GREGORY MADSEN, SVP RETAIL SERVICES
                                                 Gregory Madsen, SVP Retail Services

Phone:         _(818) 986-2642_

Fax:           _(818) 783-7781_

State Medicaid # _P4A 45690_

DEA #          _BA7623386_

State License # _PHY 45649_

Federal Tax ID # _954112121_

Printed Name:  _PATRICK CONTRADO_

Title:         _NATIONAL PHARMACY DIRECTOR_

Signature:     _Patrick J Contrado_

ADMINISTRATOR HEREBY AGREES AND CONSENTS TO THE ABOVE APPOINTMENT AND DESIGNATION.

**Administrator**

Date:          _3-1-07_

Administrator  Leader Drug Stores, Inc. d/b/a LeaderNET
Name:

By:            Pamela L. Bufe', Manager Managed Care

Signature:     _Pamela L. Bufe'_

RECEIVED
MAR - 6 2007
By_____

LeaderNet Central-Pay AGENCYADD.DOC   07-21-06                           Page 3
This document contains proprietary information of Caremark and may not be used for any purpose other than to evaluate entering into a relationship with Caremark, nor may it be duplicated or disclosed to others for any purpose. Caremark may change this document from time to time at its discretion.

Exhibit "A"

[attach copy of Administrator Agreement]



This document contains proprietary information of Caremark and may not be used for any purpose other than to evaluate entering into a relationship with Caremark, nor may it be duplicated or disclosed to others for any purpose.  Caremark may change this document from time to time at its discretion.

# EXHIBIT D

▼**CVS** caremark®

March 8, 2019

Dear Pharmacy Provider:

Please find the enclosed Network Enrollment Form for the following network:

- Medicare Part D Retail Network 72 Performance Network Program

The Network Enrollment Form is included on page two of this notification. The Network Enrollment Form will apply to all Covered Items as indicated by a Plan's dispensing limitations for all its plan members.

**If you would like to be enrolled as a provider in Medicare Part D Retail Network 72 Performance Network Program, effective January 1, 2020, complete the form and submit to CVS Caremark® no later than April 7, 2019.**

**CVS Caremark**
**Network Enrollment**
**FAX: 480-314-8205**

Please note that upon your agreement to participate in this network, your participation is for the entire applicable plan year unless you terminate with cause as in accordance with the Provider Manual

If you have questions, please contact CVS Caremark Network Services at 1-866-488-4708.

Thank you,

CVS Caremark Network Services

The recipient of this fax may make a request to opt-out of receiving telemarketing fax transmissions from CVS Caremark. There are numerous ways you may opt-out: The recipient may call the toll-free number at 877-265-2711 and/or fax the opt-out request to 401-652-0893, at any time, 24 hours a day/7 days a week. The recipient may also send an opt-out request via email to do_not_call@cvscaremark.com. An opt out request is only valid if it (1) identifies the number to which the request relates, and (2) if the person/entity making the request does not, subsequent to the request, provide express invitation or permission to CVS Caremark to send facsimile advertisements to such person/entity at that particular number. CVS Caremark is required by law to honor an opt-out request within thirty days of receipt. An opt out request will not opt you out of purely informational, non-advertisements, Caremark pharmacy communications such as new implementation notices, formulary changes, point-of sale issues, network enrollment forms, and amendments to the Provider Manual.

This communication and any attachments may contain confidential information. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution, or copying of it or its contents, is prohibited. If you have received this communication in error, please notify the sender immediately by telephone and destroy all copies of this communication and any attachments. This communication is a Caremark Document within the meaning of the Provider Manual.

**Network Enrollment Form**
**Medicare Part D Retail Network 72**
**Performance Network Program**

The undersigned hereby enrolls as a provider in the Medicare Part D Retail Network stated below, effective January 1, 2020, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein.

For the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fees are as follows:

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | **Brand** | **Generic** | |
| **Medicare Part D Retail Network 72 – Performance Network Program** | **12.0%\*** | **25.0%** | **$0.50** |
| 1-90 Days Supply | | | |

\* In the event changes are made to the Medicare Part D rules that impact this Medicare Part D Retail Network 72 Performance Network Program, and Caremark determines in its sole discretion that such changes make the continuation of the Program infeasible, Caremark reserves the right to discontinue the Program and, unless otherwise notified, the **AWP Brand Discount above (12.0%) will no longer apply and the new AWP Brand Discount will be 19.5%,** and the network variable rate, the associated Retail Performance Network Program Information, the attached Specialty Drug Reimbursement Addendum (SDRA) will all no longer apply, and a replacement SDRA will be issued.

- Other reimbursement terms may apply as set forth in an addendum to the Provider Agreement for a pharmacy that is not a **"Retail Pharmacy"** (as that term is defined in the "Standards of Operation" section of the Provider Manual ) participating in this retail network.

- For Caremark contracted chains and affiliations/PSAOs (Pharmacy Services Administration Organization), the above reimbursement rates and program terms apply to all retail pharmacies.

- To ensure adequate access to network pharmacies for Part D Enrollees, Provider agrees to participate in the Medicare Part D network identified above for the entire applicable Part D plan year and may only terminate network participation as in accordance with the "Termination" section of the Provider Manual and the *"Network Participation"* sub-section of the *"Medicare Part D"* section of the Provider Manual.

**Retail Performance Network Program Information**
- Provider will be charged a network variable rate to the Plan Sponsors that will range from **7.5% to 9.5%** for each brand product total ingredient cost paid and **14% to 16%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. The network variable rate amount and the annual performance payment will be calculated individually for each pharmacy.

- Provider may be eligible for a performance payment after the plan year based on Provider's annual performance score with respect to the performance criteria. The Retail Performance Network Program is based on two parts – performance effort (Pay per Intervention – **PPI**) and performance outcome (Performance Payment - **PP**) with the end result focused **solely** on performance outcome. PPI payments (excluding CMR payments) made for effort that exceed the annual PP may be recovered from pharmacies as part of the final plan year collection period. If the PP exceeds the PPI payments, the PP will be paid approximately after the final collection period which occurs in the first half of the next plan year.

- Caremark may modify the performance criteria and/or criteria weighting to align with a change in CMS Star measures.

- Provider shall disclose to enrollees and prescribers that Provider is working with the Part D Plan Sponsor to improve enrollee adherence and compliance with current clinical guidelines, and that Provider is receiving a payment from the Plan Sponsor for Provider's performance under this program. Provider shall advise Part D Enrollees and prescribers that participation is voluntary; that this program is not intended to substitute for the judgment of the prescriber; prescribers are not obligated to prescribe any medications for enrollees; and that Part D Enrollees are not obligated to obtain the new medication.

- The reimbursement rates for certain specialty drugs dispensed by any Provider in this Retail Performance Network Program are specified in the attached Specialty Drug Reimbursement Addendum.

—DS
SC ___Initial

## DO NOT DISCLOSE

IN WITNESS WHEREOF, the parties hereto have caused this Network Enrollment Form, which constitutes an addendum to the Caremark Provider Agreement, to be executed by their respective officers or representatives duly authorized so to do. By signing below, Provider agrees to become a participant in the Caremark Network(s). Further, the parties understand and agree that all the terms and conditions established in the Caremark Provider Agreement shall apply to Pharmacy Services provided hereunder. Capitalized terms not defined herein shall have the meanings used in the Caremark Provider Agreement. This Network Enrollment Form constitutes the entire agreement of the parties with respect to the subject matter of this Network Enrollment Form, and supersedes any and all other agreements, writings, and understandings with respect to the subject matter of this Network Enrollment Form. The terms of this Network Enrollment Form supersedes any conflicting term in the Caremark Provider Agreement.   .

| Provider Info: (Please Print) |
|---|

AIDS Healthcare Foundation, dba AHF Pharmacy
Provider Name

NCPDP Chain Code A23 / CVS Caremark Chain Code 7023
Chain Code / Affiliation Code / NCPDP#                                    NPI#

Scott Carruthers
Name of Owner / Authorized Agent (if not owner)

─DocuSigned by:

*Scott Carruthers*                                                  Sr. Manager / Chief Pharmacy Officer
Provider Signature                                                Title
───2CA7FDD2A94E2───

Caremark Signature                                              Title

Date of Acceptance by Caremark        Bill Wellman                11/20/2020
                                      VP, Network Services

**DO NOT DISCLOSE**

## Exhibit A – Medicare Part D Retail Network 72 – Performance Network Program

### Performance Criteria

| Exhibit A: Performance Criteria | | | |
|---|---|---|---|
| **Performance Criteria** | **Criteria Weight** | **Performance Criteria** | **Criteria Weight** |
| 1. RAS Antagonist Adherence | | 4. GAP Therapy (Statin) | 10% |
| 2. Statin Adherence | 75% | 5. CMR Completion Rate (MTM) | 10%[1] |
| 3. Diabetes Adherence | | 6. Formulary Compliance | 5% |
| **4. Specialty Adherence, if applicable** | | | |

1 If a Part D Plan does not enroll in the CVS Caremark MTM (Medication Therapy Management) program, and/or is selected to participate in the Enhanced MTM pilot in specific regions, the CMR (Comprehensive Medication Review) measure may be eliminated from applicable pilot regions, and the 10% weighting will be re-distributed to #1–3 Adherence criteria for a total of 85%.

### Specialty Adherence Component

For pharmacies with **greater than 25% (>25%) claims** for specialty drugs in any given trimester for a Part D Plan, the **Overall Adherence Measure** will include a specialty drug component (using specialty drug adherence criteria based on therapeutic classes), in addition to the other adherence criteria.



The specialty drug component will be allocated as **a portion of the overall 75% adherence weight**, proportionate to the percentage of claims for specialty drugs among all claims dispensed for a Part D Plan during a trimester. For example, in the pie chart, if claims for specialty drugs are 40% of all claims dispensed, then the **specialty drug component** will be allocated as **40% of the 75%** overall adherence measure (i.e., **30%**).

### Measurement, Calculation and Collection Periods

Network variable rates will be calculated retrospectively, after claims are processed and pharmacy performance measurement occurs. The variable rate is derived using each pharmacy's performance score for that measurement period and is calculated by Part D plan, by network for each network in which your pharmacy participates. The PQS measurement data for the measurement periods ending **April 2020, August 2020,** and **December 2020,** are considered the **final measurements** utilized to determine each pharmacy's individual performance score for the respective trimester.

| Measurement, Calculation and Collection Periods | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Month** | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr |
| **Year** | 2019 | | | | | | 2020 | | | | | | | | 2021 | | | |
| **1st Trimester** | | | Applicable Claims | | | Calculation* | Collection | | | | | | | | | | | |
| | | | Performance Measurement | | | | | | | | | | | | | | | |
| **2nd Trimester** | | | | | | | Applicable Claims | | | Calculation* | Collection | | | | | | | |
| | | | | | Performance Measurement | | | | | | | | | | | | | |
| **3rd Trimester** | | | | | | | | | | Applicable Claims | | | Calculation* | Collection | | | | |
| | | | | | | Performance Measurement | | | | | | | | | | | | |

**Performance Measurement**: A time period consisting of 6 months' retrospective view for trimester 1, and year-to-date retrospective view for trimesters 2 and 3—i.e., 8 and 12 months respectively—from which claims are provided to PQS (Pharmacy Quality Solutions) to include in its measurement.

**Applicable Claims**: The eligible claims within a given trimester in which the network variable rate will be applied. **Pharmacies should accrue in preparation for the collection period.**

**Calculation**: Time period immediately following a given trimester where performance scores are calculated, pharmacies are ranked among all participating pharmacies to derive each pharmacy's network variable rate by plan within each network, and applicable claims are multiplied by each network variable rate achieved by the pharmacy to determine the final amount to be collected for a trimester. *The approximate time pharmacies will be able to view PQS performance measures used in the calculation in EQuIPP™ (Electronic Quality Platform for Plans and Pharmacies) —PQS' dashboard.

**Collection**: Approximate time period following the calculation period during which the total amount due for a trimester will be collected. Collection of fees will be proportional by date of fill over an 8-week period. Detail will be provided for each applicable claim contributing to the total amount collected.

**DO NOT DISCLOSE**

### Specialty Drug Reimbursement Addendum
### Medicare Part D Retail Networks
### Performance Network Programs

Provider and Caremark agree to amend the network enrollment form ("NEF") listed below to specify the reimbursement rates and other terms for certain specialty drugs.  All other terms of the network enrollment form not amended by this Specialty Drug Reimbursement Addendum ("Reimbursement Addendum") shall remain in full force and effect, subject to the modifications set forth in this Reimbursement Addendum:

- Medicare Part D Retail Network 72 – Performance Network Program

- **Attachment A**, incorporated herein by reference, reflects the brand AWP Discount, for the specified brand specialty drug and whether a network variable rate will apply. For specialty drugs not listed in **Attachment A**, the network AWP Discount for non-specialty drugs shall apply, in addition to the network variable rate.

- Caremark may amend **Attachment A** upon prior written notice to Provider, including but not limited to, amending the brand AWP Discount for a specialty drug, or adding or removing a specialty drug from Attachment A in response to changes in the marketplace (e.g., changes in multi-source code, new to market, changes in exclusive or limited distribution status, formulary status, generic or biosimilar availability, GPI alignment).

- New-to-market specialty drugs will be reimbursed at the network non-specialty drug reimbursement rate (along with application of the network variable rate) until such time as Caremark provides written notice to Provider, prior to each trimester, of the new-to-market specialty drug's addition, if applicable, to **Attachment A** to reflect the specialty drug's brand AWP Discount and applicability of the network variable rate as of that trimester; provided that  new-to-market specialty drugs or a new brand NDC for a specialty drug listed in **Attachment A** whose GPI aligns with the GPI used for adjudication (as determined by Caremark) with an existing drug in **Attachment A** will be reimbursed at the reimbursement rate (and network variable rate, as applicable) for the existing **Attachment A** drug.

- A new brand NDC for a specialty drug listed in **Attachment A** whose GPI does NOT align with the GPI used for adjudication (as determined by Caremark) with an existing specialty drug in **Attachment A** will be reimbursed at the network AWP Discount for non-specialty drugs, in addition to application of the network variable rate, until notice is provided and a trimester revision to **Attachment A** becomes effective.

- If Provider gains access to an exclusive distribution specialty drug already in the marketplace, Provider's reimbursement rate will be at the existing reimbursement rate in place with the provider who had exclusive distribution rights for that exclusive distribution drug.

- Inclusion of a specialty drug in **Attachment A** is not indicative of coverage under a Plan's prescription benefit.

- Notwithstanding anything to the contrary in **Attachment A**, the brand AWP Discount and applicability of the network variable rate as reflected in **Attachment A** do not apply for specialty drugs with a multi-source code of "O". Upon a multi-source code change from an "N" or "M" to an "O" (which may occur when a generic equivalent becomes available), the network non-specialty drug reimbursement rate (along with application of the network variable rate) will apply and the drug will be removed from **Attachment A**, without notice to Provider.



Initial

## Attachment A

| THERAPEUTIC CLASS | DRUG NAME | EXCLUDED FROM NETWORK VARIABLE RATE "N" = No "Y" = Yes | AWP DISCOUNT Network 72 |
|---|---|---|---|
| ACROMEGALY | SOMAVERT | N | 8.42% |
| ALCOHOL/OPIOID DEPENDENCY | SUBLOCADE | Y | 14.20% |
| ALLERGEN IMMUNOTHERAPY | ORALAIR | N | 6.67% |
| ALPHA-1 ANTITRYPSIN DEFICIENCY | ARALAST NP | Y | 18.24% |
| ALPHA-1 ANTITRYPSIN DEFICIENCY | GLASSIA | Y | 18.24% |
| ALPHA-1 ANTITRYPSIN DEFICIENCY | ZEMAIRA | Y | 18.24% |
| AMYLOIDOSIS | ONPATTRO | Y | 13.33% |
| ANEMIA | MIRCERA | N | 7.65% |
| ASTHMA | CINQAIR | N | 7.32% |
| ASTHMA | FASENRA | N | 7.32% |
| ASTHMA | NUCALA | N | 9.18% |
| BOTULINUM TOXINS | DYSPORT | N | 9.29% |
| COAGULATION DISORDERS | CEPROTIN | Y | 16.00% |
| CONTRACEPTIVES | LILETTA | Y | 13.00% |
| CONTRACEPTIVES | MIRENA | N | 1.09% |
| CONTRACEPTIVES | NEXPLANON | Y | 7.50% |
| CONTRACEPTIVES | SKYLA | N | 2.08% |
| CRYOPYRIN-ASSOCIATED PERIODIC SYNDROMES | ARCALYST | Y | 15.20% |
| CRYOPYRIN-ASSOCIATED PERIODIC SYNDROMES | ILARIS | Y | 17.50% |
| CYSTIC FIBROSIS | BETHKIS | N | 8.42% |
| CYSTIC FIBROSIS | CAYSTON | N | 8.09% |
| CYSTIC FIBROSIS | KALYDECO | N | 8.96% |
| CYSTIC FIBROSIS | ORKAMBI | N | 7.32% |
| CYSTIC FIBROSIS | SYMDEKO | N | 8.96% |
| DIAGNOSTIC | MACRILEN | Y | 15.70% |
| ELECTROLYTE DISORDERS | VELTASSA | N | 8.85% |
| ENDOCRINE AND METABOLIC AGENTS | H.P. ACTHAR | N | 6.34% |
| GASTROINTESTINAL DISORDERS-OTHER | GATTEX | Y | 14.50% |
| GASTROINTESTINAL DISORDERS-OTHER | OCALIVA | Y | 15.50% |
| GASTROINTESTINAL DISORDERS-OTHER | SOLESTA | Y | 15.50% |
| GOUT | KRYSTEXXA | Y | 16.50% |
| GROWTH HORMONE AND RELATED DISORDERS | NUTROPIN AQ | N | 8.42% |
| GROWTH HORMONE AND RELATED DISORDERS | ZORBTIVE | Y | 16.45% |
| HEMATOPOIETICS | MOZOBIL | N | 10.05% |
| HEPATITIS C | DAKLINZA | N | 9.29% |
| HEPATITIS C | HARVONI | N | 10.49% |
| HEPATITIS C | SOVALDI | N | 10.27% |
| HEPATITIS C | ZEPATIER | N | 10.27% |
| HEREDITARY ANGIOEDEMA | BERINERT | N | 8.63% |
| HEREDITARY ANGIOEDEMA | CINRYZE | Y | 10.50% |
| HEREDITARY ANGIOEDEMA | FIRAZYR | N | 8.42% |
| HEREDITARY ANGIOEDEMA | HAEGARDA | N | 9.07% |
| HEREDITARY ANGIOEDEMA | KALBITOR | Y | 17.50% |
| HEREDITARY ANGIOEDEMA | RUCONEST | Y | 13.67% |
| HEREDITARY ANGIOEDEMA | TAKHZYRO | Y | 13.97% |
| HORMONAL THERAPIES | AVEED | Y | 12.00% |
| HORMONAL THERAPIES | NATPARA | Y | 15.70% |

| THERAPEUTIC CLASS | DRUG NAME | EXCLUDED FROM NETWORK VARIABLE RATE "N" = No "Y" = Yes | AWP DISCOUNT Network 72 |
|---|---|---|---|
| HORMONAL THERAPIES | VANTAS | N | 8.96% |
| HUMAN IMMUNODEFICIENCY VIRUS | CIMDUO | N | 4.79% |
| HUMAN IMMUNODEFICIENCY VIRUS | EGRIFTA | N | 10.82% |
| HUMAN IMMUNODEFICIENCY VIRUS | TROGARZO | Y | 13.33% |
| IMMUNE (IDIOPATHIC) THROMBOCYTOPENIC PURPURA | DOPTELET | N | 8.20% |
| IMMUNE (IDIOPATHIC) THROMBOCYTOPENIC PURPURA | NPLATE | N | 9.73% |
| IMMUNE (IDIOPATHIC) THROMBOCYTOPENIC PURPURA | PROMACTA | N | 9.51% |
| IMMUNE DEFICIENCIES AND RELATED DISORDERS | BIVIGAM | N | 29.51% |
| IMMUNE DEFICIENCIES AND RELATED DISORDERS | CUVITRU | N | 29.51% |
| IMMUNE DEFICIENCIES AND RELATED DISORDERS | CYTOGAM | Y | 15.50% |
| IMMUNE DEFICIENCIES AND RELATED DISORDERS | FLEBOGAMMA | N | 29.51% |
| IMMUNE DEFICIENCIES AND RELATED DISORDERS | GAMASTAN S/D | N | AWP + 8.74% |
| IMMUNE DEFICIENCIES AND RELATED DISORDERS | GAMMAGARD S/D | N | 29.51% |
| IMMUNE DEFICIENCIES AND RELATED DISORDERS | GAMMAPLEX | N | 29.51% |
| IMMUNE DEFICIENCIES AND RELATED DISORDERS | HIZENTRA | N | 29.51% |
| IMMUNE DEFICIENCIES AND RELATED DISORDERS | HYQVIA | N | 24.04% |
| IMMUNE DEFICIENCIES AND RELATED DISORDERS | OCTAGAM | N | 29.51% |
| IMMUNE DEFICIENCIES AND RELATED DISORDERS | PANZYGA | N | 6.59% |
| IMMUNE DEFICIENCIES AND RELATED DISORDERS | PRIVIGEN | N | 29.51% |
| INFECTIOUS DISEASE | ACTIMMUNE | Y | 15.00% |
| INFECTIOUS DISEASE | ARIKAYCE | Y | 13.33% |
| IRON OVERLOAD | EXJADE | N | 8.85% |
| LIPID DISORDERS | KYNAMRO | Y | 16.50% |
| LYSOSOMAL STORAGE DISORDER | ALDURAZYME | N | 10.93% |
| LYSOSOMAL STORAGE DISORDER | CERDELGA | N | 7.76% |
| LYSOSOMAL STORAGE DISORDER | CEREZYME | N | 9.51% |
| LYSOSOMAL STORAGE DISORDER | ELAPRASE | N | 10.16% |
| LYSOSOMAL STORAGE DISORDER | ELELYSO | Y | 19.00% |
| LYSOSOMAL STORAGE DISORDER | FABRAZYME | N | 9.18% |
| LYSOSOMAL STORAGE DISORDER | GALAFOLD | Y | 13.33% |
| LYSOSOMAL STORAGE DISORDER | LUMIZYME | N | 8.08% |
| LYSOSOMAL STORAGE DISORDER | NAGLAZYME | Y | 11.70% |
| LYSOSOMAL STORAGE DISORDER | VIMIZIM | Y | 16.10% |
| LYSOSOMAL STORAGE DISORDER | VPRIV | N | 9.40% |
| MOVEMENT DISORDERS | APOKYN | Y | 16.50% |
| MOVEMENT DISORDERS | AUSTEDO | N | 6.92% |
| MOVEMENT DISORDERS | INGREZZA | Y | 16.00% |
| MOVEMENT DISORDERS | NORTHERA | Y | 15.50% |
| MOVEMENT DISORDERS | NUPLAZID | Y | 15.50% |
| MULTIPLE SCLEROSIS | AUBAGIO | N | 9.62% |
| MULTIPLE SCLEROSIS | LEMTRADA | Y | 14.50% |
| MULTIPLE SCLEROSIS | OCREVUS | N | 9.51% |
| MULTIPLE SCLEROSIS | TYSABRI | N | 9.29% |
| MULTIPLE SCLEROSIS | ZINBRYTA | N | 8.85% |
| MUSCULAR DYSTROPHY | EXONDYS 51 | Y | 14.00% |
| NEUTROPENIA | NIVESTYM | N | 6.59% |
| ONCOLOGY | AFINITOR | N | 9.07% |
| ONCOLOGY | ALECENSA | Y | 16.50% |
| ONCOLOGY | ALUNBRIG | y | 16.00% |
| ONCOLOGY | ARZERRA | Y | 18.00% |

**DO NOT DISCLOSE**

| THERAPEUTIC CLASS | DRUG NAME | EXCLUDED FROM NETWORK VARIABLE RATE<br><br>"N" = No<br>"Y" = Yes | AWP DISCOUNT<br><br>Network 72 |
|---|---|---|---|
| ONCOLOGY | AVASTIN | N | 8.63% |
| ONCOLOGY | BLINCYTO | Y | 1.50% |
| ONCOLOGY | BOSULIF | N | 8.85% |
| ONCOLOGY | BRAFTOVI | Y | 15.33% |
| ONCOLOGY | CABOMETYX | Y | 15.20% |
| ONCOLOGY | CALQUENCE | Y | 15.33% |
| ONCOLOGY | COPIKTRA | Y | 13.33% |
| ONCOLOGY | COTELLIC | N | 8.96% |
| ONCOLOGY | CYRAMZA | Y | 12.70% |
| ONCOLOGY | ERIVEDGE | N | 8.96% |
| ONCOLOGY | ERLEADA | N | 7.32% |
| ONCOLOGY | FARYDAK | N | 7.76% |
| ONCOLOGY | GAZYVA | Y | 17.50% |
| ONCOLOGY | HERCEPTIN | N | 8.31% |
| ONCOLOGY | IBRANCE | N | 8.96% |
| ONCOLOGY | IDHIFA | Y | 16.00% |
| ONCOLOGY | IMBRUVICA | Y | 16.60% |
| ONCOLOGY | IMFINZI | N | 9.51% |
| ONCOLOGY | INLYTA | N | 8.42% |
| ONCOLOGY | IRESSA | N | 6.67% |
| ONCOLOGY | IXEMPRA KIT | Y | 16.50% |
| ONCOLOGY | JAKAFI | N | 8.20% |
| ONCOLOGY | KADCYLA | N | 9.07% |
| ONCOLOGY | KYPROLIS | N | 9.29% |
| ONCOLOGY | LENVIMA | Y | 15.50% |
| ONCOLOGY | LONSURF | N | 8.42% |
| ONCOLOGY | LYNPARZA | Y | 14.50% |
| ONCOLOGY | MEKINIST | N | 10.60% |
| ONCOLOGY | MEKTOVI | Y | 15.33% |
| ONCOLOGY | NERLYNX | N | 8.85% |
| ONCOLOGY | NEXAVAR | N | 8.96% |
| ONCOLOGY | NINLARO | N | 6.34% |
| ONCOLOGY | ODOMZO | N | 9.18% |
| ONCOLOGY | PERJETA | N | 8.42% |
| ONCOLOGY | POMALYST | N | 8.63% |
| ONCOLOGY | REVLIMID | N | 9.40% |
| ONCOLOGY | RITUXAN | N | 9.79% |
| ONCOLOGY | RUBRACA | Y | 17.00% |
| ONCOLOGY | STIVARGA | N | 8.85% |
| ONCOLOGY | SUTENT | N | 9.51% |
| ONCOLOGY | SYLATRON | N | 11.04% |
| ONCOLOGY | TAFINLAR | N | 9.07% |
| ONCOLOGY | TAGRISSO | N | 8.09% |
| ONCOLOGY | TARCEVA | N | 9.29% |
| ONCOLOGY | TASIGNA | N | 10.82% |
| ONCOLOGY | THALOMID | N | 8.85% |
| ONCOLOGY | TIBSOVO | Y | 15.20% |
| ONCOLOGY | TYKERB | N | 9.07% |
| ONCOLOGY | VALSTAR | N | 10.82% |
| ONCOLOGY | VENCLEXTA | Y | 15.50% |

**DO NOT DISCLOSE**

| THERAPEUTIC CLASS | DRUG NAME | EXCLUDED FROM NETWORK VARIABLE RATE "N" = No "Y" = Yes | AWP DISCOUNT Network 72 |
|---|---|---|---|
| ONCOLOGY | VERZENIO | N | 9.51% |
| ONCOLOGY | VORAXAZE | N | 7.10% |
| ONCOLOGY | VOTRIENT | N | 9.51% |
| ONCOLOGY | XALKORI | N | 9.07% |
| ONCOLOGY | XERMELO | Y | 16.00% |
| ONCOLOGY | XTANDI | N | 8.85% |
| ONCOLOGY | YERVOY | N | 8.85% |
| ONCOLOGY | YONSA | N | 10.60% |
| ONCOLOGY | ZEJULA | Y | 16.00% |
| ONCOLOGY | ZELBORAF | N | 9.07% |
| ONCOLOGY | ZOLINZA | Y | 17.60% |
| ONCOLOGY | ZYDELIG | N | 8.31% |
| ONCOLOGY | ZYKADIA | N | 8.20% |
| ONCOLOGY | ZYTIGA | N | 10.60% |
| OSTEOARTHRITIS | GELSYN-3 | Y | 18.50% |
| PAIN MANAGEMENT | PRIALT | Y | 14.00% |
| PAIN MANAGEMENT | QUTENZA | Y | 15.50% |
| PAROXYSMAL NOCTURNAL HEMOGLOBINURIA | SOLIRIS | N | 9.51% |
| PHENYLKETONURIA | KUVAN | Y | 17.50% |
| PHENYLKETONURIA | PALYNZIQ | Y | 15.20% |
| PULMONARY ARTERIAL HYPERTENSION | ADEMPAS | Y | 15.20% |
| PULMONARY ARTERIAL HYPERTENSION | LETAIRIS | N | 9.18% |
| PULMONARY ARTERIAL HYPERTENSION | OPSUMIT | Y | 15.20% |
| PULMONARY ARTERIAL HYPERTENSION | ORENITRAM | Y | 15.20% |
| PULMONARY ARTERIAL HYPERTENSION | REMODULIN | Y | 16.20% |
| PULMONARY ARTERIAL HYPERTENSION | REVATIO SUS 10MG/M | N | 9.40% |
| PULMONARY ARTERIAL HYPERTENSION | TRACLEER | N | 8.85% |
| PULMONARY ARTERIAL HYPERTENSION | TYVASO | Y | 10.50% |
| PULMONARY ARTERIAL HYPERTENSION | UPTRAVI | Y | 15.20% |
| PULMONARY ARTERIAL HYPERTENSION | VENTAVIS | Y | 10.00% |
| PULMONARY DISORDERS - OTHER | ESBRIET | N | 8.09% |
| PULMONARY DISORDERS - OTHER | OFEV | N | 9.07% |
| RARE DISORDERS - OTHER | CRYSVITA | Y | 15.70% |
| RENAL DISORDERS | JYNARQUE | Y | 15.20% |
| RETINAL DISORDERS | EYLEA | N | 7.65% |
| RETINAL DISORDERS | LUCENTIS | N | 9.07% |
| RETINAL DISORDERS | MACUGEN | Y | 17.10% |
| RETINAL DISORDERS | VISUDYNE | Y | 13.50% |
| RHEUMATOID ARTHRITIS | ACTEMRA | N | 8.52% |
| SEIZURE DISORDERS | EPIDIOLEX | Y | 13.67% |
| SLEEP DISORDER | HETLIOZ | Y | 16.70% |
| THROMBOCYTOPENIA | TAVALISSE | Y | 15.20% |
| UREA CYCLE DISORDERS | RAVICTI | Y | 16.00% |

# EXHIBIT E





# CVS Caremark
# Provider Manual

# Network Participation and Payment

## Network Participation

Caremark may make available to Provider the opportunity to participate in Caremark or Plan Sponsor networks. Provider is deemed to have accepted participation and the reimbursement rates in any Caremark or Plan Sponsor network in which Provider submits a claim for an Eligible Person in that network. Notwithstanding any prior agreements, the Provider Agreement applies to all transactions under any network or Plan for which Provider submitted a claim. Notwithstanding anything to the contrary in the Agreement, by participating in a Caremark network, Provider agrees to provide Pharmacy Services for Covered Items to all Eligible Persons for each Plan Sponsor utilizing the network and as in accordance with the Agreement unless professional judgment dictates otherwise; provided that Caremark reserves the right to limit Provider's participation in a network to certain Plan Sponsors based upon Plan Sponsor network design.

As previously communicated, Caremark may from time to time enter into an arrangement with a plan sponsor ("Other Entity") pursuant to which Provider's Provider Agreement (including reimbursements terms and schedules) with Caremark will be utilized by such Other Entity and such Other Entity's pharmacy benefit manager ("Other PBM") on the Other PBM's adjudication platform, as communicated by Caremark. Provider agrees to cooperate with Caremark, Other Entity, and Other PBM as needed to support such arrangement.

## Pharmacy Portal

Caremark provides providers online access to information via its Pharmacy Portal at **https://rxservices.cvscaremark.com**. Provider may access the Pharmacy Portal to obtain information and services Caremark may make available from time to time.

Independent or affiliated-independent providers will be prompted to set a unique username and password as part of the initial login process. Detailed provider-specific account information must be entered as part of the initial login process, including but not limited to, pharmacy NCPDP number (seven digits), pharmacy NPI, state license number, DEA number, etc.

Pharmacy chain and PSAO headquarters who have not received login information from Caremark can contact their Caremark Network Account Manager.

## Provider Payment

Notwithstanding any other provision in the Provider Agreement, in the event of a conflict between the reimbursement rate indicated through the claims adjudication system and a network enrollment form or addendum or any other agreement, the claims adjudication system reimbursement rate will apply provided there is no error in the claims adjudication system resulting in overpayment to Provider or to Eligible Person.

In the event Medi-Span (or any other similar nationally recognized reference which Caremark may reasonably select from time to time) discontinues the reporting of Average Wholesale Price (AWP) or changes the manner in which AWP is calculated, then Caremark reserves the right to modify the pricing terms of the Provider Agreement, notwithstanding any other provision in the Provider Agreement. Such modification may include:

1. Modification of the AWP unit price reported by Medi-Span (or any other similar nationally recognized reference which Caremark may reasonably select from time to time) by applying the Wholesale Average Cost (WAC) Mark-Up factor (in use before the effective date of a change in the calculation of AWP) to the WAC unit price reported by Medi-Span ("Pre-Settlement AWP Discount");

2. Utilization of a modified AWP Discount ("Post-Settlement AWP Discount"); and/or

3. Utilization of alternate Price Type other than AWP.

Nothing herein shall limit Caremark's rights and abilities to establish additional networks at reimbursement terms as determined by Caremark.

Notwithstanding any other provision in the Provider Agreement, claims (excluding compounded medications) submitted for a Plan Sponsor participating in a Caremark or Plan Sponsor network may be reimbursed at the lower of: (1) Price Type plus an applicable percentage of the Price Type, or minus the applicable percentage of the Price Type, plus the applicable Dispensing Fee less the applicable Patient Pay Amount (or if applicable Price Type is unavailable for a given drug, Caremark will pay Provider based upon AWP minus the applicable AWP Discount plus the applicable Dispensing Fee minus the applicable Patient Pay Amount); (2) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (3) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (4) Provider's U&C price less the applicable Patient Pay Amount; or (5) Provider's submitted Gross Amount Due less the applicable Patient Pay Amount.

documentation or as otherwise indicated by Provider to Caremark and agreed to by Caremark. Notwithstanding the foregoing, Caremark may give notice to Provider (1) via the claims adjudication system; (2) by facsimile via the Provider's facsimile number, or by e-mail via the e-mail address provided by Provider in Provider's enrollment documentation or as otherwise indicated by Provider to Caremark and agreed to by Caremark; or (3) via Caremark's Pharmacy Portal.

Notices are deemed received on the date of delivery to the other party when delivered in person, by courier, by e-mail, by facsimile, by secure electronic message, by certified mail, or when posted via Caremark's Pharmacy Portal. If notice is sent by first class mail, the notice is deemed received on the third business day after the date such notice was mailed.

By participating as a provider in Caremark's networks, Provider acknowledges that it has a prior express business relationship with Caremark and consents to receive facsimile communications as well as automated messages from Caremark.

The terms of this **Notices** section apply notwithstanding any other provision in the Provider Agreement.

## Amendments

From time to time, and notwithstanding any other provision in the Provider Agreement (which includes the Provider Manual), Caremark may amend the Provider Agreement, including the Provider Manual or other Caremark Documents, by giving notice to Provider of the terms of the amendment and specifying the date the amendment becomes effective. If Provider submits claims to Caremark after the effective date of any notice or amendment, the terms of the notice or amendment is accepted by Provider and is considered part of the Provider Agreement.

## Enforceability

In the event that any provision or term set forth in the Provider Agreement is determined invalid or unenforceable, such invalidity and unenforceability will not affect the validity or enforceability of any other provision or term set forth in the Provider Agreement.

## Arbitration

Any and all disputes between Provider and Caremark [including Caremark's current, future, or former employees, parents, subsidiaries, affiliates, agents and assigns (collectively referred to in this Arbitration section as "Caremark")], including but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks or exclusion from any Caremark networks, will be exclusively settled by arbitration. This arbitration provision applies to any dispute arising from events that occurred before, on or after the effective date of this Provider Manual. Unless otherwise agreed to in writing by the parties, the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to the then applicable AAA Commercial Arbitration Rules and Mediation Procedures including the rule governing Emergency Measures of Protection (available from the AAA). In no event may the arbitrator(s) award indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business, except as required by Law. The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the agreement to arbitrate, including, but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason. The arbitrator(s) must follow the rule of Law, and the award of the arbitrator(s) will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. Any such arbitration must be conducted in Scottsdale, Arizona and Provider agrees to such jurisdiction, unless otherwise agreed to by the parties in writing. Discovery shall be limited to documents and information for which there is a direct, substantial, and demonstrable need and where such documents and information can be located and produced at a cost that is reasonable in the context of all surrounding facts and circumstances. Further, when the cost and burden of e-discovery are disproportionate to the likely importance of the requested materials, the arbitrator may deny the requests or require that the requesting party advance the reasonable cost of production to the other side. The expenses of arbitration, including reasonable attorney's fees, will be paid for by the party against whom the final award of the arbitrator(s) is rendered, except as otherwise required by Law.

**Arbitration with respect to a dispute is binding and neither Provider nor Caremark will have the right to litigate that dispute through a court. In arbitration, Provider and Caremark will not have the rights that are provided in court, including the right to a trial by judge or jury. In addition, the right to discovery and the right to appeal are limited or eliminated by arbitration. All of these rights are waived and disputes must be resolved through arbitration.**

**CONFIDENTIAL AND PROPRIETARY**

No dispute between Provider and Caremark may be pursued or resolved as part of a class action, private attorney general or other representative action or proceeding (hereafter all included in the term "Class Action"). All disputes are subject to arbitration on an individual basis, not on a class or representative basis, or through any form of consolidated proceedings, and the arbitrator(s) will not resolve Class Action disputes and will not consolidate arbitration proceedings without the express written permission of all parties to the Provider Agreement. Provider and Caremark agree that each may pursue or resolve a dispute against the other only in its individual capacity, and not as a plaintiff or class member in any purported Class Action.

Except as may be required by Law, neither a party nor an arbitrator(s) may disclose the existence, content or results of any dispute or arbitration hereunder without the prior written consent of both parties. In the event a Provider is required by law to make such a disclosure, Provider shall notify Caremark five (5) business days in advance of such disclosure.

Prior to a party initiating an arbitration, such party shall request in writing to the other party ("Dispute Notice") a meeting of authorized representatives of the parties for the purpose of resolving the dispute. The parties agree that, within ten (10) days after issuance of the Dispute Notice, each party shall designate a representative to participate in dispute resolution discussions which will be held at a mutually acceptable time and place (or by telephone) for the purpose of resolving the dispute. Each party agrees to negotiate in good faith to resolve the dispute in a mutually acceptable manner. If despite the good faith efforts of the parties, the authorized representatives of the parties are unable to resolve the dispute within thirty (30) days after the issuance of the Dispute Notice, or if the parties fail to meet within such thirty (30) days, either party may, by written notice to the other party, submit the dispute to binding arbitration. The above notwithstanding, nothing in this provision shall prevent either party from utilizing the AAA's procedures for emergency relief to seek preliminary injunctive relief to halt or prevent a breach of this Provider Agreement.

The terms of this arbitration section apply notwithstanding any other or contrary provision in the Provider Agreement, including, but not limited to, any contrary language in any **Third Party Beneficiary** provision. This Arbitration section survives the termination of the Provider Agreement and the completion of the business relationship between Provider and Caremark. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

## Force Majeure

Caremark and Provider are excused from performance under the Provider Agreement to the extent that either Caremark or Provider is prevented from performing all or any part of the Provider Agreement as a result of causes that are beyond the affected party's reasonable control, including but not limited to, fire, flood, earthquakes, tornadoes, other acts of God, war, work strikes, civil disturbances, power or communications failure, court order, government intervention, a change in Law, a significant change in the industry, or third-party nonperformance.

## Anti-Kickback Statute, Stark Law, and Caremark Compliance Program

Each party certifies that it shall not violate the federal anti-kickback statute, set forth at 42 U.S.C § 1320a-7b(b) ("Anti-Kickback Statute"), or the federal "Stark Law," set forth at 42 U.S.C § 1395nn ("Stark Law"), with respect to the performance of its obligations under this Provider Agreement. In addition, Caremark's Code of Conduct and policies and procedures on the Anti-Kickback Statute and Stark Law may be accessed at **www.caremark. com/pharminfo.**

Pursuant to Caremark's obligations under a Corporate Integrity Agreement (CIA) with the Office of Inspector General of the United States Department of Health and Human Services dated March 25, 2014, Provider agrees to access the CIA through this website **https://oig.hhs.gov/compliance/corporate-integrity-agreements/cia-documents.asp** upon enrollment, and Provider shall review the CIA in its entirety on an annual basis thereafter. Provider shall immediately notify Caremark in writing if Provider does not comply with the requirement to annually access and review the CIA in its entirety.

## Rebate Programs

Caremark has the right to submit all prescriptions relating to the Provider Agreement to pharmaceutical companies in connection with Caremark's rebate programs and any similar programs. Provider must not submit any of the prescriptions relating to the Provider Agreement to any pharmaceutical company for the purpose of receiving any rebate, discount or the like, except as authorized by Caremark in writing.

## Eligible Person Communications

Provider understands and acknowledges that Caremark may communicate with Eligible Persons as required by Plan Sponsor, applicable Law, or as Caremark determines is necessary regarding matters such as plan benefits, network design and composition, formulary and clinical issues, and manufacturer recalls.



17. Part D Claims may be priced using the Provider Agreement, the Caremark Medicare Part D Retail Network, or other Caremark or Plan Sponsor specific network.

18. INTENTIONALLY BLANK

19. Provider acknowledges that it is not a mail order pharmacy and it is a "retail pharmacy" as defined in 42 C.F.R. § 423.100.

20. Entire Agreement. This Retail Addendum, the Provider Agreement, the Provider Manual, and the Medicare Network Enrollment form, and all other applicable enrollment forms, constitute the entire agreement between Provider and Caremark for the purposes of Provider's participation as a Medicare Part D Network Provider, all of which are incorporated by this reference as if fully set forth herein and referred to collectively as the "Provider Agreement" or "Agreement". Any prior agreements, promises, negotiations, or representations related to the terms of this Retail Addendum are terminated and of no force and effect. Provider's non-compliance with any of the provisions of this Retail Addendum will be a breach of the Provider Agreement. All pricing terms are considered to be Caremark's confidential and proprietary information and may not be shared with any third party without express written consent from Caremark.

21. The following terms and phrases, when capitalized and when used in this Retail Addendum, have the meanings set forth below. All other capitalized terms and conditions shall have the meaning set forth in the Provider Agreement.

   a. "Claims" means those claims processed through the Caremark online, real-time claims adjudication system.

   b. "CMS" means the Centers for Medicare and Medicaid Services under the Department of Health and Human Services.

   c. "Covered Part D Drug(s)" has the same meaning as that term as defined in 42 C.F.R. § 423.100.8.

   d. "Dispensing Fee" has the same meaning as such term is defined in 42 C.F.R. § 423.100 which states that dispensing fee means costs that are incurred at the point-of-sale and pay for costs in excess of the ingredient cost of a Covered Part D Drug each time a covered Part D Drug is dispensed, and includes only pharmacy costs associated with ensuring the possession of the appropriate Covered Part D Drug is transferred to a Part D Enrollee.

   e. "HHS" means the Department of Health and Human Services.

   f. "Insurance Risk" has the same meaning as such term is defined in 42 C.F.R. § 423.4.

   g. "Medicare Part D Retail Network" means Claims priced for a Part D Enrollee pursuant to the Retail Addendum to the Caremark Provider Agreement entitled "Caremark Medicare Part D Retail Pharmacy Network."

   h. "Negotiated Prices" has the same meaning as such terms as defined 42 C.F.R. § 423.100.

   i. "Part D" means Part D of Title XVIII of the Social Security Act, which establishes the Voluntary Prescription Drug Benefit Program under Medicare.

   j. "Part D Enrollee" means an individual covered by a Part D Plan.

   k. "Part D Plan" has the same meaning as such term as defined in § 423.4, but limited to those Part D Plans that have contracted with SilverScript, L.L.C. to use pharmacy providers that have contracted with Caremark to provide Pharmacy Services to Part D Enrollees.

   l. "Part D Plan Sponsor" has the same meaning as such term as defined in 42 C.F.R. § 423.4, but limited to those Part D Plan Sponsors that offer Part D Plans.

   m. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. part 160 and part 164, subparts A and E.

   n. "Security Rule" shall mean the Standards for Security of Electronic Protected Health Information at 45 C.F.R. parts 160, 162 and 164, subpart C. Notwithstanding anything to the contrary in the Agreement, any requirements related to the Security Rule shall be effective no earlier than the applicable Compliance Date for the Security Rule.

   o. "Transactions Standard" means the Standards for Electronic Transactions under 45 C.F.R. parts 160 and 162, subparts I et.seq.

CONFIDENTIAL AND PROPRIETARY

# EXHIBIT F

CONFIDENTIAL AND PROPRIETARY - FOIA EXEMPT - DO NOT DISCLOSE



# Provider Manual

**Network Participation and Payment**

- Provider's U&C price less the applicable Patient Pay Amount;
- Plan Sponsor-specific reimbursement less the applicable Patient Pay Amount; or
- Provider's submitted "gross amount due" (as defined by current NCPDP Industry Standards) less the applicable Patient Pay Amount.

Unless otherwise required by a Plan, Provider may retain the differential between Eligible Person's Patient Pay Amount and Provider's contracted reimbursement amount with Caremark.

## 6.03 Changes to AWP

In the event Medi-Span (or any other similar nationally recognized reference which Caremark may reasonably select from time to time) discontinues the reporting of Average Wholesale Price (AWP) or changes the manner in which AWP is calculated, then Caremark reserves the right to modify the pricing terms of the Provider Agreement, notwithstanding any other provision in the Provider Agreement. Such modification may include:

- Modification of the AWP unit price reported by Medi-Span (or any other similar nationally recognized reference which Caremark may reasonably select from time to time) by applying the Wholesale Average Cost (WAC) Mark-Up factor (in use before the effective date of a change in the calculation of AWP) to the WAC unit price reported by Medi-Span ("Pre-Settlement AWP Discount");
- Utilization of a modified AWP Discount ("Post-Settlement AWP Discount"); and/or
- Utilization of alternate Price Type other than AWP.

Nothing herein shall limit Caremark's rights and abilities to establish additional networks at reimbursement terms as determined by Caremark.

## 6.04 Maximum Allowable Cost

Maximum Allowable Cost is a commonly used tool to control drug costs by establishing a fair but competitive unit price generally at a product level, regardless of supplier. MAC pricing incentivizes pharmacies to buy generic products as cheaply as possible, including volume discounts, in order to keep overall prices down for patients and health plans. Caremark does not have visibility to individual pharmacy arrangement with wholesalers; however, it is generally known in the industry that pharmacies do receive purchase discounts and rebates. It is not possible for Caremark to know what every pharmacy pays for every drug; however, Caremark may utilize aggregate information from wholesalers and third-party sources in order to establish MAC prices and, because MAC prices are reviewed continuously and updated frequently, our MAC prices reflect our best understanding of the marketplace pricing and product availability.

Caremark determines Maximum Allowable Cost generally at a product level for generic and multi-source brand products. This determination includes a review of marketplace dynamics, product availability, and different pricing sources. Pricing sources may include Medi-Span (or any other similar nationally recognized reference), MAC lists published by CMS, National Drug Acquisition Cost (NADAC) published by CMS, Predictive Acquisition Cost (PAC) developed by Glass Box Analytics, and if available, wholesalers and retail pharmacies. Caremark may update its MAC pricing methodology and/or use alternative pricing sources, at its discretion. MAC prices are subject to change, which can occur at least on a weekly basis and are based on marketplace trends and dynamics, and price fluctuations. MAC price lists are Caremark confidential and proprietary information.

For MAC paid claim appeals and as in accordance with Law, as applicable, Provider may appeal the MAC price paid by Caremark at a product level. Submission of a paid claim by Provider is required for this process. Provider must notify Caremark within the period required by applicable Law, and provide all of the following information: date of fill, prescription number, Provider name, Pharmacy NCPDP/NABP number, chain/affiliation code, phone number, email address, and RXBIN. Chain and Pharmacy Services Administration Organization (PSAO) pharmacies will submit MAC paid claim appeals through their respective chain or PSAO headquarters, which will then submit appropriate data to Caremark. Independent pharmacies (those which are not affiliated with a PSAO for contracting purposes) will submit MAC paid claim appeals using the Caremark Pharmacy Portal at **www.rxservices.cvscaremark.com**.

Provider may access the Caremark Pharmacy Portal to obtain current MAC prices and upcoming MAC prices based on Caremark's MAC price update schedule, including for Medicare Part D plans. To locate current or upcoming MAC price information, utilize the "MAC Price Look Up" feature of the Pharmacy Portal available through a secure website: **www.rxservices.cvscaremark.com**. Providers can also request a MAC list by clicking on the "Pharmacists & Medical Professionals" link located at **caremark.com** and submitting a Pharmacy MAC List Request form to **MACPRICE@cvscaremark.com**.

Provider shall (a) provide Caremark with prompt written notice of the Government Party's request so that Caremark can object or intervene as it deems proper; (b) take all appropriate steps to protect the confidentiality of the Records, including labeling it "CONFIDENTIAL AND PROPRIETARY – FOIA EXEMPT" and attaching a statement provided by Caremark explaining the application to the Records of any Freedom of Information Act or other exemptions to disclosure; and (c) provide Caremark with the opportunity to review the Records that is subject to disclosure to the Government Party prior to Provider's release of same to the Government Party. Provider also agrees to maintain records and provide access in accordance with 42 C.F.R. § 423.505(b)(10).

7. Provider agrees that, upon a Part D Plan Sponsor delegating any activity or responsibility to Caremark and Caremark in turn delegating that activity or responsibility to Provider pursuant to this Retail Addendum, that activity or responsibility may be revoked if CMS, the Part D Plan Sponsor, or Caremark determines that Provider has not performed satisfactorily. CMS, the Part D Plan Sponsor, or Caremark may also exercise anyremedies available at Law or under the Provider Agreement in lieu of revocation. Further, Provider agrees that such activity or responsibility shall be in accordance with 42 C.F.R. § 423.505(i)(3).

8. Provider agrees that Caremark and any Part D Plan Sponsor (with respect to its Part D Enrollees only) each has the right to approve, suspend, or terminate the Agreement in their sole discretion at any time.

9. Provider agrees that Caremark and the Part D Plan Sponsor will monitor the performance of Provider on an ongoing basis.

10. Provider agrees to provide Part D Enrollees with access to Negotiated Prices for Covered Part D Drugs as required by and in accordance with 42 C.F.R. § 423.104(g).

11. Provider agrees to submit Claims to Caremark's real-time claims adjudication system.

12. Provider agrees that when it dispenses a Covered Part D Drug to a Part D Enrollee, it will inform such Part D Enrollee at the point of sale of the lowest-priced, generically-equivalent version of that Covered Part D Drug, if one exists for the Part D Enrollee's prescription, as well as any associated differential in price in accordance with 42 C.F.R. § 423.132.

13. Provider agrees to implement a method for maintaining up-to-date Part D Enrollee information such as, but not limited to, demographic and allergy (drug) information, and such other information as CMS may require.

14. Provider agrees to implement such utilization management and quality assurance programs, including concurrent drug utilization review, generic substitution and/or therapeutic interchange programs, as Caremark may require, and as consistent with and in compliance with 42 C.F.R. § 423.153(b), (c) and (d). Provider agrees to offer patient counseling to Part D Enrollees, where appropriate and/or required by Law.

15. Provider agrees to fill a prescription for a 90-day supply of Covered Part D drugs for Part D Enrollees at the appropriate cost-sharing and Negotiated Price as communicated by Caremark to Provider through the real-time claims adjudication process, including that which applies to individuals qualifying for the low-income subsidy.

16. Provider agrees to charge/apply the correct cost-sharing amount, including that which applies to individuals qualifying for the low-income subsidy.

17. Part D Claims may be priced using the Provider Agreement, the Caremark Medicare Part D Retail Network, or other Caremark or Plan Sponsor specific network.

18. INTENTIONALLY BLANK

19. Provider acknowledges that it is not a mail order pharmacy and it is a "retail pharmacy" as defined in 42 C.F.R. § 423.100.

20. Entire Agreement. This Retail Addendum, the Provider Agreement, the Provider Manual, and the Medicare Network Enrollment form, and all other applicable enrollment forms, constitute the entire agreement between Provider and Caremark for the purposes of Provider's participation as a Medicare Part D Network Provider, all of which are incorporated by this reference as if fully set forth herein and referred to collectively as the "Provider Agreement" or "Agreement". Any prior agreements, promises, negotiations, or representations related to the terms of this Retail Addendum are terminated and of no force and effect. Provider's non-compliance with any of the provisions of this Retail Addendum will be a breach of the Provider Agreement. All pricing terms are considered to be Caremark's confidential and proprietary information and may not be shared with any third party without express written consent from Caremark.

21. The following terms and phrases, when capitalized and when used in this Retail Addendum, have the meanings

# EXHIBIT G

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Tribunal

| | | |
|---|---|---|
| AIDS HEALTHCARE FOUNDATION, | ) | |
| | ) | |
| Claimant, | ) | AAA Case No. 01-19-0004-0127 |
| | ) | |
| v. | ) | |
| | ) | **INTERIM AWARD** |
| CVS CAREMARK, a subsidiary of CVS | ) | |
| HEALTH CORPORATION, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated February 1, 2007, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby issue this INTERIM AWARD as follows:

This matter came on for hearing before William "Zak" Taylor, arbitrator with testimony beginning April 12, 2021 and ending on April 23, 2021. Appearing for Claimants were Andrew F. Kim and Rebecca J. Riley of Kim Riley Law and Tom Myers of Aids Healthcare Foundation. Appearing for Respondents were Kevin P. Shea, Jonathan M. Lively, Elizabeth Z. Meraz and Aon S. Hussain of Nixon Peabody, LLP. The quality of the lawyering on both sides was high. The hearing was transcribed by a court reporter.

Nine witnesses testified at the hearing and over 690 exhibits were entered into evidence. The hearing lasted five days. After the testimony phase, the parties engaged in two rounds of simultaneous briefing. After a thorough review of the transcript, the testimony, the exhibits and the briefing, the Arbitrator makes the following determinations of fact, mixed fact and law; and issues this Interim Final Award.

## BACKGROUND

This is a breach of contract action whereby Claimant seeks recovery of damages, a declaration of non-enforcement and prohibition of the application of Respondents' Provider Network Performance program (hereinafter "PNP") going forward, and attorneys' fees and costs with respect to this proceeding. Respondent seeks denial of Claimant's claims and recovery of attorney's fees and costs. Per the contract at issue, Arizona law provides the substantive law for the claims made.

## ISSUES TO BE DETERMINED

The issues to be determined are as follows:

1. Did Respondent breach the contract with its application of the PNP resulting in Aids Healthcare Foundation (hereinafter "AHF") being paid less than the contract required?

2. Did Respondent breach the contract by violating the covenant of good faith and fair dealing by implementing the PNP?

3. Was the imposition of the PNP procedurally unconscionable?

4. Are the terms of the PNP substantively unconscionable?

5. Is the PNP an unenforceable contract of adhesion?

6. Should the PNP be enjoined going forward?

7. What, if any, damages has AHF sustained?

8. Who, Claimant or Respondent, is the prevailing party? (The attorneys' fees and costs portion of this proceeding is deferred to determination through a subsequent process.)

## STIPULATED FACTS

The parties entered into an extensive stipulation of facts as follows:

## I.  __The Parties__

### a. AIDS Healthcare Foundation

1.        Established in 1987, AHF is a California not-for-profit, tax exempt, 501(c)(3) corporation.

2.        AHF owns and operates retail pharmacies that serve HIV/AIDS patients, including patients enrolled in the Medicare Part D prescription drug program.

3.        Each AHF-affiliated pharmacy has a unique national identification number, as assigned by the National Council for Prescription Drug Programs ("NCPDP"). Each individual AHF-affiliated pharmacy uses its own unique NCPDP number when submitting claims to Caremark for reimbursement.

4.        Exhibit A attached hereto identifies the AHF-affiliated pharmacies.

### b. Caremark

5.        CVS Caremark is not a legal entity but rather, a trade name.

6.        Caremark, L.L.C. and CaremarkPCS, L.L.C. (collectively, "Caremark") contract with prescription drug plan sponsors to provide pharmacy benefit management services to the plan's members. In turn, Caremark separately contracts with pharmacies across the country for the ability to provide pharmacy services to those members.

7.        Caremark is a pharmacy benefit manager ("PBM"). In this role, Caremark manages the prescription drug benefits of its clients, which generally consist of insurers, third party administrators, business coalitions, employer sponsors of group health plans, and relevant to these proceedings, government prescription drug plan sponsors.

8.        Caremark offers many services to its clients, including the administration and maintenance of nation-wide pharmacy networks (collectively, the "Networks") to provide pharmacy access to its clients' members. These Networks differ based on a variety of factors,

including the type of prescription benefit plan being administered by Caremark. For example, commercial plan networks, not relevant to this matter, differ from government-sponsored plan networks (*i.e.*, Medicare). Caremark has over 68,000 pharmacies enrolled in its various networks, including AHF-affiliated pharmacies.

## II.   The Parties' Relationship

### a.   *General Background*

9.     Pursuant to the various contract documents, pharmacies, generally referred to as "Providers," agree to provide pharmacy services in accordance with the terms of those agreements.

10.     When a customer fills a prescription at a Caremark network pharmacy (e.g., an AHF-affiliated pharmacy), the pharmacy submits a reimbursement claim to the customer's prescriptions insurance plan via Caremark, and Caremark adjudicates that claim electronically on behalf of its client – the plan sponsor.

11.     This adjudication process, among other things, confirms that the prescribed product is covered by the customer's health plan, and advises the pharmacy the reimbursement rate at the point of service for the drug along with the amount of co-pay that the pharmacy should collect from the customer based on its plan coverage.

### b.   *The Provider Agreements and Agency Addenda*

12.     Beginning in 2007 and prior to November of 2019, each AHF-affiliated pharmacy independently entered into a separate contract with Caremark[1] to participate in Caremark's Networks, titled a "Provider Agreement."

---

[1] In some cases, the applicable provider agreement was executed by a pharmacy and an entity acquired or otherwise merged with what is now Caremark.

13.     During that time period, AHF-affiliated pharmacies utilized a pharmacy services administrative organization ("PSAO") called Leader Drug Stores, Inc. ("LeaderNet").

14.     AHF-affiliated pharmacies submitted, through LeaderNet, applications and other documentation demonstrating each pharmacy's ownership, credentialing, and proper licensing.

15.     Caremark approved AHF-affiliated pharmacies to participate in the Networks as "Providers" after they executed a Provider Agreement with Caremark.

16.     LeaderNet, among other things, managed payments between Caremark and LeaderNet's affiliated pharmacies.

17.     Sometime prior to November 4, 2019, the AHF-affiliated pharmacies terminated their relationships with LeaderNet and began contracting directly with Caremark on their own behalf.

18.     On or about November 4, 2019, the AHF pharmacies became a pharmacy chain in Caremark's Networks, and Caremark and AHF executed four provider chain agreements (the "Chain Provider Agreements"). Exhibit J-4 (Caremark000909-22); Exhibit J-5 (Caremark000923-34); Exhibit J-6 (Caremark000935-38); Exhibit J-7 (Caremark000939-50).

19.     The contract documents between AHF and Caremark include the following documents:

      a.      The Provider Agreements (prior to November 4, 2019);

      b.      The Chain Provider Agreements (after November 4, 2019);

      c.      The CVS Caremark Provider Manuals and any amendments to them in effect during the contracting periods;

      d.      The Caremark Documents, defined in the Provider Manuals as: "[T]he Provider Agreement, schedules thereto, addenda, the Provider Manual and

all attachments thereto including [the] Glossary of Terms, Federal Laws and Regulations, State Laws and Regulations, information transmitted by Caremark to Provider through the claims adjudication system, and information transmitted by Caremark to Provider specifically designated by Caremark as a 'Caremark Document' which may include educational materials related to products, programs, services, and Plan Sponsor announcements[;]" and

e.    Caremark Network Enrollment Forms ("NEFs").

20.    The Chain Provider Agreements provide, among other things, as follows:

> Provider agrees that it will participate in all Caremark and Plan Sponsor pharmacy networks in which: (1) Provider participates in as of the date of this Agreement; (2) Provider and Caremark have executed a network addendum or network enrollment form as of the date of this agreement (3) provider and Caremark subsequently execute a network addendum or network enrollment form; and (4) Provider agrees to participate as evidenced by its provision of the Pharmacy services to an Eligible Person of a Plan Sponsor utilizing such pharmacy network(s). *See e.g.,* Exhibit J-6

21.    The Provider Manuals also provide, among other things, as follows:

> Provider must support all Caremark performance initiatives, such as but not limited to, performance network programs (which may include adherence and drug therapy gap alerts)...." *See e.g.,* Exhibit J-13.

22.    The Provider Manuals also provide, among other things, as follows: "Provider must support all clinical programs and services...." *See e.g.,* Exhibit J-13.

23.    The 2018 Provider Manual also provides, among other things, as follows:

> From time to time, and notwithstanding any other provision in the Provider Agreement (which includes the Provider Manual), Caremark may amend the Provider Agreement, including the Provider Manual or other Caremark Documents, by giving notice to Provider of the terms of the amendment and specifying the date the amendment becomes effective. If Provider submits claims to

Caremark after the effective date of any notice or amendment, the terms of the notice or amendment is accepted by Provider and is considered part of the Provider Agreement.

Exhibit J-13.

24.    The 2018 Provider Manual and the 2018 Provider Manual Amendments provide,

among other things, as follows:

> In the event Provider breaches the Provider Agreement, which includes the Provider Manual, addenda and other Caremark Documents, Caremark may terminate the Provider Agreement (or Provider's participation in specific Plans or networks) and may exercise other remedies available to Caremark as may be set forth herein or otherwise available at Law or equity.

Exhibit J-13; Exhibit J-14.

25.    The Provider Agreements provide, among other things, as follows:

> Unless otherwise set forth in a network addendum or network enrollment form signed by both parties, claims submitted for a Plan Sponsor participating in an Caremark or Plan Sponsor network will be reimbursed at the lower of: (i) AWP less the applicable AWP Discount plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) gross amount due less the applicable Patient Pay Amount. The applicable AWP Discount and Dispensing Fee will be set forth in the applicable network addendum or network enrollment form. If Provider has not executed and delivered to Caremark a network addendum or network enrollment form, the applicable AWP Discount and Dispensing Fee will be the reimbursement rate as indicated in the adjudication claims system as to such claim. AWP Discounts and Dispensing Fees may be amended in accordance with the terms of the Agreement.

> Notwithstanding any other provision in the Provider Agreement, claims (excluding compounded medications) submitted for a Plan Sponsor participating in a Caremark or Plan Sponsor network may be reimbursed at the lower of: (i) Price Type plus an applicable percentage of the Price Type, or minus the

applicable percentage of the Price Type, plus the applicable Dispensing Fee less the applicable Patient Pay Amount (or if applicable Price Type is unavailable for a given drug, Caremark will pay Provider based upon AWP minus the applicable AWP Discount plus the applicable Dispensing Fee minus the applicable Patient Pay Amount); (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) Provider's submitted Gross Amount Due less the applicable Patient Pay Amount.

*See e.g.,* Exhibit J-6.

## III.  **The Networks and Network Enrollment Forms**

26.     At all relevant times, Caremark operated various Medicare Part D pharmacy networks on behalf of its Medicare Part D plan sponsor clients.

27.     AHF enrolled in, and submitted claims for reimbursement through, the following Medicare Part D Networks:

a.  ***Retail Network 22:*** AHF-affiliated pharmacies enrolled in Network 22. Exhibit J-596 (Caremark009193-94). The NEF provides, among other things, "Provider is hereby enrolled as a provider in the Caremark Medicare Part D Retail Network identified below, effective January 1, 2015, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 22 | 15.50% | 25.0% | $1.00 |
| *1-30 Days Supply | | | |

*Id.* The NEF further provides, among other things:

• Provider will be charged a network rebate to the Plan Sponsor equal to 1.75% of the ingredient cost paid, excluding claims paid at Usual and Customary.

*Id.*

b. ***Retail Network 23***: AHF-affiliated pharmacies enrolled in Network 23. Exhibit J-626 (Caremark004268). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Caremark Medicare Part D Retail Network 23 effective January 1, 2015, as indicated in the table below, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
| --- | --- | --- | --- |
| | Brand | Generic | |
| Medicare Part D Retail Network 23 | 16.25% | 25.0% | $0.50 |

\*1-90 Days Supply

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network rebate to the Plan Sponsor equal to 3.00% of the ingredient cost paid, excluding claims paid at Usual and Customary.

*Id.*

c. ***Retail Network 32:*** AHF-affiliated pharmacies enrolled in Network 32. Exhibit J-619 (Caremark004379). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Network(s) indicated below" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, of the Caremark Provider Agreement, Provider agrees to the following reimbursement, and other unique requirements, if any, as indicated below:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)\* | | |
| --- | --- | --- | --- | --- | --- | --- |
| | AWP Discount | | Disp Fee | AWP Discount | | Disp Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Preferred Retail Network 32 Effective 1/1/2014 | 15.25% | 25.0% | $1.00 | 18.0% | 25.0% | $0.00 |

\*EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply).

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network rebate to the Plan Sponsor in an amount equal to 5.25% of the ingredient cost for each Non-Extended Days Supply drug claim paid and in an amount equal to 4.00% of the ingredient cost for each Extended Days Supply drug claim paid, excluding claims paid at Usual and Customary.

*Id.*

d. ***Retail Network 34:*** AHF-affiliated pharmacies enrolled in Network 34 Preferred. Exhibit J-627 (Caremark004270). The NEF provides, among other things, that

"[t]he undersigned hereby enrolls as a provider in the Caremark Medicare Part D Retail Network 34 effective January 1, 2015, as indicated in the table below, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
| --- | --- | --- | --- |
| | Brand | Generic | |
| Medicare Part D Retail Network 34 | 15.75% | 25.0% | $0.75 |
| *1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network rebate to the Plan Sponsor equal to 2.75% of the ingredient cost paid for brands and 9.5% of the ingredient cost paid for generics, excluding claims paid at Usual and Customary.

*Id.*

e. **Retail Network Form 35:** AHF-affiliated pharmacies enrolled in Network 35 Preferred. Exhibit J-628 (Caremark004271-72). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Caremark Medicare Part D Retail and Extended Days' Supply (EDS) Network 35 effective January 1, 2015, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
| --- | --- | --- | --- | --- | --- | --- |
| | AWP Discount | | Disp Fee | AWP Discount | | Disp Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail and EDS Network 35 | 15.75% | 25.0% | $1.00 | 21.60% | 25.0% | $0.00 |
| *EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply) | | | | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network rebate to the Plan Sponsor equal to 3.00% of the ingredient cost paid for non-extended days supply and 2.00% for extended days supply, excluding claims paid at Usual and Customary.

*Id.*

## IV.    The Program and Network Enrollment Forms

28.     Beginning on January 1, 2016, select Caremark Medicare Part D pharmacy networks became part of Caremark's Performance Network Program ("PNP").

29.     As relevant to this matter, starting in 2015 and prior to January 1, 2016, Caremark reimbursed pharmacies with a point-of-sale rate (e.g., $AWP^2 - 16\%$) coupled with a set network fee (e.g., 3%), which was assessed at the point of sale. Starting on January 1, 2016, instead of assessing a flat network fee, pharmacies were assessed a variable network fee range (e.g., 3-5%) depending on performance in the performance metrics, with the higher performing pharmacies paying the lower fee and vice-versa. Caremark assesses these performance fees after the point of sale on a trimester basis.

30.     Thus, for each reimbursement claim submitted by a pharmacy after January 1, 2016, Caremark reimburses the pharmacy at the AWP rate indicated on the NEF at the point of sale. Subsequently, per the terms of the NEFs pertaining to the PNP, Caremark assesses the pharmacy a variable rate fee as determined by its performance in the PNP. Caremark determines these variable rate fees after the point of sale on a trimester basis.

31.     Specifically, Caremark calculates participating pharmacies' scores per the PNP's criteria and uses those scores to determine the applicable variable rate fee, called Performance Network Rebate fees ("PNP Fees"). Caremark provides those participating pharmacies with "Trimester Reports" three times a year, for the periods January through April, May through August, and September through December. Caremark then recoups the PNP Fees from participating pharmacies.

---

[2] AWP rate refers to the Average Wholesale Price minus the percentage dictated by the NEF. For example, AWP minus 15% means that on a drug with an average wholesale price of $100, the pharmacy receives $85 for this component of its reimbursement.

32.     The Trimester Reports include information on the pharmacy's (or chain's) scores for each performance criteria and set forth the amount of PNP Fees that Caremark will collect from that pharmacy for applicable claims during that trimester.

33.     Prior to AHF's execution of the Chain Provider Agreements in 2019, Caremark scored each AHF related pharmacy individually.

34.     Generally, Caremark has utilized the following criteria, among others, to measure pharmacy performance: Renin Angiotensin System (RAS) Antagonists Adherence, Statin Adherence, Diabetes Adherence, Specialty Adherence, GAP Therapy (Statin Use in Persons with Diabetes), Comprehensive Medication Review (CMR), Completion Rate (MTM), and Formulary Compliance.

35.     Beginning on January 1, 2018, the PNP incorporated a specialty adherence component in the overall performance score. This component comes into play if more than 25% of the pharmacy's dispensing comes from the specialty drug list for the PNP in any given trimester.

36.     AHF-affiliated pharmacies enrolled in the following PNP networks:

    a. ***Retail Network 24:*** AHF-affiliated pharmacies enrolled in Network 24. Exhibit J-597 (Caremark009243-45). The NEF provides, among other things, "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network 24, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 24 (Network Performance Program) | 15.1% | 25.0% | $0.50 |
| *1-90 Days Supply | | | |

*Id.*     The     NEF     further     provides,     among     other     things,     that:

Provider will be charged a network rebate to the Plan Sponsors that will range from 3% to 5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. Provider's performance score is measured annually in 4 month measurement periods starting January, 2016. Within 30 days after the end of a measurement period, Caremark will evaluate Provider's performance and determine the associated network rebate amount for that period. Network rebates are deducted from Caremark's pharmacy payments to Provider as a lump sum deduction divided proportionately over the sixteen (16) weeks following each measurement period.

*Id.*

b. ***Retail Network 25:*** AHF-affiliated pharmacies enrolled in Network 25. Exhibit J-604 (Caremark009254-56); Exhibit J-605 (Caremark009246-53). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network 25 ('Network'), effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" Exhibit J-604 (Caremark009254-56); Exhibit J-605 (Caremark009246-53). The NEF further provide, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 25 Network Performance Program | 15.55% | 25.0% | $0.50 |
| 1-90 Days Supply | | | |

Exhibit J-604 (Caremark009254-56); Exhibit J-605 (Caremark009246-53). The NEF further provide, among other things, that:

---

Provider will be charged a network variable rate to the Plan Sponsors that will range from 3% to 5% for each brand product total ingredient cost paid and 5% to 7% for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

Exhibit J-604 (Caremark009254-56); J-605 (Caremark009246-53).

c. ***Retail Network 36:*** AHF-affiliated pharmacies enrolled in Network 36. Exhibit J-598 (Caremark009257-59). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail Network 36, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 36 (Network Performance Program) | 14.75 % | 25.0% | $1.00 |
| 1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

> * Provider will be charged a network rebate to the Plan Sponsors that will range from 2.5% to 4.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. Provider's performance score is measured annually in 4 month measurement periods starting January, 2016. Within 30 days after the end of a measurement period, Caremark will evaluate Provider's performance and determine the associated network rebate amount for that period. Network rebates are deducted from Caremark's pharmacy payments to Provider as a lump sum deduction divided proportionately over the sixteen (16) weeks following each measurement period.

> *Id.*

d. ***Retail Network 37:*** AHF-affiliated pharmacies enrolled in Network 37 Preferred. Exhibit J-629 (Caremark004273-75); Exhibit J-599 (Caremark009260-62). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the CVS/Caremark Medicare Part D Retail Network 37, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" Exhibit J-629 (Caremark004273-75); Exhibit J-599 (Caremark009260-62). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Disp Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail 37 (Network Performance Program) Preferred | 16.00 % | 25.0% | $.50 |
| *1-90 Days Supply | | | |

Exhibit J-629 (Caremark004273-75); Exhibit J-599 (Caremark009260-62). The NEF further provides, among other things, that:

> • Provider will be charged a network rebate to the Plan Sponsors that will range from 3.5% to 5.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. Provider's performance score is measured annually in 4 month measurement periods starting January, 2016. Within 30 days after the end of a measurement period, Caremark will evaluate Provider's performance and determine the associated network rebate amount for that period. Network rebates are deducted from Caremark's pharmacy payments to Provider as a lump sum deduction divided proportionately over the sixteen (16) weeks following each measurement period.

Exhibit J-629 (Caremark004273-75); Exhibit J-599 (Caremark009260-62).

e. ***Retail Network 38:*** AHF-affiliated pharmacies enrolled in Network 38. Exhibit J-600 (Caremark009263-65). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail and Extended Days' Supply (EDS) Network 38, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| | AWP Discount | | Disp Fee | AWP Discount | | Disp Fee |
| | Brand | Generic | | Brand | Generic | |

*Id.* The NEF further provides, among other things, that:

* Provider will be charged a network rebate to the Plan Sponsors that will range from 1.5% to 3.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. Provider's performance score is measured annually in 4 month measurement periods starting January, 2016. Within 30 days after the end of a measurement period, Caremark will evaluate Provider's performance and determine the associated network rebate amount for that period. Network rebates are deducted from Caremark's pharmacy payments to Provider as a lump sum deduction divided proportionately over the sixteen (16) weeks following each measurement period.

> *Id.*

g. ***Retail Network 39:*** AHF-affiliated pharmacies enrolled in Network 39 Preferred. Exhibit J-630 (Caremark004276-77); Exhibit J-601 (Caremark009266-68). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the CVS/Caremark Medicare Part D Retail and Extended Days' Supply (EDS) Network 39, effective January 1, 2016, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" Exhibit J-631 (Caremark004276-77); Exhibit J-602 (Caremark009266-68). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | Non-Extended Days Supply | | | Extended Days Supply (EDS)* | | |
|---|---|---|---|---|---|---|
| | AWP Discount | | Disp Fee | AWP Discount | | Disp Fee |
| | Brand | Generic | | Brand | Generic | |
| Medicare Part D Retail and EDS Network 39 (Network Performance Program) Preferred | 15.50 % | 25.0% | $1.00 | 18.50% | 25.0% | $0.00 |
| *EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply) | | | | | | |

Exhibit J-630 (Caremark004276-77); Exhibit J-601 (Caremark009266-68). The NEF further provides, among other things, that:

* Provider will be charged a network rebate to the Plan Sponsors that will range from 3.5% to 5.5% of the ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period. Provider's performance score is measured annually in 4 month measurement periods starting January, 2016. Within 30 days after the end of a measurement period, Caremark will evaluate Provider's performance and determine the associated network rebate amount for that period. Network rebates are deducted from Caremark's pharmacy payments to Provider as a lump sum deduction divided proportionately over the sixteen (16) weeks following each measurement period.

Exhibit J-630 (Caremark004276-77); Exhibit J-601 (Caremark009266-68).

h. **Retail Network 40:** AHF-affiliated pharmacies enrolled in Network 40 Preferred. J-631, Caremark004280-82. The NEFs provide, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 40, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 40 Performance Network Program - Preferred | 15.75% | 25.0% | $0.40 |
| 1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **5% to 7%** for each brand product total ingredient cost paid or **6.5% to 8.5%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

i. **Retail Network 41:** AHF-affiliated pharmacies enrolled in Network 40 Preferred. Exhibit J-632 (Caremark004283-85). The NEF provides, among other things, that "[t]he undersigned hereby enrolls as a provider in the Medicare Part D Retail Network 41, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" *Id.* The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 41 Performance Network Program - Preferred | 16.0% | 25.0% | $0.40 |
| 1-90 Days Supply | | | |

*Id.* The NEF further provides, among other things, that:

- Provider will be charged a network variable rate to the Plan Sponsors that will range from **3.5% to 5.5%** for each brand product total ingredient cost paid or **6.5% to 8.5%** for each generic product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

*Id.*

k. **Retail Network 50:** AHF-affiliated pharmacies enrolled in Network 50. Exhibit J-606 (Caremark009230-32); Exhibit J-607 (Caremark009221-29). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the

16

Medicare Part D Retail and Extended Days' Supply Network 50, effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" Exhibit J-606 (Caremark009230-32); Exhibit J-607 (Caremark009221-29). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 50 Network Performance Program | 14.75% | 25.0% | $1.00 |
| Medicare Part D Extended Days Supply Network 50 Network Performance Program | 18.5% | 25.0% | $0.25 |
| * For participation in the Medicare Part D Extended Days Supply (EDS) Network Provider is also required to participate in the corresponding Retail Network (e.g., Medicare Part D Retail Network 50 and Medicare Part D EDS Network 50) *EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply) | | | |

Exhibit J-606 (Caremark009230-32); Exhibit J-607 (Caremark009221-29). The NEF further provides, among other things, that:

* Provider will be charged a network variable rate to the Plan Sponsors that will range from **1.5% to 3.5%** for each product total ingredient cost paid based on Provider's performance on the performance criteria outlined in Exhibit A during the measurement period.

Exhibit J-606 (Caremark009230-32); Exhibit J-607 (Caremark009221-29).

1. **Retail Network 51**: AHF-affiliated pharmacies enrolled in Network 51. Exhibit J-608 (Caremark009212-14); Exhibit J-609 (Caremark009203-11). The NEF provides, among other things, that "Provider is hereby enrolled as a provider in the Medicare Part D Retail and Extended Days' Supply Network 51 ('Network'), effective January 1, 2018, and agrees to accept the AWP Discount and Dispensing Fee and the other participation requirements as set forth herein" Exhibit J-608 (Caremark009212-14); Exhibit J-609 (Caremark009203-11). The NEF further provides, among other things, that "[f]or the purposes of Section 4.3 or Schedule A of the Caremark Provider Agreement, whichever is applicable, the AWP Discount for brands and generics and Dispensing Fee are as follows:"

| Network Name | AWP Discount | | Dispensing Fee |
|---|---|---|---|
| | Brand | Generic | |
| Medicare Part D Retail Network 51 Network Performance Program | 14.75% | 25.0% | $1.00 |
| Medicare Part D Extended Days Supply Network 51 Network Performance Program | 18.5% | 25.0% | $0.25 |
| * For participation in the Medicare Part D Extended Days Supply (EDS) Network Provider is also required to participate in the corresponding Retail Network (e.g., Medicare Part D Retail Network 51 and Medicare Part D EDS Network 51) *EDS is for days supply as required by select Medicare Part D Plan Sponsors' plan designs (e.g., greater than a one-month supply) | | | |

Exhibit J-608 (Caremark009212-14); Exhibit J-609 (Caremark009203-11). The NEF further provides, among other things, that: