TOM MYERS
Tom.Myers@aidshealth.org
ARTI BHIMANI
Arti.Bhimani@aidshealth.org
AIDS HEALTHCARE FOUNDATION
6255 Sunset Boulevard, 21st Floor
Los Angeles, CA 90028
Telephone: (323) 860-5200
Facsimile: (323) 467-8450

ANDREW F. KIM
AKim@afklaw.com
REBECCA J. RILEY
RRiley@afklaw.com
KIM RILEY LAW
9018 Balboa Boulevard, # 552
Northridge, CA 91325
Telephone: (818) 216-5288
Facsimile: (818) 993-3012

Attorneys for Claimant
AIDS HEALTHCARE FOUNDATION

## ARBITRATION UNDER THE AUSPICES OF

## THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION, a California non-profit corporation,<br><br><br>Claimant<br><br>v.<br><br><br>CVS CAREMARK, a subsidiary of CVS HEALTH CORPORATION, a Delaware corporation,<br><br><br>Respondent. | **CASE NO.: 01-19-0004-0127**<br><br>**AMENDED DEMAND FOR ARBITRATION BY CLAIMANT AIDS HEALTHCARE FOUNDATION AGAINST CVS CAREMARK, A SUBSIDIARY OF CVS HEALTH CORPORATION**<br><br>**WILLIAM ZAK TAYLOR, ESQ. PRESIDING** |

Pursuant to the agreement between the parties, the Federal Arbitration Act (9. U.S.C. §§1-16), the AAA Commercial Arbitration Rules and Mediation Procedures Including the Procedures for Large, Complex Commercial Disputes (Amended Effective October 1, 2013), the rule governing Emergency Measures of Protection (the "AAA Rules"), and the Preliminary Scheduling Order #1 issued by Arbitrator William Zak Taylor on March 6, 2020, Claimant AIDS Healthcare Foundation, Inc. ("AHF") files this AMENDED Demand for Arbitration against Respondent CVS Caremark, a subsidiary of CVS Health Corporation ("CVS"), for (1) breach of agreement, (2) breach of the implied covenant of good faith and fair dealing; (3) unenforceable adhesion contract terms that exceed the reasonable expectations of the adhering party, AHF, and/or are unconscionable; (4) violation of state unfair business practices statutes; (5) violation of state "Any-Willing-Provider" statutes; and (6) violation of Section 2 the Robinson-Patman Act of June 19, 1936, 15 U.S.C. §13.

## INTRODUCTION

1.　　AHF is a non-profit company that operates 48 pharmacies in 16 states serving the needs of people living with HIV/AIDS without regard to their ability to pay, as discussed more fully below.  CVS is America's largest retail pharmacy chain and Pharmacy Benefits Manager ("PBM"), managing the pharmacy benefits for many millions of Americans enrolled in Medicare Part D plans.  PBMs are responsible primarily for developing and maintaining drug formularies, contracting with pharmacies, negotiating discounts and rebates with drug manufacturers, and processing and paying prescription drug claims.  As a PBM, CVS employs "spread pricing," which it defines as CVS keeping for itself the difference in pricing from what it receives as payment for drugs and what it pays to network pharmacies for those drugs.[1]  CVS's PBM operations have, accordingly, been astonishingly profitable.

2.　　As a PBM, CVS agrees, among other things, to pay pharmacies for dispensing

---

[1] "We Offer PBM Clients a Variety of Pricing Options," https://cvshealth.com/thought-leadership/cvs-caremark-facts/pbm-clients-variety-of-pricing-options

prescription drugs to Medicare Part D beneficiaries in a fair and timely manner consistent with its agreements and with state and federal laws. In particular, CVS agrees to pay clean claims – claims submitted by pharmacies to CVS with no defects or improprieties, including any lack of documentation substantiating the claims – according to applicable state and federal laws, and to adjudicate promptly disputed claims so that those claims also may be promptly paid. Pharmacies rely on CVS's performance of its obligation to pay quickly clean and otherwise adjudicated claims to operate their businesses and to plan for the provision of superior services to pharmacy customers. In fact, the prompt payment of clean claims and the final adjudication of disputed claims are the lifeblood of pharmacies providing services to CVS's PBM members.

3.     AHF (through a non-party entity described below) contracted with CVS pursuant to a 2007 agreement to the general effect that CVS would pay AHF pharmacies to dispense prescription drugs for individuals whose Medicare Part D plan benefits CVS managed as a PBM. Years after entering into the agreement at issue in this matter, CVS unilaterally imposed upon AHF and other pharmacies a scheme, deceptively named the "Performance Network Program," to claw-back unilaterally and retroactively millions of dollars of payments made to AHF's pharmacies for dispensing prescription drugs and to make the operation of smaller pharmacies, like AHF's non-profit pharmacy business, increasingly economically untenable (the "Claw-Back Program").[2]

4.     Although CVS dresses the Claw-Back Program with fawning language concerning its expected positive impact on pharmacy "performance," and, consequently, patient care, management, and outcomes, CVS cynically designed the Claw-Back Program to permit it to claw-back from pharmacies a portion of the funds previously paid by CVS to pharmacies as clean or otherwise fully adjudicated claims. Belying any contention that the Claw-Back Program is about pharmacy performance as related to proper patient care, the Claw-Back Program *penalizes AHF for not dispensing certain drugs even when dispensing those drugs is contrary*

---

[2] The Claw-Back Program is also referred to as the Direct and Indirect Remuneration ("DIR") pay-for-performance network program.

*to the advice of AHF's world renowned, HIV/AIDS expert, treating physicians*. The Claw-Back Program creates a *minimum penalty* no matter a pharmacy's "performance." The Claw-Back Program's metrics are not geared to ensuring that patients, in particular people living with HIV/AIDS, receive the proper medication as prescribed by their physicians in appropriate amounts or that it is taken as directed by those physicians.

5.     *The Claw-Back Program also has the effect of imposing on smaller pharmacies higher net prices for drugs than on giant chain pharmacies, like CVS*. CVS boasts of the cutting-edge nature of their electronic claims processing and analyzing systems and the ability of those systems to assist CVS with bettering the quality of care and outcomes. Yet, CVS's systems and its methodology for administering the Claw-Back Program *discriminate against smaller, specialty pharmacies like AHF* and apparently cannot, or do not, account for the demands and challenges associated with particular, high-risk patient populations, including people living with HIV/AIDS. Ultimately, the Claw-Back Program generates absurd, illogical, and unpredictable results that wholly ignore AHF's patient care and penalize AHF for decisions made by expert treating physicians in the best interests of their patients.

6.     Compounding these problems, CVS shrouds in secrecy its administration of the Claw-Back Program, even the data and methodology used to impose massive, after-the-fact penalties on pharmacies. CVS has not shown, and refuses to show, how it calculates the penalties. CVS provides its conclusions but no verifiable math. It says, essentially, "trust us and our systems, methodologies and data; you owe us millions."

7.     The Claw-Back Program has wreaked havoc on AHF's ability to carry out its non-profit mission. The Claw-Back Program ultimately makes the dispensing of drugs prohibitively expensive for AHF while CVS uses its outsized market power to force contracting pharmacies to participate in the Claw-Back Program. In addition to the Claw-Back Program, CVS has for many years required more and more of its members to utilize CVS's own mail order pharmacy to fill all prescriptions thus limiting the number of patients who are even permitted to

use AHF pharmacies.

8.      CVS's goal of integrating its healthcare operations both vertically and horizontally, all to increase market share and margins, is no secret. In 2018, CVS acquired Aetna, the nation's third-largest health insurer, in a transaction valued by CVS at $78 billion. CVS has multiple obvious incentives to increase its customer and dispensing market shares. Selling more drugs and servicing more PBM clients earn more revenue. Selling more drugs through its highly automated mail order system increases CVS's market share while increasing its own margins. Swallowing smaller competitors of CVS's pharmacy operations also increases CVS's volume and margins. CVS has negotiated with drug manufacturers rebates and discounts that depend on, among other things, volume and market share. CVS lines its pockets with cash through the Claw-Back Program in part to force smaller market participants out of business and to help fund the large cash component of the Aetna acquisition.

9.      CVS has used the Claw-Back Program to recoup unlawfully payments from AHF pharmacies located in California, Florida, Georgia, Louisiana, Nevada, New York, Ohio, Pennsylvania, South Carolina, Texas, Washington, and the District of Columbia. AHF, therefore, seeks damages, restitution and injunctive relief as redress for, among other things, CVS's repeated breaches of agreement and the implied covenant of good faith and fair dealing, the adhesive nature of the terms of the Claw-Back Program combined with their exceeding the adhering party AHF's reasonable expectations and/or their unconscionability, unfair business practices, violations of numerous states' "Any-Willing-Provider" laws and violations of Section 2 of the Robinson-Patman Act of June 19, 1936, 15 U.S.C. §13.

## FACTUAL ALLEGATIONS

### The Parties

10.     Established in 1987, AHF is a California not-for-profit, tax exempt, 501(c)(3) corporation, domiciled and with its principal place of business in Los Angeles, California. AHF is the world's largest provider of health care services to people living with HIV/AIDS. AHF's

mission is to provide cutting edge medical care to people living with HIV/AIDS regardless of their ability to pay, and AHF provides medical care (including prescription drugs services) and advocacy to more than 1.2 million patients in 43 countries, including the United States. In the United States, AHF operates 66 health care centers and 48 pharmacies in 16 states, the District of Columbia, and Puerto Rico. AHF pharmacies specially serve a wide range of high-risk patients with varying types of insurance coverage, including patients enrolled in the Medicare Part D prescription drug program. AHF is an essential safety net provider for disenfranchised, high-risk populations. For every dollar earned by AHF pharmacies, 96 cents go to patient care and assisting communities affected with HIV and AIDS.

11.　　AHF is informed and believes and, based thereon, alleges, that: (a) CVS Caremark is a subsidiary of CVS Health Corporation, which is incorporated in the State of Delaware; (b) CVS operates more than 9,900 retail locations, over 1,000 medical clinics, the nation's largest PBM commanding over 30% of the total PBM market[3] with approximately 92 million plan members and a stand-alone Medicare Part D prescription drug plan; (c) CVS earned over $194 billion in 2018, approximately $9.8 billion more than the prior year;[4] (d) CVS in November 2018 completed its acquisition of the insurance giant, Aetna, exchanging each outstanding issue of Aetna common stock for $145.00 in cash and .8378 shares of CVS common stock, for a total transaction value of $78 billion[5]; and (e) CVS reported a net income loss in 2018 of $596 million when it had experienced a $6.632 billion net income gain the prior year.[6]

---

[3] "Top PBMs by Market Share," Becker's Hospital Review, May 30, 2019 (https://www.beckershospitalreview.com/pharmacy/top-pbms-by-market-share.html); "CVS Health Completes Acquisition of Aetna, Marking the Start of Transforming the Consumer Health Experience," CVS Press Release, November 18, 2018 (https://www.prnewswire.com/news-releases/cvs-health-completes-acquisition-of-aetna-marking-the-start-of-transforming-the-consumer-health-experience-300756904.html)
[4] CVS Health Corporation, "Annual Report," 2018.
[5] "CVS Health Completes Acquisition of Aetna, Marking the Start of Transforming the Consumer Health Experience," CVS Press Release, November 18, 2018.
[6] CVS Health Corporation, "Annual Report," 2018.

## AHF and the Unique Challenges in Treating People Living With HIV/AIDS

12.     AHF pharmacies hire only individuals who are knowledgeable about HIV/AIDS, are highly sensitive to the particular challenges of AHF's patient population and understand the complex drug interactions inherent with anti-retroviral medicines. AHF pharmacists must be certified by the American Academy of HIV Medicine. Moreover, all AHF pharmacies are accredited by both the Accreditation Commission for Health Care and the Utilization Review Accreditation Commission. All AHF pharmacy services are provided by staff employed by AHF. AHF outsources none of its services, including after-hours calls (24/7), computer services, and clinical and dispensing services.

13.     AHF's prescribing physicians are dedicated to serving people living with HIV/AIDS and are among the most experienced providers in the country. AHF physicians are accredited by the American Academy of HIV Medicine, and many AHF physicians have been treating patients since the earliest days of the HIV epidemic in the United States. AHF's physicians have unparalleled expertise treating patients living with HIV/AIDS and treat more HIV patients daily than any other provider group in the country. Moreover, several AHF physicians are also engaged in cutting edge clinical research devoted to finding better treatment for their HIV patients.

14.     AHF's goals with respect to each of its pharmacy patients are to provide access to life-saving HIV/AIDS medications, counsel patients and promote adherence to their medication regimens, ultimately improving patients' health outcomes. Once considered a death sentence, HIV/AIDS can now be treated with sophisticated medications in combination with other medical care and support services, but these medications must be taken daily according to strictly observed regimens, for a patient's entire life. AHF has observed that there are many possible reasons why someone living with HIV might not follow regimens or might even stop taking medicines, including lack of understanding of the serious nature of the disease, fatigue, side effects, fear of stigma, and co-existing health conditions like mental health issues or social

challenges, such as homelessness.

15.    AHF pharmacies combat these challenges by, among other things, providing discreet medicine delivery options, including meeting patients at a place of their choice – to protect patients' confidentiality and by calling on patients on a monthly basis to discuss the prescribed medication regimen, answer any questions or concerns, and encourage treatment adherence. AHF surveys its patients regularly to determine their level of satisfaction with AHF's services, and AHF's pharmacists and senior management carefully review and evaluate the survey information to strive to continue improving AHF's quality of care and patient outcomes, consistent with AHF's mission.

## Medicare Part D, PDPs, MA-PDs and PBMs

16.    The Medicare Part D program provides an outpatient prescription drug benefit to older adults and people with long-term disabilities enrolled in private plans, including stand-alone prescription drug plans ("PDPs") and Medicare Advantage prescription drug plans ("MA-PDs") that include drug coverage and other Medicare-covered benefits. AHF is informed and believes and, based thereon, alleges that a total of 45 million people with Medicare are currently enrolled in plans that provide the Medicare Part D drug benefit, representing 70 percent of all Medicare beneficiaries.[7]

17.    PDPs and MA-PDs routinely contract with PBMs to administer prescription drug programs. As noted, CVS is America's largest PBM. Several national and regional PDPs and MA-PDs (including, among others, Aetna (owned by CVS), SilverScript, WellCare Healthplans, and Envolve Pharmacy Solutions) contract with CVS to provide PBM services. AHF provides prescription drug services to patients enrolled in these, and other, plans administered by CVS.

## PSAOs and Participating Providers

18.    To fulfill its role as a PBM, CVS enters into contractual relationships with, among

---

[7] 10 Things to Know About Medicare Part D Coverage and Costs in 2019, Kaiser Family Foundation, June 4, 2019 (https://www.kff.org/medicare/issue-brief/10-things-to-know-about-medicare-part-d-coverage-and-costs-in-2019/)

others, pharmacy services administrative organizations ("PSAOs"), which manage network contracting and plan administration for independent pharmacies, like those operated by AHF. The PSAOs enter into contracts with independent pharmacies enabling the pharmacies to become participants in plans offered by PBMs. The pharmacies can then dispense prescription drugs to such participants, and CVS pays for them.

19.    AHF entered into an agreement with a PSAO called Leader Drugstores, Inc. ("LeaderNET"), and LeaderNET entered into a contract on AHF's behalf with CVS, which, in turn, enabled AHF to become a "Participating Provider" under CVS programs. These agreements, taken together, contemplate that AHF pharmacies fill prescriptions for patients and submit claims for payment to CVS, consistent with the agreements and applicable laws and regulations. CVS then pays AHF for each prescription dispensed, also consistent with the agreements and applicable laws and regulations. AHF relies on receiving prompt and fair reimbursement for prescriptions, and where applicable prompt and predictable resolution of any problems with claims so that payment can be made, to ensure timely cash-flow so that AHF can pay salaries, purchase inventory, and cover all other costs associated with operating pharmacies.

20.    Through a service offered by LeaderNET called "Central Pay," LeaderNET provides a centralized electronic payment processing center for each of its participating pharmacies, whereby the pharmacies submit all claims electronically to Central Pay. CVS receives the claims through Central Pay, and then submits payments for these claims directly into Central Pay. These payments are then credited to the pharmacy's Central Pay account. Central Pay, in essence, operates like a bank account for AHF in that Central Pay collects the outstanding claims into one ledger for each participating pharmacy, and processes and reconciles all payments and any deductions as part of one ledger.

21.    AHF became a Participating Provider with respect to CVS's plan members, and AHF has been filling prescriptions for CVS-administered plans for years.

### The Agreement, CVS's Constant, Unilateral Amendments, the Payment of Clean Claims and the Adjudication of Claim Disputes

22.    The documents and information forming the agreement at issue in this case are many, prolix and constantly subject to unilateral amendment by CVS. They are not the product of negotiation between CVS and LeaderNET or AHF. CVS drafts all such documents and information and imposes on pharmacies the terms on which it will permit pharmacies to participate in its programs. If pharmacies need to have access to CVS's PBM members to survive or accomplish their missions, those pharmacies have no choice but to agree.

23.    As relevant to AHF and Medicare Part D providers, the agreement is comprised of a Provider Agreement (which is actually a series of state-specific agreements), which includes the Provider Manuals (as repeatedly amended),[8] the Medicare Network Enrollment forms, a Retail Addendum, various addenda pertaining to specific states pursuant to those states' laws, and the "Caremark Documents." Intending to sweep as many documents and as much information as possible into the agreement, CVS defines "Caremark Documents" as:

> [T]he Provider Agreement, schedules thereto, addenda, the Provider Manual and all attachments thereto including [the] Glossary of Terms, Federal Laws and Regulations, State Laws and Regulations, information transmitted by Caremark to Provider through the claims adjudication system, and information transmitted by Caremark to Provider specifically designated by Caremark as a "Caremark Document" which may include educational materials related to products, programs, services, and Plan Sponsor announcements.[9]

24.    CVS reserves the right to amend unilaterally the agreement by giving notice to

---

[8] "The Provider Manual is …incorporated into the Provider Agreement. Provider must abide by the provisions and terms set forth in the Provider Agreement (which includes the Provider Manual and all other Caremark Documents)." 2018 Provider Manual, p. 17.

[9] Provider Manual, p. 340 (Glossary of Terms). All of the individual Provider Agreements incorporate the Glossary of Terms.

contracting parties of the terms of any such amendments; providers are deemed to have agreed to any such amendments by continuing to submit claims. In practice and given the wide scope of the documents and information designated as part of the agreement, CVS frequently amends the agreement at issue, on a day by day basis, with every communication it sends.[10]

25.     The agreement documents specifically incorporate applicable state and federal laws and regulations and provide that CVS must comply with those laws, as defined in the Agreement.[11] The agreement defines "Laws" broadly, as follows:

> Law means any Federal, State, local or other constitution, charter, act, statute, law, ordinance, code, rule, regulation, sub-regulatory guidance (including but not limited to, CMS Prescription Drug Benefit Manual, model contracts between the State Medicaid Agency and managed care organizations, and other guidance from State Medicaid Agencies, such as Medicaid Manuals, Bulletins, and other issuances), order, specified standards, or objective criteria contained in or which are (by express reference or necessary implication) order, specified standards, or objective criteria contained in or which are (by express reference or necessary implication) a condition of granting any applicable permit, license or approval required by Caremark, Provider, or a Plan Sponsor, or other legislative or administrative action of the United States of America, or state or any agency, department, authority, political subdivision or other instrumentality thereof or a decree or judgment or order of a court.[12]

26.     Specifically, the agreement requires CVS, among other things, to pay clean and otherwise adjudicated claims according to time frames set forth in applicable state and federal

---

[10] AHF would normally attach the agreement at issue; tht is not possible here as a result of the amorphous, shape-shifting nature of the agreement.
[11] 2018 Provider Manual, p. 7.
[12] 2018 Provider Manual, p. 339 (Glossary of Terms).

laws.

> In accordance with 42 C.F.R. § 423.520, payment for clean claims (that
> have been determined to be eligible for payment) will be made to Provider
> within fourteen (14) days (for electronically submitted claims), or thirty
> (30) days (for non-electronically submitted claims) from the date the claim
> is received.... A clean claim is defined as a claim that has no defect or
> impropriety (including any lack of any required substantiating
> documentation) or particular circumstance requiring special treatment that
> prevents timely payment of the claim from being made.[13]

27.     With respect to Georgia, a clean claim is a claim "received by [CVS] for adjudication, in a nationally accepted format in compliance with standard coding guidelines, which requires no further information, adjudgment or alteration by the provider of the services in order to be processed and paid by [CVS]."[14]

28.     With respect to New York, a clean claim is a:

> request for payment for a service rendered by Provider that (i) is timely
> submitted by Provider in accordance with claim filing requirements under
> Regulatory Requirements and the then Current Plan Sponsor policies and
> procedures (ii) is in a nationally accepted format in compliance with
> standard coding guidelines; (iii) includes all material information required
> by Plan Sponsor, including without limitation, all required substantiating
> documentation and information related to coordination of benefits and
> third-party liability; (iv) is undisputed as to the amount of the claim; and (v)
> includes no indication of fraudulent content or submission.[15]

29.     With respect to Louisiana, the agreement provides that:

---

[13] 2018 Provider Manual, p. 59.
[14] 2018 Provider Manual, p. 112 (Georgia Addendum).
[15] 2018 Provider Manual, p. 232 (New York Addendum).

In accordance with, and to the extent required under applicable Louisiana law, [CVS] shall pay ninety percent (90%) of all clean claims, within fifteen (15) business days of the date receipt. [CVS] shall pay ninety-nine percent (99%) of all clean claims, within thirty (30) calendar days of the date of receipt.[16]

30.     With respect to South Carolina, the agreement provides that CVS "shall pay ninety percent (90%) of all Clean Claims from practitioners…. within thirty (30) days of the date of receipt.[17]

31.     With respect to Texas, the agreement provides that "Provider shall be paid in accordance with all applicable statutes and rules pertaining to prompt payment of clean claims for covered services that are rendered to Eligible Persons.[18]

32.     The agreement contains a lengthy and detailed claims submission process and provides for the prompt resolution of claims, including disputed or otherwise "non-clean" claims and prompt payment, through its "claim adjudication system," when such claims are resolved in favor of pharmacies.[19]

33.     The agreement also prohibits CVS from discriminating with respect to reimbursement for any provider acting within the scope of its license or certification under applicable state law, including for providing services to high-risk populations.[20]

34.     The agreement provides that "[a]ll Pharmacy Services must be provided by or under the direct supervision of a Licensed Pharmacist and in accordance with Prescriber directions and applicable Law."[21] Pursuant to the agreement, AHF is required, among other

---

[16] 2018 Provider Manual, p. 169 (Louisiana Addendum).
[17] 2018 Provider Manual, p. 261 (South Carolina Addendum).
[18] 2018 Provider Manual, p. 273 (Texas Addendum).
[19] See, e.g., 2018 Provider Manual, pp. 5, 6, 13, 14, 15, 17-27, 28, 33, 34, 37, 38, 42, 45, 51, 74, 75, 77 and 78.
[20] 2018 Provider Manual, pp. 102-103 (Florida Addendum); p. 115 (Georgia Addendum); p. 171 (Louisiana Addendum).
[21] 2018 Provider Manual, p. 17. Each successive Provider Manual supersedes previous versions of the manual. 2016 Caremark Provider Manual, p. 3; 2018 Provider Manual, p. 4.

things, to comply with credentialing and quality management initiatives as required by CVS, and AHF is required to maintain internal quality management standards and procedures. AHF must make available on demand its documents and information pertaining to its pharmacy services and claims made to CVS, must comply with specific and detailed document retention practices, and also must comply with all applicable state and federal laws and regulations. If AHF takes any action or commits any omission that "may pose a risk to the health, welfare, or safety of members of the general public[,]" CVS may terminate or suspend the agreement or take other corrective action.[22]

### CVS's Prescription Management Systems and Manufacturer Rebates and Discounts

35.     On CVS's end, "[a]ll prescriptions processed by [CVS] are analyzed, processed and documented by [CVS's] proprietary prescription management systems."[23]

> These systems …streamline the process by which prescriptions are processed by staff and network pharmacists by enhancing review of various items through automation, including plan eligibility, early refills, duplicate dispensing, appropriateness of dosage, drug interactions or allergies, over-utilization and potential fraud.[24]

36.     CVS claims that the PBM industry as a whole has experienced "margin pressure as a result of competitive pressures and increased client demands for lower prices, increased revenue sharing, enhanced service offerings and/or higher service levels."[25] To address this, CVS uses its market power to negotiate contracts with drug manufacturers providing for purchase discounts and/or rebates on drugs dispensed by participating specialty pharmacies. These "rebates often depend on a PBM's ability to meet contractual market share or other requirements, including in some cases the placement of a manufacturer's products on [CVS's]

---

[22] 2018 Provider Manual, pp. 7, 8, 18, 37.
[23] CVS's Form 10-K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 2018 (the "10K"),
[24] *Id.*
[25] *Id.*

formularies."[26]

## CVS's Claw-Back Program

37.     Beginning in calendar year 2015, CVS implemented the Claw-Back Program, which all contracted pharmacies are required to join to continue to have access to CVS's critical Medicare Part-D patients. AHF has no choice but to participate in the Claw-Back Program – exclusion from CVS's network of pharmacies would have catastrophic consequences for AHF and its mission given the disproportionate market share CVS wields. CVS has operated the Program continuously since 2015 and will likely continue to do so for the foreseeable future. There is no opportunity for AHF to negotiate any of the terms of the Claw-Back Program. CVS imposes the Claw-Back Program on pharmacies, having previously imposed on pharmacies the contractual term that any "programs" CVS issues automatically become part of the overall agreements.

38.     According to CVS's website, CVS intends for the Claw-Back Program to ensure optimal pharmacy performance by driving better clinical performance.[27] In practice, the Claw-Back Program is a naked, self-serving effort to upend and frustrate the payment of clean claims, and the adjudication of claims for which there are disputes, in contravention of state and federal laws and regulations, with after-the-fact, arbitrary "adjustments," whatever the consequences to patients and regardless of their treating physicians' advice. It is a cash-grab, unlawfully discriminating against smaller, specialty pharmacies serving high-risk populations, under which CVS has unlawfully recouped at least $11,630,035.69 in payments from AHF pharmacies since 2015. As shown below, the Claw-Back Program as designed and applied to AHF has nothing to do with a pharmacy's performance in the context of patient care.

---

[26] *Id.*
[27] CVS Health Statement Regarding Direct and Indirect Remuneration (DIR), CVS Website, February 2, 2017 (https://cvshealth.com/newsroom/press-releases/cvs-health-statement-regarding-direct-and-indirect-remuneration-dir)

## CVS's Flawed, Statistically Unsound, Secret Scoring Methodology

39.      CVS operates the Claw-Back Program by using what it refers to as a "secret algorithm" to assign an overall performance score to each individual participating pharmacy. CVS updates the final score three times each year, on a trimester basis for the periods January through April, May through August, and September through December. The final score is critical because CVS uses that number to determine how much an individual pharmacy will be penalized during a given period. Performance scores are a pretext; they discriminate against small, specialty pharmacies serving high-risk populations, penalize pharmacies for decisions made by treating physicians, and are tied largely to factors entirely outside the control of any individual pharmacy, without regard to individual patients' actual medical needs or the quality of AHF's services.

40.      Under the Claw-Back Program, CVS establishes an arbitrary, per-prescription penalty based on a percentage of the cost for each prescription. The penalty varies from between 3.5% to 8.5% on the amount of every claim paid. Although CVS claims that improving clinical performance is the goal of the Claw-Back Program, CVS applies a "minimum penalty," whatever a pharmacy's "performance." The Claw-Back Program punishes all "performance," bad, good, great or even perfect, and rewards none. There is no mechanism in the Claw-Back Program for pharmacies to pay no penalty or to receive additional sums based on scoring.

41.      As relevant to this matter, CVS's chief criteria for determining "performance" and assigning scores appear to be the number of prescriptions filled and the volumes of pills or other forms of certain medicines dispensed (e.g. statins), the composition of drugs dispensed (e.g., percentage of generic drugs) and the percentage of patients completing a medication management process which might be inapplicable or even contraindicated depending on the treating physicians' advice. Only one of these criteria, the composition of drugs dispensed, rests within AHF's control. For those factors outside of AHF's control – the volume of prescribed drugs and the applicability of a medication management process – the Claw-Back Program

penalizes AHF for decisions taken by treating physicians in the best interest of AHF's high-risk pharmacy customers.

42. For example, CVS bases its "performance" score, in part, on whether patients using hypertension, cholesterol, and diabetes medications have received sufficient amounts of their medications during a particular trimester. However, a pharmacy has no control over whether a physician has prescribed a certain type of medications; nor can pharmacies force patients to fill prescriptions or to pick up their prescriptions once filled. Yet failure to meet CVS's arbitrary standard in this regard results in huge financial penalties for AHF. Perhaps most egregiously, CVS's "performance" scoring penalizes AHF for decisions taken by treating physicians based on those physicians' deep expertise in treating people taking powerful HIV mediations. As an example, CVS uses its vaunted proprietary, cutting-edge systems to measure the percentage of diabetic patients, over age 65, who are receiving cholesterol-lowering medication (i.e., statins) based on the assumption that 100% of such patients should be prescribed the medication. However, statins can be hazardous for patients taking HIV medications, and AHF physicians often affirmatively decide that patients not take statins. Nonetheless, CVS and its much-touted systems refuse, or are unable, to account for these facts. Instead, they penalize AHF's pharmacies for the medically appropriate decisions physicians make, in the (ironic) name of "performance" and "quality."

43. The Claw-Back Program discriminates against smaller pharmacies, like AHF, and their high-risk patient populations. Certain aspects of CVS's indisputably statistically unsound scoring methodology and its "secret algorithm" drive this discrimination. The small sample sizes presented by smaller pharmacies, like AHF, work to discriminate unfairly against smaller pharmacies because instances of "non-compliance" (meaning instances of AHF's inability to control what is prescribed and what is not prescribed, what prescriptions are filled and its "failure" to dispense drugs against doctor's orders) disproportionately impact and distort performance measurement. When measuring medication adherence, CVS's state-of-the-art

systems and "secret algorithm" refuse to account for instances when the number of actual patients in a particular category is insignificantly small. During one reporting period for an AHF pharmacy, one of only six patients receiving hypertension medication failed to receive a sufficient supply, but AHF's compliance score in this category dropped nearly 17% because of a single patient. CVS refuses to account for the disproportionate impact a single patient can have on a smaller, specialty pharmacy serving high-risk patients, and AHF is unfairly penalized as a result. A larger pharmacy with dozens or hundreds of patients receiving hypertension medication will not be similarly affected by a single patient.

## CVS's Secret Data and Methodology and Refusal to Explain How "Performance" Scores Tie to the Penalties Charged

44.     CVS refuses to reveal any meaningful information concerning the operation of the Claw-Back Program. CVS conceals even general information about how its "secret algorithm" and its scoring system improve clinical performance or anything other than CVS's market share and margins. CVS keeps secret the specific patient and prescription information fed into its "secret algorithm" to calculate performance scores. To be clear, AHF has complete data concerning the prescriptions it has filled. AHF provided all of that data to CVS when AHF submitted claims for payment. ***CVS will not share with AHF how that data results in scores or which data CVS uses to score.*** Rather, CVS provides only summary level data, and AHF cannot verify, confirm or even understand CVS's calculations or the scores.

45.     Further putting the lie to any suggestion that the Claw-Back Program is about "performance," CVS refuses to explain the relationship between a pharmacy's final score and the financial penalty tied to a particular score. For example, during Trimester 1, 2018, CVS awarded one AHF pharmacy a final score of 91.06% for the Aetna health plan administered by CVS. CVS informed AHF that the final score resulted in a financial penalty of 3.3% on every brand-name prescription filled during the trimester. Yet, CVS will not explain the link between the score and the penalty. AHF cannot determine whether CVS imposed the "correct" penalty

associated with the score because CVS refuses to reveal how final scores tie to such rates. AHF, therefore, has no idea how to improve its final score, how significant the factors outside of AHF's control are in CVS's "secret algorithm" in terms of impact on AHF's scores, or how improving its final score would relate to a lowered penalty rate. AHF operates blindly in regard to the risks and rewards associated with performance under the Claw-Back Program.

## CVS's Improper Retroactive Application of the Scoring System

46.     CVS applies the financial penalties retroactively, meaning CVS recoups funds from AHF at least five months after claims are initially paid. Although CVS boasts of state-of-the-art prescription management systems that "streamline' the processing of prescriptions, that system and the "secret algorithm" take five months after claims are paid to determine the claw-back. Retroactive claw-backs create havoc and uncertainty for AHF's operations and deny AHF the benefit of the bargain at the heart of the contractual relationship.

## CVS Used the Claw-Back to Help Finance the Aetna Acquisition

47.     CVS paid in cash a large component of the $78 billion price for acquiring Aetna. CVS had reduced reimbursement rates since the inception of the Claw-Back Program to increase its margins, and it reduced those rates yet again around the time of the acquisition to help fund the cash component of the acquisition price. [28] As noted, CVS reported earning nearly $10 billion more in revenues in 2018 than the prior year.[29] AHF is informed and believes and, based thereon, alleges that CVS will continue to reduce its reimbursement rates to pay down the debt it incurred in financing the Aetna acquisition as well as the debt it assumed from Aetna as part of the acquisition.

## CVS's Imposition and Operation of the Claw-Back Program

48.     As discussed above, CVS operates the Claw-Back Program with no transparency

---

[28] CVS Caremark cut payments to pharmacies amid $70 billion deal to buy Aetna, Columbus Dispatch, June 24, 2018 (https://www.dispatch.com/news/20180624/cvs-caremark-cut-payments-to-pharmacies-amid-70-billion-deal-to-buy-aetna)
[29] CVS 2018 Annual Report

and provides no meaningful way for AHF to verify the accuracy of the performance scores. CVS hides the financial impact until well after patients have been served. The Claw-Back Program is a canard; it seeks to upend the agreement and to pay to AHF less than CVS has agreed to pay and has already paid on clean and otherwise fully adjudicated claims. It seeks to co-opt participating, smaller pharmacies in its efforts to grow CVS's margins and market share, while helping to finance CVS's efforts to integrate health care industry participants horizontally and vertically. It has nothing to do with enhancing pharmacy "performance" in the context of patient care, particularly as applied to smaller, specialty pharmacies serving high-risk clientele. Independent, small pharmacies in several states have reported that, while CVS cut payments to pharmacies using the Claw-Back Program, CVS sent letters to small pharmacy owners purporting to sympathize with their financial woes and offering to buy them out.[30]

49. As noted, after the claw-back, the amount paid to AHF for some prescriptions *is less than* AHF's actual cost for acquiring these medications. AHF is losing money on some transactions without any way to know which prescriptions will lose money until five months or more after AHF dispensed medications in good faith to CVS members. Indeed, the terms and conditions of the Claw-Back Program imposed by CVS force pharmacies like AHF to lose money on transactions to continue treating high-risk patients in dire need of its services.

50. CVS has unlawfully recouped at least $11,630,035.69 from January 1, 2015 through October 31, 2019 and continues to recoup funds pursuant to its Claw-Back Program.

51. Moreover, the Claw-Back Program inherently harms small specialty pharmacies disproportionately compared to larger pharmacies. Prescriptions filled by specialty pharmacies like AHF constitute a significant portion of high-cost, sole-sourced brand name drugs. Because the Claw-Back Program recoups a *percentage* of every prescription filled, rather than a flat amount per prescription, the Program guarantees that specialty pharmacies will be unfairly penalized and damaged.

---

[30] CVS Caremark cut payments to pharmacies amid $70 billion deal to buy Aetna, Columbus Dispatch, June 24, 2018.

AMENDED DEMAND FOR ARBITRATION

52.     As a result of these unlawful recoupments, AHF is forced to curtail the breadth of services offered to patients seeking to fill prescriptions at AHF pharmacies. AHF has long-standing relationships with pharmacy patients who rely on AHF's extensive, highly specialized services provided by highly trained professionals, yet the claw-backs imposed by CVS harm AHF's financial ability to provide such services. The mounting financial harm imposed by CVS diminishes AHF's ability to provide these services, and patients are increasingly incentivized and even required to fill prescriptions at competing pharmacies, including through CVS's mail order pharmacy business, further compounding the financial damage as CVS's margins grow.

53.     The onerous, arbitrary terms of the Claw-Back Program and CVS's administration of it are patently unlawful, unreasonable and in bad faith and pose serious risk of patient harm by making continuing as a participating pharmacy increasingly untenable for small, specialty pharmacies treating high-risk patients, like AHF.

### FIRST CLAIM

#### For Breach of Agreement

54.     AHF incorporates herein as if set forth fully all the preceding allegations of the Demand.

55.     AHF agreed to provide prescription drug services to patients in health plans administered by CVS and with the full expectation that CVS would adhere to the terms of the applicable agreement and state and federal laws and regulations. Pursuant to the agreement, CVS is obligated to reimburse AHF in a timely fashion and according to a determinable formula for drugs dispensed to patients whose prescription benefits CVS administers. The agreement does not permit CVS to hide from AHF the true, net amounts CVS reimburses to AHF for drugs AHF dispenses. Nor does the agreement permit CVS to reimburse smaller, specialty pharmacies treating high-risk patients less money than reimbursed to very large pharmacy chains. The agreement requires CVS to pay clean claims promptly pursuant to applicable law. The agreement provides for the prompt resolution of disputes as to claims so that those claims may

also be paid promptly  When CVS pays claims in full (whether those claims were clean or not or subject to disputes that were resolved), there is no need or basis for AHF to challenge those payments through the established procedures for disputing CVS's actions on claims.  Once AHF receives CVS's claw-back demand, there is no basis or means for challenging that claw-back and no way to confirm that CVS's secret algorithm is designed for anything other than grabbing money from Providers.  Every 4 months AHF receives from CVS bills, the amount of which AHF cannot predict and the calculation of which is cloaked in secrecy, playing havoc with AHF's ability to cash flow its business or to plan or control its finances.  Those bills are not subject to challenge, question or appeal.

56.     AHF fully performed all its obligations under the agreement, including dispensing medications to eligible patients and timely submitting claims for reimbursement in compliance with CVS's requirements.

## CVS's Breaches

### The Claw-Back Program's Implementation, Design and Operation

57.     As described above, CVS unilaterally implemented and operates the Claw-Back Program for the purpose of increasing its margins by taking back from AHF funds already paid to AHF on clean and otherwise fully adjudicated claims for reimbursement long after AHF rendered services.  The Claw-Back Program retroactively penalizes AHF's pharmacies by clawing back millions of dollars of funds paid by CVS to AHF's pharmacies without regard to AHF's delivery of top-flight patient care or with its "performance," thereby making increasingly untenable AHF's realizing of its mission of serving people living with HIV/AIDS without regard to their ability to pay.  The Claw-Back Program has nothing to do with enhancing or improving the "performance" of pharmacies in the context of patient care.  As administered, the Claw-Back Program permits CVS to penalize AHF for acts and decisions not subject to AHF's control.  The Claw-Back Program also permits CVS to penalize AHF for medical decisions taken by expert treating physicians.  The Claw-Back Program also permits CVS to discriminate against small

pharmacies. The Claw-Back Program results in smaller, specialty pharmacies serving high-risk patents receiving smaller net reimbursements than those receive by large chain pharmacies participating in CVS' PBM programs.

58.     In its implementation, administration, and operation of the Claw-Back Program, CVS breaches the agreement and violates various federal and state laws and regulations, all of which CVS incorporated into the agreement and is obligated to follow. These violations, described more fully below, are, therefore, breaches of the agreement.

## CVS's Violation of Federal Medicare Reasonable and Relevant Terms Law 42 C.F.R. § 423.505(b)(18)

59.     Federal Medicare law, 42 C.F.R. § 423.505(b)(18), requires that all Medicare Part D plan sponsors agree to offer participating pharmacies a contract with "reasonable and relevant terms and conditions of participation." Such requirements have been uniformly and repeatedly emphasized by the Centers for Medicare and Medicaid Services. CVS's actions violate 42 C.F.R. § 435.505(b)(18).

60.     CVS secretly employs and manipulates the Claw-Back Program to reduce greatly without rational, performance-related justification the reimbursements paid to AHF and to make providing services to CVS's members financially precarious for AHF.

61.     There is nothing reasonable about the Claw-Back Program or its administration, and it has no relevance to pharmacy "performance." As a result of the reduced reimbursement, AHF is not able to provide the depth of services to treat its patients and is dissuaded from providing services at all.

## CVS's Breach of Obligation to Pay Claims Promptly and Finally
## Violation of Federal Medicare Prompt Payment Law 42 U.S.C. § 1395w-112

62.     Federal law, 42 U.S.C. § 1395w-112, requires prompt payment of clean claims submitted by a pharmacy within 14 days after the clean claim has been received or within 30 days of receiving any other claim. The agreement contains some state-specific provisions

requiring the prompt payment of clean claims. The Claw-Back Program violates 42 U.S.C. § 1395w-112 and the agreement.

63.     The Claw-Back Program is predicated on retroactively assessing payment reductions on individual clean or otherwise fully adjudicated claims at least five months (and up to one year) after the claims have been submitted electronically. CVS designed the Claw-Back Program not to enhance or improve "performance," but so that clean and otherwise adjudicated claims would not be timely paid, in violation of 42 U.S.C. §1395w-11.

### CVS's Breaches of Obligation to Promptly Adjudicate and Pay Disputed Claims

64.     The agreement requires providers to submit and process claims using CVS's "claims adjudication system." Clean claims, non-clean claims and otherwise disputed claims are processed through this system, which is required to adjudicate disputed claims promptly and then to pay those claims promptly after any disputes are resolved.

65.     The Claw-Back Program is predicated on retroactively assessing payment reductions on individual fully adjudicated claims at least five months (and up to one year) after the claims have been submitted electronically and resolved. CVS designed the Claw-Back Program not to enhance or improve "performance," but so that adjudicated claims would not be timely paid, in violation of the agreement.

### CVS's Violations of State Law Unfair Business Practice Laws
### [Cal. Bus. & Prof. Code, § 17200, et. seq.]

66.     The California Business and Professions Code provides that unfair competition includes any unlawful, unfair or fraudulent business act or practice.

67.     As shown above, CVS engaged in unlawful, unfair and fraudulent business practices by, among other things, breaching its agreement with AHF, and violating federal and state laws and applicable regulations. CVS's conduct was unethical, oppressive, unscrupulous and unjustly enriched CVS, to the detriment of AHF and its patients.

68.     CVS's repeated unfair business practices in California caused damages to AHF,

and unjustly enriched CVS, in an amount in excess of $442,639.44, not including attorneys' fees and costs, to be proved at arbitration.

## [Florida Deceptive and Unfair Trade Practices Act,
## Sections 501.201-.213, Florida Statutes]

69.     Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) protects the consuming public and legitimate business enterprises from unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce. The FDUTPA declares unlawful all unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. The FDUTPA defines a violation of the FDUTPA as violation of any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

70.     As shown above, CVS engaged in unlawful, unfair and fraudulent business practices by, among other things, breaching its agreement with AHF, and violating federal and state laws and applicable regulations. CVS's conduct was unethical, oppressive, unscrupulous and unjustly enriched CVS, to the detriment of AHF and its patients. CVS's conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

71.     CVS's repeated unfair business practices in Florida caused damages to AHF, and unjustly enriched CVS, in an amount in excess of $546,609.82, not including attorneys' fees and costs, to be proved at arbitration.

72.     AHF is also entitled to receive a civil penalty in the amount of $10,000 per violation of the FDUTPA.

## [Louisiana Unfair Trade Practices, La. Rev. Stat. Ann. § 22:1964]

73.     Louisiana statutes prohibit unfair methods of competition and unfair or deceptive acts or practices in the business of insurance. Unfair discrimination in the context of this case is

defined as the making or permitting any unfair discrimination between individuals of the same class involving essentially the same hazards in the benefits payable pursuant to a health care plan, or in any of the terms or conditions of such a plan, or in any other manner whatever.

74.     As shown above, CVS engaged in unlawful, unfair, deceptive and fraudulent business practices by, among other things, breaching its agreement with AHF, and violating federal and state laws and applicable regulations. CVS's conduct was unethical, oppressive, unscrupulous and unjustly enriched CVS, to the detriment of AHF and its patients. CVS's conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

75.     CVS's repeated unfair business practices in Louisiana caused damages to AHF, and unjustly enriched CVS, in an amount in excess of $33,051.01, not including attorneys' fees and costs, to be proved at arbitration.

### New York Deceptive Trade Practices, NYGBL, Section 349

76.     New York General Business Law, §349 prohibits any business or person from engaging in deceptive business practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York State.

77.     As shown above, CVS engaged in unlawful, unfair, deceptive and fraudulent business practices by, among other things, breaching its agreement with AHF, and violating federal and state laws and applicable regulations. CVS's conduct was unethical, oppressive, unscrupulous and unjustly enriched CVS, to the detriment of AHF and its patients. CVS's conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

78.     CVS's repeated unfair business practices in New York caused damages to AHF, and unjustly enriched CVS, in an amount in excess of $270,243.42, not including attorneys' fees and costs, to be proved at arbitration.

**[Washington State Consumer Protection Act, ARCW Section 19.86 et. seq.]**

79.      Washington State's Consumer Protection Act declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as unlawful.  Any person injured in his or her business property by a violation of the Consumer Protection Act may bring a civil action to enjoin further violations, to recover actual damages, or both, together with costs of suit, including reasonable attorneys' fees.

80.      As shown above, CVS engaged in unlawful, unfair, deceptive and fraudulent business practices by, among other things, breaching its agreement with AHF, and violating federal and state laws and applicable regulations.  CVS's conduct was unethical, oppressive, unscrupulous and unjustly enriched CVS, to the detriment of AHF and its patients.  CVS's conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

81.      CVS's repeated unfair business practices in Washington caused damages to AHF, and unjustly enriched CVS, in an amount in excess of $43,921.65, not including attorneys' fees and costs, to be proved at arbitration.

### CVS's Violations of State "Any-Willing-Provider" Laws

82.      AHF operates pharmacies in six states – Georgia, Illinois, Louisiana, Mississippi, South Carolina, and Texas – with Any-Willing-Provider Laws ("AWP Laws").

83.      AWP Laws require PBMs like CVS to allow participation by any pharmacy willing to meet the terms and conditions generally offered to pharmacies in each respective state.  However, the terms and conditions imposed on pharmacies must be reasonable and non-discriminatory and may not work to disqualify or exclude any pharmacy from participating in CVS's network of pharmacies.

### [O.C.G.A. § 33-20-16 (Georgia)]

84.      Georgia law requires that every health care provider, including pharmacies, has the right to become a participating provider under such terms or conditions offered to other

approved health care providers under similar circumstances.

## [215 ILCS 134/72(a) (Illinois)]

85.     The Illinois Managed Care Reform and Patient Rights Act states that plans may not refuse to contract with pharmacy providers that can meet the plan's contractual terms. The terms and conditions in an agreement between health care plans and pharmacy providers "shall not discriminate against a pharmacy provider."

## [La. Rev. Stat. 22:1964(15) (Louisiana)]

86.     Louisiana insurance laws prohibit pharmacy plans from limiting beneficiaries from selecting a pharmacy of the beneficiaries' choice for pharmaceutical services. Plans may not interfere with plan participants' selections of a pharmacy. Louisiana law defines "interfere" as including plan terms that have the effect of charging to or imposing on an insured or other beneficiary who does not utilize a specified or designated pharmacy or pharmacist, a copayment fee or other condition not equally charged to or imposed on all insureds or other beneficiaries in or under the same program or policy or plan.

## [Miss. Code Ann. § 83-9-6 (Mississippi)]

87.     The Mississippi Code requires plans to allow participants their choice of pharmacies that have agreed to participate in plans according to the terms offered by the insurer. Also, a plan may not deny such pharmacies the right to participate as a contract provider. A plan may not impose a monetary advantage or penalty under a health benefit plan that would affect a participant's choice among those pharmacies that have agreed to participate in the plan according to the terms offered by the insurer. Monetary advantages or penalties are defined as including higher copayments, reductions in reimbursement for services, or promotion of one participating pharmacy over another by these methods.

## [S.C. Code § 38-71-147 (South Carolina)]

88.     The South Carolina Codes provide that plans may not prohibit or limit a participant in a plan from having the choice of pharmacies that have agreed to participate in the

plan according to the terms offered by the insurer. In addition, a plan may not deny a pharmacy the right to participate as a contract provider under the plan.

### [Tex. Insurance Code § 21.52B (Texas)]

89.    The Texas Insurance Code forbids the limiting of a plan participant's choice of pharmacies and the denial of a pharmacy's the right to participate as a contract provider under the policy or plan if the pharmacy agrees to provide pharmaceutical services that meet all terms and requirements. Also, plans are forbidden from requiring a participant to obtain or request a specific quantity or dosage supply of pharmaceutical products.

### CVS's Violations of the AWP Laws

90.    As shown above, CVS violated AWP Laws by forcing AHF to participate in the Claw-Back Program, operating the Claw-Back Program in a discriminatory manner and forcing AHF to provide prescription medications to patients below AHF's cost.

91.    CVS understands that recouping funds pursuant to the Claw-Back Program means substantially reduced reimbursement for AHF and that AHF will lose money on many prescriptions. CVS further understands that the Claw-Back Program makes continued participation in PDP and MA-PD plans administered by CVS increasingly untenable. CVS is intentionally driving AHF out of its networks in direct contravention of AWP Laws.

92.    AHF is, therefore, entitled to preliminary and permanent injunctive relief, prohibiting CVS from operating the Claw-Back Program in Georgia, Illinois, Louisiana Mississippi, South Carolina, and Texas in a manner that forces AHF to lose money filling prescriptions and/or drives AHF out of CVS's network.

### CVS's Violations of Section 2 of the Robinson-Patman Act, 15 U.S.C. §13

93.    For purposes of CVS's antitrust violations, the relevant service market affected by CVS's unlawful conduct is pharmacy services provided by smaller, specialty pharmacies to high-risk patients and reimbursed by or through the Medicare Part D program. The relevant geographic market for that activity is nationwide.

94. As shown above, by operation of the Claw-Back Program, CVS unlawfully discriminates in commerce against small pharmacies in that the net amounts reimbursed through the Medicare Part D program to small, specialty pharmacies, serving high-risk populations and participating in CVS's PBM programs *are lower than* the amounts reimbursed by CVS to large retail chain pharmacies with far larger customer bases. Ultimately, large and even giant pharmacy chains, like CVS, dispense drugs of like grade and quality as those dispensed by smaller pharmacy chains but receive *substantially higher* net reimbursements from CVS's PBM operations than smaller pharmacies.

95. The impact of this discriminatory pricing is to substantially lessen competition and to tend to create a monopoly and/or to injure, destroy, or prevent competition with CVS's own retail and mail order pharmacy operations in violation of Section 2 of the Robinson-Patman Act, 15 U.S.C. §13.

96. AHF is, therefore, entitled to preliminary and permanent injunctive relief, pursuant to Section 16 of the Robinson-Patman Act, 15 U.S.C. §26, prohibiting CVS from demanding payment from AHF as a result of the operation of the Claw-Back Program in a fashion that violates Section 2 of the Robinson-Patman Act, 15 U.S.C. §13;

97. CVS's repeated violations of Section 2 of the Robinson-Patman Act, 15 U.S.C. §13, in connection with the Claw-Back Program caused damages to AHF, and unjustly enriched CVS, in an amount to be proved at arbitration.

98. CVS's repeated breaches of the agreement in connection with the Claw-Back Program caused harm to AHF in an amount in excess of $11,630,035.69, not including attorneys' fees and costs, to be proved at arbitration.

## SECOND CLAIM

### For Breach of the Implied Covenant of Good Faith and Fair Dealing

99. AHF incorporates herein as if set forth fully all the preceding allegations of the Demand.

100.     Arizona law implies in every agreement, including the agreement at issue here, a covenant of good faith and fair dealing which can be breached even where the express terms are not violated. The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent the other contracting parties from receiving the benefits of the agreement.

101.     AHF agreed to provide prescription drug services to patients in health plans administered by CVS in good faith and with the full expectation that CVS would adhere to the terms of the applicable agreement and applicable law and regulations. Pursuant to the applicable agreement, CVS is obligated to reimburse AHF in a timely fashion and according to a determinable formula for drugs dispensed to patients whose prescription benefits CVS administers. The agreement does not permit CVS to hide from AHF the true, net amounts CVS reimburses to AHF for drugs AHF dispenses.

102.     AHF fully performed all its obligations under the agreement, including dispensing medications to eligible patients and timely submitting claims for reimbursement in compliance with CVS's requirements.

103.     CVS acted in bad faith and breached the implied covenant of good faith and fair dealing in the unilateral imposition and operation of the Claw-Back Program without regard to improving the quality of patient care. The Claw-Back Program has nothing to do with enhancing or improving the "performance" of pharmacies in the context of patient care. As administered, the Claw-Back Program permits CVS to penalize AHF for acts and decisions not subject to AHF's control. The Claw-Back Program also permits CVS to penalize AHF for medical decisions taken by expert treating physicians. CVS has used the Claw-Back Program to its own pecuniary benefit to deprive AHF of the benefit of its bargain.

104.     CVS's repeated breaches of the implied covenant in connection with the Claw-Back Program caused harm to AHF in an amount in excess of $11,630,035.69, not including attorneys' fees and costs, to be proved at arbitration.

## THIRD CLAIM

### Unenforceable Adhesive Terms of Agreement

### [Arizona Common Law]

105.     AHF incorporates herein as if set forth fully all the preceding allegations of the Demand.

106.     As shown, the terms of the Claw-Back Program are adhesive.

107.     The terms of the Claw-Back Program do not fall within the reasonable expectations of AHF, the adhering party, in the manners shown above.

108.     As also shown, the terms of the Claw-Back Program are both substantively and procedurally unconscionable.

109.     AHF has suffered damages as a result of the unenforceable adhesive terms of the Agreement pertaining to the Claw-Back Program in an amount in excess of $11,630,035.69, not including attorneys' fees and costs, to be proved at arbitration.

110.     AHF is entitled to preliminary and permanent injunctive relief, forbidding and enjoining CVS from attempting to enforce the portions of the agreement pertaining to the Claw-Back Program which are adhesive and do not fall within AHF's reasonable expectations and/or are substantively and/or procedurally unconscionable.

## FOURTH CLAIM

### For State Law Unfair Business Practices

### [Cal. Bus. & Prof. Code, § 17200, *et. seq.*]

111.     AHF incorporates herein as if set forth fully all the preceding allegations of the Demand.

112.     As shown above, CVS's repeated unfair business practices in California unjustly enriched CVS in an amount in excess of $442,639.44, not including attorneys' fees and costs, to be proved at arbitration.

113.     AHF's business was substantially harmed, and continues to be harmed, by CVS's

unfair and deceptive practices. AHF is entitled to preliminary and permanent injunctive relief, forbidding and enjoining CVS from engaging in California in the unlawful, unfair business practices described herein.

## [Florida Deceptive and Unfair Trade Practices Act,
## Sections 501.201-.213, Florida Statutes]

114.    As shown above, CVS's repeated unfair business practices in Florida unjustly enriched CVS in an amount in excess of $546,609.82, not including attorneys' fees and costs, to be proved at arbitration.

115.    AHF's business was substantially harmed, and continues to be harmed, by CVS's unfair and deceptive practices. AHF is entitled to preliminary and permanent injunctive relief, forbidding and enjoining CVS from engaging in Florida in the unlawful, unfair business practices described herein.

116.    AHF is also entitled to receive a civil penalty in the amount of $10,000 per violation of the FDUTPA.

## [Louisiana Unfair Trade Practices, La. Rev. Stat. Ann. § 22:1964]

117.    As shown above, CVS's repeated unfair business practices in Louisiana damaged AHF in an amount in excess of $33,051.01, not including attorneys' fees and costs, to be proved at arbitration.

118.    AHF's business was substantially harmed, and continues to be harmed, by CVS's unfair and deceptive practices. AHF is entitled to preliminary and permanent injunctive relief, forbidding and enjoining CVS from engaging in Louisiana in the unlawful, unfair business practices described herein.

## [Washington State Consumer Protection Act, ARCW Section 19.86 *et. seq.*]

119.    As shown above, CVS's repeated unfair business practices in Washington State caused damages to AHF in an amount in excess of $43,921.65, not including attorneys' fees and costs, to be proved at arbitration.

120.     AHF's business was substantially harmed, and continues to be harmed, by CVS's unfair and deceptive practices. AHF is entitled to preliminary and permanent injunctive relief, forbidding and enjoining CVS from engaging in Washington State in the unlawful, unfair business practices described herein.

## FIFTH CLAIM

### For Violation of State "Any-Willing-Provider" Laws

121.     AHF incorporates herein as if set forth fully all the preceding allegations of the Demand.

### [O.C.G.A. § 33-20-16 (Georgia)]

122.     As shown above, CVS has violated the Georgia AWP Law.

### [215 ILCS 134/72(a) (Illinois)]

123.     As shown above, CVS has violated the Illinois AWP Law.

### [La. Rev. Stat. 22:1964(15) (Louisiana)]

124.     As shown above, CVS has violated the Illinois AWP Law.

### [Miss. Code Ann. § 83-9-6 (Mississippi)]

125.     As shown above, CVS has violated the Illinois AWP Law.

### [S.C. Code § 38-71-147 (South Carolina)]

126.     As shown above, CVS has violated the Illinois AWP Law.

### [Tex. Insurance Code § 21.52B (Texas)]

127.     As shown above, CVS has violated the Illinois AWP Law.

128.     AHF is, therefore, entitled to preliminary and permanent injunctive relief, prohibiting CVS from operating the Claw-Back Program in Georgia, Illinois, Louisiana Mississippi, South Carolina, and Texas in a manner that forces AHF to lose money filling prescriptions and/or drives AHF out of CVS's network.

## SIXTH CLAIM

### For Violation of the Section 2 of the Robinson-Patman Act, 15 U.S.C. §13

129.    AHF incorporates herein as if set forth fully all the preceding allegations of the Demand.

130.    As shown above, in its unilateral implementation, administration and operation of the Claw-Back Program, CVS has violated Section 2 of the Robinson-Patman Act, 15 U.S.C. §13.

131.    AHF is, therefore, entitled, pursuant to Section 4 of the Robinson-Patman Act, 15 U.S.C. §15, to an award of damages in an amount to be proved at arbitration and to preliminary and permanent injunctive relief, pursuant to Section 16 of the Robinson-Patman Act, 15 U.S.C. §26.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for Judgment against Defendants, and each of them, on all of their causes of action herein, in an amount sufficient to compensate Plaintiffs for the losses that they suffered as set forth in each of the causes of action contained herein, and respectfully requests that this Court grant them the following relief:

1.    On the First Claim for Breach of Agreement:

a.    For general damages, according to proof at arbitration, in excess of $11,630,035.69; and

b.    For pre-award and post-award interest at the applicable legal rate; and

c.    For expenses and costs of suit, including arbitration costs and fees and attorneys' fees; and

d.    For preliminary and permanent injunctions prohibiting CVS from demanding payment from AHF as a result of the operation of the Claw-Back Program and from breaching the agreement in the manners proved at arbitration; and

e.     For specific performance by CVS of all its obligations pursuant to the agreement, including refraining in the future from demanding payment from AHF as a result of the operation of the Claw-Back Program.

2.     On the Second Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing:

a.     For general damages, according to proof at arbitration, in excess of $11,630,035.69; and

b.     For pre-award and post-award interest at the applicable legal rate; and

c.     For expenses and costs of suit, including arbitration costs and fees and attorneys' fees; and

d.     For preliminary and permanent injunctions prohibiting CVS from demanding payment from AHF as a result of the operation of the Claw-Back Program and from breaching the implied covenant of good faith and fair dealing in the manners proved at arbitration.

3.     On the Third Claim for Unenforceable Adhesive Contract Terms:

a.     For general damages, according to proof at arbitration, in excess of $11,630,035.69; and

b.     For pre-award and post-award interest at the applicable legal rate; and

c.     For expenses and costs of suit, including arbitration costs and fees and attorneys' fees; and

d.     For preliminary and permanent injunctions prohibiting CVS from attempting to enforce the portions of the agreement pertaining to the Claw-Back Program which are adhesive and not within AHF's reasonable expectations and/or or substantively and/or procedurally unconscionable.

4.     On the Fourth Claim for State Law Unfair Business Practices:

a.     For restitution of all amounts by which CVS was unjustly enriched at AHF's expense and/or damages (as applicable), according to proof at arbitration, in excess of $442,639.44 in California, $43,921.65 in Washington State, $546,609.82 in Florida and $33,051.01 in Louisiana; and

b.     For pre-award and post-award interest at the applicable legal rate; and

c.     For expenses and costs of suit, including arbitration costs and fees and attorneys' fees; and

d.     For preliminary and permanent injunctions, pursuant to the applicable unfair business practices statutes, in California, Florida, Washington State, and Louisiana prohibiting CVS from engaging in the unfair business practices proved at arbitration.

5.     On the Fifth Claim for Violation of State Any Willing Provider Laws:

a.     For preliminary and permanent injunctions, pursuant to the applicable AWP Laws, in Georgia, Illinois, Louisiana, Mississippi, South Carolina, and Texas prohibiting CVS from violating the AWP Laws in those states through the operation of the Claw-Back Program.

6.     On the Sixth Claim for Violation of Section 2 of the Robinson-Patman Act, 15 U.S.C. §13:

a.     For general damages pursuant to Section 4 of the Robinson-Patman Act, 15 U.S.C. §15, according to proof at arbitration; and

b.     For pre-award and post-award interest at the applicable legal rate; and

c.     For expenses and costs of suit, including arbitration costs and fees and attorneys' fees; and

d.     For preliminary and permanent injunctions, pursuant to Section 16 of the Robinson-Patman Act, 15 U.S.C. §26, prohibiting CVS from demanding payment from AHF as a result of the operation of the Claw-Back Program in a fashion that violates Section 2 of the Robinson-Patman Act, 15 U.S.C. §13.

7.    On all Claims, for such other and further relief as the Arbitrator may deem just, proper, and equitable.

DATE:  April 6, 2020

AIDS HEALTHCARE FOUNDATION
Tom Myers
Arti Bhimani
KIM RILEY LAW
Andrew F. Kim
Rebecca J. Riley


By _____
ANDREW F. KIM
Attorneys for Claimant
AIDS HEALTHCARE FOUNDATION

# EXHIBIT L



NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Kevin P. Shea**
*Partner*
T 312-977-4860
kpshea@nixonpeabody.com

70 W. Madison Street, Suite 3500
Chicago, IL 60602-4224
(312) 977-4400

May 13, 2020

*Via Email*

Arbitrator William J. Taylor
Tsao-Wu & Yee LLP
4215 Geary Street
San Francisco, CA 94118
wtaylor@tsaoyee.com

**RE:** *AIDS Healthcare Foundation v. CVS Caremark*, No. 01-19-0004-0127
      **Caremark's Request for Leave to File Motion to Sever and Partially Dismiss**

Dear Arbitrator Taylor:

      Pursuant to Provision 6 of Scheduling Order #1 entered on March 6, 2020, please accept this letter as the request of Respondents Caremark, L.L.C. and CaremarkPCS, L.L.C. (collectively "Caremark")[1] for leave to file a Motion to Sever and Dismiss ("Motion") claims asserted by Claimant, AIDS Healthcare Foundation ("AHF"), in its Amended Demand for Arbitration ("Amended Complaint") filed on April 6, 2020. A copy of Caremark's proposed motion is enclosed with this letter.

      The purpose of this letter is to outline: (1) the factual and legal bases for the Motion; and (2) the good cause reasons why the Motion should be addressed at this juncture.

## I.   AHF MAY NOT ASSERT CLAIMS ON BEHALF OF MULTIPLE PHARMACIES IN A SINGLE ARBITRATION

      AHF is not a single pharmacy but operates as 48 separate pharmacies in 16 different states. Here, AHF has filed a *single* arbitration on behalf of *multiple* pharmacies. Each AHF pharmacy entered into a *separate* Provider Agreement with Caremark, which expressly requires arbitrations to be conducted on an *individual*, not a *consolidated*, basis. Specifically, the individual Provider Agreements mandate that arbitration proceedings are to be brought on "an individual basis," not through a "form of consolidated proceedings" and further instruct the Arbitrator to "not

---

[1] Claimant incorrectly names CVS Health Corporation as a Respondent. However, the contracts at issue in this arbitration are between various providers that AHF operates, on the one hand, and Caremark, L.L.C. and CaremarkPCS, L.L.C., on the other hand. CVS Health Corporation is not a proper party.

consolidate arbitration proceedings without the express written permission of all parties to the Provider Agreement." Provider Manual (2018), at p. 52. This contractual requirement precludes AHF from aggregating the claims of each of its independent pharmacies into one arbitration proceeding. *Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C. LLC,* 213 Ariz. 83, 88 (App. 2006) (when the terms of a valid contract are clear and unambiguous, a court must give effect to the contract as written).

Courts have universally held that there must be an affirmative contractual basis that allows for consolidated arbitration proceedings. *Lamps Plus, Inc. v. Varela,* 139 S. Ct. 1407, 1416 (2019). In fact, attempts to consolidate arbitration proceedings under multiple agreements will not be allowed absent the consent of every party to those agreements. *Weyerhaeuser Co. v. Western Seas Shipping Co.,* 743 F.2d 635, 637 (9th Cir. 1984) (refusing to consolidate two arbitration proceedings because there were two separate agreements, each of which contained its own arbitration clause requiring arbitration only between the parties to the agreement). Because Caremark has never consented to consolidated proceedings, AHF's aggregation of claims is improper.

Thus, AHF should be required to identify one pharmacy that will continue in this arbitration. Once AHF identifies that pharmacy, the Arbitrator should sever and dismiss the remaining claims. *See* Ariz. R. Civ. P. 21 (a court can dismiss an improperly joined party or sever any claim against a party so that such a claim may be pursued in a separate action); Fed. R. Civ. P. 21 (same).

## II.   THE ARBITRATOR SHOULD DISMISS THE AMENDED COMPLAINT'S STATE LAW-BASED STATUTORY CLAIMS

The Amended Complaint alleges that Caremark breached the unfair competition laws and deceptive trade practices acts of various states, including California, Florida, Louisiana, New York, and Washington. *See* Cal. Bus. & Prof. Code § 17200; West's F.S.A. §§ 501.201-213; La. Rev. Stat. Ann. § 22:1964; NY Gen. Bus. Law Section 349; Wa. St. § 19.86.020. These claims should be dismissed.

First, the Provider Agreements at-issue contain Arizona choice of law provisions. Arizona courts have consistently held that, if there is an applicable choice of law provision favoring one state's law, then statutory claims (including for deceptive trade practices) cannot be brought under another state's laws. *See Sherman v. PremierGarage Systems, LLC,* 2010 WL 3023320, at *5-7 (D. Ariz. July 30, 2010) (dismissing claim brought by Florida-based franchisee under Florida's deceptive trade practices act because dealer agreement contained a choice of law provision favoring Arizona law); *Zounds Hearing Franchising LLC v. Moser,* 2016 WL 6476291, at *5-6 (D. Ariz. Nov. 2, 2016) (holding that Arizona choice of law provision precluded party's right to assert claim under Florida Franchise Misrepresentation Act).

Second, the state-based statutory claims also are preempted by federal Medicare law. *Uhm v. Humana, Inc.,* 620 F.3d 1134 (9th Cir. 2010) (finding that claim under consumer protection statute was preempted by federal law and regulations related to Medicare Part D sponsors); 70 FR 4194-01, 2005 WL 176041, at 4319 (Jan. 28, 2005) (for purposes of Part D, with the exceptions of State licensing laws or State law related to plan solvency, State laws would not apply to prescription drug plans or plan sponsors).

Third, the California, Louisiana and New York based state-based claims fail to state claims for relief. California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, cannot be invoked if the plaintiff has an adequate remedy at law, which the individual pharmacies have here. *Moss v. Infinity Ins. Co.,* 197 F. Supp. 3d 1191, 1203 (N.D. Cal. 2016). With respect to La. Rev. Stat. Ann. § 22:1964, AHF does not have a private right of action under that statute. *Voorhies Supply Co., L.L.C. v. Ohio Cas. Ins. Co.,* 2009 WL 482284, at *8 (W.D. La. Feb. 20, 2009). Finally, AHF's claims under NY Gen. Bus. Law § 349 fail because Caremark's alleged conduct does not impact consumers at large. *Benetech, Inc. v. Omni Fin. Group, Inc.,* 984 N.Y.S. 2d 186, 88 (App. Div. 2014); *Chemist Corner, Inc. v. Epic Pharmacy Network, Inc.,* 2019 WL 4750293, at *4 (D. Md. Sep. 30, 2019).

## III. THE ARBITRATOR SHOULD DISMISS AHF'S CLAIMS UNDER THE ROBINSON-PATMAN ACT

The Amended Complaint alleges that Caremark is in violation of the Robinson-Patman Act, 15 U.S.C. § 13. This claim fails because Caremark is not a seller of "commodities." *May Dep't Store v. Graphic Process Co.,* 637 F.2d 1211, 1214 (9th Cir. 1980) (noting that sale of commodities under the Robinson-Patman Act requires a 'sale of goods, wares, or merchandise, and [] not merely a contract for services"). Rather, Caremark provides a service to its plan sponsor clients to maintain pharmacy networks and remit payments to pharmacies who dispense drugs. This service does not fall within the scope of the Robinson-Patman Act. *See also Matthew Enterprise, Inc. v. Chrysler Group L.L.C.,* 2015 WL 3664843, at *5 (N.D. Cal. Jan. 12, 2015) (dismissing claim under Robinson-Patman Act because complained of activity related to service, a lease, and not sale of commodities); *Goodloe v. National Wholesale Co., Inc.,* 2004 WL 1631728, at *10 (N.D. Ill. July 19, 2004) (web site maintenance, electronic retail franchise, credit card processing services, and order processing services are not "commodities" for purposes of the Robinson-Patman Act).

Further, AHF has not alleged, nor can it show, a competitive injury as mandated under the Robinson-Patman Act.

## IV. GOOD CAUSE EXISTS TO GRANT A FILING OF THE MOTION AT THIS JUNCTURE

The Commercial Rules allow dispositive motions if it can be "shown that the motion is likely to succeed and dispose of or narrow the issues in the case." R-33. *See also* AZ R. Civ. P.

16(a)(1) (courts must manage a civil action with an objective of "expediting a just disposition of the action"). Caremark easily meets this standard.

First, severing the claims of individual pharmacies is required under controlling law. The United States Supreme Court recently held that a party cannot be forced into a class arbitration, even when the contract was ambiguous regarding whether class arbitration was allowed. *Lamps Plus*, 139 S. Ct. at 1416. In reaching this conclusion, the Court noted that, in individual arbitration, "parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *Id.* In contrast, class arbitration "sacrifices the principal advantage of arbitration – its informality – and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.*

As explained in *Lamps Plus,* forcing arbitration on a non-individual basis only complicates the issues that need to be resolved, makes the process slower, and potentially costlier. Indeed, if the Motion is not heard, the scope of the issues, and particularly discovery, significantly increases. AHF claims that Caremark's assessment of performance network rebate ("PNR") fees is improper. Caremark assesses PNR fees on an individual pharmacy level based on that individual pharmacy's performance under various criteria. Each individual pharmacy received trimester reports detailing its scoring. As the matter is currently constituted, discovery would involve the individual scoring of 48 separate pharmacies, a massive undertaking. Under the reasoning of *Lamps Plus*, Caremark's demand that AHF pursue its claims on an individual basis not only narrows the issues that need to be arbitrated, but it also promotes the policy behind why parties agree to arbitration provisions in the first place.

Further, dismissing futile claims – like those relating to the state-based statutory claims and the Robinson-Patman Act – will significantly narrow the issues for discovery and the final hearing.

## V.   **MEET AND CONFER**

Counsel for Caremark certifies that, prior to submitting this letter to the Arbitrator, counsel for Caremark conferred with counsel for AHF regarding whether AHF would oppose the filing of the instant Motion.

Specifically, on May 4, 2020, counsel for Caremark emailed a copy of the Motion to AHF's counsel and requested AHF's position on the Motion. After several follow-ups, the parties were unable to reach agreement regarding the appropriateness of the Motion. Accordingly, AHF opposes the Motion.

## VI.    **CONCLUSION**

For the foregoing reasons, Caremark respectfully requests that the Arbitrator allow it to submit the Motion and allow the parties to brief the issues presented therein.

Sincerely,

Kevin P. Shea

cc:    ***Via Email***
       Andrew Kim, Esq. (akim@kimriley.com)
       Rebecca Riley, Esq. (rriley@kimriley.com)
       Arti Bhimani, Esq. (arti.bhimani@aidshealth.org)
       Elizabeth Z. Meraz, Esq. (ezmeraz@nixonpeabody.com)
       Aon S. Hussain, Esq. (ahussain@nixonpeabody.com)
       Jen Mora, Case Manager (jenmora@adr.org)

| | | |
|---|---|---|
| AIDS HEALTHCARE FOUNDATION, | ) | |
| | ) | |
| Claimants, | ) | |
| | ) | |
| v. | ) | AAA Case No. 01-19-0004-0127 |
| | ) | |
| CVS CAREMARK, a subsidiary of CVS | ) | |
| HEALTH CORPORATION, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| | ) | |

## RESPONDENTS' MOTION TO SEVER AND DISMISS

Claimants Caremark L.L.C. and CaremarkPCS, L.L.C. (collectively "Caremark")[1] submit the following Motion to Sever and Dismiss and state as follows:

### PRELIMINARY STATEMENT

AIDS Healthcare Foundation ("AHF") seeks $11,630,035.69 in damages arising out of performance network fees ("PNR Fees") assessed to *multiple* pharmacies across the country from January 1, 2015 to October 31, 2019. While the recently-filed amended complaint ("Amended Complaint") names the single entity of AIDS Healthcare Foundation ("AHF") as the Claimant, in reality, this matter involves the claims of at least 48 pharmacies across 16 states – each of which had its own contract with Caremark during the relevant period and was assessed PNR Fees separately based on individual scoring metrics. AHF's attempt to assert claims on behalf of multiple pharmacies in a single consolidated proceeding is prohibited under the parties' contracts and controlling law.

---

[1] Claimant incorrectly names CVS Health Corporation as a Respondent. However, the contracts at issue in this arbitration are between various providers that AHF operates, on the one hand, and Caremark, L.L.C. and CaremarkPCS, L.L.C., on the other hand. CVS Health Corporation is not a proper party.

Each individual AHF pharmacy is enrolled as a separate entity within the Caremark network and submits claims to Caremark under a separate, unique NCPDP provider identification number.[2] As such, prior to November 2019,[3] each AHF pharmacy executed a separate provider agreement ("Provider Agreement") with Caremark that is *solely between Caremark and that individual pharmacy* and expressly requires arbitrations on an *individual*, not a *consolidated*, basis. Thus, AHF may only arbitrate this matter on behalf of a single independent pharmacy.

Additionally, the Arbitrator should dismiss the Amended Complaint's state-based unfair competition or deceptive trade practices claims under California, Florida, Louisiana, New York and Washington law. First, the relevant Provider Agreements each contain an Arizona choice of law provision and courts across the country, *including Arizona*, have held that such a provision prevents statutory claims from another state. Second, each of these state-based claims are preempted by federal Medicare law. Third, several of these state-based statutory claims also fail to state a claim for relief.

Finally, the Arbitrator should dismiss AHF's claim under the Robinson-Patman Act because Caremark is not a seller of commodities and AHF has not alleged, and cannot prove, competitive injury.

---

[2] A NCPDP is a unique national identifier that assists pharmacies in their interactions with pharmacy payers and claims processes

[3] After November 4, 2019, AHF became designated as a chain pharmacy in the Caremark networks and individual AHF pharmacies were enrolled under either Caremark's standard chain agreement or one of three state-specific agreements: (1) New York; (2) New Jersey; and (3) Washington. As AHF only seeks PNR Fees through October 31, 2019, these agreements are not pertinent to this case. However, even if applicable, each of these agreements also expressly incorporates Caremark's Provider Manual's anti-consolidation provisions as part of its terms.

On April 6, 2020, AHF filed the Amended Complaint, primarily challenging the validity of Caremark's PNR fee program ("PNR Program"). The Amended Complaint alleges that AHF is a "non-profit company that operates 48 pharmacies in 16 states ….." Amended Complaint, at p. 2 ¶1. Aside from this vague allegation, AHF fails to detail whether this action is on behalf of all 48 pharmacies or a smaller select number. AHF's allegations, however, clearly demonstrate that this action is on behalf of *multiple* unnamed pharmacies across the country.

AHF perplexingly alleges that it cannot attach the relevant contracts as exhibits because "of the amorphous, shape-shifting nature of the agreement." Amended Complaint, p. 11, fn. 10. Despite AHF's failure to attach the contracts at issue (which is required under AAA R-4(a)), this motion is based on the standard contract that Caremark requires all participating pharmacies to execute to join its "retail pharmacy" network. [4] Prior to November of 2019, each AHF pharmacy entered into *its own* Provider Agreement with Caremark. Attached as Exhibit A is an example of a Provider Agreement between Caremark and an AHF pharmacy. Each Provider Agreement incorporates by reference the Provider Manual. Exhibit A, p. 2, ¶11. The Provider Manual includes a valid and enforceable arbitration provision that, in part, requires the following:

> **No dispute between Provider and Caremark may be pursued or resolved as part of a class action, private attorney general or other representative action or proceeding (hereafter all included in the term "Class Action").** *All disputes are subject to arbitration on an individual basis not on a class or representative basis, or through any form of consolidated proceedings, and the arbitrator(s) will not resolve Class Action disputes and will not consolidate arbitration proceedings without the express written permission of all parties to the Provider Agreement.* **Provider and Caremark agree that each may pursue or resolve a dispute against the other only in its individual capacity, and not as a plaintiff or class member in any purported Class Action.**

---

[4] The Provider Manual defines "retail pharmacy" as "a duly licensed and established community pharmacy or dispensing practitioner that dispenses and sells non-specialty prescription drugs to Eligible Persons through in-person hand delivery at the point of sale." Exhibit B, Provider Manual (2018), at p. 341.

Exhibit B, Provider Manual (2018) at p. 51-52 (emphasis in italics).

Each individual AHF pharmacy is enrolled as a separate entity in Caremark's pharmacy network and submits claims with its own unique NCPDP number. As to the PNR Program, each individual pharmacy is assessed PNR fees based on individual scoring metrics unique to each pharmacy. Caremark provides each pharmacy with a separate trimester scoring report detailing each pharmacy's performance and PNR fees. Caremark limits distribution of these reports to individual pharmacies regardless of common ownership.

<u>**LEGAL ANALYSIS**</u>

The Commercial Rules allow pre-hearing motions if it can be "shown that the motion is likely to succeed and dispose of or narrow the issues in the case." R-33. *See also* AZ R. Civ. P. 16(a)(1) (courts must manage a civil action with an objective of "expediting a just disposition of the action"). Caremark easily meets this standard here.

## I. <u>AHF MAY NOT CONSOLIDATE THE CLAIMS OF MULTIPLE PHARMACIES IN A SINGLE ARBITRATION</u>

### a. *The Provider Agreement Expressly Precludes Consolidated Proceedings*

The construction of a contract is a matter of law. *Smith v. Melson, Inc.,* 135 Ariz. 119, 121 (Ariz. 1983). When the terms of a valid contract are clear and unambiguous, a court must give effect to the contract as written. *Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C. LLC,* 213 Ariz. 83, 88 (App. 2006).

Prior to November of 2019, each pharmacy involved in this arbitration entered into a separate Provider Agreement requiring that arbitration proceedings be brought on "an individual basis," not through a "form of consolidated proceedings." Exhibit B, Provider Manual, p. 52. The Provider Agreements further provide that an arbitrator must "not consolidate arbitration proceedings without the express written permission of all parties to the Provider Agreement." *Id.*

4

Here, AHF seeks $11,630,035.69 in damages for PNR Fees assessed to *multiple* pharmacies from January 1, 2015 to October 31, 2019. Amended Complaint ¶¶38, 50, 98, 104, 109. Because Caremark never consented to consolidated proceedings, the Arbitrator should sever and dismiss the Amended Complaint's consolidated claims on behalf of multiple pharmacies. *IB Property Holdings, LLC v. Rancho Del Mar Apartments Ltd. Partnership,* 228 Ariz. 61, 66-67 (App. 2011) (noting that the court will not "pervert or do violence to the language used, or expand it beyond its plain and ordinary meaning or add something to the contract which the parties have not put there").

Further, contracts must be interpreted as a whole so that every part of the agreement is given effect. *C&T Land & Dev. Co. v. Bushnell,* 106 Ariz. 21, 22 (1970); *Chandler Medical Bldg. Partners v. Chandler Dental Group,* 175 Ariz. 273, 277 (App. 1993). The Provider Agreements independently agreed to by each of the pharmacies provide that the agreements are between Caremark and the "provider," which is defined as:

> **Provider** means *a provider of Pharmacy Services that is the signatory of the Agreement* and who must provide all services including the provision of prescription drugs usually and customarily rendered by a provider, Licensed Pharmacist or Dispensing Practitioner licensed to provide such Pharmacy Services in the normal course of business, including services mandated by applicable Law.

Exhibit B, Provider Manual (2018) at p. 340 (emphasis in italics).

Critically, the Provider Agreement is a bilateral agreement solely between Caremark and "the signatory of the Agreement." Given their assent to the Provider Agreement, each pharmacy may only raise claims it has against Caremark on an "individual basis" under its own Provider Agreement. In other words, a pharmacy cannot rely on an arbitration agreement between Caremark and AHF to bring forth its claims in a consolidated action. *See also Marbaker v. Statoil USA Onshore Properties, Inc.,* 2020 WL 733049, at *4 (3rd Cir. Feb. 13, 2020) (rejecting

call for class arbitration by relying on language of five separate leases to determine there were five separate bilateral agreements requiring individual arbitration).

### b. Courts Have Not Allowed "Consolidated Proceedings" Without the Consent of All Parties to the Agreement

There is a "liberal federal policy favoring arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983). As such, arbitration agreements must be placed on equal footing with other contracts and must be enforced according to their terms. *AT&T Mobility, LLC v. Concepcion,* 563 U.S. 333, 339 (2011). Parties are "free to limit the issues subject to arbitration, to arbitrate according to specific rules, and to limit *with whom* a party will arbitrate its disputes." *Id.* at 344 (emphasis in original and internal citations omitted).

The United States Supreme Court recently held that it is improper to force a party to submit to a class arbitration, even when the contract was ambiguous regarding whether class arbitration was allowed. *Lamps Plus, Inc. v. Varela,* 139 S. Ct. 1407, 1416 (2019). In reaching this conclusion, the Court noted that, in individual arbitration, "parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *Id.*

In contrast, class arbitration "sacrifices the principal advantage of arbitration – its informality – and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.* Thus, the Court held that it cannot "infer consent to participate in class arbitration absent an affirmative 'contractual basis for concluding that the party agreed to do so.'" *Id.*

Per *Lamps Plus,* forcing arbitration on a consolidated basis in this matter only complicates the issues, slows the process and increases costs exponentially. Specifically, AHF claims that Caremark's assessment of PNR fees is improper. Caremark assesses PNR fees on an individual pharmacy level based on that individual pharmacy's performance under various criteria. Each individual pharmacy received separate trimester reports detailing its scoring. As the matter is currently constituted, discovery would involve the individual scoring of 48 separate pharmacies, a massive undertaking. As a result, requiring that the individual pharmacies pursue their claims individually narrows the issues and promotes the policy considerations behind arbitration provisions in the first place.

Courts across the country have reached conclusions similar to *Lamps Plus*. *Weyerhaeuser Co. v. Western Seas Shipping Co.,* 743 F.2d 635, 637 (9th Cir. 1984) (refusing to consolidate two arbitration proceedings because there were two separate agreements, each of which contained its own arbitration clause requiring arbitration only between the parties to the agreement); *see also Champ v. Siegel Trading Co., Inc.,* 55 F.3d 269, 275 (7th Cir. 1995) (finding class arbitration could not be ordered without express contractual language requiring same); *American Centennial Ins. Co. v. National Cas. Co.,* 951 F.2d 107, 108 (6th Cir. 1991) (holding that courts cannot consolidate arbitration proceedings over the objection of a party to the arbitration agreement). The Arbitrator should follow this clear precedent.

c.    ***The Arbitrator Should Require AHF to Proceed Only on Behalf of a Single Pharmacy***

Because consolidated proceedings are not allowed under the Provider Agreement, AHF should immediately identify the one specific pharmacy that will continue in this arbitration. Once AHF identifies that pharmacy, the Arbitrator should sever and dismiss the claims of the remaining pharmacies. *See* Ariz. R. Civ. P. 21 (noting that joinder of a party that is not permitted

is not a ground to dismiss an entire action and that court can dismiss an improperly joined party or sever any claim against a party so that such a claim may be pursued in a separate action); Fed. R. Civ. P. 21 (same).

## II.     THE ARBITRATOR SHOULD DISMISS THE STATE LAW-BASED STATUTORY CLAIMS

The Amended Complaint alleges that Caremark breached the unfair competition laws and deceptive trade practices acts of various states, including California, Florida, Louisiana, New York, and Washington. *See* Cal. Bus. & Prof. Code § 17200; West's F.S.A. §§ 501.201-213; La. Rev. Stat. Ann. § 22:1964; NY Gen. Bus. Law § 349; Wa. St. § 19.86.020. The Arbitrator should dismiss these state-law claims.

### a.     *The Arizona Choice of Law Provisions Preclude Claims Based on Another State's Statutes*

Arizona courts have consistently held that, if there is an applicable choice of law provision favoring one state's law, then statutory claims (including for deceptive trade practices) cannot be brought under another state's laws. *See Sherman v. PremierGarage Systems, LLC,* 2010 WL 3023320, at *5-7 (D. Ariz. July 30, 2010) (dismissing claim brought by Florida-based franchisee under Florida's deceptive trade practices act because dealer agreement contained a choice of law provision favoring Arizona law). Indeed, a party's agreement to a choice of law provision implicitly constitutes a waiver of that party's right to bring statutory claims under another state's statutory scheme. *Zounds Hearing Franchising LLC v. Moser,* 2016 WL 6476291, at *5-6 (D. Ariz. Nov. 2, 2016) (holding that Arizona choice of law provision precluded party's right to assert claim under Florida Franchise Misrepresentation Act).

Apart from Arizona, many other states similarly hold that choice of law provisions preclude claims under another state's statutes. *See Lambert v. Navy Federal Credit Union,* 2019

WL 3843064 (E.D. Va. Aug. 14, 2019) (Virginia choice of law provision precluded deceptive trade practices claim under North Carolina law); *Canon U.S.A., Inc. v. Cavin's Business Solutions, Inc.,* 208 F. Supp. 3d 494, 504 (E.D.N.Y. 2016) (New York choice of law provision prevented consumer protection and unfair trade practices claims under North Carolina, Nevada and Florida statutes); *New England Surfaces v. E.I. Du Pont De Nemours and Co.,* 460 F. Supp. 2d 153, 162 (D. Maine 2006) (Delaware choice of law provision precluded statutory claim under New Hampshire deceptive trade practices act); *Proctor & Gamble Co. v. Bankers Trust Co.,* 925 F. Supp. 1270, 1289 (S.D. Ohio 1996) (New York choice of law provision precluded Ohio statutory claims); *Burger King Corp. v. Weaver,* 798 F. Supp. 684, 690 (S.D. Fla. 1992) (statutory claim under Montana law was foreclosed by choice of law provision favoring Florida).

Here, because the Provider Agreement includes a valid and enforceable Arizona choice of law provision (Exhibit A, p. 2, ¶13), the Arbitrator should dismiss all state law statutory claims in the Amended Complaint.

### b. *Federal Medicare Law Preempts the State-Based Claims*

AHF also may not assert state law claims because they are preempted by federal law. *Uhm v. Humana, Inc.,* 620 F.3d 1134 (9th Cir. 2010) (finding that claim under consumer protection statute was preempted by federal law and regulations related to Medicare Part D sponsors); 70 FR 4194-01, 2005 WL 176041, at 4319 (Jan. 28, 2005) (for purposes of Part D, with the exceptions of State licensing laws or State law related to plan solvency, State laws would not apply to prescription drug plans or plan sponsors). *See also Estate of Ethridge v. Recovery Management Systems, Inc.,* 235 Ariz. 30, 35 (App. 2014) (noting that Medicare Part D broadened the scope of preemption and finding that Congress preempted all but a very limited number of state laws, those related to state licensing and plan solvency).

Here, the PNR Program is limited to pharmacy claims reimbursed by Medicare Part D, which is exclusively governed by federal law. Thus, the Arbitrator should dismiss the state-based statutory claims because they are preempted by federal law.

### c. The California, Louisiana and New York State-Based Statutory Claims Fail to State Claims for Relief

California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, cannot be invoked if the plaintiff has an adequate remedy at law. *Moss v. Infinity Ins. Co.,* 197 F. Supp. 3d 1191, 1203 (N.D. Cal. 2016). Because AHF has an adequate remedy at law, namely monetary damages for an alleged breach of contract, it cannot raise a claim under the California UCL. *Rhynes v. Stryker Corp.,* 201 WL 2149095, at *4 (N.D. Cal. May 31, 2011) ("Plaintiff's argument that they will have no adequate remedy at law if their other claims fail is unavailing. Where the claims pleaded by a plaintiff *may* entitle her to an adequate remedy at law, equitable relief is unavailable.").

Similarly, AHF's claims under the Louisiana Unfair Deceptive Trade Practices Act fail because that statute does not afford a private right of action. *Voorhies Supply Co., L.L.C. v. Ohio Cas. Ins. Co.,* 2009 WL 482284, at *8 (W.D. La. Feb. 20, 2009).

Finally, AHF's claims under NY Gen. Bus. Law § 349 also fail to state a claim. Under the statute, the "challenged act or practice" must be consumer oriented. *Benetech, Inc. v. Omni Fin. Group, Inc.,* 984 N.Y.S. 2d 186, 188 (App. Div. 2014). AHF's allegations only allege allegations to the individual pharmacies it operates, not to consumers at large. *Chemist Corner, Inc. v. Epic Pharmacy Network, Inc.,* 2019 WL 4750293, at *4 (D. Md. Sep. 30, 2019).

## III. THE ARBITRATOR ALSO SHOULD DISMISS AHF'S CLAIM UNDER THE ROBINSON-PATMAN ACT

The Amended Complaint alleges that Caremark violated the Robinson-Patman Act, 15 U.S.C. § 13, because Caremark "unlawfully discriminates in commerce against small pharmacies in that the net amounts reimbursed through the Medicare Part D program to small, specialty pharmacies, serving high-risk populations ... are lower than the amounts reimbursed by CVS to larger retail chain pharmacies with far larger customer bases," causing larger pharmacy chains to receive "substantially higher net reimbursements ...." Amended Complaint, ¶94.

According to AHF, "[t]he impact of this discriminatory pricing is to substantially lessen competition and to tend to create a monopoly and/or to injure, destroy, or prevent competition with CVS's own retail and mail order pharmacy operations in violation of Section 2 of the Robinson-Patman Act ...." Amended Complaint, ¶95. These allegations do not state a claim under the Robinson-Patman Act.[5]

First, Caremark is not a seller of "commodities" as required under the Robinson-Patman Act. *May Dep't Store v. Graphic Process Co.,* 637 F.2d 1211, 1214 (9th Cir. 1980) (noting that sale of commodities under the Robinson-Patman Act requires a 'sale of goods, wares, or merchandise, and [] not merely a contract for services"). Rather, Caremark provides a service to its plan sponsor clients to administer pharmacy networks and remit payments to pharmacies who dispense drugs. This service does not fall within the scope of the Robinson-Patman Act. *See also Matthew Enterprise, Inc. v. Chrysler Group L.L.C.,* 2015 WL 3664843, at *5 (N.D. Cal. Jan. 12, 2015) (dismissing claim under Robinson-Patman Act because complained of activity related to

---

[5] Section 2(a) of the Robinson-Patman Act makes it unlawful "to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition ... or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them[.]" 15 U.S.C. § 13(a).

service, a lease, and not sale of commodities); *Goodloe v. National Wholesale Co., Inc.,* 2004 WL 1631728, at *10 (N.D. Ill. July 19, 2004) (web site maintenance, electronic retail franchise, credit card processing services, and order processing services are not "commodities" for purposes of the Robinson-Patman Act).

Second, AHF fails to allege any competitive injury as required under the Robinson-Patman Act. *Cash & Henderson Drugs, Inc. v. Johnson & Johnson,* 799 F.3d 202, 206 (2d Cir. 2015) is on point. In that case, a group of 28 retail pharmacies brought suit because pharmaceutical manufacturers sold products at lower prices to "favored purchasers," including PBMs. *Id.* The court held that the claim under Robinson-Patman Act was not viable because the plaintiffs were unable to show "competitive injury." *Id.*

Likewise, AHF has not alleged, nor can it show, that its pharmacies suffered a competitive injury, i.e. a significant loss of customers as a result of the alleged discrimination related to reimbursements.

### CONCLUSION

Caremark, L.L.C. and CaremarkPCS, L.L.C. request that the Arbitrator grant this motion and: (i) order AIDS Healthcare Foundation to identify the pharmacy that will continue in this arbitration; (2) sever and dismiss the claims of the remaining AHF pharmacies; and (3) dismiss the state-law based statutory claims and AHF's claims under the Robinson-Patman Act, 15 U.S.C. § 13.

Dated: May 4, 2020          Respectfully submitted,

                     /s/  *Kevin P. Shea*         .
                     Kevin P. Shea
                     Elizabeth Meraz
                     Aon S. Hussain
                     Nixon Peabody, LLP
                     70 W. Madison St., Suite 3500

Chicago, IL 60602
Ph. 312-977-4400
*Caremark, LLC, Caremark PCS, LLC and CVS Pharmacy, Inc.*

# EXHIBIT A

# CAREMARK PROVIDER AGREEMENT

This Provider Agreement (the "Provider Agreement" or "Agreement") is entered into between Caremark, L.L.C., a California limited liability company and CaremarkPCS, L.L.C., a Delaware limited liability company (collectively "Caremark"), and the undersigned provider ("Provider").   Caremark and Provider agree as follows:

1. **Definitions.**  Unless otherwise defined herein, capitalized terms used in the Agreement shall have the meanings set forth in the Glossary of Terms contained in the Provider Manual.

2. **Credentialing.**  Provider represents, warrants, and agrees that as of the date of execution of the Agreement, Provider is and shall maintain in good standing, all federal, state and local licenses and certifications as required by Law.  Provider will provide Caremark with the information required from time to time regarding Provider's credentials, including, but not limited to Provider's licensure, accreditation, certification, and insurance, and will comply with and maintain Caremark credentialing standards and requirements.

3. **Provider Services and Standards.**  Unless Provider's professional judgment dictates otherwise, Provider will render to all Eligible Persons the Pharmacy Services to which the Eligible Person is entitled in accordance with the Agreement, the prescriber's directions, the applicable Plan, and applicable Law.  Provider will submit all Claims for such Pharmacy Services electronically to Caremark in accordance with the Caremark Documents.  Caremark may inspect all records of Provider relating to the Agreement.

4. **Eligible Person Identification and Cost Share.**  Provider will require each person requesting Pharmacy Services to verify that he or she is an Eligible Person.  With respect to each Covered Item dispensed to an Eligible Person, Provider will collect from the Eligible Person the applicable Patient Pay Amount communicated to Provider through the Caremark claims adjudication system or other method established by Caremark.  Provider will not waive, discount, reduce, or increase the Patient Pay Amount indicated in the Caremark claims adjudication system unless otherwise authorized in writing by Caremark.  Except for the collection of the applicable Patient Pay Amount, in no event will Provider seek compensation in any manner from an Eligible Person for Pharmacy Services with respect to a Covered Item.

5. **Network Participation and Payment.**  Provider agrees to participate in the networks identified on the attached Schedule A according to the terms set forth therein.  Caremark will pay Provider for Covered Items dispensed to Eligible Persons pursuant to the Agreement in accordance with Schedule A.  Any overpayments made to Provider by Caremark may be deducted from amounts otherwise payable to Provider.

6. **Compliance with Law.**  Provider will comply with all applicable Laws, including but not limited to those Laws referenced in the Federal and State Laws and Regulations section (and attached Addendums thereto) set forth in the Provider Manual.

7. **Indemnification.**  Provider acknowledges that Provider bears sole responsibility for any liability arising (i) from any actual or alleged malpractice, negligence, misconduct, or breach by Provider in the performance or omission of any act or responsibility assumed by Provider or (ii) in the provision of Pharmacy Services or the sale, compounding, dispensing, manufacturing, or use of a drug or device dispensed by Provider.  Provider will indemnify and hold harmless Caremark and Plan Sponsors and their respective shareholders, directors, employees, agents, and representatives from and against any and all liabilities, losses, settlements, claims, injuries, damages, expenses, demands, or judgments of any kind (including reasonable expenses and attorneys' fees) that may result or arise out of (i) any actual or alleged malpractice, negligence, misconduct, or breach by Provider in the performance or omission of any act or responsibility assumed by Provider or (ii) in the provision of Pharmacy Services or the sale, compounding, dispensing, manufacturing, or use of a drug or device dispensed by Provider.

FEB 0 3 2017

_____
Initial

8.  **Limitation on Liability.** In no event will Caremark be liable to Provider for indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business.

9.  **Term.** The Agreement will begin on the date of acceptance by Caremark and will remain in effect until terminated in accordance with the Provider Manual.

10. **Assignment.** Neither party may assign this Agreement without the prior written consent of the other party; provided, however, that Caremark may, without consent, assign this Agreement to any direct or indirect parent, subsidiary, or affiliated company or to a successor company. Any permitted assignee shall assume all obligations of its assignor under this Agreement. This Agreement shall inure to the benefit of and be binding upon each party, its respective successors and permitted assignees.

11. **Entire Agreement.** This Agreement, the Provider Manual, and all other Caremark Documents constitute the entire agreement between Provider and Caremark, all of which are incorporated by this reference as if fully set forth herein and referred to collectively as the "Provider Agreement" or "Agreement". Any prior agreements, promises, negotiations, or representations concerning the subject matter covered by the Agreement are terminated and of no force and effect. Provider's non-compliance with any of the provisions of this Agreement, including the Provider Manual and other Caremark Documents will be a breach of the Provider Agreement. In the event there is a conflict between any of the provisions in this Provider Agreement, the Provider Manual, other Caremark Documents and a provision in an applicable State specific addendum attached to the Federal and State Laws and Regulations section of the Provider Manual, the terms of the applicable State specific addendum shall govern.

12. **Waiver.** Failure to exercise any of the rights granted under the Agreement for any one default will not be a waiver of any other or subsequent default. No act or delay shall be deemed to impair any of the rights, remedies, or powers granted in the Agreement.

13. **Lawful Interpretation and Jurisdiction.** Whenever possible, each provision of the Agreement shall be interpreted so as to be effective and valid under applicable Law. Should any provision of this Agreement be held unenforceable or invalid under applicable Law, the remaining provisions shall remain in full force and effect. Unless otherwise mandated by applicable Law, the Agreement will be construed, governed, and enforced in accordance with the laws of the State of Arizona without regard to choice of law provisions.

14. **Headings.** The headings of Sections contained in the Agreement are for convenience only and do not affect in any way the meaning or interpretations of the Agreement.

FEB 0 3 2017

_KSe_
Initial

Caremark Provider Agreement
9-21-2015

By signing below, Provider agrees to the terms set forth above and acknowledges receipt of the Provider Manual.

Pharmacy Name: _AHF PHARMACY_

NCPDP#: _1169007_

NPI # _1366991283_

By: _[signature]_
(Signature of authorized agent)

_SCOTT CARRUTHERS_
(Print name of authorized agent)

Date: _1/23/2017_

Caremark, L.L.C. _[signature]_
John M. Lavin
GVP Provider Network Services

_____
(Signature of authorized agent)

By: _____

Date _____

CaremarkPCS, L.L.C. _[signature]_
John M. Lavin
GVP Provider Network Services

_____
(Signature of authorized agent)

By: _____

Date _____

```
******ATTENTION********

PAGES 1, 2, AND 4 MUST BE INITIALED
BY AUTHORIZED AGENT BEFORE
CONTRACT WILL BE ACCEPTED
```

_FEB 03 2017_

_[initials] KSC_
Initial

Caremark Provider Agreement
9-21-2015

# SCHEDULE A
# NETWORK PARTICIPATION AND PAYMENT

This Schedule A is comprised of this Schedule A and all prior and subsequent network addendums and network enrollment forms, all of which are incorporated herein by this reference and referred to collectively as "Schedule A". Provider agrees that it will participate in all Caremark and Plan Sponsor pharmacy networks in which: (1) Provider participates in as of the date of this Agreement; (2) Provider and Caremark have executed a network addendum or network enrollment form as of the date of this Agreement; (3) Provider and Caremark subsequently execute a network addendum or network enrollment form; and (4) Provider agrees to participate as evidenced by its provision of Pharmacy Services to an Eligible Person of a Plan Sponsor utilizing such pharmacy network(s).

Unless otherwise set forth in a network addendum or network enrollment form signed by both parties, claims submitted for a Plan Sponsor participating in an Caremark or Plan Sponsor network will be reimbursed at the lower of: (i) AWP less the applicable AWP Discount plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) gross amount due less the applicable Patient Pay Amount. The applicable AWP Discount and Dispensing Fee will be set forth in the applicable network addendum or network enrollment form. If Provider has not executed and delivered to Caremark a network addendum or network enrollment form, the applicable AWP Discount and Dispensing Fee will be the reimbursement rate as indicated in the adjudication claims system as to such claim. AWP Discounts and Dispensing Fees may be amended in accordance with the terms of the Agreement.

Notwithstanding any other provision in the Provider Agreement, claims (excluding compounded medications) submitted for a Plan Sponsor participating in a Caremark or Plan Sponsor network may be reimbursed at the lower of: (i) Price Type plus an applicable percentage of the Price Type, or minus the applicable percentage of the Price Type, plus the applicable Dispensing Fee less the applicable Patient Pay Amount (or if applicable Price Type is unavailable for a given drug, Caremark will pay Provider based upon AWP minus the applicable AWP Discount plus the applicable Dispensing Fee minus the applicable Patient Pay Amount); (ii) MAC plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iii) ingredient cost submitted by Provider plus the applicable Dispensing Fee less the applicable Patient Pay Amount; (iv) Provider's U&C price less the applicable Patient Pay Amount; or (v) Provider's submitted Gross Amount Due less the applicable Patient Pay Amount.

FEB 0 3 2017

*Initial*

# EXHIBIT B

CONFIDENTIAL AND PROPRIETARY - FOIA EXEMPT - DO NOT DISCLOSE



# CVS Caremark
# Provider Manual

documentation or as otherwise indicated by Provider to Caremark and agreed to by Caremark. Notwithstanding the foregoing, Caremark may give notice to Provider (1) via the claims adjudication system; (2) by facsimile via the Provider's facsimile number, or by e-mail via the e-mail address provided by Provider in Provider's enrollment documentation or as otherwise indicated by Provider to Caremark and agreed to by Caremark; or (3) via Caremark's Pharmacy Portal.

Notices are deemed received on the date of delivery to the other party when delivered in person, by courier, by e-mail, by facsimile, by secure electronic message, by certified mail, or when posted via Caremark's Pharmacy Portal. If notice is sent by first class mail, the notice is deemed received on the third business day after the date such notice was mailed.

By participating as a provider in Caremark's networks, Provider acknowledges that it has a prior express business relationship with Caremark and consents to receive facsimile communications as well as automated messages from Caremark.

The terms of this **Notices** section apply notwithstanding any other provision in the Provider Agreement.

## Amendments

From time to time, and notwithstanding any other provision in the Provider Agreement (which includes the Provider Manual), Caremark may amend the Provider Agreement, including the Provider Manual or other Caremark Documents, by giving notice to Provider of the terms of the amendment and specifying the date the amendment becomes effective. If Provider submits claims to Caremark after the effective date of any notice or amendment, the terms of the notice or amendment is accepted by Provider and is considered part of the Provider Agreement.

## Enforceability

In the event that any provision or term set forth in the Provider Agreement is determined invalid or unenforceable, such invalidity and unenforceability will not affect the validity or enforceability of any other provision or term set forth in the Provider Agreement.

## Arbitration

Any and all disputes between Provider and Caremark [including Caremark's current, future, or former employees, parents, subsidiaries, affiliates, agents and assigns (collectively referred to in this Arbitration section as "Caremark")], including but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks or exclusion from any Caremark networks, will be exclusively settled by arbitration. This arbitration provision applies to any dispute arising from events that occurred before, on or after the effective date of this Provider Manual. Unless otherwise agreed to in writing by the parties, the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to the then applicable AAA Commercial Arbitration Rules and Mediation Procedures including the rule governing Emergency Measures of Protection (available from the AAA). In no event may the arbitrator(s) award indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business, except as required by Law. The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the agreement to arbitrate, including, but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason. The arbitrator(s) must follow the rule of Law, and the award of the arbitrator(s) will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. Any such arbitration must be conducted in Scottsdale, Arizona and Provider agrees to such jurisdiction, unless otherwise agreed to by the parties in writing. Discovery shall be limited to documents and information for which there is a direct, substantial, and demonstrable need and where such documents and information can be located and produced at a cost that is reasonable in the context of all surrounding facts and circumstances. Further, when the cost and burden of e-discovery are disproportionate to the likely importance of the requested materials, the arbitrator may deny the requests or require that the requesting party advance the reasonable cost of production to the other side. The expenses of arbitration, including reasonable attorney's fees, will be paid for by the party against whom the final award of the arbitrator(s) is rendered, except as otherwise required by Law.

**Arbitration with respect to a dispute is binding and neither Provider nor Caremark will have the right to litigate that dispute through a court. In arbitration, Provider and Caremark will not have the rights that are provided in court, including the right to a trial by judge or jury. In addition, the right to discovery and the right to appeal are limited or eliminated by arbitration. All of these rights are waived and disputes must be resolved through arbitration.**

Caremark
Provider Manual

**Miscellaneous**

No dispute between Provider and Caremark may be pursued or resolved as part of a class action, private attorney general or other representative action or proceeding (hereafter all included in the term "Class Action"). All disputes are subject to arbitration on an individual basis, not on a class or representative basis, or through any form of consolidated proceedings, and the arbitrator(s) will not resolve Class Action disputes and will not consolidate arbitration proceedings without the express written permission of all parties to the Provider Agreement. Provider and Caremark agree that each may pursue or resolve a dispute against the other only in its individual capacity, and not as a plaintiff or class member in any purported Class Action.

Except as may be required by Law, neither a party nor an arbitrator(s) may disclose the existence, content or results of any dispute or arbitration hereunder without the prior written consent of both parties. In the event a Provider is required by law to make such a disclosure, Provider shall notify Caremark five (5) business days in advance of such disclosure.

Prior to a party initiating an arbitration, such party shall request in writing to the other party ("Dispute Notice") a meeting of authorized representatives of the parties for the purpose of resolving the dispute. The parties agree that, within ten (10) days after issuance of the Dispute Notice, each party shall designate a representative to participate in dispute resolution discussions which will be held at a mutually acceptable time and place (or by telephone) for the purpose of resolving the dispute. Each party agrees to negotiate in good faith to resolve the dispute in a mutually acceptable manner. If despite the good faith efforts of the parties, the authorized representatives of the parties are unable to resolve the dispute within thirty (30) days after the issuance of the Dispute Notice, or if the parties fail to meet within such thirty (30) days, either party may, by written notice to the other party, submit the dispute to binding arbitration. The above notwithstanding, nothing in this provision shall prevent either party from utilizing the AAA's procedures for emergency relief to seek preliminary injunctive relief to halt or prevent a breach of this Provider Agreement.

The terms of this arbitration section apply notwithstanding any other or contrary provision in the Provider Agreement, including, but not limited to, any contrary language in any **Third Party Beneficiary** provision. This Arbitration section survives the termination of the Provider Agreement and the completion of the business relationship between Provider and Caremark. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

### Force Majeure

Caremark and Provider are excused from performance under the Provider Agreement to the extent that either Caremark or Provider is prevented from performing all or any part of the Provider Agreement as a result of causes that are beyond the affected party's reasonable control, including but not limited to, fire, flood, earthquakes, tornadoes, other acts of God, war, work strikes, civil disturbances, power or communications failure, court order, government intervention, a change in Law, a significant change in the industry, or third-party nonperformance.

### Anti-Kickback Statute, Stark Law, and Caremark Compliance Program

Each party certifies that it shall not violate the federal anti-kickback statute, set forth at 42 U.S.C § 1320a-7b(b) ("Anti-Kickback Statute"), or the federal "Stark Law," set forth at 42 U.S.C § 1395nn ("Stark Law"), with respect to the performance of its obligations under this Provider Agreement. In addition, Caremark's Code of Conduct and policies and procedures on the Anti-Kickback Statute and Stark Law may be accessed at **www.caremark. com/pharminfo.**

Pursuant to Caremark's obligations under a Corporate Integrity Agreement (CIA) with the Office of Inspector General of the United States Department of Health and Human Services dated March 25, 2014, Provider agrees to access the CIA through this website **https://oig.hhs.gov/compliance/corporate-integrity-agreements/cia-documents.asp** upon enrollment, and Provider shall review the CIA in its entirety on an annual basis thereafter. Provider shall immediately notify Caremark in writing if Provider does not comply with the requirement to annually access and review the CIA in its entirety.

### Rebate Programs

Caremark has the right to submit all prescriptions relating to the Provider Agreement to pharmaceutical companies in connection with Caremark's rebate programs and any similar programs. Provider must not submit any of the prescriptions relating to the Provider Agreement to any pharmaceutical company for the purpose of receiving any rebate, discount or the like, except as authorized by Caremark in writing.

### Eligible Person Communications

Provider understands and acknowledges that Caremark may communicate with Eligible Persons as required by Plan Sponsor, applicable Law, or as Caremark determines is necessary regarding matters such as plan benefits, network design and composition, formulary and clinical issues, and manufacturer recalls.

CONFIDENTIAL AND PROPRIETARY



**Glossary of Terms**

**Pharmacy Services/Provider Services** means all services including the provision of prescription drugs usually and customarily rendered by a Provider and Licensed Pharmacist or Dispensing Practitioner licensed to provide pharmacy services in the normal course of business, including services mandated by applicable Law. Pharmacy Services may include, but not be limited to: the maintenance of Eligible Person profiles; the interpretation of prescriptions; the selection of medications and medical devices; the sale of compounding or dispensing of medications and medical devices (also includes Over-the-Counter medications [OTCs] and supplies covered by or used in conjunction with a pharmacy benefit); the counseling of Eligible Persons, which may consist of information about the proper storage, dosing, side effects, potential interactions and use of the medication dispensed; the monitoring of appropriate drug use; and the implementation of drug utilization review programs and other clinical programs and services.

**Plan** means that portion of a Plan Sponsor's pharmacy benefit plan that relates to Covered Items with respect to a group of Eligible Persons.

**Plan Sponsor** means the entity that contracts with Caremark or any of Caremark Rx, L.L.C.'s affiliates for pharmacy benefit management services, which entity could be, among other things, an insurance company, self-insured group, health maintenance organization, preferred provider organization, multi-employer trust or third party administrator.

**Prescriber** means a physician, dentist, physician's assistant, optometrist or other health care professional authorized by law to write prescriptions for prescription drugs within the scope of practice as designated by regulatory agency.

**Price Type** means a current price of a given drug as defined by a nationally recognized reference that Caremark may reasonably select from time to time, which may include, but is not limited to: AWP (Average Wholesale Price), WAC (Wholesale Acquisition Cost), AMP (Average Manufacturer Price), ASP (Average Sales Price), DP (Direct Price), or Federal Upper Limit (FUL).

**Provider** means a provider of Pharmacy Services that is the signatory to the Agreement and who must provide all services including the provision of prescription drugs usually and customarily rendered by a provider, Licensed Pharmacist or Dispensing Practitioner licensed to provide such Pharmacy Services in the normal course of business, including services mandated by applicable Law.

**Retail Pharmacy** means a duly licensed and established community pharmacy or dispensing practitioner that dispenses and sells non-specialty prescription drugs to Eligible Persons through in-person hand delivery at the point of sale. Refer to the **Standards of Operation** section of the Provider Manual.

**Third-Party Agreement** means an agreement between Caremark and a Caremark client in which Caremark serves as an auditor for that client's participating network pharmacies.

**Usual and Customary Price or U&C** means the lowest price Provider would charge to a particular customer if such customer were paying cash for an identical prescription on that particular day at that particular location. This price must include any applicable dispensing fee and/or level of effort. This price must include any applicable discounts offered to attract customers.

**Wholesale Acquisition Cost or WAC** means the current wholesale acquisition cost of a given drug as defined in the latest edition of Medi-Span (with supplements), MICROMEDEX, or any other similar nationally recognized reference which Caremark may reasonably select from time to time.

# EXHIBIT M

AMERICAN ARBITRATION ASSOCIATION

AIDS HEALTHCARE FOUNDATION,　　　　　CASE NO.:01-19-0004-0127

　　　　Claimant,

v.

CVS CAREMARK,　　　　　　　　　　　RULING ON MOTION TO SEVER AND TO
　　　　　　　　　　　　　　　　　　　DISMISS

　　　RESPONDENT


　　　Respondents' Motion to Sever and to Dismiss came on for hearing. Respondent was
represented by Aon Hussain; Kevin Shea and Elizabeth Meraz of Nixon Peabody, LLP. Claimants
were represented by Andrew Kim and Rebecca Riley of Kim Riley Law and Arti Bhimani of Aids
Healthcare Foundation.

　　　　The parties engaged in extensive briefing and submissions as well as thorough oral
argument. The quality of the representation was high on both sides. After thoughtful
consideration of the briefing, submissions and argument, the Arbitrator rules as follows.

1. Operative Contract. Claimant is the master of its own Arbitration Demand. The
   Amended Demand for Arbitration dated April 6, 2020 refers to the agreement in
   dispute as a "2007 agreement" in paragraph 3. In paragraph 22, it states: "The
   documents and information forming the agreement at issue are many, prolix and
   constantly subject to unilateral amendment by CVS." In paragraph 23, it says that with
   respect to Medicare Part D the "Provider Agreement" is "actually a series of state-
   specific agreements."

   In its Motion, Respondent contends that Claimant is allowed to proceed under one
   contract only and has to choose which one it will advance. Respondent is correct that
   the Arbitration cannot be based on more than one agreement unless the parties
   mutually agree or a court so orders.

   In its opposition to the Motion, Claimant states the operative contract is a pharmacy
   chain agreement of November 4, 2019. Given that the opposition is focused on that
   document, the Arbitrator concludes that Claimant has elected to proceed with that
   agreement as the foundation for this Arbitration. Thus, it is held that the Arbitration
   will proceed on this basis.

2. <u>Claims Arising Timewise before Execution of the Operative Contract</u>. While the
   agreement in dispute was signed on November 4, 2019, the claims at issue arose from
   events occurring almost exclusively before then. Per the Provider Manual provisions
   incorporated in the agreement on the subject of Arbitration (see AHF, Exh. "2" at pgs.
   60-61), those claims nonetheless are at issue in this Arbitration pursuant to the written
   provisions of the November 2019 agreement.

   The "Arbitration" section of the Manual states that "**any and all disputes** . . . including
   but not limited to, disputes in connection with, arising out of, or relating in any way to,
   the Provider Agreement **or to Provider's participation in one or more Caremark
   networks** . . . ," are to be arbitrated (emphasis added). The Arbitrator interprets this
   language to mean that the range of issues to be arbitrated need not arise explicitly
   from the chain pharmacy agreement, but includes any claims not barred by the statute
   of limitations that the chain has arising from "participation in one or more Caremark
   networks." This is application of the plain meaning of the arbitration clause. It does
   not involve retroactivity but merely allows all cognizable claims existing at the time of
   the contract that are not precluded by the statute of limitations to be brought in a
   single arbitration. To the extent it is argued that this violates the anti-class action
   provisions of the arbitration provision, the Arbitrator finds that, in a chain pharmacy
   agreement, which necessarily contemplates a number of pharmacy locations, the plain
   language of the Arbitration clause from the Provider Manual, permits aggregation of
   claims the chain has from any contracts and agreements arising from "participation in
   one or more Caremark networks." The "one or more" language is instructive that
   claims arising under multiple subcontracts, such as the four individual state Medicaid
   agreements here, are within the scope of the arbitration clause. Thus, claims arising
   prior to the agreement at issue pursuant to prior contracts between the parties are
   cognizable in this Arbitration even if such contracts were terminated by the November
   4, 2019 Agreement.

3. <u>Severance</u>. Absent a court order or agreement of the parties, the Arbitrator does not
   have authority to sever claims or to create multiple arbitrations. Thus, the severance
   portion of the motion is denied.

4. <u>Dismissal Issues</u>. The Motion seeks to dismiss various non-Arizona state law claims and
   the Robinson-Patman Act claim. The parties agreed in Section 13 of their agreement
   that the Arbitration is to be decided under the substantive law of Arizona "without
   regard to choice of law provisions." The question then becomes how an Arizona court
   would interpret the bringing of claims under the laws of other states in light of the
   quoted language. The Arbitrator follows the reasoning as set forth by the District Court
   in *Zounds Hearing Franchising LLC v. Moser*, 2016 WL 6476291 (D. Arizona) No. CV-16-
   00619-PHX-DGC. Under *Zounds*, applying the Arizona Supreme Court decision in
   *Swanson v. Image Bank, Inc.*, 206 Ariz. 264 (2003), the choice of law provision controls
   unless the foreign state stature to be applied is one that cannot be waived by
   agreement. There, the District Court held that the Florida Franchise Misrepresentation

Act, was not to be applied because recovery under that Act could be waived by contract. Per *Zounds*, if the foreign state statute cannot be waived by the parties, a second layer of conflicts of law analysis is to be held for each of the non-waivable statutes to determine if the foreign state statute should apply under the circumstances.

    a. <u>Non-Arizona Competition Laws</u>. No authority, either statutory or case law, was submitted, with two exceptions discussed below, that the state unfair competition statutes at issue could not be waived by agreement As to the Florida Unfair and Deceptive Practices Act, Claimant cited two cases. Neither one is applicable. *John's Pass Seafood Co. v. Weber*, 396 So. 2d 616 (1979) involved whether certain claims could be waived in a lease. In any event, that case was only a "Cf." cite in the other. *Rollins, Inc. v. Heller*, 454 So.2d 580 (1984) involved a contract provision that was not explicit enough to constitute a waiver such that the issue of waiver needed to be addressed. The language regarding limitation on liability was thus *dicta*. The Arbitrator declines to follow this *dictum*, noting the lack of any statutory or actual case law authority despite the statute having been on the books for many, many decades.

    As to Washington, the cases cited do not hold that claims for relief under the Washington Consumer Protection Act could never be waived. *Marshall v. Higginson*, 62 Wn.App. 212 (1991) held that in the specific circumstances of the attorney-client relationship an attorney could not enforce a waiver of prospective liability. This case is too bound up in the state law of attorney-client to be a holding that the Act can never be waived. *Scott v. Cingular Wireless*, 160 Wn.2d 843 (2007), dealt with class action waivers in arbitration agreements and concludes that these types of provisions are not enforceable and cannot be enforced in an arbitration. In effect, this was a holding of unconscionability precluding enforcement of the class action waiver and not a holding that relief under the Act could never be waived. Neither of these cases involved interpretation of a choice of law provision such as is presented here. Thus, the Arbitrator concludes there is no prohibition of waiver under Washington law.

    The Arbitrator interprets and concludes that the above means that under *Zounds*, *supra*, the claims under the anticompetition laws of Washington, Florida, Louisiana, California and New York were waived by agreement. Thus, the non-Arizona competition laws are dismissed.

    b. <u>Non-Arizona Any Willing Provider Laws</u>. Again, the parties have directed that any conduct at issue be assessed under the substantive rules of Arizona law. Applying *Zounds*, there was no statutory or case law authority submitted prohibiting waiver of the statutes of Georgia, Illinois, Louisiana, Mississippi or South Carolina law. As to Texas law, *Mission Specialty Pharmacy, LLC v. OptumRX, Inc.*, 154 F.Supp.3d, 453 (W.D. Tex. 2015), the Court there held Texas law would not bar enforcement of a contractual provision for California law on

all fours with the contractual language here. Thus, the Arizona rules of conflicts would apply and under *Zounds*, the Texas statute would not apply. Thus, the claims under Non-Arizona any willing provider laws are dismissed.

    c. <u>Robinson-Patman Act Claims</u>. Under the agreement Claimant provides prescription fulfillment services. While the Claimant's pharmacies provide prescription drugs for a fee received from health plan providers and patient co-pays, the pharmacies also provide counseling services by pharmacists advising patients about the drugs prescribed, the risks they present and how to use them. The services are provided by pharmacists, licensed health care providers. The health services provided by Claimant are not a "good" or "commodity" within the ambit of the Robinson-Patman Act. Thus, the Robinson-Patman Act claim is dismissed.

5. <u>Remainder of the Motion</u>. To the extent any other issues were raised in the motion, they are denied.

Dated: August 1, 2020

By: _____

William Zak Taylor

Arbitrator