# EXHIBIT N

AMERICAN ARBITRATION ASSOCIATION


AIDS Healthcare Foundation,  )
                           )
      Claimant,          )
                           )
       vs.             )  NO. 01-19-0004-0127
                           )
CVS Caremark, a Subsidiary of )
CVS Health Corporation,    )
                           )
      Respondent.      )
                           )


VOLUME II
ARBITRATION HELD BEFORE
WILLIAM TAYLOR, ARBITRATOR
(Via Videoconference)


Tuesday, April 13, 2021
9:05 a.m. - 4:59 p.m.


Reported by:  Ruben Garcia CSR #11305



```
 1    BY MR. LIVELY:
 2            Q     I think this is well within your
 3    scope.  You understand and you've testified that
 4    there's a variable rate range assessed at
 5    the network -- as a network rebate fee after the
 6    point of sale, correct?
 7            A     Based off of our performance, yes.
 8            Q     So my point is, sir, and that range
 9    is defined between X percent and Y percent, correct?
10            A     Yes.
11            Q     So just to use hypothetically and as
12    an example, it could be 3 to 5 percent, correct?
13            A     For a specific plan it could be that,
14    yes.
15            Q     And your understanding is the
16    calculation of the network rebate fee after the
17    point of sale is that Caremark's performance
18    determines where on that, in our hypothetical, that
19    3 to 5 percent range Caremark is charged, correct?
20            THE ARBITRATOR:  I think you meant AHF's
21    performance.
22            MR. LIVELY:  I apologize.
23            THE ARBITRATOR:  So try again.
24    BY MR. LIVELY:
25            Q     And, sir, your understanding that
```



1    AHF's performance determines where on that 3 to

2    5 percent range AHF will fall, correct?

3            A    That's correct.  And with 100 percent

4    perfect performance, we will still get a 3 percent

5    charge-back.

6            Q    My point is simply this, sir.  This

7    is my last question on this area.  So the after

8    point of sale -- excuse me.

9                 So when AHF fills a prescription,

10   they know that their after-point-of-sale rebate will

11   be within, in this hypothetical, two percentage

12   points, correct?

13           A    Between that 3 and 5 percent, yes.

14           Q    So AHF understands completely when

15   they fill a prescription that they will be charged

16   at least 3 percent, and potentially 5 percent,

17   correct?

18           A    For a specific plan I would say that

19   that answer is yes.  The complexities happen when

20   every plan, multiple plans have different ranges,

21   ranges change between brands, ranges change between

22   generics.  So talking about the specific plan that

23   you're speaking of, that is correct, yes.

24           Q    And that's what I was trying to

25   clarify for everybody here, is that at the point of



# EXHIBIT O

## AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| AIDS HEALTHCARE FOUNDATION, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | AAA Case No. 01–19–0004–0127 |
| | ) | |
| CVS CAREMARK, a subsidiary of CVS | ) | |
| HEALTH CORPORATION, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## RESPONDENTS' MOTION TO RECALCULATE
## DAMAGES COMPUTATION PRIOR TO FINALIZING AWARD

Respondents Caremark, L.L.C., and CaremarkPCS, L.L.C. (together, "Caremark"), respectfully request that the Arbitrator modify certain limited aspects of the interim arbitration award dated August 3, 2021, and transmitted on August 9, 2021 (the "Interim Award").[1]

## INTRODUCTION

The Interim Award's damages calculation of $19,276,611 to AIDS Healthcare Foundation ("AHF") contradicts the Arbitrator's holding that DIR fees based on DIR rates "known at the outset" are enforceable. As such, the Interim Award provides an improper windfall to AHF by eliminating the contractual floor of DIR fees that AHF knew was the minimum it would pay when it agreed to participate in Caremark's Medicare Part D performance networks. Therefore, Caremark respectfully requests that the Arbitrator modify the damages calculation to award AHF damages based on the contractual floor of DIR fees under the contracts at issue for 2016 through 2020 (*i.e.*, award AHF the lowest available DIR fees), rather than award AHF damages based on a return of *all* DIR fees.

---

[1] Caremark submits this motion subject to, and without waiving, its right to pursue judicial review of the Interim Award, including but not limited to under sections 10 and 11 of the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. §§ 10, 11.

The Interim Award held that fixed DIR rates "knowable at the outset and at the Point of Sale" are enforceable and not unconscionable. *See* Interim Award, p. 56, ¶ 6. When AHF joined Caremark's Performance Network Program ("PNP") networks, it knew that there was a minimum (*e.g.*, 3%) fee for pharmacies with perfect performance. By its own admission, AHF knew that it would never pay 0% in DIR fees because that was an impossibility under the terms of the PNP. Awarding AHF a complete return of all its DIR fees—or, put differently, assigning a 0% DIR rate unavailable to any of the 68,000+ pharmacies in the networks[2]—contradicts the internal reasoning of the Interim Award, which upheld fees based on rates that were "knowable at the outset and at the Point of Sale," and gifts AHF a reimbursement rate beyond any of its contractual expectations. *Id.* As detailed below, awarding the known contractual floor of DIR fees to AHF results in damages of $2,710,305 rather than $19,276,611. *See* Exhibit A, Column C.[3]

## **LEGAL STANDARDS**

Courts uniformly acknowledge that an arbitrator has the inherent authority to clarify and correct an arbitration award. *See, e.g., Barranco v. 3D Sys. Corp.*, 734 Fed. App'x 885, 888–89 (4th Cir. 2018) (affirming confirmation of arbitration award clarified by arbitrator); *Martel v. Ensco Offshore Co.,* 449 Fed. App'x 351, 354 (5th Cir. 2011) (affirming confirmation of arbitration award corrected by arbitrator); *Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1270–72 (10th Cir. 1999) (affirming enforcement of arbitration award clarified by arbitrator); *Int'l*

---

[2] At the outset of the PNP in 2016, Caremark implemented a variable range of DIR rates **coupled with** improved point-of-sale reimbursement. *See e.g.,* J-597; *see also* Day 5 Tr. 700:10–701:1. This structure awarded high-performing pharmacies with greater reimbursement than the fixed fees in 2015. Day 2 Tr. At 276:16–277:1, 323:2–22; Day 5 Tr. 710:16–711:21. The Interim Award's methodology provides AHF with the benefit of this increased point-of-sale reimbursement while at the same time eliminating the DIR component. This results in incredibly high reimbursement rates to AHF that no other pharmacy comes close to achieving.

[3] The Interim Award also contains a typographical error on its face. Specifically, the last sentence of paragraph 1 of the interim award's "Summary" section, located on page 59, should state that "Respondent did **not** breach the contract for the fixed rate years," not that "Respondent did breach the contract for the fixed rate years." Caremark also requests that the Arbitrator modify this sentence.

*Bhd. of Teamsters, Chauffers, Warehousemen & Helpers of Am., AFL–CIO, Local 631 v. Silver State Disposal Servs., Inc.*, 109 F.3d 1409, 1411 (9th Cir. 1997) (affirming confirmation of arbitration award clarified by arbitrator); *Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, AFL–CIO, CLC, Local 182B v. Excelsior Foundry Co.*, 56 F.3d 844, 846–48 (7th Cir. 1995) (reversing refusal to enforce arbitration award clarified by arbitrator).

This authority allows an arbitrator to reconsider an award in its entirety, with few, if any, limitations, within a reasonable period of time after the award is issued and before the award is confirmed by a court. *See Martel*, 449 Fed. App'x at 354; *Excelsior Foundry*, 56 F.3d at 846–48. But even narrower interpretations of this authority acknowledge that an arbitrator may "correct a mistake which is apparent on the face of [an] award, complete an arbitration if the award is not complete, and clarify an ambiguity in the award." *See Silver State*, 109 F.3d at 1411.

In addition, under AAA Rule 50—which, at various times, has been designated as AAA Rules 46 and 48 and also appears at Rule 47 of the AAA's Consumer Arbitration Rules and Rule 40 of the AAA's Employment Arbitration Rules and Mediation Procedures—an arbitrator may "correct any clerical, typographical, or computational errors in the award," as long as the arbitrator does not "redetermine the merits of any claim already decided." *See* AAA Commercial R-50; *see also* AAA Consumer R-47; AAA Employment R. 40.

AAA Rule 50 provides a separate, independent basis for clarifying and correcting awards issued by AAA arbitrators. *See, e.g., In re Rollins, Inc.*, 552 F. Supp. 2d 1318, 1324–25 (M.D. Fla. 2004) (analyzing supplemental arbitration award under both variant of Rule 50 and common-law doctrine of *functus officio*), *aff'd in part and rev'd on other grounds in part by Rollins, Inc. v. Black*, 167 Fed. App'x 798, 800 (11th Cir. 2006). Arbitrators have discretion to interpret the scope of this rule. *See* AAA Commercial R-8 ("The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties."); *Barranco v. 3D Sys. Corp.*, No. 3:14–cv–

3

00188–RJC–DSC, 2016 WL 4546449, at *5 (W.D.N.C. Aug. 31, 2016) (arbitrator's interpretation of AAA rules is entitled to "deference"), *aff'd by Barranco*, 734 Fed. App'x at 889.

## THE INTERIM AWARD AND ITS RATIONALE

After a five-day evidentiary hearing, the Arbitrator issued the Interim Award. In pertinent part, the Interim Award made the following findings of fact and conclusions of law:

Caremark's network-enrollment forms ("NEFs") "attempt to disclose the rates and network rebates . . . to be charged, if any." Interim Award at 55, ¶ 1. "Rebates have been in place for some networks since 2006." *Id.*, ¶ 2. NEFs "are presented in the Spring before the next plan year." *Id.* "AHF was free to accept or reject participating in each particular network . . . ." *Id.*

"The movement from fixed rebates to variable range rebates was a result of some pharmacies' efforts to differentiate themselves based on superior performance." *Id.*, ¶ 3. "The rebate ranges resulted in high scoring pharmacies paying a rebate smaller than would have been the case if there was just a fixed rebate." *Id.* "The variable rates were introduced for the 2016 plan year." *Id.* at 56, ¶ 3.

"For the years 2006 through 2015, the DIR fees were fixed rates and thus knowable at the outset and at the Point of Sale." *Id.*, ¶ 6. The Interim Award found that "***these contract terms were not unconscionable. Thus, the fixed rate DIRs are enforceable as agreed***." *Id.* (emphasis added).

The Interim Award then determined that, starting in 2016, the DIR rates were variable and unconscionable as implemented because they "were unknowable when the NEF was entered into and at the Point of Sale." *Id.*, ¶ 7 & at 58, ¶ 11. The Interim Award found a number of flaws with Caremark's calculation of variable DIR fees, including that they "were not actuarially based" or "based on sound statistical methodologies." *Id.* at 57, ¶ 8. Further, "[s]mall variances had a disproportionate impact," and "statistically insignificant sample sizes . . . worked to AHF's

disadvantages." *Id.* In addition, the Interim Award determined that Caremark's practice of imputing average scores when no data existed was "arbitrary" and not appropriate. *Id.*

Based on these flaws, which only affected AHF's scores within the variable range, the Interim Award found that Caremark breached the covenant of good faith and fair dealing and that the DIRs as implemented were unconscionable. *Id.* at 58, ¶¶ 10–11. While the noted flaws impacted AHF's scoring, the Interim Award did not calculate the increase in DIR fees paid by AHF because of those flaws. Instead, the Interim Award simply awarded AHF a return of 100% of its DIR fees from 2016 through 2020, including the portion of fees resulting from application of the minimum DIR rate. *Id.*, ¶ 12. In other words, rather than award AHF damages based on the contractual floor of DIR fees derived from the lowest DIR rates known at the outset, this methodology eliminated all of AHF's DIR fees, resulting in an award of $19,276,611.

The evidence presented at the hearing regarding the minimum amount of DIR fees collectible from AHF was clear and unambiguous. The Interim Award cites to the annual NEFs, which clearly disclose the range of fees (the minimum and the maximum). *See id.* at 8–29, ¶¶ 26–37. Importantly, Dr. Brandon Patchett, AHF's pharmacist-in-charge, testified on cross-examination that AHF understood that, even with perfect scores, pharmacies participating in the PNP would be subject to the minimum DIR rates for a given network:

> Q: And, sir, your understanding [is] that AHF's performance determines where on that 3 to 5 percent range AHF will fall, correct?
>
> A: That's correct. And with 100 percent perfect performance, we will still get a 3 percent charge back.

Day 2 Tr. at 239:25–240:10.

As discussed below, Caremark respectfully requests that the Arbitrator modify the Interim Award's damages calculation to award AHF damages based on the contractual floor of DIR fees under the NEFs, not based on a full refund of those fees.[4]

## **ARGUMENT**

**I.    The Arbitrator Should Modify the Interim Award's Damage Methodology to Award AHF Damages Based on the Contractual Floor of DIR Fees, as Established by the Minimum DIR Rates Known at the Point of Sale.**

The Arbitrator should modify the Interim Award's damages calculation to match the Arbitrator's stated rationale regarding DIR rates known at the point of sale. AHF knew "at the outset and at the Point of Sale" that there was a contractual floor of fees for each network. *See* Interim Award at 56, ¶ 6. While AHF may not have known how Caremark would assess fees within the variable range, it indisputably knew the lowest and highest possibilities available to any participating pharmacy. Thus, consistent with the Arbitrator's acceptance of known DIR rates prior to 2016, the damages should be measured based on the lowest available contractual rate—*i.e.*, measured as if AHF were a perfect-scoring pharmacy—rather than measured based on a rate of 0% that does not exist in the parties' contracts. This computation results in a damages award of $2,710,305, not $19,276,611. *See* Exhibit A, Column C.

Employing this methodology is consistent with the Interim Award's underlying rationale that if a rate is "knowable at the outset and at the Point of Sale," then it is not unconscionable. Interim Award at 56, ¶ 6. Again, AHF conceded, through Dr. Patchett's testimony, that it was aware that, under the PNP, even "with 100 percent performance," it would "still get a 3 percent charge back." Day 2 Tr. at 239:25–240:10. The contractual floor for each network, like the "3 percent charge back" referenced in Dr. Patchett's testimony, was "knowable" to AHF and provides

---

[4] Caremark also requests that the Arbitrator correct the typographical error on page 59 regarding. *See supra* footnote 3.

a proper baseline for measuring the damages in this matter. *See* Interim Award at 56, ¶ 6; Day 2 Tr. at 239:25–240:10.

Using this measure of damages, if AHF was the very top-performing pharmacy in the networks, the minimum amount of DIR fees collectible for 2016 through 2020 was $16,566,305, as established by AHF's trimester reports for January 1, 2016, through August 31, 2020. *See* Trimester Reports, J-9–J-11A, J-17–J-19, J-22–J-32, J-35–J-45, J-48–J-58, J-61–J-71, J-74–J-84, J-87–J-97, J-100–J-110, J-113–J-123, J-126–J-136, J-139–J-149, J-152–J-162, J-165–J-175, J-178–J-188, J-191–J-201, J-204–J-214, J-217–J-227, J-230–J-240, J-243–J-253, J-256–J-266, J-269–J-279, J-282–J-292, J-295–J-305, J-308–J-316, J-321–J-331, J-336–J-346, J-349–J-359, J-362–J-372, J-374–J-385, J-400–J-410, J-413–J-423, J-426–J-436, J-439–J449, J-452–J-462, J-452–J-462, J-483–J-493, J-496–J-505, J-508–J-517, J-520–J-528, J-532–J-539, J-541–J-547, J-550–J-554, J-557–J-561, J-565–J-570, J-573–J-576, J-584–J-586, J-589–J-590, J-593; *see* also Exhibit A, Column C.

The difference between the amount AHF knew it would have to pay ($16,566,305) and the total variable fees as awarded ($19,276,611) results in a proper measure of damages of $2,710,305. Under no scenario did AHF expect to be exempted from DIR fees altogether. Indeed, wiping out DIR fees in their entirety provides AHF with far more than the benefit of the parties' bargain. Caremark's point-of-sale reimbursement rates do not exist in a vacuum. Caremark sets those rates to align with the range of variable rates. Thus, the variable fees are a critical component of AHF's overall reimbursement structure. If the variable fees are wiped away, then the parties' agreement provides that the point-of-sale reimbursement rates would not remain static. For example, the contractual terms that AHF agreed to in 2019 and 2020 provide that if Caremark discontinues the variable rates based on CMS guidance, then the pharmacy will have a lower payment at the point-

of-sale (*i.e.*, point-of-sale reimbursement rates will decrease significantly) to adjust for the lack of variable fees. Day 5 Tr. 720:25–721:17; *see also* J-612, J-613, J-614, J-635, J-642, J-644, J-645, J-646, J-647, J-649, J-650, J-651, J-652, J-653.

Here, the Interim Award deletes this fundamental component of AHF's bargain with Caremark, namely that its current point-of-sale reimbursement is linked to the variable fees. Taking away the entire fee component of the PNP for 2016 through 2020, while leaving the point-of-sale rates in place, provides AHF with an unparalleled level of reimbursement in Caremark's network of 68,000+ pharmacies that is far beyond what AHF ever expected or agreed to receive.

Black-letter law for assessing damages in contract cases prohibits placing a non-breaching party in a better position than it would have enjoyed if the breaching party had not breached the agreement. "Double recovery is disfavored." *Edwards v. Stewart Tit. & Trust. of Phoenix, Inc.*, 753 P.2d 1187, 1191 (Ariz. Ct. App. 1988). Instead, "[d]amages for breach of contract are those which arise naturally from the breach itself or which are reasonably supposed to have been within the contemplation of the parties at the time the contract was entered." *Id.* This is because "[t]he familiar aim of compensatory contract damages . . . is to yield the net amount of the losses caused and the gains prevented by the breach of contract"—*i.e.*, "[t]he expected additions to the plaintiff's wealth and the actually resulting subtractions therefrom." *A.R.A. Mfg. Co. v. Pierce*, 341 P.2d 928, 932 (Ariz. 1959) (internal quotation marks omitted).

At best, AHF is entitled to receive damages based on the contractual floor of DIR fees that AHF was required to pay under the NEFs—*i.e.*, AHF's best possible DIR fees. This computation avoids an improper windfall of almost $17,000,000 to AHF.[5] *See Mullins v. Butler Am., L.L.C.*,

---

[5] Exhibit A outlines the different DIR calculations that the Interim Award found as conscionable and enforceable side by side to illustrate how the Interim Award's damage calculation is beyond the terms of the contract and inequitable. Column B lists the amount of DIR fees paid each year under the PNP (*i.e.*, the damages currently awarded). Column C lists the amount of DIR fees that AHF would have paid by assigning it the minimum DIR rates disclosed in the

19–cv–22616–MARTINEZ–OTAZO–REYES, 2020 WL 4905435, at *6 (S.D. Fla. April 2, 2020) (noting that "double recovery constitutes a materially unjust miscalculation which may be modified under section 11 of the FAA"); *Collins & Aikman Floor Coverings Corp. v. Froehlich*, 736 F. Supp. 480, 484, 487–88 (S.D.N.Y. 1990) (denying motion to confirm arbitration award, and remanding for further proceedings, where arbitrator refused to modify windfall damages computation encompassing time period longer than allowed by contract).

Correcting the Interim Award's computational error in this way is consistent with well-established law. *See Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 471–72 (5th Cir. 2012) (affirming confirmation of arbitration award corrected under variant of Rule 50 based on arbitrator's inadvertent inclusion in award of language proposed by claimant); *E. Seaboard Constr. Co. v. Gray Constr., Inc.*, 553 F.3d 1, 5–6 (1st Cir. 2008) (reversing vacation of arbitration award clarified under variant of Rule 50 for purposes of allocating damages); *Gen. Re Life Corp. v. Lincoln Nat'l Life Ins. Co.*, 273 F. Supp. 3d 307, 316–19, 325 (D. Conn. 2017) (confirming clarified arbitration award applying methodology that significantly changed amount of damages); *AP Seating USA, L.L.C. v. Circuit of the Ams., L.L.C.*, No. A–14–CA–058–SS, 2014 WL 3420805, at *2–3 (W.D. Tex. July 10, 2014) (confirming arbitration award clarified under variant of Rule 50 to allocate ownership percentages between claimant and respondent); *Laclede Grp., Inc. v. NiSource Inc.*, No. 1:06–cv–1846–LJM–JMS, 2007 WL 9752730, at *2–3 (S.D. Ind. July 24,

---

annual NEFs (*i.e.*, eliminating the unknown variable rates). This methodology results in damages of $2,710,305. Column D lists the amount of DIR fees if Caremark imputed perfect performance instead of the network averages when insufficient data existed, as the Interim Award suggested. *See* Interim Award at 57, ¶ 8 ("A neutral and fair practice would have treated lack of data situations as perfect performance."). This methodology results in damages of just over $4,000. Column E lists the amount of DIR fees if AHF had received a known fixed rate DIR fee equaling the midpoint of the DIR variable rates (*e.g.*, 4% in a network with 3%–5% variable rates). This methodology results in no damages to AHF and an overpayment by Caremark of $1,808,847. This last calculation graphically illustrates how AHF benefited from the PNP.

2007) (confirming arbitration award corrected under variant of Rule 50 by applying different rate to calculating damages); *Oakwood Labs. v. Howrey Simon Arnold & White, L.L.P.*, Nos. 1:04 CV 2270 & 1:05 CV 2070, 2007 WL 1544577, at *1–3 (N.D. Ohio May 24, 2007) (confirming arbitration award clarified under variant of Rule 50 to insert references to different burden of proof); *Waveform Telemedia, Inc. v. Panorama Weather N. Am.*, Nos. 06 Civ. 5270 CMMDF & 06 Civ. 5271 CMMDF, 2007 WL 678731, at *8 (S.D.N.Y. Mar. 2, 2007) (confirming corrected arbitration award in which mathematical error affecting amount of damages was fixed); *Clarendon Nat'l Ins. Co. v. TIG Reins. Co.*, 183 F.R.D. 112, 116–17 (S.D.N.Y. 1998) (same).

*Rain* is instructive. There—as here with respect to the damages computation the Arbitrator adopted from AHF's spreadsheet—an arbitrator issued an award containing terms proposed by the claimant that were inconsistent with the rest of the award. *Rain*, 674 F.3d at 471. When the respondent requested clarification under a variant of Rule 50, the arbitrator removed the inconsistent, inadvertently included terms from the award. *Id.* The district court confirmed the award, and the court of appeals affirmed the confirmation on the basis that there was no reason to conclude that "the arbitrator's correction of [the] award for clerical errors was not genuine or credible." *Id.* at 473.

*Rain*, as well as the other authorities cited above, firmly support clarifying the interim award's damages computation based on the Arbitrator's inherent authority and AAA Rule 50.

## CONCLUSION

For these reasons, either independently or in combination, Caremark respectfully requests the issuance of an amended interim arbitration award (1) modifying the Interim Award's damages computation to state that the damages award is $2,710,305, not $19,276,611, and (2) correcting the last sentence of paragraph 1 of the Interim Award's "Summary" section, located on page 59,

to state that "Respondent did not breach the contract for the fixed rate years," not that "Respondent did breach the contract for the fixed rate years."

By: /s/ *Kevin P. Shea*

*Attorney for Respondents*

Kevin P. Shea
Jonathan M. Lively
Elizabeth Z. Meraz
Aon S. Hussain
NIXON PEABODY LLP
70 W. Madison Street, Suite 3500
Chicago, IL 60602-4224
Telephone: (312) 977-4400
Facsimile: (312) 977-4405
Dated: August 29, 2021

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a copy of the foregoing **Respondents' Motion to Recalculate Damages Computation Prior to Finalizing Award** was served upon the following:

Andrew Kim, akim@kimriley.com
Rebecca Riley, rriley@kimriley.com
Tom Myers, tom.myers@aidshealth.org

William J. "Zak" Taylor, wtaylor@tsaoyee.com, AAA Arbitrator

Jen Mora, jenmora@adr.org, AAA Case Manager

*via electronic mail on this 29th day of August, 2021.*

By: */s/ Elizabeth Meraz*

# EXHIBIT A

| Year | Amount of Arbitrator's Calculated Damages Award | PNR Fees Based on Contractual Floor of DIR Rates | Total Fees When Scoring Lack of Data Situations as Perfect Performance | Total Fees Based on Known DIR Midpoint Rates |
|---|---|---|---|---|
| **Total** | $19,276,611.00 | $16,566,305.43 | $19,272,532.47 | $21,085,457.78 |
| 2016 | $2,164,775.00 | $1,854,277.52 | $2,229,009.46 | $2,468,435.86 |
| 2017 | $2,503,514.00 | $2,131,301.28 | $2,526,597.32 | $2,837,408.23 |
| 2018 | $4,090,475.00 | $3,374,376.82 | $3,902,007.11 | $4,430,306.22 |
| 2019 | $4,704,095.00 | $3,854,331.13 | $4,699,031.55 | $5,051,155.98 |
| 2020 | $5,813,752.00 | $5,352,018.68 | $5,915,887.03 | $6,298,151.50 |
| **Damages Based on Corrected Calculation:** | | $2,710,305.57 | $4,078.53 | -$1,808,846.78 |

# EXHIBIT P

TOM MYERS
Tom.Myers@aidshealth.org
AIDS HEALTHCARE FOUNDATION
6255 Sunset Boulevard, 21st Floor
Los Angeles, CA 90028
Telephone: (323) 860-5200
Facsimile: (323) 467-8450

ANDREW F. KIM
AKim@kimrileylaw.com
REBECCA J. RILEY
RRiley@kimrileylaw.com
KIM RILEY LAW
9018 Balboa Boulevard, # 552
Northridge, CA 91325
Telephone: (818) 216-5288
Facsimile: (818) 993-3012

Attorneys for Claimant
AIDS HEALTHCARE FOUNDATION

## ARBITRATION UNDER THE AUSPICES OF

## THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION, a California non-profit corporation,<br><br>          Claimant<br><br>  v.<br><br>CVS CAREMARK, a subsidiary of CVS HEALTH CORPORATION, a Delaware corporation,<br><br>        Respondent. | **CASE NO.: 01-19-0004-0127**<br><br>**OPPOSITION OF CLAIMANT AIDS HEALTHCARE FOUNDATION TO RESPONDENT CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES COMPUTATION PRIOR TO FINALIZING AWARD**<br><br>**WILLIAM ZAK TAYLOR, ESQ. PRESIDING** |

# TABLE OF CONTENTS

I.     INTRODUCTION..................................................................................1

II.    BACKGROUND...................................................................................6

    A.     The Interim Award ........................................................................ 6

        1.     The Arbitrator Held That CVS Caremark Breached the Provider
             Agreements and the Implied Covenant of Good Faith and Fair
             Dealing by, Among Other Things, Imposing on AHF the Adhesive,
             Substantively Unconscionable NEFs ........................................................ 6

        2.     The Arbitrator Held that the Adhesive NEFs Are Substantively
             Unconscionable and Are Not to Be Enforced ........................................ 7

        3.     The Arbitrator Properly Awarded Damages Consistent with the
             Evidence and Arizona Law and Enjoined Any Further Claw Backs
             Pursuant to the Variable Rate Claw Back Programs .......................... 9

    B.     CVS Caremark's Defense Case – Generally........................................ 10

    C.     CVS Caremark's Arguments Pertaining to Damages Prior to the Close of
        the Hearing ........................................................................................ 10

    D.     CVS Caremark's Argument Concerning the Remedy of Unenforceability
        Prior to the Close of the Hearings ....................................................... 12

    E.     The Arbitrator Closes the Hearings ..................................................... 12

    F.     CVS Caremark Waits Until After the Close of Evidence and Of the
        Evidentiary Hearings, and After the Arbitrator Issued the Interim Award,
        to Advance an Entirely New Theory on Damages and to Try to Put On
        "Evidence" in Support of That Theory ................................................. 12

III.   ARGUMENT......................................................................................13

    A.     CVS Caremark Seeks a Wholesale Revisiting by the Arbitrator of the
        Awarded Damages as Well as the Liability Bases on Which the Arbitrator
        Awarded Damages .............................................................................. 13

    B.     CVS Caremark Seeks Relief From its Own Tactical Litigation Decisions
        Not to Make Arguments or Elicit Evidence Concerning Alternate Damages
        Theories or Remedies for Substantive Unconscionability Prior to the Close
        of Evidence and the Hearings ............................................................. 14

    C.     The Arbitrator's Award of Damages Is Supported by Applicable Arizona
        Law, There Has Been No Miscalculation, and CVS Caremark Asks That
        the Arbitrator Rewrite the Unconscionable NEFs, Which the Arbitrator
        May Not Do ....................................................................................... 17

    D.     The Arbitrator's Determination That the Adhesive, Substantively
        Unconscionable NEFs Are Unenforceable is Supported by Applicable
        Arizona Law ...................................................................................... 18

  E.  CVS Caremark Cites a Legion of Cases Not One of Which Is Remotely
     Applicable to an Attempt by a Litigant to Persuade an Arbitrator to
     Reverse Liability Holdings and Reduce Damages Based on Arguments Not
     Made or New "Evidence" Not Submitted Prior to the Close of Evidence ....... 18

IV.  CONCLUSION....................................................................................23

AHF'S OPPOSITION TO CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES

## TABLE OF AUTHORITIES

### Cases

A.P. Seating USA, LLC v. Circuit of the Americas LLC, (W.D. Tex. 2014) 2014 U.S. Dist. LEXIS 93640 .................................................................................................................. 19

A.R.A. Mfg. Co. v. Pierce (1959) 86 Ariz. 136 ............................................................. 17

Barranco v. 3D Sys. Corp. (2018) 734 Fed. Appx. 885 .................................................... 19

Clarendon Nat'l Ins. Co. v. TIG Reinsurance Co. (S.D.N.Y. 1998) 183 F.R.D. 112 ...................... 19

Clark v. Renaissance West, LLC (2013) 232 Ariz. 510 ....................................................... 8

Collins & Aikman Floor Coverings Corp. v. Froehlich (S.D.N.Y. 1990) 736 F.Supp. 480 ........... 20

Cooper v. QC Fin. Servs. (D.Ariz. 2006) 503 F.Supp.2d 1266 ......................................... 18

Eastern Seaboard Constr. Co. v. Gray Constr. Inc. (2008) 553 F.3d 1 ............................... 20

Gen. Re Life Corp. v. Lincoln Nat'l Life Ins. Co. (D. Conn. 2017) 273 F.Supp.3d 307 .............. 20

Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, Local 182B v. Excelsior Foundry Co. (7th Cir. 1995) 56 F.3d 844 ............................................................................ 21

In re Rollings, Inc. (M.D. Fla. 2004) 552 F.Supp.2d 1318 ............................................... 21

International Bhd. of Teamsters, Local 631 v. Silver State Disposal Serv. (9th Cir. 1997) 109 F.3d 1409 ................................................................................................................. 21

Kennecott Utah Copper Corp. v. Becker (10th Cir. 1999) 186 F.3d 1261 ............................. 22

Laclede Group v. Nisource Inc. (S.D. Ind. 2007) 2007 U.S. Dist. LEXIS 113210* ...................... 22

Martel v. Ensco Offshore Co. (5th Cir. 2011) 449 Fed.Appx. 352 ...................................... 22

Mullins v. Butler Am. (S.D.Fla. 2020) 2020 U.S. Dist. LEXIS 153528 ............................... 22

Northern Ariz. Gas Serv., Inc. v. Petrolane Transp., Inc. (App. 1984) 145 Ariz. 467 .................. 17

Oakwood Labs. V. Howrey Simon Arnold & White, LLP (N.D.Ohio 2007) 2007 U.S. Dist. LEXIS 37909* ................................................................................................ 23

Olliver/Pilcher Insur. Inc. v. Daniels (1986) 148 Ariz. 530 ............................................. 18

Rain CII Carbon, LLC v. ConocoPhillips Co. (5th Cir. 2012) 674 F.3d 469 .......................... 23

Rollins, Inc. v. Black (11th Cir. 2006) 167 Fed.Appx. 798 ............................................. 23

Southern Ariz. School for Boys, Inc. v. Chery (App. 1978) 119 Ariz. 277 .............................. 17

Waveform Telemedia, Inc. v. Panorama Weather N. Am., Inc. (S.D.N.Y. 2007) 2007 U.S. Dist. LEXIS 105306* ........................................................................................ 24

AHF'S OPPOSITION TO CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES

<u>Statutes</u>

9 U.S.C. §10(d) ........................................................................................................................... 20

A.R.S. Section 47-2302.................................................................................................................. 8

<u>Other Authorities</u>

RAJI (CIVIL) 6th Contract 17 .................................................................................................. 2, 17

Rule 39 AAA Rules ...................................................................................................................... 12

Rule 40 AAA Rules ........................................................................................................................ 5

<u>Treatises</u>

Restatement (Second) Of Contracts §§ 347, 351 (1981) ............................................................. 17

AHF'S OPPOSITION TO CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES

**CLAIMANT AIDS HEALTHCARE FOUNDATION'S OPPOSITION TO RESPONDENT CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES PRIOR TO FINALIZING AWARD**

I.      **INTRODUCTION**

AHF's claimed measure of damages has been clear and unequivocal from the date it filed the arbitration demand against CVS Caremark in this matter, and the Arbitrator awarded damages according to that measure in the Interim Award. Throughout this mater, CVS Caremark has proffered only one theory of damages: AHF suffered no damages whatsoever. Having lost at arbitration, CVS Caremark now disingenuously submits a motion styled "Respondent's Motion to Recalculate Damages Computation Prior to Finalizing Award" in which CVS Caremark in fact seeks a retrial in the form of the Arbitrator's consideration of new "theories" and new, untested (indeed, untestable) "evidence" without affording to AHF due process. CVS Caremark advances in the motion a new untested theory of damages never proffered in their answer, in any pleading filed during more than a year of motion practice, during a five-day evidentiary hearing (notwithstanding the Arbitrator's repeated admonitions, described below, that he would hold the parties to their litigation choices, CVS Caremark rested long before the scheduled close of evidence with 5 hearing days to spare), or in subsequent, extensive post trial briefing. CVS Caremark cites no law or rule of the American Arbitration Association permitting it to obtain a retrial of any issues or to obtain the relief it seeks, which is nothing less than a reversal of the Arbitrator's substantive holdings on liability *and* damages. There is no evidence in the record to support CVS Caremark's new, deeply flawed damages theory, which depends on the Arbitrator ignoring his own holding that, among other things, the adhesive NEFs that established the variable rate DIR programs (the "Claw Back Programs") are *unenforceable* because they are substantively unconscionable.

As shown more fully below, the Arbitrator clearly and unambiguously held, among other things, that the adhesive NEFs imposed from 2016 forward were substantively unconscionable and, therefore, unenforceable. CVS Caremark does not challenge the Arbitrator's power to declare these substantively unconscionable agreements unenforceable. The Arbitrator further clearly and

1 | unambiguously held, among other things, that the very *imposition* of the adhesive, substantively

2 | unconscionable NEFs was a breach of the Provider Agreements then in force as well as a breach of

3 | the implied covenant of good faith and fair dealing. In other words, CVS Caremark breached the

4 | Provider Agreements and covenant of good faith and fair dealing implied therein by imposing upon

5 | AHF the adhesive, substantively unconscionable NEFs. Ultimately, the Arbitrator awarded to AHF,

6 | based on Exhibit C-71, damages in the amount of $19,276,611. CVS Caremark all but ignored this

7 | exhibit at and after the hearings, stubbornly insisting that AHF suffered no damages at all.

8 |       As shown below, the Arbitrator held that one of the consequences of CVS Caremark's

9 | imposing upon AHF adhesive, substantively unconscionable NEFs is that those NEFs cannot be

10 | enforced, either retrospectively or going forward. Consistent with this, the Arbitrator further held that

11 | another of the consequences of imposing adhesive, substantively unconscionable NEFs was that CVS

12 | Caremark must pay back to AHF all monies CVS Caremark clawed back pursuant to those NEFs. The

13 | measure of damages the Arbitrator applied in the Interim Award was absolutely consistent with the

14 | evidence presented and applicable Arizona law, which provides that damages on a contract claim are

15 | "the amount of money that will reasonably and fairly compensate [plaintiff] for the damages proved

16 | by the evidence to have resulted naturally and directly from the breach of contract." Revised Arizona

17 | Jury Instructions (civil) ("RAJI (CIVIL)") 6th Contract 17." RAJI (CIVIL) 6th Contract 17. This *must*

18 | *include* "the amount of money that will place [plaintiff] in the position [plaintiff] would have been in

19 | if the contract had been performed." *Id.*

20 |       It seems somewhat tautological to say it, but if CVS Caremark had not breached the Provider

21 | Agreements and the covenant of good faith and fair dealing implied therein by imposing upon AHF

22 | the adhesive, substantively unconscionable, and unenforceable NEFs establishing the Claw Back

23 | Programs, there would have been *no adhesive, substantively unconscionable NEFs*. The money CVS

24 | Caremark took from AHF based on these adhesive, substantively unconscionable, and unenforceable

25 | NEFs is AHF's damages, as the Arbitrator so held. Whether viewed from the standpoint of

26 | unconscionability or breach of contract and the implied covenant, the *only way* to put AHF in the

27 | position it would have occupied had CVS Caremark *not* breached the Provider Agreements and the

28 |

1  covenant of good faith and fair dealing implied therein by, among other things, imposing on AHF the

2  adhesive, substantively unconscionable, and unenforceable NEFs is to require CVS Caremark to

3  refund the entire Claw Back it has taken from AHF as a result of the Claw Back Programs

4  established by those NEFs. This is an exceedingly simple theory, fully supported by binding Arizona

5  case law, and one that AHF has espoused since the inception of this matter, without revision or

6  equivocation.

7      CVS Caremark now argues for the first time that the Arbitrator should rewrite the

8  unenforceable NEFs such that they are read to "establish," contrary to all the evidence, a different,

9  fixed rate Claw Back Program (which they did not). CVS Caremark attempts to support its new

10  argument with talk of calculating damages based on the "contractual floor," "minimum collectible

11  amount," and "benefit of the bargain" with respect to *adhesive, substantively unconscionable,*

12  *unenforceable NEFs.* This is all beside the point. The NEFs are adhesive, substantively

13  unconscionable, unenforceable, and violate the covenant of good faith and fair dealing. The Arbitrator

14  expressly so held. There is no "benefit of the bargain" as to the NEFs, because there was no

15  enforceable "bargain." *There are no longer any adhesive, substantively unconscionable NEFs, for the*

16  *Arbitrator has wiped them out of existence based on the evidence and arguments of the parties.* The

17  expectation of the parties as to an unconscionable term or contract is irrelevant. The "contractual

18  floor" or the "minimum collectible amount' of an unconscionable term or contract is similarly

19  irrelevant.

20      Having made the tactical decision not to proffer prior to the close of the hearings or the

21  Arbitrator's issuance of the Interim Award (when CVS Caremark realized the consequences of this

22  decision) any alternative damages theories (other than that AHF suffered none) or any evidence or

23  argument as to why the Arbitrator should rewrite the adhesive, substantively unconscionable, and

24  unenforceable NEFs to "enforce" non-existent, hypothetical NEFs establishing fixed rate Claw Back

25  Programs, CVS Caremark seeks essentially a re-determination of the merits by the Arbitrator under

26  the disingenuous guise of a mere "recalculation." It seeks, for example, a reversal by the Arbitrator of

27  his clear, unambiguous (and clearly correct) holding that CVS Caremark breached the Provider

28

3

1 Agreements and the covenant of good faith and fair dealing implied therein by *the very imposition of*

2 *the adhesive, substantively unconscionable, and unenforceable NEFs*. It asks the Arbitrator to reverse

3 his holding that the adhesive, substantively unconscionable NEFs are unenforceable and to hold anew

4 that those NEFs will be enforced *as if they were different contracts establishing materially different,*

5 *fixed rate Claw Back Programs*. This point bears expansion: CVS Caremark asks the Arbitrator,

6 under the false guise of a motion to "recalculate," to rewrite and then *enforce as rewritten* the

7 adhesive, substantively unconscionable, and unenforceable NEFs, contrary to fact and all the

8 evidence. According to CVS Caremark, the Arbitrator is to ignore that the adhesive, substantively

9 unconscionable, and unenforceable NEFs established a claw back process stretching over many

10 months after the point of sale that involved taking vast sums of money from future contractually

11 required reimbursements to AHF's pharmacies for prior claw back periods. As shown below, CVS

12 Caremark cites no authority for the proposition that an arbitrator can rewrite agreements and then

13 enforce the rewritten agreements under any circumstances, much less to fit a damages theory *never*

14 *advanced* by a litigant until after the close of evidence and the hearings. In fact, as also shown below,

15 the law is crystal clear that an arbitrator may *not* rewrite the parties' agreements, either generally or in

16 the context of substantively unconscionable, unenforceable agreements.

17        Undeterred, CVS Caremark tries vainly to shoehorn its motion into reams of inapplicable case

18 law involving the correction of clerical or mathematical errors made by arbitrators. Yet *not one* of its

19 cited cases support CVS Caremark's "right" to seek a wholesale overhaul of the Interim Award. CVS

20 Caremark does not seek to correct computational errors in the Interim Award. It, instead, submits, and

21 seeks the Arbitrator's consideration of, new "evidence," namely a hearsay spreadsheet containing the

22 results and summary conclusions of unknown calculations made by an unidentified person, not

23 provided under oath nor tested by cross examination or presentation of contrary witnesses. It claims

24 this "evidence" supports *entirely new theories of damages and of the remedies the Arbitrator may*

25 *award*. It asks the Arbitrator to ignore his unambiguous holdings that the adhesive NEFs are

26 substantively unconscionable and unenforceable, and that CVS Caremark breached the contracts and

27 the implied covenant by, among other things, imposing on AHF the adhesive, substantively

28

1  unconscionable NEFs.

2       CVS Caremark makes no effort to seek the Arbitrator's leave to put on new "evidence" or to

3  show the basis for choosing the numbers or the underpinnings of the actual calculations underlying

4  the summary monetary conclusions it reaches.[1] CVS Caremark does not provide an excuse nor

5  explain why it did not make this new "argument" or submit this new "evidence" at any time prior to

6  the close of evidence, the close of the hearings, or even the filing of its instant motion (or, in the

7  alternative, why it was prevented from doing so). It merely asks that the Arbitrator accept its new

8  "argument" and new (inadmissible) "evidence" at face value and undo without due process all that

9  has been done at great cost of time and money to the parties.

10       AHF is given no opportunity to test this new "evidence" by cross-examination or by any other

11  means, because CVS Caremark did not at the evidentiary hearings and has not in its motion disclosed

12  the actual calculations leading to the summary monetary amounts in its new "evidence." At bottom,

13  CVS Caremark seeks to deny AHF an opportunity, which is the purpose of evidentiary hearings, to

14  address the purported substantive basis for the bald conclusion that the Arbitrator should reverse his

15  liability holdings *and* reduce the damages set forth in the lengthy, considered Interim Award by any

16  percentage, much less 90%.

17       AHF, accordingly, objects to the Arbitrator's admission of the spreadsheet attached as the

18  only exhibit to the motion on the grounds that it is unreliable hearsay, not authenticated, not given

19  under oath, lacking any foundation whatsoever, contains exclusively summary conclusions not

20  supported by any underlying evidence, and was submitted after the close of evidence and the close of

21  the hearings. To the extent CVS Caremark seeks a re-opening of the hearings, AHF objects. The

22  Motion is frivolous. AHF respectfully requests that the Arbitrator deny it with prejudice in its

23  entirety.

24  / /

25  —————————————

26  [1] CVS Caremark notably *does not request* a reopening of the hearing, pursuant to Rule 40 the AAA
Commercial Arbitration Rules and Mediation Procedures Including Procedures for Large, Complex
27  Commercial Disputes (the "AAA Rules"), which is the only circumstance under which CVS
Caremark may offer new "evidence" or new damages "theories. Rule 40 AAA Rules.
28

**II.** **BACKGROUND**

    **A.** **The Interim Award**

        AHF sets forth below verbatim quotations of the relevant portions of the Interim Award. As shown below, CVS Caremark selectively quotes the Interim Award, ignoring large portions of the Interim Award *and* the effect that the granting of the motion would have on the entire award, including requiring the Arbitrator to revisit and reverse his liability determinations.

        **1.** **The Arbitrator Held That CVS Caremark Breached the Provider Agreements and the Implied Covenant of Good Faith and Fair Dealing by, Among Other Things, Imposing on AHF the Adhesive, Substantively Unconscionable NEFs**

> "It is the NEF that constitutes the agreement to join a particular network. The NEFs attempt to disclose the rates and the network rebates (hereinafter "rebates" or "DIR") to be charged, if any."

Interim Award, p. 55, No. 1.

> "[F]or each reimbursement claim submitted by a pharmacy after January 1, 2016, Caremark reimburses the pharmacy at the AHF rate indicated on the NEF at the point of sale. Subsequently, per the terms of the NEFs pertaining to the PNP, Caremark assesses the pharmacy a variable rate fee as determined by its performance in the PNP. Caremark determines these variable rate fees after the point of sale on a trimester basis."

Id., p. 11, No. 30.

> "Specifically, Caremark calculates participating pharmacies' scores per the PNP's criteria and uses those scores to determine the applicable variable rate fee, call ed the Performance Network Rebate fees ("PNP Fees"). Caremark provides those participating pharmacies with 'Trimester Reports' three times a year, for the periods January through April, May through August, and September through December. Caremark then recoups the PNP Fees from participating pharmacies."

Id., p. 11, No. 31.

> "The DIR was recouped by CVS from future reimbursement payments to AHF."

Id., p. 55, No. 1.

> "AHF was free to accept or reject participating in each particular network although the consequences of not signing on to a particular NEF could have a severe impact on AHF's business."

1 | <u>Id.</u>, p. 55, No. 2.

2 | "The variable rates were introduced for the 2016 plan year."

3 | <u>Id.</u>, p. 56, no. 3.

4 | "However, CVS had considerable bargaining leverage as one of the largest PBM's. A
   pharmacy would lose out on large amounts of business if it did not sign up to CVS'
5 | networks. Those networks were exclusive and there was no alternative if AHF wanted
   to serve the members of the plans in CVS' networks. The parties did not engage on a
6 | level playing field. CVS and its health plan partners set the terms. The growth in the
   range of the variable DIR's demonstrates the unequal bargaining power. CVS and its
7 | plan partners had no competitive check on how much they increased the variable DIR
   rates. There was no valid business reason presented for the escalating growth in the
8 | percentages recouped, and this growth shows unchecked economic power."

9 | <u>Id.</u>, p. 56, No. 4.

10 | "Thus, the Arbitrator finds the contracts were adhesive."

11 | <u>Id.</u>, p. 56, No. 5.

12 | "The upshot of the unsound methodology for the calculation of the variable DIR's was
   that AHF was unfairly treated to its financial disadvantage and CVS gained unfair
13 | economic advantage both in revenue to CVS and passthrough payments to plan
   sponsors which enhanced CVS' competitive posture."

14 |

15 | <u>Id.</u>, p. 58, No. 9.

16 | "The provisions of, and application of variable DIR's was contrary to the covenant of
   good faith and fair dealing inherent in the NEFs."

17 |

18 | <u>Id.</u>, p. 58, no. 10.

19 | "Respondent breached the contract with its application of the PNP resulting in A[IDS]
   Healthcare Foundation (hereinafter "AHF") being paid less than the contract required
20 | in the variable rate DIR years."

21 | <u>Id.</u>, Summary, p. 59, No. 1.

22 | "Respondent breached the contract by violating the covenant of good faith and fair
   dealing by *implementing* the PNP in the variable rate DIR year."

23 |

24 | <u>Id.</u>, Summary, p. 59, No. 2.

25 | **2.     The Arbitrator Held that the Adhesive NEFs Are Substantively**

26 | **Unconscionable and Are Not to Be Enforced**

27 | "For the years from 2016 on the DIRs were variable using the 'imputed average
   pharmacy' when no data was available. For these years the DIRs were unknowable
28 |

1  when the NEF was entered into and at the Point of Sale. Thus, there was no
expectation as to what the variable DIR would entail other than that it would be
2  calculated fairly and applied in a nondiscriminatory manner. The variable DIR
calculations were in the discretion of CVS. Inherent in the contracts were the unstated
3  expectations that CVS would not exercise this discretion to AHF's disadvantage and to
AHF's detriment."

4  Interim Award, p. 56, No. 7.

5  "The calculations to determine the variable DIRs were not actuarily based. [Citation].
Nor were they based on sound statistical methodologies. Small variances had
6  disproportionate impact for extremely small samples (e.g., three patients where the
physician of one did not prescribe a statin, etc.). [Citation]. Use of these statistically
7  insignificant sample sizes again worked to AHF's disadvantages. Moreover, for some
there was no correction possible. Of course, pharmacies have no control over what
8  physicians prescribe. [Citation]. Some of the calculations were arbitrary, such as
applying some average of other pharmacies when there was no data available for the
9  AHF pharmacy. [Citation]. This practice is particularly arbitrary as perfect
performance (as there was no data showing less than perfect performance) was
10  'punished' with a recoupment across the entirety of the prescriptions filled. A neutral
and fair practice would have treated lack of data situations as perfect performance.
11  Instead, CVS applied the average score over all pharmacies participating in the
network nationwide. [Citation]. The calculations were unfair to AHF and served to
12  benefit CVS disproportionately as it collected revenue for administering the variable
program based on unsound and arbitrary methods and benefitted CVS in its
13  competition to gain health plan business."

14  Id., pp. 57-58, No. 8 (record citations omitted).

15  "The upshot of the unsound methodology for the calculation of the variable DIR's was
that AHF was unfairly treated to its financial disadvantage and CVS gained unfair
16  economic advantage both in revenue to CVS and passthrough payments to plan
sponsors which enhanced CVS' competitive posture."

17

18  Id., p. 58, No. 9.

19  "Substantively unconscionable contract terms are unenforceable. As stated in *Clark v.
Renaissance West, LLC* (2013) 232 Ariz. 510, 512; *see also* A.R.S. Section 47-2302:
20

21  If the court as a matter of law finds the contract or any clause of the
contract to have been unconscionable…it may enforce the remainder of
22  the contract without the unconscionable clause, or it may so limit the
application of any unconscionable clause as to avoid any
23  unconscionable result."
The variable DIRs *as implemented* were substantively unconscionable as a matter of
24  law. Having found the variable DIR provisions to be substantively unconscionable, the
Arbitrator choses [sic] to limit the application of the variable DIR provisions and
25  award damages to AHF."

Id., p. 58, No. 11.
26

27  "The terms of the PNP were substantively unconscionable for the variable rate DIR
years."

28

8

Id., Summary, p. 60, No. 4.

"Based on the foregoing, the Arbitrator holds that the variable rate DIR provisions are substantively unconscionable and unenforceable."

Id., Conclusion, p. 60.

### 3. The Arbitrator Properly Awarded Damages Consistent with the Evidence and Arizona Law and Enjoined Any Further Claw Backs Pursuant to the Variable Rate Claw Back Programs

"For the years when variable DIRs were applied, the damages suffered by AHF per Claimant's Exhibit 71 were as follows:

    a.    2016: $2,164,775.

    b.    2017: $2,503,514

    c.    2018: $4,090,475

    d.    2019: $4,704,095

    e.    2020: $5,813,752[2]

    f.    Total: $19,276,611."

Interim Award, p. 58-59, No. 13.

"AHF has sustained $19,276,611 in damages."

Id., Summary, p. 60, No. 7.

"CVS is enjoined from using and collecting variable DIRs for 2020 and in the future that use *the same methodologies as those presented in the claims in this Arbitration*."

Id., p. 59, no. 13 (emphasis added).

"The variable rate DIRs as set forth and applied in the years at issue are enjoined going forward. Nothing prevents CVS from moving forward with a *fair and nondiscriminatory variable DIR methodology based on sound principles*."

Id., Summary, p. 60, No. 6 (emphasis added).

---

[2] Although the Arbitrator used the figure "$5,813,752" for the year 2020, Claimant's Exhibit C-71 shows "$5,831,752" for that year. The Arbitrator plainly juxtaposed the "3" and the "1." AHF asks that the Arbitrator use his inherent power to correct that clerical mistake. AHF will file a motion seeking to correct, clarify, and complete the Interim Award concurrently with its motion for attorneys' fees in which AHF will seek the correction set forth above, an order from the Arbitrator, consistent with the Interim Award, clarifying that CVS Caremark is to pay back to AHF all monies clawed back pursuant to the adhesive, substantively unconscionable, unenforceable NEFs after the second trimester of 2020, and to complete the Interim Award by awarding to AHF, in addition to its attorneys' fees, pre- and post-judgment interest, as AHF prayed in its initial and amended Demands for Arbitration.

AHF'S OPPOSITION TO CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES

"AHF is entitled to damages in the amount of $19,276,611."

Id., Conclusion, p. 60.

### B.   CVS Caremark's Defense Case – Generally

On April 16, 2021, CVS Caremark rested its defense case after calling two witnesses, and the Arbitrator declared the testimony portion of the proceedings concluded. Hearing Trans., Vol V., 729:22-25. During its notably brief defense case, CVS Caremark presented no witness to testify as to any alleged facts pertaining to damages, or to perform any calculations, or identify which numbers and/or percentages were relevant to determination of damages, or to present any evidence under oath and subject to cross examination as to the prior performing of any damages calculations. CVS Caremark made no arguments to that effect.

CVS Caremark chose not to argue, or present evidence concerning, a damages theory in the event the Arbitrator held, as he ultimately did, that CVS Caremark breached the Provider Agreements and the covenant of good faith and dealing implied therein by, among other things, imposing on AHF adhesive, substantively unconscionable, unenforceable NEFs. CVS Caremark also chose not to argue or present evidence during its defense case concerning why the Arbitrator should enforce a part of the adhesive, substantively unconscionable NEFs or should enforce non-existent, hypothetical NEFs if the Arbitrator determined any of the NEFs to be substantively unconscionable and, therefore unenforceable.

### C.   CVS Caremark's Arguments Pertaining to Damages Prior to the Close of the Hearing

CVS Caremark understood from AHF's filing of the Arbitration Demand that AHF sought damages measured by the entire sum of money clawed back by CVS Caremark during the relevant years. Instead of offering alternative damages theories or proffering evidence, including supporting calculations made or confirmed under oath by competent witnesses as to those theories, CVS Caremark consistently argued that AHF *suffered no damages* and that, to the extent AHF did suffer damages, it failed to mitigate them.

1       The closest CVS Caremark came to making any specific argument about damages prior to the

2 close of the hearings appeared in its Post-Hearing Brief. CVS Caremark Post-Hearing Brief, p. 12

3 There, CVS Caremark argued that the proper measure of AHF's damages was the difference between

4 the total reimbursement rates AHF received, minus the Claw-Back, and the reimbursement rates that

5 CVS Caremark *would have imposed* (but did not) *if it had not imposed the Claw-Back Program.*

6 According to CVS Caremark, this amount would calculate to $0 because CVS Caremark *would have*

7 imposed and paid reimbursement rates that, taken together, would approximate the reimbursement

8 rates in the Provider Agreement *minus the Claw-Back.* Id. ("Mr. Wellman testified, absent the [Claw-

9 Back Program], reimbursement rates *would not be equivalent to the point-of-sale rate AHF claims it*

10 *anticipated*") (emphasis added). In other words, CVS Caremark argued that damages should be

11 measured – and would amount to $0 – based on a counter-factual hypothetical concerning what

12 reimbursement rates CVS Caremark would have but did not impose if CVS Caremark had not

13 imposed the substantively unconscionable, unenforceable Claw Back Programs. CVS Caremark

14 elicited no admissible evidence (nor could it have) to "support" this inherently speculative and self-

15 serving notion. The Arbitrator plainly rejected this "argument." CVS Caremark now makes a similar

16 "argument," this time after the "horse has left the barn."

17       Nowhere does CVS Caremark ever argue, or try to proffer any "evidence" (until the filing of

18 its instant motion) that AHF's damages should be measured by the difference between what CVS

19 Caremark actually clawed back – as a result of the adhesive, substantively unconscionable,

20 unenforceable NEFs (the very imposition of which the Arbitrator clearly held breached the contracts

21 and the implied covenant of good faith and fair dealing) – and what CVS Caremark *would have*

22 *clawed back if it had imposed different, fixed rate Claw Back Programs.* Instead, without so much as

23 a shred of authority, CVS Caremark seeks a wholesale reworking of the liability and damages

24 holdings in the Interim Award so that, ultimately, damages are measured by (yet another) counter-

25 factual hypothetical.

26 / /

27 / /

28

AHF'S OPPOSITION TO CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES

**D.**     **CVS Caremark's Argument Concerning the Remedy of Unenforceability Prior to the Close of the Hearings**

CVS Caremark made no argument, and proffered no evidence, prior to the close of evidence or the close of the hearings as to why the Arbitrator should enforce part of the adhesive, substantively unconscionable, and unenforceable NEFs or should enforce nonexistent, hypothetical NEFs upon a holding that the adhesive NEFs are substantively unconscionable and unenforceable. CVS Caremark takes this desperate, untimely position for the first time in its motion but made no argument on this point prior to the close of the hearings or *even in the instant motion*.

**E.**     **The Arbitrator Closes the Hearings**

On April 16, 2021, after the close of evidence, the Arbitrator and the parties worked out a post-hearing briefing schedule. Hearing Trans. Vol V, 730:8-18. Pursuant to AAA Rule 39 (b), the Arbitrator must declare the hearings closed "as of the final date set by the arbitrator for the receipt of briefs." Rule 39 AAA Rules. The hearings in this matter were, therefore, closed on June 18, 2021, and the AAA expressly declared the hearings closed. Hearing Trans. Vol V 730:8-18; *see also* June 22, 2021 letter from Jen Mora, Manager of ADR Services of the AAA, to counsel for the parties closing the hearings.

**F.**     **CVS Caremark Waits Until After the Close of Evidence and of the Evidentiary Hearings, and After the Arbitrator Issued the Interim Award, to Advance an Entirely New Theory on Damages and to Try to Put On "Evidence" in Support of That Theory**

As noted above, although CVS Caremark couches its Motion as seeking a mere "recalculation," what it really seeks is a rewriting of the Agreements and a re-determination of liability and damages based on an argument never before made, evidence not proffered, and inadmissible, hearsay monetary sums which are purportedly the result of "calculations" not provided to the Arbitrator and not subject to testing through cross-examination or contradicting witnesses (or any other method because how can one test calculations not revealed?).

/ /

AHF'S OPPOSITION TO CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES

III.   **ARGUMENT**

A.     **CVS Caremark Seeks a Wholesale Revisiting by the Arbitrator of the Awarded Damages as Well as the Liability Bases on Which the Arbitrator Awarded Damages**

CVS Caremark does not seek a recalculation; it seeks a wholesale modification of the Interim Award on the issues of liability *and* damages. As shown above, the Arbitrator cannot reduce AHF's damages as awarded in the Interim Award without having to reverse his holdings on the substantive merits that the very imposition of the adhesive, substantively unconscionable NEFs on AHF constituted breaches by CVS Caremark of the Provider Agreements and the covenant of good faith and fair dealing implied therein. The Arbitrator would also have to reverse his holding that these same NEFs are unenforceable and then enforce *non-existent, hypothetical NEFs* that CVS Caremark *could have but never imposed on AHF*. There is no other reasonable reading of the motion. CVS Caremark cites no authority for the proposition that an arbitrator may make such a wholesale change in an Interim Award based on theories never plead and (inadmissible) evidence proffered after the close of the evidence and the hearings.

CVS Caremark repeatedly intones that damages should be measured with reference to the "contractual floor" and "the minimum amount collectible" as purportedly set forth in *adhesive, substantively unconscionable NEFs which the Arbitrator held unenforceable*. In fact, CVS Caremark refers to a "contractual floor" of the adhesive, substantively unconscionable, unenforceable NEFs no fewer than 9 times[3] and a "minimum" collectible amount 6 times.[4] There is no legal or factual support for the absurd notion that the Arbitrator must or even should calculate damages based on adhesive, substantively unconscionable, unenforceable agreements or that the Arbitrator may pretend that the NEFs say something different than they say. CVS Caremark does not even attempt to cite any.

CVS Caremark "supports" its "calculation" of a "contractual floor" or "minimum collectible amount" with an inadmissible spreadsheet, as noted above, and a string citation to no fewer than *461*

---

[3] Motion, pp. 1 (2 references), 2, 5, 6 (4 references), and Exhibit "A."

[4] Motion, pp. 1, 2, 5 (3 references), and 7.

AHF'S OPPOSITION TO CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES

*scoring reports but not one actual calculation.* As the Arbitration knows, however, the scoring reports

cannot provide the foundation for any calculations; they *do not show actual clawed-back amounts*.

They expressly show estimated amounts to be collected. *See, e.g.,* Joint Exh. J-11A; Hearing Trans.,

Vol. III, 485:11-486:22 (Englehart) (scoring reports show estimated amounts to be collected, and

there was customarily a variance between amounts in the scoring reports and amounts CVS Caremark

actually clawed back). Only Claimant's Exhibit 71 shows actual amounts actually clawed back by

CVS Caremark. Hearing Trans., Vol. III, 474:14-475:6 (Englehart) (Claimant's Exhibit C-71 shows

actual amounts clawed back based on remittance files showing funds taken from the bank). This is

presumably why the Arbitrator expressly stated in the Interim Award that he based his damages

calculations on Claimant's Exhibit C-71.

  CVS Caremark also refers several times to a claimed benefit of a "bargain" with respect to the

adhesive, substantively unconscionable, unenforceable NEFs. Motion, pp. 7 and 8. The Arbitrator was

as clear as day in the Interim Award that *there was no bargain* as to the adhesive, substantively

unconscionable, unenforceable NEFs. CVS Caremark has the temerity to seek, under the guise of a

"recalculation," that the Arbitrator find that there *was a bargain*. CVS Caremark seeks a reversal of

the Arbitrator's liability determinations, plain and simple.[5]

**B.**   **CVS Caremark Seeks Relief From its Own Tactical Litigation Decisions Not to**
    **Make Arguments or Elicit Evidence Concerning Alternate Damages Theories or**
    **Remedies for Substantive Unconscionability Prior to the Close of Evidence and**
    **the Hearings**

  In developing their strategy and tactics for the hearings, CVS Caremark apparently did not

entertain the possibility that the Arbitrator might find it liable on one or more of AHF's claims, much

less all of them. *CVS Caremark, therefore, put on no evidence and made no arguments prior to the*

---

[5] CVS Caremark cites for the first time "evidence" for the proposition that the flat, negotiated
reimbursement rates *improved* for pharmacies when CVS Caremark forced the adhesive,
substantively unconscionable, unenforceable NEFs down AHF's gullet. Motion, p. 2, n. 2. CVS
Caremark's cited "evidence" states nothing of the kind. *There is no evidence of any such
"improvement" in reimbursement rates.* In fact, the actual evidence showed, and the Arbitrator held,
that the claw back grew precipitously from year to year for no legitimate business reason.

AHF'S OPPOSITION TO CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES

*close of the hearings concerning the remedies that Arbitrator should impose under such*

*circumstances.* CVS Caremark did not argue at the hearings or prior to the close of the hearings for

alternative damages and did not argue that only portions of the adhesive, unconscionable, and

unenforceable NEFs should be enforced *or* that the Arbitrator should enforce different, nonexistent,

hypothetical NEFs. CVS Caremark has waived any arguments not made prior to the close of evidence

and the close of the hearings and has also waived the right to submit any new "evidence." It was CVS

Caremark's duty to proffer alternate theories of damages in its pleadings and during the evidentiary

hearings. CVS Caremark chose not to do so, instead disclaiming that AHF suffered any damages at all

or failed to mitigate the damages it never suffered.

     The Arbitrator was clear with the parties that he would let them "try [their] case" and would

hold the parties to the litigation choices they made. Hearing Trans., Vol. I, 136:5-6 (The Arbitrator

noted to counsel: "You're free to try your cases however you see fit"); Hearing Trans., Vol. IV,

569:21-570:2 (in permitting CVS Caremark to withdraw its designated expert, the Arbitrator noted:

"And if Respondent chooses not to have an expert, even though I've indicated that might be helpful, I

think that's on Respondent as a litigation choice, and I'm not going to force the experts, although I

know people have spent a lot of money on these experts."); Hearing Trans. Vol. IV, 571:7-14 (in

refusing to permit AHF to call its rebuttal expert, the Arbitrator noted: "Well, Mr. Kim, your side has

made two litigation choices…" – which were not to designate an expert in AHF's case in chief and to

rest AHF's case without calling AHF's expert as part of that case – "…in my view that informed my

decision").

     CVS Caremark made the tactical decisions—the litigation choices – not to present alternative

damages theories (or any evidence on such theories) and not to argue or present evidence concerning

why the Arbitrator may (or should) enforce parts of adhesive, substantively unconscionable NEFs the

Arbitrator already found unenforceable or may (or should) enforce non-existent, hypothetical, fixed

rate NEFs in place of the adhesive, substantively unconscionable, unenforceable NEFs. CVS

Caremark apparently takes no issue with settled law, cited by the Arbitrator in the Interim Award, that

the Arbitrator may determine whether to enforce or not enforce, in whole or in part, a contract held to

1   be substantively unconscionable. Under the guise of a motion to "recalculate," CVS Caremark seeks

2   to have the Arbitrator alter substantively and drastically the portion of the Interim Award in which the

3   Arbitrator held the adhesive, substantively unconscionable NEFs unenforceable. CVS Caremark

4   appears to prefer that the Arbitrator create and enforce nonexistent, hypothetical, NEFs that

5   "established" nonexistent fixed rate Claw Back Programs. As noted and discussed more fully below,

6   there is no authority, and CVS Caremark has cited none, for this absurd "argument." CVS Caremark

7   does not address that such a change in the Interim Award would require the Arbitrator to invent out of

8   whole cloth fixed rate Claw Back Program NEFs (or rewrite the adhesive, substantively

9   unconscionable NEFs) and would contradict the Arbitrator's unambiguous holdings that the adhesive,

10  substantively unconscionable NEFs are not enforceable.

11         It is simply disingenuous for CVS Caremark to claim they seek nothing more than a

12  "recalculation." CVS Caremark seeks a retrial to make "arguments" and proffer new "evidence" not

13  made or proffered prior to the close of the hearings. CVS Caremark seeks to make the Interim Award

14  internally inconsistent, not consistent with applicable law regarding remedies for substantive

15  unconscionability and breaches of contract and the implied covenant, and not consistent with

16  applicable law or the AAA rules concerning the according of due process to litigants. There is a time

17  and a place for litigants to make even absurd arguments unsupported by evidence or law. CVS

18  Caremark had ample opportunity to present whatever arguments or "evidence" it wished prior to the

19  close of evidence and the hearings; CVS Caremark rested its astonishingly brief defense case with the

20  arbitration hearings set to proceed for the subsequent *five business days* (CVS Caremark rested its

21  defense case on the Friday at the end of the first of two contiguous weeks set for evidentiary

22  hearings). CVS Caremark plainly rolled the dice that it would get a defense award on liability. It

23  crapped out and now wants a "do over" but with different arguments and unchallenged, untested

24  (indeed, untestable) "evidence" more than four months after the close of evidence and more than two

25  months after the close of the hearings. When CVS Caremark rested its brief defense case, the

26  evidence closed and the hearings closed without CVS Caremark having even attempted to make the

27

28

arguments or submit the "evidence" on which the motion is based, CVS Caremark waived those

arguments and the submission of such "evidence."

**C.** **The Arbitrator's Award of Damages Is Supported by Applicable Arizona Law, There Has Been No Miscalculation as Alleged by CVS Caremark, and CVS Caremark Asks That the Arbitrator Rewrite the Adhesive, Substantively Unconscionable, Unenforceable NEFs, Which the Arbitrator May Not Do**

As noted, contract damages in Arizona are: "the amount of money that will reasonably and fairly compensate [plaintiff] for the damages proved by the evidence to have resulted naturally and directly from the breach of contract." RAJI (CIVIL) 6th Contract 17. This *must include* "the amount of money that will place [plaintiff] in the position [plaintiff] would have been in if the contract had been performed." Id.; see also A.R.A. Mfg. Co. v. Pierce (1959) 86 Ariz. 136, 141; Northern Ariz. Gas Serv., Inc. v. Petrolane Transp., Inc. (App. 1984) 145 Ariz. 467, 478-79; Southern Ariz. School for Boys, Inc. v. Chery (App. 1978) 119 Ariz. 277, 280; Restatement (Second) Of Contracts §§ 347, 351 (1981). These are precisely the damages AHF plead in its initial Demand for Arbitration (and has sought consistently ever since), and the Arbitrator awarded in the Interim Award. Had CVS Caremark not breached the Provider Agreements and the implied covenant by imposing the adhesive, substantively unconscionable, and unenforceable NEFs, there would *have been no adhesive substantively unconscionable NEFs*. The Arbitrator did not hold that the unconscionable Claw Back Programs are partially unenforceable, and *CVS Caremark never asked the Arbitrator to hold in that fashion*. CVS Caremark wants to keep money wrongly taken from AHF pursuant to adhesive, substantively unconscionable, and *unenforceable* NEFs.

Although CVS Caremark seeks for the first time *after* the close of the hearings and the Arbitrator's issuance of the Interim Award the enforcement of nonexistent, hypothetical agreements the parties never entered, neither arbitrators nor courts may rewrite parties' agreements. Cooper v. QC Fin. Servs. (D.Ariz. 2006) 503 F.Supp.2d 1266, 1291, citing Olliver/Pilcher Insur. Inc. v. Daniels (1986) 148 Ariz. 530 ("Generally, the Arizona 'courts do not rewrite contracts for parties...If it is clear from its terms that a contract was intended to be severable, the court can enforce the lawful part

AHF'S OPPOSITION TO CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES

1  and ignore the unlawful part... Where the severability of the agreement is not evident from the

2  contract itself, the court cannot create a new agreement for the parties to uphold the contract'"');

3  Collins & Aikman Floor Coverings Corp. v. Froehlich (S.D.N.Y. 1990) 736 F.Supp 480, 484, citing

4  Torrington Co. v. Metal Prod. Workers Union Local 1645 (2d Cir. 1966) 362 F.2d 677, 682 ("An

5  arbitrator cannot re-write a new agreement for the parties").

6  **D.  The Arbitrator's Determination That the Adhesive, Substantively**

7      **Unconscionable NEFs Are Unenforceable is Supported by Applicable Arizona**

8      **Law**

9  As shown above, the Interim Award expressly cites Arizona law on remedies for

10  unconscionability. The Arbitrator held, based on and in accordance with that law, that the adhesive,

11  substantively unconscionable NEFs are not enforceable. The Arbitrator held, among other things, that

12  CVS Caremark breached the Provider Agreements and the covenant of good faith and fair dealing

13  implied therein by imposing the adhesive, substantively unconscionable NEFs in the first place.

14  Ultimately, as shown above, the Arbitrator awarded damages absolutely consistent with Arizona law,

15  including the law cited by CVS Caremark in their frivolous motion.

16  **E.  CVS Caremark Cites a Legion of Cases Not One of Which Is Remotely**

17      **Applicable to an Attempt by a Litigant to Persuade an Arbitrator to Reverse**

18      **Liability Holdings and Reduce Damages Based on Arguments Not Made or New**

19      **"Evidence" Not Submitted Prior to the Close of Evidence**

20  All of CVS Caremark's cited cases are readily and obviously distinguishable, and none of

21  those cases even remotely or obliquely support CVS Caremark's improvident, frivolous motion. CVS

22  Caremark's blunderbuss citation of inapplicable case law, much of which militates strongly *against*

23  the granting of the motion, cannot save CVS Caremark from its failure to try the defense case it now

24  wishes it had tried.

25  In A.P. Seating USA, LLC v. Circuit of the Americas LLC, (W.D. Tex. 2014) 2014 U.S. Dist.

26  LEXIS 93640, the court confirmed an arbitration award as corrected to clarify, but not alter the initial

27

28

1 award concerning, ownership percentages in a business awarded by the arbitrator. <u>A.P. Seating</u> is

2 nothing like this case.

3      In <u>Barranco v. 3D Sys. Corp.</u> (2018) 734 Fed. Appx. 885, 88-889, the court affirmed the lower

4 court's confirmation of an arbitration award as amended with "minor changes" by the arbitrator,

5 affirmed the arbitrator's damages holding because it was "sufficiently supported by the arbitrator's

6 finding of three other breaches," and held that claims by a party seeking to resist confirmation of the

7 award of "contract interpretation error rather than a mathematical error" failed to "show entitlement to

8 medication of the award." The <u>Barranco</u> case, also, has nothing to do with this matter.

9      In <u>Clarendon Nat'l Ins. Co. v. TIG Reinsurance Co.</u> (S.D.N.Y. 1998) 183 F.R.D. 112, 118, the

10 court granted a motion to confirm a clarified arbitration award where the clarified award remedied

11 mathematical error *that both parties agreed was an error and which the parties had pointed out to the*

12 *arbitration panel prior to the issuance of the award* that was later clarified. Here, there is no

13 agreement between the parties made at or prior to the arbitration. In fact, as noted above, CVS

14 Caremark never made the instant, frivolous arguments before and never showed AHF or the

15 Arbitrator its inadmissible, non-evidence spreadsheet. This case, too, is inapplicable to this matter.

16      In <u>Collins & Aikman Floor Coverings Corp. v. Froehlich</u> (S.D.N.Y. 1990) 736 F.Supp. 480,

17 487-488, the court denied motions to vacate and confirm an arbitration award and remanded to the

18 arbitrator for further proceedings because the award of damages was not subject to calculation based

19 on the evidence and was therefore irrational under the provisions of 9 U.S.C. §10(d). CVS Caremark

20 does not claim that the Arbitrator's straightforward calculation of damages according to a measure

21 advocated by AHF from the very beginning of this matter is "irrational." This case also lends no

22 support to CVS Caremark.

23      In <u>Eastern Seaboard Constr. Co. v. Gray Constr. Inc.</u> (2008) 553 F.3d 1, 13, the court reversed

24 the trial court's vacating of an amended arbitration award finding that the arbitrator's omission from

25 the initial award of a particular sum *not disputed by any of the litigants in the initial award* was a

26 "clerical, typographical, technical or computational error" that *did not reopen the merits of the case.*

27 This case, like <u>Clarendon</u>, has nothing to do with the instant matter.

28

AHF'S OPPOSITION TO CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES

In Gen. Re Life Corp. v. Lincoln Nat'l Life Ins. Co. (D. Conn. 2017) 273 F.Supp.3d 307, 326, the court confirmed a clarified final award because the award was initially ambiguous as to how recapture provisions in the award would work, and the clarified the final award in that regard "without impermissibly modifying the spirit and basic effect of the award." Because CVS Caremark claims no "ambiguity" in the Interim Award, this case, like all the others CVS Caremark cites, is inapposite.

In Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, Local 182B v. Excelsior Foundry Co. (7th Cir. 1995) 56 F.3d 844, 847, the court determined that the arbitrator could extend the period set forth in a labor arbitration award for a terminated union member employee to complete a drug rehabilitation program and to thereby gain reinstatement because the arbitrator's award created confusion as to whether the employee or the employer was required to pay for the program. There is no confusion claimed by CVS Caremark as to the meaning of the Interim Award; this case is, therefore, inapplicable for the same reasons as Gen. Re Life Corp., above.

In In re Rollings, Inc. (M.D. Fla. 2004) 552 F.Supp.2d 1318, 1326-27, the court addressed two contradictory arbitration awards and confirmed the compensatory damages and attorneys' fees awards but vacated the punitive damages award as made "in manifest disregard of the law" because the underlying substantive law did not permit awards of punitive damages. CVS Caremark makes no claim of "manifest disregard of the law" or that damages are not awardable in this matter, so this case also does not help CVS Caremark.

In International Bhd. of Teamsters, Local 631 v. Silver State Disposal Serv. (9th Cir. 1997) 109 F.3d 1409, 1412, the court affirmed the district court's confirmation of a labor arbitration award as amended by the arbitrator to clarify that she intended to award backpay to the employee because the clarification merely completed the award. CVS Caremark does not seek a clarification or a completion; it seeks a wholesale change, as shown above, and Silver State Disposal Serv. is readily distinguishable.

In Kennecott Utah Copper Corp. v. Becker (10th Cir. 1999) 186 F.3d 1261, 1272, the court confirmed a labor arbitration award as clarified by the arbitrator not to award backpay to employees

because the clarification did not augment or alter the award in any other way than clarifying whether backpay was awarded. Here, too, CVS Caremark cites a case that concerns clarification of an award without any alteration in that award, which is not what CVS Caremark seeks in its motion.

In <u>Laclede Group v. Nisource Inc.</u> (S.D. Ind. 2007) 2007 U.S. Dist. LEXIS 113210* 7, the court determined that an arbitration panel had the power to amend its award "when one party to the arbitration sought to correct a factual error to conform the award to a stipulation of the parties which was unacknowledged in the award by the Panel." This case is inapplicable here for the same reason as <u>Clarendon</u> and <u>Eastern Seaboard Constr. Co.</u>

In <u>Martel v. Ensco Offshore Co.</u> (5th Cir. 2011) 449 Fed.Appx. 352, 354-55, the court found that an arbitrator's use of the wrong figure ($300,000) to calculate damages, rather than using a stipulated figure ($3,000,000) to calculate those damages, was a clerical error which the arbitrator had the power to correct. This case is manifestly distinguishable for the same reasons as <u>Clarendon</u>, <u>Eastern Seaboard Constr. Co.</u>, and <u>Laclede Group</u>, above.

In <u>Mullins v. Butler Am.</u> (S.D.Fla. 2020) 2020 U.S. Dist. LEXIS 153528*, *16, the court modified a final award to eliminate double recovery of damages. CVS Caremark does not claim double damages have been awarded. Instead, CVS Caremark wrongly claims that the Arbitrator awarded damages using the wrong measure and theories of liability.

In <u>Oakwood Labs. V. Howrey Simon Arnold & White, LLP</u> (N.D.Ohio 2007) 2007 U.S. Dist. LEXIS 37909*, 13-14, the court confirmed a clarified arbitration award in which an arbitrator clarified that he inadvertently referred in the initial award to the applicable burden of proof as "clear and convincing evidence" when that burden was, and the arbitrator actually applied in the award, a "preponderance of the evidence." This case has nothing to do with the instant matter.

In <u>Rain CII Carbon, LLC v. ConocoPhillips Co.</u> (5th Cir. 2012) 674 F.3d 469, 472-73, the court affirmed the lower court's confirmation of a clarified arbitration award in a baseball-style arbitration in which the arbitrator removed from the award provisions of the losing parties' proposal which the arbitrator had previously inadvertently incorporated into the award instead of choosing one proposal over the other. CVS Caremark curiously relies heavily on this case, emphasizing it for the

Arbitrator. CVS Caremark apparently does not understand how a baseball-style arbitration works. In such an arbitration (which is based on the salary arbitration procedure set forth in the Major League Baseball collective bargaining agreement), both sides make a proposal to resolve the matter, and the arbitrator is empowered only to choose one of those proposals. The theory behind these arbitrations is that, because the arbitrator can choose only one of the two proposals, the parties are incentivized to moderate their proposals, drawing both parties closer to "the middle." In Rain, the arbitrator mistakenly incorporated terms in the accepted proposal from the rejected proposal. Rain is not only not instructive, it is completely irrelevant to this matter.

In Rollins, Inc. v. Black (11th Cir. 2006) 167 Fed.Appx. 798, 799-800, the court reversed the vacatur of an arbitrator panel's award of punitive damages because, although the panel initially awarded punitive damages on a claim for which such damages are not available, the panel clarified the award stating that it awarded damages on fraud and negligence claims, there was "ample factual support for the award, both in the record and in the award itself[,]" and "the panel made explicit findings that would support gross negligence and fraud." This case obviously militates strongly in favor of the Arbitrator denying CVS Caremark's motion.

In Waveform Telemedia, Inc. v. Panorama Weather N. Am., Inc. (S.D.N.Y. 2007) 2007 U.S. Dist. LEXIS 105306*, *23, a magistrate recommended to the United States District Court that it confirm an arbitration award modified by an arbitrator to include as expenses salaries for two individuals (instead of just one individual) because the modification of the award made "it consistent with the arbitrator's intent, but maintained the underlying resolution of the dispute, which was to award Waveform consequential damages for the Respondents' breach of the contract, offset by Waveform's preexisting expenses." This case involves the correction of an error based on leaving out entirely an expense the arbitrator intended to include. Like all of CVS Caremark's cited cases, Waveform is nothing like the instant case and sheds no light on any issue of consequence in this matter.

//

//

AHF'S OPPOSITION TO CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES

**IV.**   **CONCLUSION**

For the reasons stated above, AHF respectfully requests that the Arbitrator deny CVS Caremark's frivolous motion with prejudice.

DATE: September 8, 2021

AIDS HEALTHCARE FOUNDATION
Tom Myers

KIM RILEY LAW
Andrew F. Kim
Rebecca J. Riley

By: _____
ANDREW F. KIM
Attorneys for Claimant
AIDS HEALTHCARE FOUNDATION

AHF'S OPPOSITION TO CVS CAREMARK'S MOTION TO RECALCULATE DAMAGES

# EXHIBIT Q

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION,    ) | |
| ) | AAA Case No. 01-19-0004-0127 |
| Claimant,    ) | |
| ) | |
| v.    ) | **RULING ON RESPONDENT'S** |
| ) | **MOTION TO RECALCULATE** |
| CVS CAREMARK, a subsidiary of CVS    ) | **DAMAGES** |
| HEALTH CORPORATION,    ) | |
| ) | |
| Respondents.    ) | |
| ) | |

After the issuance of the Interim Award in this matter, Respondent filed a Motion to Recalculate Damages. As set forth below, the motion is denied. Thus, the damages award remains as stated in the Interim Award.

### DISCUSSION

Respondent's motion is an attempt to raise an after-the-fact argument on damages for the first time. It is not a motion to correct a mathematical error or calculation error in the sense contemplated by the AAA Rules. Claimant has been consistent throughout that it seeks to invalidate the entire network rebate amount as the product of an unconscionable contract term. The Interim Award so found and held. Respondent's argument seeks to substantially reduce the damages awarded and is not a recalculation but an argument as to an alternative theory of damages. Respondent did not raise its alternative damages theory in its prehearing brief; it did not raise the argument during the hearing; it did not raise the argument in its initial post-hearing brief; and it did not raise the argument in its responsive post-hearing brief. Rather, it "sandbagged" the issue and raised it as a "gotcha" motion.

1

The Arbitrator concludes that Respondent made a tactical decision not to attack the damages amount sought based on the view that presenting an alternative theory of damages would undercut and detract from its position that no damages at all should be awarded. This is a common decision faced by trial counsel. Respondent made the decision to hold off on presenting this alternative theory of damages. This ruling holds Respondent to the choice it voluntarily made.

**CONCLUSION**

Based on the foregoing, the Arbitrator denies the Motion to Recalculate Damages. As stated in the Interim Award, Claimant is entitled to damages in the amount of $19,276,611.

Dated: September 11, 2021

William "Zak" Taylor, Arbitrator

# EXHIBIT R

TOM MYERS
Tom.Myers@aidshealth.org
AIDS HEALTHCARE FOUNDATION
6255 Sunset Boulevard, 21st Floor
Los Angeles, CA 90028
Telephone: (323) 860-5200
Facsimile: (323) 467-8450

ANDREW F. KIM
AKim@kimrileylaw.com
REBECCA J. RILEY
RRiley@kimrileylaw.com
KIM RILEY LAW
9018 Balboa Boulevard, # 552
Northridge, CA 91325
Telephone: (818) 216-5288
Facsimile: (818) 993-3012

Attorneys for Claimant
AIDS HEALTHCARE FOUNDATION

**ARBITRATION UNDER THE AUSPICES OF**

**THE AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION, a California non-profit corporation,<br><br><div align="center">Claimant</div><br>v.<br><br>CVS CAREMARK, a subsidiary of CVS HEALTH CORPORATION, a Delaware corporation,<br><br><div align="center">Respondent.</div> | CASE NO.: 01-19-0004-0127<br><br>**MOTION OF CLAIMANT AIDS HEALTHCARE FOUNDATION TO CORRECT, CLARIFY AND COMPLETE THE INTERIM AWARD; DECLARATION OF MEGAN ENGLEHART**<br><br>**WILLIAM ZAK TAYLOR, ESQ. PRESIDING** |

I.    INTRODUCTION..................................................................................1

II.   BACKGROUND....................................................................................3

    A.    The Interim Award .................................................................... 3

        1.   The Arbitrator Held That CVS Caremark Breached the Provider
            Agreements and the Implied Covenant of Good Faith and Fair
            Dealing by, Among Other Things, Imposing on AHF the Adhesive,
            Substantively Unconscionable, Unenforceable NEFs .............................. 3

        2.   The Arbitrator, Citing Claimant's Exhibit C-71, Awarded Damages
            Intended to be Consistent With That Exhibit C-71 and Enjoined
            Any Further Claw Backs Pursuant to the Variable Rate Claw Back
            Programs For Time Periods After the Second Program Trimester
            of 2020 ............................................................................................. 4

        3.   The Arbitrator Intended for the Parties to Abide by the Interim
            Award ............................................................................................. 5

    B.    The Interim Award Contains an Error Based on the Arbitrator's
        Inadvertent Juxtaposing of Two Digits in a Damages Figure Set Forth in
        Claimant's Exhibit C-71 ................................................................. 5

    C.    The Interim Award Specifically Enjoins  CVS Caremark From Clawing
        Back any Further Monies Pertaining to the Second Trimester of 2020 and
        Afterward, but Does Not State What Happens if CVS Caremark Did Claw
        Back Those Monies ......................................................................... 5

    D.    Although AHF Requested in its Demands for Arbitration an Award of
        Pre-Judgment and Post-Judgment Interest, the Interim Award Does Not
        Address Interest ............................................................................. 6

III.  ARGUMENT.......................................................................................6

    A.    The Arbitrator Should Correct the Damages Award from $19,276,611 to
        $19,294,611 ................................................................................... 6

        1.   The Arbitrator May Correct Mistaken Calculations in the Interim
            Award ............................................................................................. 6

         2.   The Arbitrator Should Correct The Mistaken Calculation in the
            Interim Award ................................................................................ 8

    B.    The Arbitrator Should Exercise His Power to Complete the Interim
        Award to Award to AHF Pre- and Post-Award Interest and to Clarify the
        Interim Award by Ordering CVS Caremark to Pay Back to AHF All Sums
        CVS Caremark Clawed Back Pursuant to the Adhesive, Substantively
        Unconscionable, and Unenforceable Claw Back Programs Pertaining to
        Periods After the Second Program Trimester of 2020 ......................... 8

        1.   The Arbitrator May Clarify and Complete the Interim Award ............. 8

2.  The Arbitrator Should Clarify the Interim Award by Ordering CVS Caremark to Pay Back to AHF all Monies – Thus Far Amounting to $6,770,445.03 – Clawed Back by CVS Caremark Pursuant to the Adhesive, Substantively Unconscionable, and Unenforceable Claw Back Programs Since the Second Trimester of 2020 ........................................................................................... 10

    a.  The Arbitrator Expressly Intended That CVS Caremark Not Keep the Funds it Clawed Back from AHF Pursuant to the Adhesive, Substantively Unconscionable, and Unenforceable Claw Back Programs ........................................... 10

    b.  Although the Arbitrator Ordered CVS Caremark to Cease Any Claw Backs Pursuant to the Adhesive, Substantively Unconscionable, and Unenforceable Claw Back Programs for 2020 and Going Forward, CVS Caremark Clawed Back $2,864,537.83 for the Third Program Trimester of 2020 and $3,905,907.20 for the First Program Trimester of 2021 ............ 10

    c.  Consistent With the Arbitrator's Interim Award, the Arbitrator Should Order CVS Caremark to Pay to AHF all Funds Clawed Back from AHF Pursuant to the Adhesive, Substantively Unconscionable, and Unenforceable Claw Back Programs for the Third Program Trimester of 2020 and for 2021 ..................................................................... 11

3.  The Arbitrator Should Complete the Interim Award by Ordering CVS Caremark to Pay to AHF Pre- and Post-Award Interest Pursuant to Arizona Law on the Monies CVS Caremark Clawed Back from AHF Pursuant to the Adhesive, Substantively Unconscionable, and Unenforceable Claw Back Programs .................. 12

    a.  Awards of Pre- and Post-Judgment Interest Are Mandatory in Arizona .................................................................................. 12

    b.  The Applicable Interest Rate for Pre- and Post-Award Interest is 4.25% Simple Interest Per Annum. ........................... 13

    c.  Prejudgment Interest is Calculated Commencing Upon the Amount Owed Becoming Liquidated ......................................... 13

    d.  As of the Filing of this Motion, Pre-Judgment Interest on the Liquidated Amounts Owed to AHF Amounts to $1,966,126.30 ................................................................................ 13

IV.  CONCLUSION ................................................................................. 14

AHF'S MOTION TO CORRECT, CLARIFY AND COMPLETE THE INTERIM AWARD

# TABLE OF AUTHORITIES

## Cases

A.P. Seating USA, LLC v. Circuit of the Americas LLC,
(W.D. Tex. 2014) 2014 U.S. Dist. LEXIS 93640 ................................................................ 9

AMHS Ins. Co. v. Mut. Ins. Co. (9th Cir. 2001) 258 F.3d 1090 ..................................................... 14

Clarendon Nat'l Ins. Co. v. TIG Reinsurance Co. (S.D.N.Y. 1998) 183 F.R.D. 112 ........................... 7

Colonial Penn Ins. Co. v. Omaha Indemnity Co. (3rd Cir. 1991) 943 F.2d 327 .............................. 7

Creative Builders v. Avenue Dev. (App. 1986) 148 Ariz. 452 ........................................................ 13

Eastern Seaboard Constr. Co. v. Gray Constr. Inc. (2008) 553 F.3d 1 .......................................... 7

Employer's Mut. Casualty Co. v. McKeon (App. 1991) 170 Ariz. 75 .......................................... 14

Fleming v. Pima County (1984) 141 Ariz. 149 ............................................................................. 14

Fleming v. Tanner (App. 2019) 248 Ariz. 63 ........................................................................ 13, 15

Gemstar Ltd. v. Ernst & Young (1996) 185 Ariz. 493 .................................................................. 13

Gen. Re Life Corp. v. Lincoln Nat'l Life Ins. Co. (D. Conn. 2017) 273 F.Supp.3d 307 ................. 9

Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, Local 182B v.
Excelsior Foundry Co. (7th Cir. 1995) 56 F.3d 844 .................................................................. 10

International Bhd. of Teamsters, Local 631 v. Silver State Disposal Serv.
(9th Cir. 1997) 109 F.3d 1409 ................................................................................................ 10

Kennecott Utah Copper Corp. v. Becker (10th Cir. 1999) 186 F.3d 1261 ..................................... 10

Martel v. Ensco Offshore Co. (5th Cir. 2011) 449 Fed.Appx. 352 ................................................. 7

Play Star, S.A. De C.V. v. Haschel Export Corp.,
(S.D.N.Y. 2003) 2003 U.S. Dist. LEXIS 7049 ........................................................................ 7

Schade v. Diethrich, 158 Ariz. 1, 14 (1988) ............................................................................. 14

Trus Joist Corp. v. Safeco Ins. Co. of Am., 153 Ariz. 95, 109 ..................................................... 15

Waveform Telemedia, Inc. v. Panorama Weather N. Am., Inc.
(S.D.N.Y. 2007) 2007 U.S. Dist. LEXIS 105306* ................................................................. 8

## Statutes

A.R.S. 44-1201 ................................................................................................................. 13, 14

A.R.S. 44-1201(B) ............................................................................................................ 13, 14

A.R.S. 44-1201(F) .................................................................................................................. 14

A.R.S. Section 47-2302............................................................................................................... 3

AHF'S MOTION TO CORRECT, CLARIFY AND COMPLETE THE INTERIM AWARD

**CLAIMANT AIDS HEALTHCARE FOUNDATION'S MOTION TO CORRECT, CLARIFY AND COMPLETE THE INTERIM AWARD**

## I.  INTRODUCTION

By this Motion, Claimant AIDS Healthcare Foundation ("AHF") seeks:

- The Arbitrator's correction of a clerical mistake in the Interim Award;

- Clarification that CVS Caremark is to pay back to AHF all monies pertaining to the third program trimester of the 2020 program year and afterward which CVS Caremark clawed back pursuant to the adhesive, substantively unconscionable, and unenforceable Claw Back Programs, currently totaling $6,770,445.03, as shown below; and

- Completion of the Interim Award so that it awards to AHF, pursuant to Arizona law, pre- and post-judgment interest, as AHF prayed in its Demands for Arbitration.

AHF *does not seek* any reexamination or redetermination of the merits of this matter. AHF *does not seek* any alteration in the Arbitrator's holdings on the merits. Indeed, AHF seeks to make the Final Award consistent with the Arbitrator's holdings and the clearly expressed intent behind those holdings in the Interim Award.

Regarding the clerical mistake, as shown below, the Arbitrator awarded damages to AHF relying expressly on Claimant's Exhibit C-71 in the Interim Award. Interim Award, p 58, No. 12. The Arbitrator, however, juxtaposed two digits from the damages figure for first two trimesters of the 2020 program year such that the figure in the Interim Award was "$5,813,752" when the actual figure from Claimant's Exhibit C-71 is "$5,831,752" for that timeframe. See Id. and Claimant's Exhibit C-71, p 1., 2020 Total. The Arbitrator juxtaposed the "3" and the "1." AHF seeks the Arbitrator's correction of the damages calculations in the Interim Award to that extent only, such that the total damages figure is "$19,294,611" and not "$19,276,611." Again, AHF seeks only that the Final Award is consistent with the Arbitrator's clearly expressed intent and with the evidence on which the Arbitrator expressly relied in awarding damages.

Second, as also shown below, in addition to awarding to AHF damages based on Claimant's

1 Exhibit C-71 in the form of the claw back taken by CVS Caremark pursuant to the adhesive,

2 unconscionable, and unenforceable Claw Back Programs, the Arbitrator in the Interim Award

3 specifically enjoined CVS Caremark from continuing those programs for 2020 and afterward, clearly

4 intending to stop CVS Caremark from clawing back any monies for the third program trimester of

5 2020 and afterward pursuant to those Claw Back Programs. Interim Award, p 59, No. 13, p. 60,

6 Summary, No. 6. Yet CVS Caremark has clawed back from AHF vast sums of money – currently

7 totaling $6,770,445.03, as shown below – for the third program trimester of 2020 and for the first

8 program trimester of 2021. Notwithstanding that the Arbitrator expressly ordered that the Interim

9 Award would remain "in full force and effect" until the Arbitrator issues the Final Award, *CVS*

10 *Caremark has continued to claw back from AHF vast sums of money pursuant to the adhesive,*

11 *substantively unconscionable, and unenforceable Claw Back Programs since August 9, 2021, the date*

12 *on which the Arbitrator issued the Interim Award containing the injunction.* AHF, therefore, requests

13 that the Arbitrator order in the Final Award, consistent with the Interim Award, that CVS Caremark

14 pay back to AHF all funds clawed back for program periods for the third trimester of 2020 and

15 afterward.

16       Third, as discussed more fully below, AHF requests that the Arbitrator complete the Interim

17 Award by awarding to AHF pre- and post-award interest, as AHF prayed in its Demand for

18 Arbitration and its Amended Demand for Arbitration. Under Arizona law, awards of pre-judgment

19 interest and post-judgment interest are mandatory under the circumstances of this matter, and the

20 Arbitrator unquestionably has the power to complete the Interim Award in this fashion.

21       *Again, AHF seeks no redetermination of any holding, or any conclusion of fact, in the Interim*

22 *Award*. With respect to AHF's requests to correct and clarify the Interim Award, AHF seeks merely

23 to have the Final Award be consistent with the Arbitrator's clearly expressed intent. With respect to

24 AHF's request to complete the Interim Award, AHF seeks to have the Final Award address all of the

25 issues presented to the Arbitrator *and* for the Final Award to be consistent with Arizona law, which

26 requires the awarding of pre- and post-award interest. AHF, therefore, respectfully requests that the

27 Arbitrator grant the motion in its entirety.

28

1   **II.**    <u>**BACKGROUND**</u>

2      **A.**    <u>**The Interim Award**</u>

3        **1.**    <u>**The Arbitrator Held That CVS Caremark Breached the Provider**</u>

4          <u>**Agreements and the Implied Covenant of Good Faith and Fair Dealing by,**</u>

5          <u>**Among Other Things, Imposing on AHF the Adhesive, Substantively**</u>

6          <u>**Unconscionable, Unenforceable NEFs**</u>

7      "[T]he Arbitrator finds the contracts were adhesive."

8 Interim Award, p. 56, No. 5.

9
10      "The provisions of, and application of variable DIR's was contrary to the covenant of good faith and fair dealing inherent in the NEFs."

11 <u>Id.</u>, p. 58, no. 10.

12
13      "Respondent breached the contract with its application of the PNP resulting in A[IDS] Healthcare Foundation (hereinafter "AHF") being paid less than the contract required in the variable rate DIR years."

14 <u>Id.</u>, Summary, p. 59, No. 1.

15
16      "Respondent breached the contract by violating the covenant of good faith and fair dealing by *implementing* the PNP in the variable rate DIR year."

17 <u>Id.</u>, Summary, p. 59, No. 2.

18
19      "Substantively unconscionable contract terms are unenforceable. As stated in <u>Clark v. Renaissance West, LLC</u> (2013) 232 Ariz. 510 <u>see</u> <u>also</u> A.R.S. Section 47-2302:

20
21          If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable...it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

22
23      The variable DIRs *as implemented* were substantively unconscionable as a matter of law. Having found the variable DIR provisions to be substantively unconscionable, the Arbitrator cho[o]ses to limit the application of the variable DIR provisions and award damages to AHF."

24

25 <u>Id.</u>, p. 58, No. 11 (emphasis added).

26
27      "The terms of the PNP were substantively unconscionable for the variable rate DIR years."

28 <u>Id.</u>, Summary, p. 60, No. 4.

<div align="center">3</div>

"Based on the foregoing, the Arbitrator holds that the variable rate DIR provisions are substantively unconscionable and unenforceable."

Id., Conclusion, p. 60.

### 2. The Arbitrator, Citing Claimant's Exhibit C-71, Awarded Damages Intended to be Consistent With That Exhibit C-71 and Enjoined Any Further Claw Backs Pursuant to the Variable Rate Claw Back Programs For Time Periods After the Second Program Trimester of 2020

"For the years when variable DIRs were applied, the damages suffered by AHF per Claimant's Exhibit 71 were as follows:

    a.    2016: $2,164,775.

    b.    2017: $2,503,514

    c.    2018: $4,090,475

    d.    2019: $4,704,095

    e.    2020: $5,813,752[1]

    f.    Total: $19,276,611."

Interim Award, p. 58-59, No. 13.

"AHF has sustained $19,276,611 in damages."

Id., Summary, p. 60, No. 7.

"CVS is enjoined from using and collecting variable DIRs *for 2020 and in the future* that use *the same methodologies as those presented in the claims in this Arbitration.*"

Id., p. 59, no. 13 (emphasis added).

"The variable rate DIRs as set forth and applied in the years at issue are enjoined *going forward.*"

Id., Summary, p. 60, No. 6 (emphasis added).

"AHF is entitled to damages in the amount of $19,276,611."

---

[1] As noted, the Arbitrator mistakenly used the figure "$5,813,752" for the year 2020. Claimant's Exhibit C-71, on which the Arbitrator relied in computing and awarding damages, shows "$5,831,752" for that year. The Arbitrator plainly juxtaposed the "3" and the "1." Instead of awarding to AHF damages of $19,294,611, which is what Claimant's Exhibit C-71 shows is the total of the claw back taken pursuant to the adhesive, substantively unconscionable, and unenforceable Claw Back Programs for the years 2016 through the second trimester of 2020, the Arbitrator awarded damages in the amount of $19,276,611 as a result of the juxtaposition of digits in the 2020 total.

1  Id., Conclusion, p. 60.

2      **3.   The Arbitrator Intended for the Parties to Abide by the Interim Award**

3      "This Award *shall remain in full force and effect until such time as a final Award is*

4  *rendered.*" Interim Award, Conclusion, p 60 (emphasis added).

5      **B.   The Interim Award Contains an Error Based on the Arbitrator's Inadvertent**

6          **Juxtaposing of Two Digits in a Damages Figure Set Forth in Claimant's Exhibit**

7          **C-71**

8      Although the Arbitrator used the figure "$5,8*1*3,752" for damages for the year 2020,

9  Claimant's Exhibit C-71, on which the Arbitrator expressly relied in computing and awarding

10  damages to AHF, shows "$5,8*3*1,752" for that year's claw back pursuant to the adhesive,

11  substantively unconscionable, and unenforceable Claw Back Programs. As mentioned, the Arbitrator

12  juxtaposed the "3" and the "1." As set forth more fully below, AHF asks that the Arbitrator use his

13  inherent power to correct that clerical mistake.

14      **C.   The Interim Award Specifically Enjoins CVS Caremark From Clawing Back any**

15          **Further Monies Pertaining to the Second Trimester of 2020 and Afterward, but**

16          **Does Not State What Happens if CVS Caremark Did Claw Back Those Monies**

17      CVS Caremark clawed back monies for the third trimester of 2020 pursuant to the adhesive,

18  substantively unconscionable, and unenforceable Claw Back Programs. Notwithstanding that the

19  Arbitrator specified that the Interim Order is to "remain in full force and effect" until the entry of a

20  Final Award [Interim Award, Conclusion, p 60], CVS Caremark has already commenced clawing

21  back monies for 2021 and has continued to claw back monies even after the issuance of the Interim

22  Award.[2]

23      For the third trimester of 2020, CVS Caremark clawed back a total of $2,864,537.83 pursuant

24  to the adhesive, substantively unconscionable Claw Back Programs. Declaration of Megan Englehart

25

26  _____

27  [2] The continued clawing back of monies from AHF pursuant to the adhesive, substantively
unconscionable, unenforceable Claw Back Programs is a deliberate and wanton violation of the
Interim Award.

28

1  ("Englehart Decl."), ¶7, Exh. "1," rows 138 through 145. So far, CVS Caremark has clawed back

2  $3,905,907.20 pursuant to the adhesive, substantively unconscionable Claw Back Programs for the

3  first program trimester of 2021. Englehart Decl., ¶8, Exh. "1," rows 147 through 155. Since August 9,

4  2021, the date on which the Arbitrator issued the Interim Award, CVS Caremark has clawed back

5  $2,494,508.99 pursuant to the adhesive, substantively unconscionable, and unenforceable Claw Back

6  Programs. Id., rows 151 through 155.

7      **D.      Although AHF Requested in its Demands for Arbitration an Award of Pre-**

8              **Judgment and Post-Judgment Interest, the Interim Award Does Not Address**

9              **Interest**

10          In its original Demand for Arbitration, AHF prayed for "pre-award and post-award interest at

11  the applicable legal rate" on its claims for breach of contract and breach of the implied covenant of

12  good faith and fair dealing. Demand for Arbitration, Prayer 1.b. and 2.b., pp. 34-35.

13          In its Amended Demand for Arbitration, AHF reiterated its prayer for pre- and post-award

14  interest on its claims for breach of contract and breach of the implied covenant of good faith and fair

15  dealing. Amended Demand for Arbitration, Prayer 1.b. and 2.b., pp. 34 and 35. AHF also prayed for

16  pre- and post-award interest with respect to its claim that the Claw-Back Program was unconscionable

17  and, therefore, unenforceable. Id., Prayer 3.b., p. 36.

18  **III.  ARGUMENT**

19      **A.      The Arbitrator Should Correct the Damages Award from $19,276,611 to**

20              **$19,294,611**

21              **1.      The Arbitrator May Correct Mistaken Calculations in the Interim Award**

22          Although the Interim Award is by its terms "in full force and effect," it is not yet final by

23  definition. As shown below, the Arbitrator may alter the Interim Award to correct mathematical errors

24  without fear that the corrected Final Award will be vacated. In fact, even if the Interim Award were

25  final, the Arbitrator may clarify the award by correcting mathematical errors as long as the

26  Arbitrator's clarification does "not modify the effect of the award but only interpret[s] the

27

28

AHF'S MOTION TO CORRECT, CLARIFY AND COMPLETE THE INTERIM AWARD

1   [A]rbitrator['s] intent." Clarendon Nat'l Ins. Co. v. TIG Reinsurance Co. (S.D.N.Y. 1998) 183 F.R.D.

2   116, 118. This "interpretation of the Arbitrator's intent" is precisely what AHF seeks by this motion.

3       "An arbitrator can (1) correct a mistake which is apparent on the face of his award; (2)
        decide an issue which has been submitted but which has not been completely
4       adjudicated by the original award; or (3) clarify or construe an arbitration award that
        seems complete but proves to be ambiguous in its scope and implementation."
5

6   Martel v. Ensco Offshore Co. (5th Cir. 2011) 449 Fed.Appx. 352, 354; see also Waveform Telemedia,

7   Inc. v. Panorama Weather N. Am., Inc. (S.D.N.Y. 2007) 2007 U.S.Dist.LEXIS 105306, at *19, citing

8   Play Star, S.A. De C.V. v. Haschel Export Corp., (S.D.N.Y. 2003) 2003 U.S. Dist. LEXIS 7049 n.5

9   (quoting Colonial Penn Ins. Co. v. Omaha Indemnity Co. (3rd Cir. 1991) 943 F.2d 327, 332) ("(1)

10  [A]n arbitrator 'can correct a mistake which is apparent on the face of his award,' (2) 'where the

11  award does not adjudicate an issue which has been submitted, then as to such issue the arbitrator has

12  not exhausted his function and it remains open to him for subsequent determination,' and (3) '[w]here

13  the award, although seemingly complete, leaves doubt whether the submission has been fully

14  executed, an ambiguity arises which the arbitrator is entitled to clarify.'").

15      In Clarendon, the court granted a motion to confirm a clarified arbitration award where the

16  clarified award remedied a mathematical error but did not alter the arbitrator's determinations on the

17  merits. In Eastern Seaboard Constr. Co. v. Gray Constr. Inc. (2008) 553 F.3d 1, 13, the court reversed

18  the trial court's vacatur of an amended arbitration award holding that the arbitrator's omission from

19  the initial award of a particular sum was a "clerical, typographical, technical or computational error"

20  that did not reopen the merits of the case. In Martel, the court found that an arbitrator's use of the

21  wrong figure ($300,000) to calculate damages, rather than using a stipulated figure ($3,000,000) to

22  calculate those damages, was a clerical error the arbitrator had the power to correct. In Waveform

23  Telemedia, Inc. v. Panorama Weather N. Am., Inc. (S.D.N.Y. 2007) 2007 U.S. Dist. LEXIS 105306*,

24  *23, a magistrate recommended to the United States District Court that it confirm an arbitration award

25  modified by an arbitrator to include as expenses salaries for two individuals (instead of just one

26  individual) because the modification of the award made "it consistent with the arbitrator's intent, but

27

28

1  maintained the underlying resolution of the dispute, which was to award Waveform consequential

2  damages for the Respondents' breach of the contract, offset by Waveform's preexisting expenses."

### 2. The Arbitrator Should Correct The Mistaken Calculation in the Interim Award

5  Here, AHF does not seek a reopening or reconsideration of the merits of the Arbitrator's

6  holdings. In fact, AHF seeks to make the Arbitrator's holding on the amount of damages consistent

7  with the very evidence on which the Arbitrator expressly relied in computing damages, Claimant's

8  Exhibit C-71. AHF seeks merely that the Arbitrator remedy in the Final Award the calculational

9  mistake caused by the inadvertent juxtaposing of numbers pertaining to the first two trimesters of the

10  2020 Claw Back Program year. As noted, the Arbitrator stated clearly in the Interim Award that he

11  relied on Claimant's Exhibit C-71 in calculating damages, but the Arbitrator then mistakenly used the

12  figure "$5,813,752" instead of "$5,831,752" for first two trimesters of program year 2020. Interim

13  Award, pp 58-59, No. 12; see also Claimant's Exh. C-71. This reduced the total award from

14  $19,294,611 to $19,276,611. The Arbitrator clearly intended to award to AHF damages of $5,831,752

15  for the year 2020 and $19,294,611 in total, and AHF respectfully requests that the Arbitrator remedy

16  in the Final Award this calculational mistake, based on an inadvertent juxtaposing of digits.

### B. The Arbitrator Should Exercise His Power to Complete the Interim Award to Award to AHF Pre- and Post-Award Interest and to Clarify the Interim Award by Ordering CVS Caremark to Pay Back to AHF All Sums CVS Caremark Clawed Back Pursuant to the Adhesive, Substantively Unconscionable, and Unenforceable Claw Back Programs Pertaining to Periods After the Second Program Trimester of 2020

### 1. The Arbitrator May Clarify and Complete the Interim Award

24  As noted above, the Arbitrator may clarify and complete the Interim Award "where the award

25  does not adjudicate an issue which has been submitted…" Waveform Telemedia, Inc. 2007

26  U.S.Dist.LEXIS 105306, at *19, citing Play Star, 2003 U.S. Dist. LEXIS 7049 n.5 (quoting Colonial

27  Penn Ins. Co., 943 F.2d 327, 332). "[T]hen as to such issue the arbitrator has not exhausted his

28

1  function and it remains open to him for subsequent determination…." Id. Also, "[w]here the award,

2  although seemingly complete, leaves doubt whether the submission has been fully executed, an

3  ambiguity arises which the arbitrator is entitled to clarify." Id.

4          In A.P. Seating USA, LLC v. Circuit of the Americas LLC, (W.D. Tex. 2014) 2014 U.S. Dist.

5  LEXIS 93640, the court confirmed an arbitration award as corrected to clarify, but not alter the initial

6  award concerning, ownership percentages in a business awarded by the arbitrator. In Gen. Re Life

7  Corp. v. Lincoln Nat'l Life Ins. Co. (D. Conn. 2017) 273 F.Supp.3d 307, 326, the court confirmed a

8  clarified final award because the award was initially ambiguous as to how recapture provisions in the

9  award would work, and the arbitrator clarified the final award in that regard "without impermissibly

10  modifying the spirit and basic effect of the award."

11          In Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, Local 182B v. Excelsior

12  Foundry Co. (7th Cir. 1995) 56 F.3d 844, 847, the court determined that the arbitrator could extend the

13  period set forth in a labor arbitration award for a terminated union member employee to complete a

14  drug rehabilitation program and to thereby gain reinstatement because the arbitrator's award created

15  confusion as to whether the employee or the employer was required to pay for the program. In

16  International Bhd. of Teamsters, Local 631 v. Silver State Disposal Serv. (9th Cir. 1997) 109 F.3d

17  1409, 1412, the court affirmed the district court's confirmation of a labor arbitration award as

18  amended by the arbitrator to clarify that she intended to award backpay to the employee because the

19  clarification merely completed the award. In Kennecott Utah Copper Corp. v. Becker (10th Cir. 1999)

20  186 F.3d 1261, 1272, the court confirmed a labor arbitration award as clarified by the arbitrator not to

21  award backpay to employees because the clarification did not augment or alter the award in any other

22  way than clarifying whether backpay was awarded.

23  / /

24  / /

25  / /

26  / /

27  / /

28

9

2. **The Arbitrator Should Clarify the Interim Award by Ordering CVS Caremark to Pay Back to AHF all Monies – Thus Far Amounting to $6,770,445.03 – Clawed Back by CVS Caremark Pursuant to the Adhesive, Substantively Unconscionable, and Unenforceable Claw Back Programs Since the Second Trimester of 2020**

    a. **The Arbitrator Expressly Intended That CVS Caremark Not Keep the Funds it Clawed Back from AHF Pursuant to the Adhesive, Substantively Unconscionable, and Unenforceable Claw Back Programs**

The Arbitrator expressly intended in the Interim Award to: 1) award to AHF all monies clawed back by CVS Caremark pursuant to the adhesive, substantively unconscionable, and unenforceable Claw Back Programs [Interim Award, pp 58, 59, and 60, Nos. 12, Summary No. 7, and Conclusion]; and 2) enjoin CVS Caremark from clawing back from AHF any monies in the future pursuant to the adhesive, substantively unconscionable, and unenforceable Claw Back Programs. Interim Award, pp 59 through 60, Nos. 13, Summary, No. 6, and Conclusion. Put another way, the Arbitrator decided that CVS Caremark is not to claw back or keep any funds clawed back pursuant to the adhesive, substantively unconscionable, and unenforceable Claw Back Programs. There is no other reasonable reading of the Interim Award.

    b. **Although the Arbitrator Ordered CVS Caremark to Cease Any Claw Backs Pursuant to the Adhesive, Substantively Unconscionable, and Unenforceable Claw Back Programs for 2020 and Going Forward, CVS Caremark Clawed Back $2,864,537.83 for the Third Program Trimester of 2020 and $3,905,907.20 for the First Program Trimester of 2021**

As shown above and the in Englehart Declaration (and Exhibit "1" thereto), CVS Caremark clawed back $2,864,537.83 for the third trimester of 2020 pursuant to the adhesive, substantively unconscionable, and unenforceable Claw Back Programs. Englehart Decl., ¶7, Exh. "1," Rows 138

1  through 145. CVS Caremark has thus far clawed back pursuant to the adhesive, substantively

2  unconscionable, and unenforceable Claw Back Programs $3,905,907.20 pertaining to the first

3  trimester of 2021. Id., ¶8, Exh. "1," rows 147 through 155. Since the Arbitrator's issuance of the

4  Interim Award, which, among other things enjoins CVS Caremark from collecting any funds pursuant

5  to the adhesive, substantively unconscionable, and unenforceable Claw Back Programs and provides

6  on its face that it is in "full force and effect" until the Arbitrator issues the Final Award, CVS

7  Caremark has thus far clawed back $2,494,508.99. Id., ¶9, Exh. "1," rows 151 through 155.

8          c.    **Consistent With the Arbitrator's Interim Award, the Arbitrator**

9                  **Should Order CVS Caremark to Pay to AHF all Funds Clawed**

10                 **Back from AHF Pursuant to the Adhesive, Substantively**

11                 **Unconscionable, and Unenforceable Claw Back Programs for the**

12                 **Third Program Trimester of 2020 and for 2021**

13         Given CVS Caremark's ignoring of the Interim Award and CVS Caremark's continued claw

14 backs pursuant to the adhesive, substantively unconscionable, and unenforceable Claw Back

15 Programs thus far, AHF anticipates that CVS Caremark will continue to claw back monies until the

16 Arbitrator's ultimate Final Award is confirmed into a judgment (and maybe afterward). CVS

17 Caremark, notably, has filed no motion with the Arbitrator attacking the Arbitrator's imposition of an

18 injunction or even damages.[3] Yet, CVS Caremark continues to claw back pursuant to the adhesive,

19 substantively unconscionable, and unenforceable Claw Back Programs as if it won this case. All AHF

20 seeks in this regard is an order in the Final Award that CVS Caremark must pay back to AHF all such

21 clawed back funds for the third program trimester of 2020 and afterward, consistent with the

22 Arbitrator's imposition of an injunction and award of damages. As of the filing of this Motion, these

23 sums amount to $6,770,445.03, calculated as follows:  $2,864,537.83 (the claw back for the third

24

25 _____

26 [3] CVS Caremark's pending motion seeks a redetermination on the merits of both liability and
   damages but does not argue that the awarding of damages was, *per se*, improper. In fact, CVS

27 Caremark seeks in its pending motion the imposition of a *different amount* of damages than the
   Arbitrator awarded based on new arguments and evidence.

28

1  trimester of 2020) plus $3,905,907.20 (the claw back for the first trimester of 2021). Englehart Decl.,

2  ¶7, Exh. "1," Rows 138 through 145; ¶8, Exh. "1," rows 147 through 155.

3          **3.**    <u>**The Arbitrator Should Complete the Interim Award by Ordering CVS**</u>

4              <u>**Caremark to Pay to AHF Pre- and Post-Award Interest Pursuant to**</u>

5              <u>**Arizona Law on the Monies CVS Caremark Clawed Back from AHF**</u>

6              <u>**Pursuant to the Adhesive, Substantively Unconscionable, and**</u>

7              <u>**Unenforceable Claw Back Programs**</u>

8              **a.**    <u>**Awards of Pre- and Post-Judgment Interest Are Mandatory in**</u>

9                  <u>**Arizona**</u>

10        As noted above, AHF requested pre- and post-award interest in its initial Demand for

11  Arbitration and in its Amended Demand for Arbitration on all the claims tried at the arbitration

12  hearings. Arizona Revised Statutes 44-1201 provides, in pertinent part that "[u]nless specifically

13  provided for in statute or a different rate is contracted for in writing, interest on any judgment *shall be*

14  at the lesser of ten per cent per annum or at a rate per annum that is equal to one per cent plus the

15  prime rate as published by the board of governors of the federal reserve system in statistical release

16  H.15 or any publication that may supersede it on the date that the judgment is entered." A.R.S. 44-

17  1201(B)(emphasis added). That statute further provides that "[i]f awarded, prejudgment interest shall

18  be at the rate described in subsection …B of this section." A.R.S. 44-1201(F).

19        In Arizona, awards of pre- and post-award interest are a matter of right. A.R.S. 44-1201(B)

20  ("…interest on any judgment *shall be*…" the lesser of 10% per annum and the prime rate established

21  by the Federal Reserve at the date judgment is entered) (emphasis added); <u>Creative Builders v.</u>

22  <u>Avenue Dev.</u> (App. 1986) 148 Ariz. 452,457 (In Arizona, an award of prejudgment interest is allowed

23  as a matter of right on a liquidated claim); <u>Fleming v. Tanner</u> (App. 2019) 248 Ariz. 63, 68-69, citing

24  <u>Gemstar Ltd. v. Ernst & Young</u> (1996) 185 Ariz. 493, 508 ("[P]rejudgment interest on a liquidated

25  claim is a matter of right."); <u>Fleming v. Pima County</u> (1984) 141 Ariz. 149, 155 (1984)(same);

26  <u>Employer's Mut. Casualty Co. v. McKeon</u> (App. 1991) 170 Ariz. 75, 77 (Prejudgment interest on a

27  liquidated claim is a matter of right and not a matter of discretion).

28

**b.** **The Applicable Interest Rate for Pre- and Post-Award Interest is**
**4.25% Simple Interest Per Annum.**

As noted, the applicable interest rate is "Federal Reserve prime plus 1." A.R.S. 44-1201. Currently, the Federal Reserve's (the "Fed") prime rate is 3.25% (this has been the Fed's prime rate since April 2020, and it is highly unlikely that the Fed will raise or lower that rate prior to entry of the Final Award). The applicable interest rate for calculating prejudgment interest is, therefore, 4.25%, which is the Fed's prime rate as of the entry of the Final Award plus 1%.[4] Id.

**c.** **Prejudgment Interest is Calculated Commencing Upon the Amount**
**Owed Becoming Liquidated**

Under Arizona law, prejudgment interest begins to accrue when the creditor provides to the debtor sufficient information and supporting data so as to enable the debtor to ascertain the amount owed – i.e., when the claims are liquidated. AMHS Ins. Co. v. Mut. Ins. Co. (9th Cir. 2001) 258 F.3d 1090,1103. In other words, prejudgment interest is calculated when an amount owed becomes capable of precise calculation based on the evidence.

> Glen argues that because he disputed the amount owing on the loan, the Flemings' April 2015 claim was not liquidated. But the amount of a claim need not be undisputed for the claim to be liquidated. Instead, *"[a] claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion."* Schade v. Diethrich, 158 Ariz. 1, 14 (1988) (emphasis added and citations omitted). Accordingly, "mere differences of opinion as to the amount due under a contract" or disputes as to the accuracy or import of underlying facts do not render a claim unliquidated *as long as the information provided, if believed, permits calculation.* Trus Joist Corp. v. Safeco Ins. Co. of Am., 153 Ariz. 95, 109.

Fleming, 248 Ariz. 63 at 68-69 (emphasis added).

**d.** **As of the Filing of this Motion, Pre-Judgment Interest on the**
**Liquidated Amounts Owed to AHF Amounts to $1,966,126.30**

Obviously, the amount of the claw back pursuant to the adhesive, substantively unconscionable, and unenforceable Claw Back Programs – which the Arbitrator ruled are AHF's

---

[4] AHF requests the opportunity to recalculate prejudgment interest if the Fed does change its prime rate prior to the entry of the Final Award. As noted in the Englehart Declaration, the recalculation of pre-judgment interest can be accomplished with a few keystrokes. Englehart Decl., ¶6.

AHF'S MOTION TO CORRECT, CLARIFY AND COMPLETE THE INTERIM AWARD

damages – was "liquidated" the moment the claw backs took place. Prejudgment interest must, therefore, be calculated with respect to all amounts clawed back pursuant to the adhesive, substantively unconscionable, and unenforceable Claw Back Programs from the moment those amounts were clawed back. AHF has performed such calculations, as shown in the Englehart Declaration, using information garnered from the same source used to create Claimant's Exhibit C-71, the exhibit on which the Arbitrator relied in awarding damages in the first place: bank records showing the precise amounts and dates of all claw backs. Englehart Decl., ¶3; Exh. "1." All tolled, prejudgment interest through September 16, 2021 amounts to $1,966,126.30 with pre-judgment interest accruing thereafter at a daily rate of $3,034.97 until the Final Award is entered. Id., ¶10; Exh. "1."

## IV. CONCLUSION

For the reasons stated above and based on the Interim Award and the Arbitrator's clear intentions in rendering that award, AHF respectfully requests that the Arbitrator:

- Correct the clerical error in the Interim Award which incorrectly lists the claw back for 2020 pursuant to the adhesive, substantively unconscionable, and unenforceable Claw Back Programs as "$5,813,752" and substitute for that number "$5,831,752," which is the actual amount of the claw back for the first two trimesters of 2020, as noted in Claimant's Exhibit C-71, on which the Arbitrator expressly relied in computing and awarding damages.

- Correct the total damages awarded from "$19,276,611" to "$19,294,611" based on the correction set forth in the preceding bullet point.

- Clarify the Interim Award to order, consistent with the Arbitrator's injunction, that CVS Caremark forthwith pay back to AHF all monies clawed back for the third program trimester of 2020 and afterward, pursuant to the adhesive substantively unconscionable, and unenforceable Claw Back Programs, currently estimated at $6,770,445.03, calculated as follows: $2,864,537.83 (the claw back for the third trimester of 2020) plus $3,905,907.20 (the claw back for the first trimester of 2021).

AHF'S MOTION TO CORRECT, CLARIFY AND COMPLETE THE INTERIM AWARD

- Complete the Interim Award to order that CVS Caremark pay to AHF prejudgment interest, computed through September 16, 2021, in the amount of $1,966,126.30 and accruing thereafter at the daily rate of $3,034.97 until the Final Award is entered.
- Complete the Interim Award to order that CVS Caremark pay to AHF post-award interest at the applicable rate (Fed prime plus 1%) from the date of entry of the Final Award until the Award is paid in full.

DATE: September 14, 2021

AIDS HEALTHCARE FOUNDATION
Tom Myers

KIM RILEY LAW
Andrew F. Kim
Rebecca J. Riley

By: _____
ANDREW F. KIM
Attorneys for Claimant
AIDS HEALTHCARE FOUNDATION

DocuSign Envelope ID: B11AA392-B110-49D9-9F3F-AECA9D5C22F5

## DECLARATION OF MEGAN ENGLEHART

I, Megan Englehart, declare as follows:

1.     The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

2.     I am the Associate Director of Accounts Receivable and Reconciliation at AIDS Healthcare Foundation ("AHF") and I provide this declaration in support of AHF's Motion for Preliminary Injunction against CVS. I testified in the arbitration hearings in this matter, and I created and discussed at the hearing Claimant's Exhibit C-71, which contains, among other things, a description of all the monies clawed back by CVS Caremark pursuant to the Claw Back Programs for the relevant time periods.

3.     Attached hereto as Exhibit "1" is a true copy of a spreadsheet I created using Microsoft Excel showing, among other things, the total sums of money clawed back by CVS Caremark from 2016 until the present. (I attach hereto a .pdf file containing Exhibit "1," and AHF's counsel will file concurrently with this declaration a copy of this exhibit in its native Excel format). To create this spreadsheet, I consulted and used the very same information sources I consulted and used to create Claimant's Exhibit C-71, namely the actual funds clawed back by CVS Caremark for the relevant periods as evidenced in the cash receipt files pertaining to the bank account from which CVS Caremark reimburses AHF for filling prescriptions *and* takes the claw back. I pulled all the data I used to create Exhibit "1" and compiled it into one spreadsheet that shows, among other things, the amounts of each claw back and the dates when those particular claw backs were taken. Accordingly, in inputting information into Exhibit "1," I noted the specific claw back amounts, the dates on which CVS Caremark took those claw backs, and the program trimester to which the particular claw backs pertain. I constructed the spreadsheet so that Excel would, among other things, calculate the time periods (in days) from the specific claw backs to the present. Clicking on the cells in the Excel version of the spreadsheet reveals the formulae I used to direct Excel to calculate the applicable days on which pre-judgment interest accrued.

1       4.    The rows in Exhibit "1" under columns E and F contain descriptions of the actual

2  claw backs taken by CVS Caremark; each row that shows a monetary figure represents a weekly

3  claw back by CVS Caremark from the bank account the parties use to collect reimbursements and

4  for the claw back (which, as the Arbitrator has noted, is taken against reimbursements for

5  subsequent periods to which the claw back pertains).

6       5.    Exhibit "1" contains descriptions of the content of the columns in the headings.

7  Excel calculates the data in columns H and I, which show the number of days elapsed since specific

8  claw backs by CVS Caremark. Columns K through N show the interest due as of the end of the

9  relevant calendar years for each of the claw back amounts taken by CVS Caremark. Column P

10  shows the total interest due as of September 16, 2021, and Column R shows the daily interest

11  accruing on the claw back amounts after September 16, 2021 and until the entry by the Arbitrator of

12  his Final Award.

13       6.    I used the Federal Reserve's prime rate (3.25%) plus 1% to calculate pre-judgment

14  interest; I understand that this is the statutory rate for pre-judgment interest in Arizona currently. If

15  that interest rate changes (i.e., the Federal Reserve changes the prime rate) prior to the Arbitrator's

16  entry of the Final Award, I can use the spreadsheet set forth in Exhibit "1" to recalculate the total

17  interest owing with a few keystrokes.

18       7.    As shown in Exhibit "1" at rows 138 through 145, CVS Caremark clawed back

19  $2,864,537.83 for the third trimester of 2020. As of the conclusion of the evidentiary hearings on

20  April 16, 2021, CVS Caremark had yet to claw back $725,052.41.

21       8.    As shown in Exhibit "1" at rows 147 through 155, CVS Caremark clawed back thus

22  far $3,905,907,20 for the first trimester of 2021.

23       9.    As shown in Exhibit "1" at rows 151 through 155, CVS Caremark clawed back from

24  AHF $2,494,508.99 (see also Exhibit "1," row 158) after August 9, 2021, the date the Arbitrator

25  issued the Interim Award.

26      10.    As shown in Exhibit "1" at column P, rows 6 through 155, the interest accrued on the

27  claw backs at the statutory interest rate (Federal Reserve prime rate plus 1% or 4.25%) through

28

DocuSign Envelope ID: B11AA392-B110-49D9-9F3F-AECA9D5C22F5

1   September 16, 2021 amounts to $1,966,126.30. As shown in Exhibit "1" at column R, the daily rate

2   for interest at the statutory rate from September 16, 2021 forward is $3,034.97.

3       I declare under penalty of perjury pursuant to the laws of the State of California that the

4   foregoing facts are true and correct.

5       Executed on     9/14/2021     at Orlando, Florida.

6

7                          MEGAN ENGLEHART

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MEGAN ENGLEHART

DocuSign Envelope ID: B11AA392-B110-49D9-9F3F-AECA9D5C22F5

## Simple Interest Due Calculation for CVS Caremark

| | | Simple Interest Rate (Annual) | 4.25% | | | | | | | | | |
| | | Simple Interest Rate (Daily) | 0.01164% | | | | | | | | | |
| | | Simple Interest Rate (Daily_Leap Year) | 0.01161% | 365 | | Leap Year | | | | Leap Year | |
| | | | | | | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | 9/16/202 |
| Trimester | Year | Deposit Date/Recoupment Date | Tracking Log header | Amount | Days Count until Year End | Days Count Until 9/16/2021 | 2016 Interest due as of 12/31/2016 | 2017 Interest due as of 12/31/2017 | 2018 Interest due as of 12/31/2018 | 2019 Interest due as of 12/31/2019 | 2020 Interest due as of 12/31/2020 | 2021 Interest due as of 9/16/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2016 | 7/15/2016 | 7/15/16 pdf RA (Ck 10284155) | $ (45,430.23) | 169 | 259 | $ 891.54 | $ 1,930.78 | $ 1,930.78 | $ 1,930.78 | $ 1,930.78 | $ 1,370.06 |
| 1 | 2016 | 7/22/2016 | 7/22/16 pdf RA (Ck 15630728) | $ (60,614.26) | 162 | 259 | $ 1,140.24 | $ 2,576.11 | $ 2,576.11 | $ 2,576.11 | $ 2,576.11 | $ 1,827.98 |
| 1 | 2016 | 7/29/2016 | 7/29/16 pdf RA (Ck 12309128) | $ (54,788.03) | 155 | 259 | $ 986.11 | $ 2,328.49 | $ 2,328.49 | $ 2,328.49 | $ 2,328.49 | $ 1,652.27 |
| 1 | 2016 | 8/5/2016 | 8/5/16 pdf RA (Ck 18397728) | $ (62,021.98) | 148 | 259 | $ 1,065.90 | $ 2,635.93 | $ 2,635.93 | $ 2,635.93 | $ 2,635.93 | $ 1,870.43 |
| 1 | 2016 | 8/12/2016 | 8/12/16 pdf RA (Ck 15361689) | $ (54,589.74) | 141 | 259 | $ 893.80 | $ 2,320.06 | $ 2,320.06 | $ 2,320.06 | $ 2,320.06 | $ 1,646.29 |
| 1 | 2016 | 8/19/2016 | 8/19/16 pdf RA (Ck 15885967) | $ (52,288.60) | 134 | 259 | $ 813.62 | $ 2,222.27 | $ 2,222.27 | $ 2,222.27 | $ 2,222.27 | $ 1,576.90 |
| 1 | 2016 | 8/26/2016 | 8/26/16 pdf RA (Ck 15287114) | $ (64,295.54) | 127 | 259 | $ 948.18 | $ 2,732.56 | $ 2,732.56 | $ 2,732.56 | $ 2,732.56 | $ 1,938.99 |
| 1 | 2016 | 9/2/2016 | 9/2/16 pdf RA (Ck 11027767) | $ (55,113.52) | 120 | 259 | $ 767.98 | $ 2,342.32 | $ 2,342.32 | $ 2,342.32 | $ 2,342.32 | $ 1,662.09 |
| 1 | 2016 | 9/9/2016 | 9/9/16 pdf RA (Ck 15568266) | $ (69,727.96) | 113 | 259 | $ 914.94 | $ 2,963.44 | $ 2,963.44 | $ 2,963.44 | $ 2,963.44 | $ 2,102.82 |
| 1 | 2016 | 9/16/2016 | 9/16/16 pdf RA (Ck 16606610) | $ (55,182.04) | 106 | 259 | $ 679.22 | $ 2,345.24 | $ 2,345.24 | $ 2,345.24 | $ 2,345.24 | $ 1,664.15 |
| 1 | 2016 | 9/23/2016 | 9/23/16 pdf RA (Ck 16386432) | $ (70,913.29) | 99 | 259 | $ 815.21 | $ 3,013.81 | $ 3,013.81 | $ 3,013.81 | $ 3,013.81 | $ 2,138.57 |
| 1 | 2016 | 9/30/2016 | 9/30/16 pdf RA (Ck 12090144) | $ (55,896.92) | 92 | 259 | $ 597.15 | $ 2,375.62 | $ 2,375.62 | $ 2,375.62 | $ 2,375.62 | $ 1,685.71 |
| 2 | 2016 | 11/17/2016 | 11/14/16 pdf RA (Ck 17001926) | $ (61,208.95) | 44 | 259 | $ 312.73 | $ 2,601.38 | $ 2,601.38 | $ 2,601.38 | $ 2,601.38 | $ 1,845.91 |
| 2 | 2016 | 11/18/2016 | 11/18/16 pdf RA (Ck 16088450) | $ (68,079.81) | 43 | 259 | $ 339.93 | $ 2,893.39 | $ 2,893.39 | $ 2,893.39 | $ 2,893.39 | $ 2,053.12 |
| 2 | 2016 | 11/28/2016 | 11/28/16 pdf RA (Ck 14532013) | $ (53,281.31) | 33 | 259 | $ 204.17 | $ 2,264.46 | $ 2,264.46 | $ 2,264.46 | $ 2,264.46 | $ 1,606.83 |
| 2 | 2016 | 12/2/2016 | 12/2/16 pdf RA (Ck 11420147) | $ (70,015.03) | 29 | 259 | $ 235.77 | $ 2,975.64 | $ 2,975.64 | $ 2,975.64 | $ 2,975.64 | $ 2,111.48 |
| 2 | 2016 | 12/9/2016 | 12/09/16 pdf RA (Ck 16687735) | $ (58,178.70) | 22 | 259 | $ 148.63 | $ 2,472.59 | $ 2,472.59 | $ 2,472.59 | $ 2,472.59 | $ 1,754.53 |
| 2 | 2016 | 12/16/2016 | 12/16/16 pdf RA (Ck 16723886) | $ (60,757.88) | 15 | 259 | $ 105.83 | $ 2,582.21 | $ 2,582.21 | $ 2,582.21 | $ 2,582.21 | $ 1,832.31 |
| 2 | 2016 | 12/23/2016 | 12/23/16 pdf RA (Ck 15866746) | $ (49,083.83) | 8 | 259 | $ 45.60 | $ 2,086.06 | $ 2,086.06 | $ 2,086.06 | $ 2,086.06 | $ 1,480.25 |
| 2 | 2016 | 12/30/2016 | 12/30/16 pdf RA (Ck 12822483) | $ (73,267.13) | 1 | 259 | $ 8.51 | $ 3,113.85 | $ 3,113.85 | $ 3,113.85 | $ 3,113.85 | $ 2,209.56 |
| 2 | 2016 | 1/6/2017 | 1/6/17 pdf RA (Ck 15840967) | $ (55,545.36) | 359 | 259 | $ - | $ 2,321.87 | $ 2,360.68 | $ 2,360.68 | $ 2,360.68 | $ 1,675.11 |
| 2 | 2016 | 1/13/2017 | 1/13/17 pdf RA (Ck 11036917) | $ (74,798.81) | 352 | 259 | $ - | $ 3,065.73 | $ 3,178.95 | $ 3,178.95 | $ 3,178.95 | $ 2,255.75 |
| 2 | 2016 | 1/20/2017 | 1/20/17 pdf RA (Ck 16415835) | $ (58,695.18) | 345 | 259 | $ - | $ 2,357.86 | $ 2,494.55 | $ 2,494.55 | $ 2,494.55 | $ 1,770.10 |
| 2 | 2016 | 1/27/2017 | 1/27/17 pdf RA (Ck 16636595) | $ (68,030.64) | 338 | 259 | $ - | $ 2,677.43 | $ 2,891.30 | $ 2,891.30 | $ 2,891.30 | $ 2,051.64 |
| 3 | 2016 | 3/10/2017 | 3/10/17 pdf RA (Ck 17494445) | $ (56,169.25) | 296 | 259 | $ - | $ 1,935.92 | $ 2,387.19 | $ 2,387.19 | $ 2,387.19 | $ 1,693.93 |
| 3 | 2016 | 3/17/2017 | 3/17/17 pdf RA (Ck 18075116) | $ (61,855.75) | 289 | 259 | $ - | $ 2,081.49 | $ 2,628.87 | $ 2,628.87 | $ 2,628.87 | $ 1,865.42 |
| 3 | 2016 | 3/24/2017 | 3/24/17 pdf RA (Ck 17633273) | $ (63,109.96) | 282 | 259 | $ - | $ 2,072.25 | $ 2,682.17 | $ 2,682.17 | $ 2,682.17 | $ 1,903.24 |
| 3 | 2016 | 3/31/2017 | 3/31/17 pdf RA (Ck 14607241) | $ (55,004.93) | 275 | 259 | $ - | $ 1,761.29 | $ 2,337.71 | $ 2,337.71 | $ 2,337.71 | $ 1,658.81 |
| 3 | 2016 | 4/7/2017 | 4/7/17 pdf RA (multi chk #s) | $ (63,768.63) | 268 | 259 | $ - | $ 1,989.93 | $ 2,710.17 | $ 2,710.17 | $ 2,710.17 | $ 1,923.10 |
| 3 | 2016 | 4/14/2017 | 4/14/17 pdf RA (multi chk #s) | $ (60,536.12) | 261 | 259 | $ - | $ 1,839.72 | $ 2,572.79 | $ 2,572.79 | $ 2,572.79 | $ 1,825.62 |
| 3 | 2016 | 4/21/2017 | 4/21/17 pdf RA (multi chk #s) | $ (60,417.89) | 254 | 259 | $ - | $ 1,786.88 | $ 2,567.76 | $ 2,567.76 | $ 2,567.76 | $ 1,822.05 |
| 3 | 2016 | 4/28/2017 | 4/28/17 pdf RA (multi chk #s) | $ (53,930.54) | 247 | 259 | $ - | $ 1,551.06 | $ 2,292.05 | $ 2,292.05 | $ 2,292.05 | $ 1,626.41 |
| 3 | 2016 | 5/5/2017 | 5/5/17 pdf RA (multi chk #s) | $ (63,199.69) | 240 | 259 | $ - | $ 1,766.13 | $ 2,685.99 | $ 2,685.99 | $ 2,685.99 | $ 1,905.95 |
| 3 | 2016 | 5/12/2017 | 5/12/17 pdf RA (multi chk #s) | $ (57,922.77) | 233 | 259 | $ - | $ 1,571.45 | $ 2,461.72 | $ 2,461.72 | $ 2,461.72 | $ 1,746.81 |
| 3 | 2016 | 5/19/2017 | 5/19/17 pdf RA (Ck 21932934) | $ (58,604.43) | 226 | 259 | $ - | $ 1,542.18 | $ 2,490.69 | $ 2,490.69 | $ 2,490.69 | $ 1,767.37 |
| 3 | 2016 | 5/26/2017 | 5/26/17 pdf RA (Ck 21725776) | $ (58,515.77) | 219 | 259 | $ - | $ 1,492.15 | $ 2,486.92 | $ 2,486.92 | $ 2,486.92 | $ 1,764.69 |
| 3 | 2016 | 6/9/2017 | 6/9/17-6/23/17 pdf RA (multi check #) | $ 65.00 | 205 | 259 | $ - | $ (1.55) | $ (2.75) | $ (2.76) | $ (2.76) | $ (1.96 |
| 1 | 2017 | 7/21/2017 | 7/21/17 EFT Bank Date | $ (92,477.49) | 163 | 259 | $ - | $ 1,755.17 | $ 3,930.29 | $ 3,930.29 | $ 3,930.29 | $ 2,788.89 |
| 1 | 2017 | 7/28/2017 | 7/28 EFT Bank Date | $ (112,824.55) | 156 | 259 | $ - | $ 2,049.39 | $ 4,795.04 | $ 4,795.04 | $ 4,795.04 | $ 3,402.51 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2017 | 8/4/2017 | 8/4/17 EFT Bank Date | $ | (104,097.41) | 149 | 259 | $ - | $ 1,806.02 | $ 4,424.14 | $ 4,424.14 | $ 4,424.14 | $ 3,139.32 |
| 1 | 2017 | 8/11/2017 | 8/11/17 EFT Bank Date | $ | (81,913.53) | 142 | 259 | $ - | $ 1,354.38 | $ 3,481.33 | $ 3,481.33 | $ 3,481.33 | $ 2,470.31 |
| 1 | 2017 | 8/18/2017 | 8/18/17 EFT Bank Date | $ | (118,124.60) | 135 | 259 | $ - | $ 1,856.82 | $ 5,020.30 | $ 5,020.30 | $ 5,020.30 | $ 3,562.35 |
| 1 | 2017 | 8/25/2017 | 8/23/18-8/25/17 EFT Bank Date | $ | (112,432.60) | 128 | 259 | $ - | $ 1,675.71 | $ 4,778.39 | $ 4,778.39 | $ 4,778.39 | $ 3,390.69 |
| 1 | 2017 | 9/1/2017 | 8/30/17-9/1/17 EFT Bank Date | $ | (100,077.44) | 121 | 259 | $ - | $ 1,410.00 | $ 4,253.29 | $ 4,253.29 | $ 4,253.29 | $ 3,018.09 |
| 1 | 2017 | 9/8/2017 | 9/8/17 EFT Bank Date | $ | (101,490.89) | 114 | 259 | $ - | $ 1,347.19 | $ 4,313.36 | $ 4,313.36 | $ 4,313.36 | $ 3,060.71 |
| 1 | 2017 | 9/15/2017 | 9/15/17 EFT Bank Date | $ | (0.69) | 107 | 259 | $ - | $ 0.01 | $ 0.03 | $ 0.03 | $ 0.03 | $ 0.02 |
| 2 | 2017 | 11/10/2017 | Deposited 11/8/17-11/10/17 | $ | (111,363.51) | 51 | 259 | $ - | $ 661.32 | $ 4,732.95 | $ 4,732.95 | $ 4,732.95 | $ 3,358.45 |
| 2 | 2017 | 11/17/2017 | Deposited 11/15/17-11/17/17 | $ | (106,390.48) | 44 | 259 | $ - | $ 545.07 | $ 4,521.60 | $ 4,521.60 | $ 4,521.60 | $ 3,208.47 |
| 2 | 2017 | 11/27/2017 | Deposited 11/22/17-11/27/17 | $ | (111,410.73) | 34 | 259 | $ - | $ 441.06 | $ 4,734.96 | $ 4,734.96 | $ 4,734.96 | $ 3,359.87 |
| 2 | 2017 | 12/1/2017 | Deposited 11/29/17-12/01/17 | $ | (108,972.45) | 30 | 259 | $ - | $ 380.66 | $ 4,631.33 | $ 4,631.33 | $ 4,631.33 | $ 3,286.34 |
| 2 | 2017 | 12/8/2017 | Deposited 12/06/17-12/08/17 | $ | (99,236.13) | 23 | 259 | $ - | $ 265.76 | $ 4,217.54 | $ 4,217.54 | $ 4,217.54 | $ 2,992.72 |
| 2 | 2017 | 12/15/2017 | Deposited 12/13/17-12/15/17 | $ | (105,745.67) | 16 | 259 | $ - | $ 197.01 | $ 4,494.19 | $ 4,494.19 | $ 4,494.19 | $ 3,189.03 |
| 2 | 2017 | 12/22/2017 | Deposited 12/20/17-12/22/17 | $ | (109,654.60) | 9 | 259 | $ - | $ 114.91 | $ 4,660.32 | $ 4,660.32 | $ 4,660.32 | $ 3,306.91 |
| 2 | 2017 | 12/29/2017 | Deposited 12/27/17-12/29/17 | $ | (110,999.96) | 2 | 259 | $ - | $ 25.85 | $ 4,717.50 | $ 4,717.50 | $ 4,717.50 | $ 3,347.49 |
| 3 | 2017 | 3/16/2018 | Deposited 3/16/18 | $ | (93,198.34) | 290 | 259 | $ - | $ - | $ 3,147.04 | $ 3,960.93 | $ 3,960.93 | $ 2,810.63 |
| 3 | 2017 | 3/23/2018 | Deposited 3/23/18 | $ | (106,962.74) | 283 | 259 | $ - | $ - | $ 3,524.64 | $ 4,545.92 | $ 4,545.92 | $ 3,225.73 |
| 3 | 2017 | 3/30/2018 | Deosited 3/30/18 | $ | (92,181.44) | 276 | 259 | $ - | $ - | $ 2,962.43 | $ 3,917.71 | $ 3,917.71 | $ 2,779.96 |
| 3 | 2017 | 4/6/2018 | Deposited 4/6/18 | $ | (116,358.19) | 269 | 259 | $ - | $ - | $ 3,644.56 | $ 4,945.22 | $ 4,945.22 | $ 3,509.08 |
| 3 | 2017 | 4/13/2018 | Deposited 4/13/18 | $ | (103,481.55) | 262 | 259 | $ - | $ - | $ 3,156.90 | $ 4,397.97 | $ 4,397.97 | $ 3,120.75 |
| 3 | 2017 | 4/20/2018 | Deposited 4/20/18 | $ | (106,835.41) | 255 | 259 | $ - | $ - | $ 3,172.13 | $ 4,540.50 | $ 4,540.50 | $ 3,221.89 |
| 3 | 2017 | 4/27/2018 | Deposited 4/27/18 | $ | (104,949.76) | 248 | 259 | $ - | $ - | $ 3,030.60 | $ 4,460.36 | $ 4,460.36 | $ 3,165.05 |
| 3 | 2017 | 5/4/2018 | Deposited 5/4/18 | $ | (92,333.78) | 241 | 259 | $ - | $ - | $ 2,591.04 | $ 3,924.19 | $ 3,924.19 | $ 2,784.56 |
| 1 | 2018 | 7/20/2018 | Deposited 7/20/18 | $ | (158,912.96) | 164 | 259 | $ - | $ - | $ 3,034.58 | $ 6,753.80 | $ 6,753.80 | $ 4,792.42 |
| 1 | 2018 | 7/27/2018 | Deposited 7/27/18 | $ | (181,604.76) | 157 | 259 | $ - | $ - | $ 3,319.88 | $ 7,718.20 | $ 7,718.20 | $ 5,476.75 |
| 1 | 2018 | 8/3/2018 | Deposited 8/3/18 | $ | (172,058.47) | 150 | 259 | $ - | $ - | $ 3,005.13 | $ 7,312.48 | $ 7,312.48 | $ 5,188.86 |
| 1 | 2018 | 8/10/2018 | Deposited 8/10/18 | $ | (137,068.54) | 143 | 259 | $ - | $ - | $ 2,282.29 | $ 5,825.41 | $ 5,825.41 | $ 4,133.65 |
| 1 | 2018 | 8/17/2018 | Deposited 8/17/18 | $ | (181,331.51) | 136 | 259 | $ - | $ - | $ 2,871.50 | $ 7,706.59 | $ 7,706.59 | $ 5,468.51 |
| 1 | 2018 | 8/24/2018 | Deposited 8/24/18 | $ | (170,422.60) | 129 | 259 | $ - | $ - | $ 2,559.84 | $ 7,242.96 | $ 7,242.96 | $ 5,139.53 |
| 1 | 2018 | 8/31/2018 | Deposited 8/31/18 | $ | (158,246.78) | 122 | 259 | $ - | $ - | $ 2,247.97 | $ 6,725.49 | $ 6,725.49 | $ 4,772.33 |
| 1 | 2018 | 9/7/2018 | Deposited 9/7/18 | $ | (173,470.89) | 115 | 259 | $ - | $ - | $ 2,322.85 | $ 7,372.51 | $ 7,372.51 | $ 5,231.45 |
| 2 | 2018 | 11/26/2018 | Deposited 11/26/18 | $ | (195,363.25) | 35 | 259 | $ - | $ 796.17 | $ 8,302.94 | $ 8,302.94 | $ 5,891.67 |
| 2 | 2018 | 11/30/2018 | Deposited 11/30/18 | $ | (187,166.03) | 31 | 259 | $ - | $ 675.59 | $ 7,954.56 | $ 7,954.56 | $ 5,644.47 |
| 2 | 2018 | 12/7/2018 | Deposited 12/7/18 | $ | (173,011.72) | 24 | 259 | $ - | $ 483.48 | $ 7,353.00 | $ 7,353.00 | $ 5,217.61 |
| 2 | 2018 | 12/14/2018 | Deposited 12/14/18 | $ | (177,242.03) | 17 | 259 | $ - | $ 350.84 | $ 7,532.79 | $ 7,532.79 | $ 5,345.18 |
| 2 | 2018 | 12/21/2018 | Deposited 12/21/18 | $ | (152,914.58) | 10 | 259 | $ - | $ 178.05 | $ 6,498.87 | $ 6,498.87 | $ 4,611.53 |
| 2 | 2018 | 12/28/2018 | Deposited 12/28/18 | $ | (198,785.32) | 3 | 259 | $ - | $ 69.44 | $ 8,448.38 | $ 8,448.38 | $ 5,994.88 |
| 2 | 2018 | 1/4/2019 | Deposited 1/04/19 | $ | (168,836.23) | 361 | 259 | $ - | $ - | $ 7,096.90 | $ 7,175.54 | $ 5,091.68 |
| 2 | 2018 | 1/11/2019 | Deposited 1/11/19 | $ | (188,134.44) | 354 | 259 | $ - | $ - | $ 7,754.75 | $ 7,995.71 | $ 5,673.67 |
| 3 | 2018 | 3/22/2019 | Deposited 3/22/19 | $ | (153,890.09) | 284 | 259 | $ - | $ - | $ 5,088.91 | $ 6,540.33 | $ 4,640.95 |
| 3 | 2018 | 3/29/2019 | Deposited 3/29/19 | $ | (156,351.26) | 277 | 259 | $ - | $ - | $ 5,042.86 | $ 6,644.93 | $ 4,715.17 |
| 3 | 2018 | 4/5/2019 | Deposited 4/5/19 | $ | (163,556.74) | 270 | 259 | $ - | $ - | $ 5,141.96 | $ 6,951.16 | $ 4,932.47 |
| 3 | 2018 | 4/12/2019 | Deposited 4/12/19 | $ | (192,296.69) | 263 | 259 | $ - | $ - | $ 5,888.76 | $ 8,172.61 | $ 5,799.19 |
| 3 | 2018 | 4/19/2019 | Deposited 4/19/19 | $ | (165,365.82) | 256 | 259 | $ - | $ - | $ 4,929.26 | $ 7,028.05 | $ 4,987.03 |
| 3 | 2018 | 4/26/2019 | Deposited 4/26/19 | $ | (163,118.52) | 249 | 259 | $ - | $ - | $ 4,729.32 | $ 6,932.54 | $ 4,919.25 |
| 3 | 2018 | 5/3/2019 | Deposited 5/3/19 | $ | (162,941.85) | 242 | 259 | $ - | $ - | $ 4,591.39 | $ 6,925.03 | $ 4,913.92 |
| 3 | 2018 | 5/10/2019 | Deposited 5/10/19 | $ | (158,383.55) | 235 | 259 | $ - | $ - | $ 4,333.85 | $ 6,731.30 | $ 4,776.46 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2019 | 7/25/2019 | Deposited 7/25/2019 | $ (0.27) | 159 | 259 | $ - | $ - | $ - | $ 0.00 | $ 0.01 | $ 0.01 |
| 1 | 2019 | 7/29/2019 | REFERENCED 7/29/2019 | $ (186,932.23) | 155 | 259 | $ - | $ - | $ - | $ 3,373.74 | $ 7,944.62 | $ 5,637.42 |
| 1 | 2019 | 8/2/2019 | Deposited 8/2/2019 | $ (207,134.84) | 151 | 259 | $ - | $ - | $ - | $ 3,641.88 | $ 8,803.23 | $ 6,246.68 |
| 1 | 2019 | 8/9/2019 | Deposited 8/9/19 | $ (189,896.61) | 144 | 259 | $ - | $ - | $ - | $ 3,184.02 | $ 8,070.61 | $ 5,726.81 |
| 1 | 2019 | 8/16/2019 | Deposited 8/16/19 | $ (183,617.14) | 137 | 259 | $ - | $ - | $ - | $ 2,929.07 | $ 7,803.73 | $ 5,537.44 |
| 1 | 2019 | 8/23/2019 | Deposited 8/23/19 | $ (194,736.20) | 130 | 259 | $ - | $ - | $ - | $ 2,947.72 | $ 8,276.29 | $ 5,872.76 |
| 1 | 2019 | 8/30/2019 | Deposited 8/30/19 | $ (196,686.68) | 123 | 259 | $ - | $ - | $ - | $ 2,816.93 | $ 8,359.18 | $ 5,931.59 |
| 1 | 2019 | 9/6/2019 | Deposited 9/6/19 | $ (207,474.79) | 116 | 259 | $ - | $ - | $ - | $ 2,802.33 | $ 8,817.68 | $ 6,256.93 |
| 1 | 2019 | 9/13/2019 | Deposited 9/13/19 | $ (205,963.81) | 109 | 259 | $ - | $ - | $ - | $ 2,614.05 | $ 8,753.46 | $ 6,211.36 |
| 2 | 2019 | 11/20/2019 | PNR Fees' in 11/20/19 paper remit | $ (107,253.82) | 41 | 259 | $ - | $ - | $ - | $ 512.03 | $ 4,558.29 | $ 3,234.51 |
| 2 | 2019 | 12/4/2019 | Deposit 12/4/2019 | $ (288,155.89) | 27 | 259 | $ - | $ - | $ - | $ 905.91 | $ 12,246.63 | $ 8,690.07 |
| 2 | 2019 | 12/11/2019 | Deposit 12/11/19 | $ (372,855.54) | 20 | 259 | $ - | $ - | $ - | $ 868.29 | $ 15,846.36 | $ 11,244.40 |
| 2 | 2019 | 12/18/2019 | Deposit 12/18/19 | $ (211,185.51) | 13 | 259 | $ - | $ - | $ - | $ 319.67 | $ 8,975.38 | $ 6,368.83 |
| 2 | 2019 | 12/26/2019 | Deposit 12/26/19 | $ (209,606.29) | 5 | 259 | $ - | $ - | $ - | $ 122.03 | $ 8,908.27 | $ 6,321.21 |
| 2 | 2019 | 1/2/2020 | Deposit 1/2/2020 | $ (207,656.27) | 364 | 259 | $ - | $ - | $ - | $ - | $ 8,777.17 | $ 6,262.40 |
| 2 | 2019 | 1/8/2020 | Deposit 1/8/2020 | $ (199,503.46) | 358 | 259 | $ - | $ - | $ - | $ - | $ 8,293.57 | $ 6,016.53 |
| 3 | 2019 | 3/11/2020 | Deposit 3/11/2020 | $ (181,356.73) | 295 | 259 | $ - | $ - | $ - | $ - | $ 6,212.46 | $ 5,469.27 |
| 3 | 2019 | 3/18/2020 | Deposit 3/18/2020 | $ (193,282.76) | 288 | 259 | $ - | $ - | $ - | $ - | $ 6,463.88 | $ 5,828.93 |
| 3 | 2019 | 3/25/2020 | Deposit 3/25/2020 | $ (210,088.24) | 281 | 259 | $ - | $ - | $ - | $ - | $ 6,855.13 | $ 6,335.74 |
| 3 | 2019 | 4/1/2020 | Deposit 4/1/2020 | $ (204,396.63) | 274 | 259 | $ - | $ - | $ - | $ - | $ 6,503.28 | $ 6,164.10 |
| 3 | 2019 | 4/8/2020 | Deposit 4/8/2020 | $ (170,299.89) | 267 | 259 | $ - | $ - | $ - | $ - | $ 5,279.99 | $ 5,135.82 |
| 3 | 2019 | 4/15/2020 | Deposit 4/15/2020 | $ (176,439.31) | 260 | 259 | $ - | $ - | $ - | $ - | $ 5,326.92 | $ 5,320.97 |
| 3 | 2019 | 4/22/2020 | Deposit 4/22/2020 | $ (188,044.21) | 253 | 259 | $ - | $ - | $ - | $ - | $ 5,524.44 | $ 5,670.95 |
| 3 | 2019 | 4/29/2020 | Deposit 4/29/2020 | $ (211,527.96) | 246 | 259 | $ - | $ - | $ - | $ - | $ 6,042.42 | $ 6,379.16 |
| 1 | 2020 | 7/22/2020 | Deposited 7/22/20 | $ (335,951.24) | 162 | 259 | $ - | $ - | $ - | $ - | $ 6,319.74 | $ 10,131.46 |
| 1 | 2020 | 7/24/2020 | Deposited 7/24/2020 | $ (550.47) | 160 | 259 | $ - | $ - | $ - | $ - | $ 10.23 | $ 16.60 |
| 1 | 2020 | 7/29/2020 | Deposited 7/29/2020 | $ (362,327.50) | 155 | 259 | $ - | $ - | $ - | $ - | $ 6,521.40 | $ 10,926.90 |
| 1 | 2020 | 8/5/2020 | Deposited 8/5/2020 | $ (352,921.24) | 148 | 259 | $ - | $ - | $ - | $ - | $ 6,065.23 | $ 10,643.23 |
| 1 | 2020 | 8/12/2020 | Deposited 8/12/2020 | $ (316,944.90) | 141 | 259 | $ - | $ - | $ - | $ - | $ 5,189.32 | $ 9,558.28 |
| 1 | 2020 | 8/19/2020 | Deposited 8/19/2020 | $ (366,625.74) | 134 | 259 | $ - | $ - | $ - | $ - | $ 5,704.74 | $ 11,056.53 |
| 1 | 2020 | 8/26/2020 | Deposited 8/26/2020 | $ (508,708.81) | 127 | 259 | $ - | $ - | $ - | $ - | $ 7,502.07 | $ 15,341.40 |
| 1 | 2020 | 9/2/2020 | Deposited 9/2/2020 | $ (365,130.57) | 120 | 259 | $ - | $ - | $ - | $ - | $ 5,087.88 | $ 11,011.44 |
| 1 | 2020 | 9/9/2020 | Deposited 9/9/2020 | $ (367,700.64) | 113 | 259 | $ - | $ - | $ - | $ - | $ 4,824.82 | $ 11,088.94 |
| 2 | 2020 | 11/18/2020 | Deposited 11/18/20 | $ (363,520.95) | 43 | 259 | $ - | $ - | $ - | $ - | $ 1,815.12 | $ 10,962.90 |
| 2 | 2020 | 11/25/2020 | Deposited 11/25/20 | $ (334,393.84) | 36 | 259 | $ - | $ - | $ - | $ - | $ 1,397.88 | $ 10,084.49 |
| 2 | 2020 | 12/2/2020 | Deposited 12/2/20 | $ (366,516.60) | 29 | 259 | $ - | $ - | $ - | $ - | $ 1,234.24 | $ 11,053.24 |
| 2 | 2020 | 12/9/2020 | Deposited 12/09/20 | $ (360,912.05) | 22 | 259 | $ - | $ - | $ - | $ - | $ 922.00 | $ 10,884.22 |
| 2 | 2020 | 12/16/2020 | Deposited 12/16/20 | $ (357,041.86) | 15 | 259 | $ - | $ - | $ - | $ - | $ 621.90 | $ 10,767.50 |
| 2 | 2020 | 12/23/2020 | Deposited 12/23/20 | $ (364,913.77) | 8 | 259 | $ - | $ - | $ - | $ - | $ 338.99 | $ 11,004.90 |
| 2 | 2020 | 12/30/2020 | Deposited 12/30/20 | $ (334,063.07) | 1 | 259 | $ - | $ - | $ - | $ - | $ 38.79 | $ 10,074.52 |
| 2 | 2020 | 1/6/2021 | Deposited 01/06/2021 | $ (373,528.36) | | 253 | $ - | $ - | $ - | $ - | $ - | $ 11,003.74 |
| 3 | 2020 | 3/10/2021 | Deposited 3/10/2021 | $ (348,580.75) | | 190 | $ - | $ - | $ - | $ - | $ - | $ 7,711.75 |
| 3 | 2020 | 3/17/2021 | Deposited 3/17/2021 | $ (376,107.19) | | 183 | $ - | $ - | $ - | $ - | $ - | $ 8,014.17 |
| 3 | 2020 | 3/24/2021 | Deposited 3/24/21 | $ (357,760.59) | | 176 | $ - | $ - | $ - | $ - | $ - | $ 7,331.64 |
| 3 | 2020 | 3/31/2021 | Deposited 3/31/21 | $ (359,277.63) | | 169 | $ - | $ - | $ - | $ - | $ - | $ 7,069.89 |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 2020 | 4/7/2021 | Deposited 4/7/21 | $ | (324,480.38) | 162 | $ | - | $ | - | $ | - | $ | - | $ | 6,120.68 |
| 3 | 2020 | 4/14/2021 | Deposited 4/14/21 | $ | (373,278.88) | 155 | $ | - | $ | - | $ | - | $ | - | $ | 6,736.92 |
| 3 | 2020 | 4/21/2021 | Deposited 4/21/21 | $ | (361,250.62) | 148 | $ | - | $ | - | $ | - | $ | - | $ | 6,225.39 |
| 3 | 2020 | 4/28/2021 | Deposited 4/28/21 | $ | (363,801.79) | 141 | $ | - | $ | - | $ | - | $ | - | $ | 5,972.83 |
| 1 | 2021 | 7/21/2021 | Deposited 7/21/21 | $ | (495,481.58) | 57 | $ | - | $ | - | $ | - | $ | - | $ | 3,288.50 |
| 1 | 2021 | 7/23/2021 | Deposited 7/23/21 | $ | (335.17) | 55 | $ | - | $ | - | $ | - | $ | - | $ | 2.15 |
| 1 | 2021 | 7/28/2021 | Deposited 7/28/21 | $ | (441,269.06) | 50 | $ | - | $ | - | $ | - | $ | - | $ | 2,569.03 |
| 1 | 2021 | 8/4/2021 | Deposited 8/4/21 | $ | (474,312.40) | 43 | $ | - | $ | - | $ | - | $ | - | $ | 2,374.81 |
| 1 | 2021 | 8/11/2021 | Deposited 8/11/21 | $ | (449,395.33) | 36 | $ | - | $ | - | $ | - | $ | - | $ | 1,883.77 |
| 1 | 2021 | 8/18/2021 | Deposited 8/18/21 | $ | (512,900.70) | 29 | $ | - | $ | - | $ | - | $ | - | $ | 1,731.92 |
| 1 | 2021 | 8/25/2021 | Deposited 8/25/21 | $ | (526,224.91) | 22 | $ | - | $ | - | $ | - | $ | - | $ | 1,348.00 |
| 1 | 2021 | 9/1/2021 | Deposited 9/1/21 | $ | (483,728.73) | 15 | $ | - | $ | - | $ | - | $ | - | $ | 844.87 |
| 1 | 2021 | 9/8/2021 | Deposited 9/8/21 | $ | (522,259.32) | 8 | $ | - | $ | - | $ | - | $ | - | $ | 486.49 |

**Subtotal of Recoupments since 8/9/2021  $  (2,494,508.99)**

# EXHIBIT S

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION, ) | |
| ) | |
| Claimant, ) | |
| ) | |
| v. ) | AAA Case No. 01–19–0004–0127 |
| ) | |
| CVS CAREMARK, a subsidiary of CVS ) | |
| HEALTH CORPORATION, ) | |
| ) | |
| Respondents. ) | |
| ) | |

## RESPONDENTS' OPPOSITION TO CLAIMANT'S MOTION TO CORRECT, CLARIFY, AND COMPLETE THE INTERIM AWARD

Respondents Caremark, L.L.C., and CaremarkPCS, L.L.C. (together, "Caremark"), submit

the following response in opposition to Claimant AIDS Healthcare Foundation's ("AHF") motion

to correct, clarify, and complete the Interim Final Award dated August 3, 2021, and transmitted

on August 9, 2021 (the "Interim Award").

### INTRODUCTION

AHF's motion asks the Arbitrator to (1) correct the amount of AHF's alleged 2020

damages listed in paragraph 12(e) of page 59 of the Interim Award, (2) modify the Interim Award

to include alleged damages for the third trimester of 2020, (3) modify the Interim Award to include

alleged damages for the first trimester of 2021, and (4) modify the Interim Award to include

prejudgment and postjudgment interest. In total, AHF seeks to add $8,754,571.33, plus accruing

postjudgment interest, to the Interim Award. AHF's motion is flawed for several reasons and

should be denied in its entirety.

*First*, the motion is untimely. AHF did not submit the motion until September 14, 2021, 22

days after the 20-day deadline in AAA Rule 50. The parties expressly consented to be bound by

this rule when they agreed to arbitrate their disputes under the Commercial Arbitration Rules of the American Arbitration Association.

All of AHF's requests for relief fall within the scope of AAA Rule 50. These requests should have been made, if at all, in a timely motion filed under that rule. AHF failed to file a motion within the 20-day time period allotted by AAA Rule 50. The Arbitrator should hold AHF to the choice it voluntarily made and deny AHF's motion as time-barred.

*Second*, if the Arbitrator recalculates the damages awarded to AHF for the time period after the second trimester of 2020, then the Arbitrator should use the methodology set forth in Caremark's posthearing brief, Caremark's response to AHF's posthearing brief, and Caremark's motion to recalculate damages.

AHF submitted an alleged damages amount for the third trimester of 2020 into evidence. That amount was not awarded. AHF did not submit an alleged damages amount for the first trimester of 2021 into evidence because, at the time of the arbitration hearing, no recoupment had occurred for that time period. If the Arbitrator decides to modify the Interim Award to include damages for the second trimester of 2020 and the first trimester of 2021, then the proper method for calculating those damages is either (1) the actual loss sustained, as directed by Arizona law, or (2) the total amount of fees recouped by Caremark from AHF for that time period, less the amount of known, conscionable, and enforceable fees.

Under the first approach, AHF suffered no harm by participating in the PNP. It continued to be a high-performing pharmacy in the third trimester of 2020 and the first trimester of 2021. As a result, it paid approximately $258,780 less in fees than it would have paid in a fixed-rate network. *See* Hutchins Decl., Ex. 1, Column E.

Under the second approach, AHF's damages were approximately $259,285 for the third trimester of 2020 and $401,359 for the first trimester of 2021, not, as AHF suggests, $2,864,537.83 for the former and $3,905,907.20 for the latter. *See* Hutchins Decl., Ex. 1, Column C.

*Third*, AHF's request for postjudgment interest has no merit. If a claim is not liquidated, then a claimant cannot recover interest on the claim because the person liable does not know the sum owed and cannot be in default for not paying. Here, the damages awarded based on AHF's claims were not capable of precise computation and thus were not liquidated.

Specifically, the Arbitrator had discretion to calculate the exact damages award. The percentage of the recoupments that qualified as damages was an open question until the Arbitrator issued the Interim Award. Over Caremark's objection, the Interim Award quantified those damages to encompass not just the lowest available DIR fees for 2016 through 2020, but *all* DIR fees for that time period.

## PROCEDURAL HISTORY

After a five-day evidentiary hearing, the Arbitrator issued the Interim Award. In pertinent part, the Interim Award made the following findings of fact and conclusions of law:

Caremark's network-enrollment forms ("NEFs") "attempt to disclose the rates and network rebates . . . to be charged, if any." Interim Award at 55, ¶ 1. "Rebates have been in place for some networks since 2006." *Id.*, ¶ 2. NEFs "are presented in the Spring before the next plan year." *Id.* "AHF was free to accept or reject participating in each particular network . . . ." *Id.*

"The movement from fixed rebates to variable range rebates was a result of some pharmacies' efforts to differentiate themselves based on superior performance." *Id.*, ¶ 3. "The rebate ranges resulted in high scoring pharmacies paying a rebate smaller than would have been

the case if there was just a fixed rebate." *Id*. "The variable rates were introduced for the 2016 plan year." *Id*. at 56, ¶ 3.

"For the years 2006 through 2015, the DIR fees were fixed rates and thus knowable at the outset and at the Point of Sale." *Id*., ¶ 6. The Interim Award found that "***these contract terms were not unconscionable. Thus, the fixed rate DIRs are enforceable as agreed***." *Id*. (emphasis added).

The Interim Award then determined that, starting in 2016, the DIR rates were variable and unconscionable as implemented because they "were unknowable when the NEF was entered into and at the Point of Sale." *Id*., ¶ 7 & at 58, ¶ 11. The Interim Award found a number of flaws with Caremark's calculation of variable DIR fees, including that they "were not actuarially based" or "based on sound statistical methodologies." *Id*. at 57, ¶ 8. Further, "[s]mall variances had a disproportionate impact," and "statistically insignificant sample sizes . . . worked to AHF's disadvantages." *Id*. In addition, the Interim Award determined that Caremark's practice of imputing average scores when no data existed was "arbitrary" and not appropriate. *Id*.

Based on these flaws, which only affected AHF's scores within the variable range, the Interim Award found that Caremark breached the covenant of good faith and fair dealing and that the DIRs as implemented were unconscionable. *Id*. at 58, ¶¶ 10–11. While the noted flaws affected AHF's scoring, the Interim Award did not calculate the increase in DIR fees paid by AHF because of those flaws.

Instead, the Interim Award simply awarded AHF a return of 100% of its DIR fees from 2016 through 2020, including the portion of fees resulting from the application of the minimum DIR rate. *Id*., ¶ 12. In other words, rather than award AHF damages based on the contractual floor of DIR fees derived from the lowest DIR rates known at the outset, this methodology eliminated all of AHF's DIR fees, resulting in an award of $19,276,611.

The evidence presented at the hearing regarding the minimum amount of DIR fees collectible from AHF was clear and unambiguous. The Interim Award cites to the annual NEFs, which clearly disclose the range of fees (the minimum and the maximum). *See id.* at 8–29, ¶¶ 26–37. Importantly, Dr. Brandon Patchett, AHF's pharmacist-in-charge, testified on cross-examination that AHF understood that, even with perfect scores, pharmacies participating in the PNP would be subject to the minimum DIR rates for a given network:

> Q: And, sir, your understanding [is] that AHF's performance determines where on that 3 to 5 percent range AHF will fall, correct?
>
> A: That's correct. And with 100 percent perfect performance, we will still get a 3 percent charge back.

Day 2 Tr. at 239:25–240:10.

On August 29, 2021, within 20 days after the Interim Award was transmitted, Caremark filed a motion asking the Arbitrator to modify the Interim Award's damages calculation to award AHF damages based on the contractual floor of DIR fees under the NEFs, not based on a full refund of those fees. AHF did not file a motion within this 20-day period. Nor did it file a cross-motion in responding to Caremark's motion. *See* AHF's 9/8/21 Resp.

On September 11, 2021, the Arbitrator issued an order denying Caremark's motion. The Arbitrator found that, "[a]s stated in the Interim Award, Claimant is entitled to damages in the amount of $19,276,611. *See* 9/11/21 Order at 2.

Subsequently, on September 14, 2021, after Caremark's motion had been fully briefed and ruled upon, AHF filed its own motion to "correct, clarify, and complete" the Interim Award. *See* AHF's 9/14/21 Mot. That untimely motion is currently before the Arbitrator. For the reasons set forth below, it should be denied.

## LEGAL STANDARDS

AAA Rule 50 states as follows:

> Within 20 calendar days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto.

AAA Commercial R-50. "This rule essentially codifies the common law doctrine of *functus officio*, which forbids an arbitrator to redetermine an issue which he has already decided." *Bosack v. Soward*, 586 F.3d 1096, 1103 (9th Cir. 2009) (internal quotation marks omitted).

As the U.S. Supreme Court has recognized, "[t]he notion that a filing deadline can be complied with by filing sometime after the deadline falls due is . . . a notion without limiting principle." *See U.S. v. Locke*, 471 U.S. 84, 100–01 (1985). "If 1-day late filings are acceptable, 10-day late filings might be equally acceptable, and so on in a cascade of exceptions that would engulf the rule erected by the filing deadline . . . ." *Id.* at 101. It follows that, "if the concept of a filing deadline is to have any content, the deadline must be enforced." *Id.; see also Gross v. Town of Cicero, Ill.*, 528 F.3d 498, 499–500 (7th Cir. 2006) ("Courts cannot operate without setting and enforcing deadlines.").

## ARGUMENT

### I.     All of AHF's Requests for Relief Should Be Denied Because They Are Untimely Under AAA Rule 50.

Caremark does not dispute that an arbitrator has the inherent authority to clarify and correct an arbitration award. *Compare* Caremark's 8/29/21 Mot. at 2–3 *with* AHF's 9/14/21 Mot. at 5. But where exercising that authority would require an arbitrator to disregard a mutually agreed-upon, rule-based deadline for taking the requested action, the arbitrator must adhere to the deadline.

This is because, as one of the cases cited by AHF recognizes, the AAA rules become "part and parcel of the arbitration contract" when, as in this case, the parties "agree[] that the AAA rules w[ill] govern the arbitration process." *See E. Seaboard Constr. Co. v. Gray Constr., Inc.*, 553 F.3d 1, 4 (1st Cir. 2008) (reversing vacation of arbitration award clarified under variant of AAA Rule 50 for purposes of allocating damages where party timely filed motion under 20-day deadline set forth in the rule) (internal quotation marks omitted); *see also* AHF's 9/14/21 Mot. at 7.

To suggest, as AHF has, that an arbitrator has unlimited inherent authority to ignore a clear-cut procedural rule such as AAA Rule 50 is "too sweeping" an interpretation of that authority. *See Cent. W. Va. Energy v. Bayer Cropscience, LP*, 645 F. 3d 267, 276 (4th Cir. 2011). Indeed, "[i]f the arbitrator ignores the plainly stated procedural rules incorporated in the agreement to arbitrate while arriving at the arbitral award, the award is subject to a manifest disregard of the law challenge." *Kasher Davidson Secs. Corp. v. Mscisz*, 531 F.3d 68, 77 (1st Cir. 2008).

It is telling that *none* of the cases on which AHF relies to support its untimely request for relief involved a situation where an arbitrator exceeded the explicit deadline in AAA Rule 50, or one of its variants, in favor of exercising the arbitrator's inherent authority to clarify and correct an award. Four of the cases cited by AHF involved timely requests under the AAA rules. *See E. Seaboard Constr.*, 553 F.3d at 2, 4 (award was issued on September 21, 2007, and, as indicated by underlying docket, *see E. Seaboard Constr. Co. v. Gray Constr., Inc.*, No. 2:08–cv–00037–GZS (D. Me.), ECF No. 4 at 3, movant filed motion under variant of AAA Rule 50 on September 26, 2007, within 20-day period set forth in applicable rule); *Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, Local 182B v. Excelsior Foundry Co.*, 56 F.3d 844, 848–469 (7th Cir. 1995) (AAA labor-arbitration rules in effect at time did not contain time limit governing request to clarify arbitration award and request was made within time period contemplated by award itself); *Play*

7

*Star, S.A. de C.V. v. Haschel Export Corp.*, No. 02 Civ. 7364(LLS), 2003 WL 1961625, at *2 (S.D.N.Y. Apr. 28, 2003) (award was issued on June 28, 2002, and movant filed motion under variant of AAA Rule 50 on July 15, 2002, within 30-day period set forth in applicable rule); *A.P. Seating USA, LLC v. Circuit of the Americas LLC*, No. A–14–CA–058–SS, 2014 WL 3420805, at *1, 2 (W.D. Tex. Jul. 10, 2014) (award was issued on October 21, 2013, and, as indicated by underlying docket, *see A.P. Seating USA, LLC v. Circuit of the Americas LLC*, No. A–14–CA–058–SS (W.D. Tex.), ECF No. 15, at 55, movant filed motion under variant of AAA Rule 50 on November 8, 2013, within 20-day period set forth in applicable rule).

The other cases cited by AHF did not involve the AAA rules at all and therefore did not present situations in which the arbitrator exceeded the explicit 20-day deadline of AAA Rule 50, which, again, is what AHF asks the Arbitrator to do here. *See Martel v. Ensco Offshore Co.*, 449 Fed. App'x 352, 356 (5th Cir. 2011) ("The parties in this case never entered into a written arbitration agreement adopting any formal rules of arbitration, such as those promulgated by the American Arbitration Association."); *Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1263–64, 1272 (10th Cir. 1999) (relying on common-law principles in labor arbitration, under collective-bargaining agreement, without reference to the rules of a particular arbitration association); *Int'l Bhd. of Teamsters, Local 631 v. Silver State Disposal Serv.*, 109 F.3d 1409, 1410–11 (9th Cir. 1997) (relying on common-law principles in labor arbitration where, "[p]ursuant to the collective bargaining agreement, the grievance was submitted to an arbitrator for resolution," without reference to the rules of a particular arbitration association); *Colonial Penn Ins. Co. Omaha Indem. Co.*, 943 F.2d 327, 329, 331 (3d Cir. 1991) (relying on common-law principles where "[a] panel of three arbitrators was formed, whereby each party appointed an arbitrator and the two arbitrators together selected an umpire," without reference to the rules of a particular

arbitration association); *Gen. re Life Corp. v. Lincoln Nat'l Life Ins. Co.*, 273 F. Supp. 3d 307, 319–20 (D. Conn. 2017) (relying on common-law principles where "[t]he dispute was submitted to a panel of three arbitrators," without reference to the rules of a particular arbitration association); *Waveform Telemedia, Inc. v. Panorama Weather N. Am., Inc.*, No. 06 Civ. 5270 CMMDF, 06 CIV. 5271 CMMDF, 2007 WL 678731, at *1 (S.D.N.Y. Mar. 2, 2007) (noting that "[t]he parties submitted to arbitration before National Arbitration and Mediation," not the AAA); *Clarendon Nat'l Ins. Co. v. TIG Reins. Co.*, 183 F.R.D. 112, 114, 115–17 (S.D.N.Y. 1998) (relying on common-law principles where the dispute was arbitrated without reference to the rules of a particular arbitration association).

In fact, multiple cases *not* cited by AHF further confirm that, when the AAA's rules apply, courts evaluate an arbitrator's decision to modify an arbitration award based on those rules and the deadlines imposed by them. *See Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 471, 472–73 (5th Cir. 2012) (affirming confirmation of arbitration award corrected under variant of AAA Rule 50 where award was issued on March 7, 2011, and movant filed motion on March 25, 2011, within 20-day period set forth in applicable rule); *Laclede Grp., Inc. v. NiSource Inc.*, No. 1:06–cv–1846–LJM–JMS, 2007 WL 9752730, at *1, 2–3 (S.D. Ind. July 24, 2007) (confirming arbitration award corrected under variant of AAA Rule 50 where award was issued on September 28, 2006, and movant filed motion on October 18, 2006, within 20-day period set forth in applicable rule); *Oakwood Labs. v. Howrey Simon Arnold & White, L.L.P.*, Nos. 1:04 CV 2270 & 1:05 CV 2070 (cons.), 2007 WL 1544577, at *1–3 (N.D. Ohio May 24, 2007) (confirming arbitration award clarified under variant of AAA Rule 50 where award was issued on February 27, 2007, and, as indicated by underlying docket, *see Oakwood Labs. v. Howrey Simon Arnold &*

*White, L.L.P.*, Nos. 1:04 CV 2270 & 1:05 CV 2070 (cons.) (N.D. Ohio), ECF No. 26-2 at 1, movant filed motion on March 19, 2007, within 20-day period set forth in applicable rule).

*Oakwood* is particularly instructive. There, when faced with arguments based both on a variant of AAA Rule 50 and on the arbitrator's inherent common-law authority, the court based its ruling solely on the former, noting that, "[u]pon review, . . . the arbitrator did not exceed his authority by issuing the 'clarification,'" since "[t]he AAA rules permit an arbitrator to correct 'any clerical, typographical, or computational errors in the award.'" *See Oakwood*, 2007 WL 1544577, at \*3; *see also E. Seaboard Constr.*, 553 F.3d at 4–6 (discussing common-law principles for guidance where court had "not had occasion to consider the application of" variant of AAA Rule 50, but ultimately adjudicating propriety of decision clarifying arbitration award based solely on the provisions of a variant of AAA Rule 50).

Despite the existence of this well-established case law, the vast majority of which was addressed in Caremark's own timely motion to recalculate the damages award, AHF does not even mention AAA Rule 50 in its motion. Instead, AHF completely ignores this agreed-upon limitation on the Arbitrator's authority to correct the Interim Award.

To the extent AHF intends to suggest that the Interim Award is subject to ongoing, discretionary modification at any time until a final award is transmitted, *see, e.g.,* AHF's 9/14/21 Mot. at 1, 2, 5, 6, 8, 11, 13, 14, 15, this argument, which is not supported by any case law, has no merit. The Arbitrator characterized the Interim Award as an "Interim Final Award." Interim Award at 1. The only issue that was "deferred to determination through a subsequent process" was the issue of attorney's fees and costs. *Id.* at 2, 59, ¶ 14. All other issues were resolved. Those issues were thus subject to AAA Rule 50, which does not differentiate between interim awards and final awards. *See* AAA Commercial R-50 (stating that party may request correction under AAA Rule

50 "[w]ithin 20 calendar days after the transmittal of *an award*"); *see also Bosack*, 586 F.3d at

1103 (stating that "an interim award may be deemed final for *functus officio* purposes if the award

states it is final, and if the arbitrator intended the award to be final").

In this case, Caremark timely submitted a motion for the Arbitrator to modify the damages

calculation in this matter. *See* Caremark's 8/29/21 Mot. at 1. AHF could have done so as well.

Instead, AHF waited until Caremark's motion was fully briefed and decided to submit its own

motion. *See* AHF's 9/14/21 Mot. at 1. As set forth below, the requests for relief in AHF's motion

all fall within the purview of AAA Rule 50. Because those requests were not made within the time

frame mandated by AAA Rule 50, they are time-barred.

A.    **AHF's Request to Correct the Paragraph of the Interim Award Listing $5,813,752, Rather than $5,831,752, as the Damages Purportedly Suffered by AHF in 2020 Is Untimely.**

AHF improperly seeks to correct the paragraph of the Interim Award listing $5,813,752,

rather than $5,831,752, as the damages purportedly suffered by AHF in 2020. *See* AHF's 9/14/21

Mot. at 14; *see also* Interim Award at 59, ¶ 12(e). AHF characterizes this as a "clerical error." *See*

*id*. This type of purported error falls squarely within the scope of AAA Rule 50. *See* AAA

Commercial R-50 (movant has 20 days seek "to correct any *clerical*, typographical, or

computational errors in the award") (emphasis added). Because AHF did not request this relief

until 36 days after the Interim Award was transmitted, the request was untimely and should be

denied.

B.    **AHF's Request to Modify the Interim Award to Include Damages for the Third Trimester of 2020 Is Untimely.**

AHF's request to modify the Interim Award to include damages for the third trimester of

2020 is likewise untimely. *See* AHF's 9/14/21 Mot. at 10, 14, & Ex. 1.

The Arbitrator awarded AHF $19,276,611 in damages, which included $5,813,752 for 2020. Interim Award at 59, ¶¶ 12(e), (f). AHF presented evidence that the recouped amount totaled $20,593,439.81, which included $5,831,751.61 for 2020. *See* Ex. C-71. AHF then presented the testimony of Megan Englehart, who stated that the recouped amount for the third trimester of 2020 was $2,865,141, as set forth in a report for the third trimester of 2020. *See* Day 3 Tr. at 485:11–486:2; Ex. J-11A. Ms. Englehart's testimony was that the total recoupment was $23,458,580.81, which included the third trimester of 2020. *See* Day 3 Tr. at 489:15–19.

AHF now seeks $2,864,537.83 for the third trimester of 2020. *See* AHF's 9/14/21 Mot. at 10, 14, & Ex. 1. In doing so, AHF, seeks to recompute the damages award within the meaning of AAA Rule 50. *See* AAA Commercial R-50. Because AHF did not request this relief until 36 days after the Interim Award was transmitted, the request was untimely and should be denied.

### C. AHF's Request to Modify the Interim Award to Include Damages for the First Trimester of 2021 Is Untimely.

AHF's request to modify the Interim Award to include damages for the first trimester of 2021 is also untimely. *See* AHF's 9/14/21 Mot. at 10, 14, & Ex. 1.

During the arbitration hearing, AHF did not present any evidence regarding the recouped amount for the first trimester of 2021 because no recoupment had occurred for that time period. Instead, AHF obtained injunctive relief addressing that trimester. *See* Interim Award at 59, ¶ 13.

AHF now states that it is seeking $3,905,907.20 for the first trimester of 2021. *See* AHF's 9/14/21 Mot. at 10, 14, & Ex. 1. In doing so, AHF, seeks to recompute the damages award within the meaning of AAA Rule 50. *See* AAA Commercial R-50.

Caremark will, of course, comply with the Arbitrator's injunction, subject to and without waiving its right to pursue judicial review of the Interim Award, including but not limited to under sections 10 and 11 of the Federal Arbitration Act. *See* 9 U.S.C. §§ 10, 11. But because AHF did

not request additional damages based on the first trimester of 2021 until 36 days after the Interim Award was transmitted, the request was untimely and should be denied. *See also McClatchy Newspapers v. Cent. Valley Typographical Union No. 46, Int'l Typographical Union*, 686 F.2d 731, 733 (9th Cir. 1982) ("Even assuming the availability of new evidence, it would not be appropriate for the arbitrator to consider such evidence and then redetermine the issues originally submitted to him.").

**D.     AHF's Request to Modify the Interim Award to Include Interest Is Untimely.**

AHF's request to modify the Interim Award to include prejudgment and postjudgment interest is also untimely. *See* AHF's 9/14/21 Mot. at 12, 15, & Ex. 1.

AHF did not seek prejudgment or postjudgment interest in its prehearing brief or its posthearing brief. *See* AHF's 4/1/21 Prehearing Br. at 27; AHF's 5/28/21 Posthearing Br. at 63. In addition, the Interim Award did not award prejudgment or postjudgment interest or leave the issue open for further deliberations. *See* Interim Award at 60.

AHF now seeks prejudgment interest of $1,966,126 and postjudgment interest at a daily rate of $3,034.97. *See* AHF's 9/14/21 Mot. at 12, 15, & Ex. 1. In doing so, AHF, seeks to recompute the damages award within the meaning of AAA Rule 50. *See* AAA Commercial R-50. Because AHF did not request this relief until 36 days after the Interim Award was transmitted, the request was untimely and should be denied.

**II.     Alternatively, If the Arbitrator Recalculates the Damages Awarded to AHF, Then the Arbitrator Should Use the Method Proposed by Caremark.**

Alternatively, if the Arbitrator recalculates the damages awarded to AHF for the time period after the second trimester of 2020, then the Arbitrator should use the method proposed by Caremark in its posthearing brief, its response to AHF's posthearing brief, and its motion to recalculate damages. As discussed in further detail below, the Arbitrator did not fully adopt either

Caremark's or AHF's damages theory when the Arbitrator issued the Interim Award. Now, AHF asks the Arbitrator to consider additional evidence of damages. *See* AHF's 9/14/21 Mot. at 10, 14, & Ex. 1. If the Arbitrator considers that evidence, the Arbitrator should do so in light of Caremark's proposed method for computing damages.

It is well established that, in a breach-of-contract action, the plaintiff, not the defendant, has the burden to prove and calculate damages. *See Gilmore v. Cohen*, 95 Ariz. 34, 36 (1963) ("The burden was on the plaintiffs to show the amount of their damages with reasonable certainty."); *Chartone, Inc. v. Bernini*, 207 Ariz. 162, 172 (Ct. App. 2004) ("It is plaintiffs' burden to establish adequate foundation for the documents that purportedly support their damages claim; to present a precise amount of damages 'with reasonable certainty,' and to provide any additional documentary or testimonial evidence that will assist a jury in determining the amount of damages." (internal citation omitted)); *Walter v. F.J. Simmons & Others*, 169 Ariz. 229, 236 (Ct. App. 1991) ("In an action for breach of contract, the burden clearly is on the plaintiff to prove the amount of his damages 'with reasonable certainty.'").

Once competent evidence of damages has been presented, the trier of fact—in this case, the Arbitrator—is responsible for determining whether the plaintiff has met this burden and also for calculating the damages according to the law. *See Rancho Pescado, Inc. v. Nw. Mut. Life Ins. Co.*, 140 Ariz. 174, 184 (Ct. App. 1984) (stating that there "must be a reasonable basis in the evidence for the trier of fact to fix computation when a dollar loss is claimed").

The proper measure of damages in a breach-of-contract dispute is the actual loss sustained. *See Tech. Const., Inc. v. City of Kingman*, 229 Ariz. 564, 569 (Ct. App. 2012); *Edwards v. Stewart Tit. & Trust. of Phoenix, Inc.*, 156 Ariz. 531, 535 (Ct. App. 1988). This is because "[t]he familiar aim of compensatory contract damages . . . is to yield the net amount of the losses caused and the

gains prevented by the breach of contract"—*i.e.*, "[t]he expected additions to the plaintiff's wealth and the actually resulting subtractions therefrom." *A.R.A. Mfg. Co. v. Pierce*, 86 Ariz. 136, 141 (1959) (internal quotation marks omitted).

Despite not having the burden to calculate potential damages for AHF, Caremark presented evidence for a proper calculation of AHF's damages. Bill Wellman of Caremark testified that, when one compares overall reimbursement rates for PNP networks and non-PNP networks for Medicare Part D plans, those rates are roughly equivalent. Day 5 Tr. at 714:5–16. Practically speaking, networks without a post-point-of-sale rebate reimburse pharmacies for claims at a much lower rate at the point of sale than those with a post-point-of-sale rebate. *Id.* at 714:22–715:2.

Mr. Wellman performed precise calculations establishing this fact through three examples. Day 5 Tr. at 695:23–727:4. As the Interim Award correctly found, the PNP allows high-performing pharmacies to pay lower rates, like the lower rates enjoyed by AHF. Interim Award at 55, ¶ 3.

Based on this evidentiary record, Caremark argued for an alternative damages methodology if the Arbitrator chose to award damages. In the section of Caremark's posthearing brief titled "AHF Presented No Proof of Damages," Caremark argued that AHF failed to carry its burden on damages and stated the calculation AHF should have performed:

> Even if AHF had proven a breach—which it did not—it failed to present any evidence of damages. Instead, it demonstrated, through the testimony of Ms. Englehart, the total amount of PNR fees assessed against AHF pharmacies in the PNP from 2016 to the present. Day 3 Tr. 489:6–19. This calculation does not represent the proper calculation of damages.
>
> Breach of contract damages are the actual loss sustained. *See Tech. Const., Inc. v. City of Kingman*, 229 Ariz. 564, 569 (Ct. App. 2012). As Mr. Wellman testified, absent the PNP, reimbursement rates would not be equivalent to the point-of sale rate AHF claims it anticipated. Day 5 Tr. 721:2–13. Indeed, making this intuitive point explicit, newer NEFs expressly state: "In the event changes are made to the Medicare Part D rules that impact this Medicare Part D

> Retail Network 73 Performance Network Program and Caremark
> determines in its sole discretion that such changes make the
> continuation of the Program infeasible, Caremark reserves the right
> to discontinue the Program" and deeper reimbursement rates will
> apply. *See, e.g.,* J642, NEF Network 73, eff. Jan. 1, 2020.

> Therefore, if AHF were entitled to damages—which it is not—the
> true measure of its damages would be any difference between the
> rates they were paid in the PNP and the rates they would have been
> paid if there were no PNP at all. Furthermore, we know that any
> delta between those two numbers is likely negligible because the
> reimbursement rates for PNP versus non-PNP Medicare networks is
> roughly the same. Day 5 Tr. 714:5–16. Regardless, as stated above,
> AHF failed to provide any evidence to establish the amount of its
> actual damages.

*See* Caremark's 5/28/21 Posthearing Br. at 11–12.

After reviewing AHF's posthearing brief, Caremark submitted a response in which it again

asserted that AHF had failed to properly demonstrate damages and again asserted the proper way

to do so if damages were awarded:

> Equally importantly, even if PNR fees were to disappear tomorrow,
> AHF pharmacies would not be reimbursed any more than they are
> now. They would still be paid in accordance with the plan sponsor's
> target rate. Day 5 Tr. 720:25–721:13 ("in the event CMS issued
> guidance that would make the—implementation of [Caremark's]
> performance program no longer feasible, that it would revert to the
> more historical and straight discount networks... where there is no
> network variable rate."). The law is clear that contract damages are
> the actual loss sustained. *See Tech. Const., Inc. v. City of Kingman,*
> 229 Ariz. 564, 569 (Ct. App. 2012). AHF presented no evidence to
> demonstrate that its actual loss is equal to the amount of PNR fees
> assessed in the PNP. Instead, as Mr. Kim put it during the Hearing,
> AHF presented a witness to "do [] some addition." Day 1 Tr. 56:1–
> 2; Day 3 Tr. 489:6–19. This is again for strategic reasons: there is
> no evidence that AHF has sustained any damages as there is no
> plausible business scenario where there would be no PNR fees
> without a change to the fixed reimbursement rates.

*See* Caremark's 6/18/21 Resp. to Posthearing Br. at 5–6 (internal footnote omitted).

After the Interim Award was published, Caremark filed its motion to recalculate the

damages award, arguing that the damages calculation used in the Interim Award was contrary to

16

law and inconsistent with the Interim Award's findings. *See* Caremark's 8/29/21 Mot. at 1–2. In

its motion, as in its posthearing brief and its response to AHF's posthearing brief, Caremark argued

that the proper damages calculation was what AHF would have paid in fees if the PNP did not

exist. Referring to the exhibit submitted with its motion, Caremark noted that:

> Column E lists the amount of DIR fees if AHF had received a known
> fixed rate DIR fee equaling the midpoint of the DIR variable rates
> (*e.g.*, 4% in a network with 3%–5% variable rates). This
> methodology results in no damages to AHF and an overpayment by
> Caremark of $1,808,847. This last calculation graphically illustrates
> how AHF benefited from the PNP.

*Id.* at 9 n. 5; *see also id.* Ex. A. Consistent with the Interim Award's finding that high-performing

pharmacies would pay lower fees under the PNP, AHF, a high-performing pharmacy, paid

substantially lower fees than it would have within a fixed-rate network.

To calculate an award consistent with the Interim Award's findings, Caremark analyzed

the amounts submitted into evidence in a manner consistent with those findings. Caremark stated

as follows:

> Exhibit A outlines the different DIR calculations that the Interim
> Award found as conscionable and enforceable side by side to
> illustrate how the Interim Award's damage calculation is beyond the
> terms of the contract and inequitable. Column B lists the amount of
> DIR fees paid each year under the PNP (*i.e.*, the damages currently
> awarded). Column C lists the amount of DIR fees that AHF would
> have paid by assigning it the minimum DIR rates disclosed in the
> annual NEFs (*i.e.*, eliminating the unknown variable rates). This
> methodology results in damages of $2,710,305. Column D lists the
> amount of DIR fees if Caremark imputed perfect performance
> instead of the network averages when insufficient data existed, as
> the Interim Award suggested. *See* Interim Award at 57, ¶ 8 ("A
> neutral and fair practice would have treated lack of data situations
> as perfect performance."). This methodology results in damages of
> just over $4,000.

*Id.* at 8–9 n. 5.

The Interim Award's holding that "known" DIR fees were conscionable and valid was not a theory advanced by either party during the arbitration hearing. *See* Interim Award at 56, ¶ 6. AHF argued that all DIR fees—including the known fees charged between 2006 and 2015—were not proper. In the Interim Award, the Arbitrator disagreed. Caremark argued that all DIR fees—including the known fees, and the variable-rate fees, charged between 2006 and 2021—were proper. In the Interim Award, the Arbitrator disagreed. Thus, neither party submitted a damages calculation used by the Arbitrator in calculating the Interim Award.

Caremark submits that, if the Arbitrator decides to modify the Interim Award to include damages after the second trimester of 2020, then the proper method for calculating those damages is either (1) "the actual loss sustained," as directed by Arizona law, *see* Hutchins Decl., Ex. 1, Column E, or (2) the amount of fees recouped by Caremark from AHF for that time period, less the amount of known, conscionable, and enforceable fees, *see* Hutchins Decl., Ex. 1, Column C.

Under the first approach, AHF suffered no harm by participating in the PNP. It continued to be a high-performing pharmacy in the third trimester of 2020 and the first trimester of 2021. As a result, it paid approximately $258,780 less in fees than it would have paid in a fixed-rate network. *See* Hutchins Decl., Ex. 1, Column E.

Under the second approach, AHF's damages were approximately $259,285 for the third trimester of 2020 and $401,359 for the first trimester of 2021, not, as AHF suggests, $2,864,537.83 for the former and $3,905,907.20 for the latter. *See* Hutchins Decl., Ex. 1, Column C.

## III.    AHF Is Not Entitled to Prejudgment Interest Because the Claims at Issue Are Not Liquidated.

Although an award of prejudgment interest is allowed as a matter of right on a "liquidated" claim, *Creative Builders v. Avenue Dev.*, 148 Ariz. 452, 457 (Ct. App. 1986), a claim is "liquidated" only when the amount due can be computed with exactness, without reliance upon

opinion or discretion, *John C. Lincoln Hosp. & Health Corp. v. Maricopa Cnty.*, 208 Ariz. 532, 544 (Ct. App. 2004).

If the claim is unliquidated, then no interest is allowed because the person liable does not know the sum owed and cannot be in default for not paying. *Arizona E. R.R. Co. v. Head*, 26 Ariz. 259, 262 (Ariz. 1924*); see* A.R.S. § 44–1201(D) ("A court shall not award . . . Prejudgment interest for any unliquidated, future, punitive, or exemplary damages. . ."); *see also Am. Eagle Fire Ins. Co. v. Van Denburgh*, 76 Ariz. 1, 6 (Ariz. 1953) (holding that interest on an unliquidated claim is available only from the date of judgment). Prejudgment interest does not accrue when the amount of damages must still be determined by opinion or discretion. *Pueblo Santa Fe Townhomes Owners' Ass'n v Transcontinental Ins. Co.*, 218 Ariz. 13, 24 (Ct. App. 2008).

Here, the damages awarded based on AHF's claims were not capable of precise computation and thus were not liquidated. The Arbitrator had discretion to calculate the exact damages award. AHF incorrectly asserts that the damages were liquidated "the moment the claw backs took place." AHF's 9/14/21 Mot. at. 13–14. They were not. The percentage of the recoupments that qualified as damages was an open question until the Arbitrator issued the Interim Award, which, over Caremark's objection, quantified those damages to encompass not just the lowest available DIR fees for 2016 through 2020, but *all* DIR fees for that time period. *See* Caremark's 8/29/21 Mot. at 1.

Because the damages were unliquidated, interest could not be applied until after the Interim Award was issued. As a result, for this alternative reason, AHF is not entitled to prejudgment interest.

## CONCLUSION

For these reasons, Caremark respectfully requests that the Arbitrator (1) deny AHF's motion in its entirety or, alternatively, (2) apply the methodology proposed by Caremark's motion

in order to recalculate the additional damages requested by AHF and deny AHF's request for prejudgment interest.

By: /s/ Kevin P. Shea

*Attorney for Respondents*

Kevin P. Shea
Jonathan M. Lively
Elizabeth Z. Meraz
Aon S. Hussain
NIXON PEABODY LLP
70 W. Madison Street, Suite 3500
Chicago, IL 60602-4224
Telephone: (312) 977-4400
Facsimile: (312) 977-4405
Dated: September 28, 2021

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused copy of the foregoing **Respondents' Opposition to Claimant's Motion to Correct, Clarify, and Complete the Interim Award** was served upon the following:

Andrew Kim, akim@kimriley.com
Rebecca Riley, rriley@kimriley.com
Tom Myers, tom.myers@aidshealth.org

William J. "Zak" Taylor, wtaylor@tsaoyee.com, AAA Arbitrator

Jen Mora, jenmora@adr.org, AAA Case Manager

*via electronic mail on this 28th day of September, 2021.*

By: */s/ Elizabeth Meraz*

| | | |
|---|---|---|
| AIDS HEALTHCARE FOUNDATION, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | AAA Case No. 01–19–0004–0127 |
| | ) | |
| CVS CAREMARK, a subsidiary of CVS | ) | |
| HEALTH CORPORATION, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## DECLARATION OF DAVID HUTCHINS

I, David Hutchins, declare as follows:

1.     I am an adult of sound mind with personal knowledge of the facts stated in this declaration and could testify competently to those facts if called on to do so.

2.     I am the Director of Retail Network Strategy for Caremark, LLC ("Caremark"), and am providing this declaration in support of Respondents' Opposition to Claimant's Motion to Correct, Clarify, and Complete the Interim Award in the arbitration referenced above.

3.     As Director of Retail Network Strategy, my responsibilities include overseeing the process that generates the specialty adherence measure for pharmacies that participate in Caremark's Performance Network Program.

4.     Attached as Exhibit 1 is a true copy of a Microsoft Excel spreadsheet showing the amounts recouped from AIDS Healthcare Foundation ("AHF") for the third trimester of 2020 ("T3 2020") and the first trimester of 2021 ("T1 2021").

5.     Those amounts, which are referred to in the spreadsheet as "DIR fees," are also referred to by Caremark as "Performance Network Rate fees" or "PNR fees."

6.　To create this spreadsheet, I used the values pulled from AHF's actual claims upon which fees were applied for T3 2020 and T1 2021 by Caremark's finance system, which handles billing and credits.

7.　The cells B2 through B4 of Exhibit 1 represent the actual billed DIR fees pulled from AHF's claims for T3 2020 and T1 2021 after Caremark's finance system had billed the fees.

8.　The cells C2 through C4 of Exhibit 1 represent what the DIR fees would have been if AHF had paid the fees based on the minimum known contractual DIR rate. To calculate these numbers, I used the lowest value of the DIR variable range.

9.　The cells D2 through D4 of Exhibit 1 represent the DIR fees AHF would have paid if categories with no data for the AHF pharmacies had been imputed as theoretical "perfect performance." This equates to the maximum possible performance score (i.e., 100%) for those categories being used to rescore the performance-ranking score for the AHF pharmacies. The revised performance-ranking score was then applied to the cut points established during the actual modeling process to determine what the rate would have been had the AHF pharmacies been scored with a "perfect" value for missing performance.

10.　The cells E2 through E4 of Exhibit 1 represent the DIR fees the AHF pharmacies would have paid had they been assigned the DIR midpoint between the minimum and maximum contractual DIR rates, regardless of where their performance-ranking score would have ranked them.

11.　The cells C6 through C8 of Exhibit 1 represent the difference between the actual DIR fees based on claims at the time of processing and the DIR fees based on the minimum known contractual DIR value.

12.     The cells D6 through D8 of Exhibit 1 represent the difference between the actual DIR fees based on claims at the time of processing and the DIR fees if the AHF pharmacies had been bestowed with "perfect performance" in categories with no data.

13.     The cells E6 through E8 of Exhibit 1 represent the difference between the actual DIR fees applied to AHF's claims by Caremark's finance system and the DIR fees if the AHF pharmacies had simply been assigned the DIR midpoint between the minimum and maximum rates rather than ranking them based on the performance-ranking score.

I declare under penalty of perjury pursuant to the laws of the State of Arizona that the foregoing facts are true and correct.

Executed on September 28, 2021, at Chandler, Arizona

By: /s/ *David S. Hutchns*

David Hutchins

# Exhibit 1

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Year and Trimester | Actual DIR Fees for 2020T3 and 2021T1 | DIR Fees Based on Contractual Floor of DIR Rates | DIR Fees When Scoring Lack-of-Data Situations as Perfect Performance | DIR Fees Based on Known DIR Midpoint Rates |
| 2 | Total | $6,770,799.76 | $6,110,155.07 | $6,594,451.41 | $7,029,580.13 |
| 3 | 2020T3 | $2,864,653.97 | $2,605,368.63 | $2,777,487.74 | $3,068,448.93 |
| 4 | 2021T1 | $3,906,145.79 | $3,504,786.44 | $3,816,963.67 | $3,961,131.20 |
| 5 | Difference | | | | |
| 6 | Total | $0.00 | -$660,644.69 | -$176,348.35 | $258,780.37 |
| 7 | 2020T3 | $0.00 | -$259,285.34 | -$87,166.23 | $203,794.96 |
| 8 | 2021T1 | $0.00 | -$401,359.35 | -$89,182.12 | $54,985.41 |

# EXHIBIT T

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION, ) | |
| ) | |
| Claimant, ) | |
| ) | |
| v. ) | AAA Case No. 01–19–0004–0127 |
| ) | |
| CVS CAREMARK, a subsidiary of CVS ) | |
| HEALTH CORPORATION, ) | |
| ) | |
| Respondents. ) | |
| ) | |

## RESPONDENTS' OBJECTION TO CLAIMANT'S
## STATEMENT OF TOTAL 2020 DAMAGES

Respondents Caremark, L.L.C., and CaremarkPCS, L.L.C. (together, "Caremark"), submit the following objection (the "Objection") to the "Statement of Claimant AIDS Healthcare Foundation of the Total Claw Back for Claw Back Program Year 2020 Taken by CVS Caremark" submitted on October 6, 2021 (the "Statement"):

On September 14, 2021, Claimant AIDS Healthcare Foundation ("AHF") filed a motion to "correct, clarify, and complete" the interim arbitration award dated August 3, 2021, and transmitted on August 9, 2021 (the "Interim Award"). *See* AHF's 9/14/21 Mot. In relevant part, AHF asked the Arbitrator to (1) correct the amount of AHF's alleged 2020 damages listed in paragraph 12(e) of page 59 of the Interim Award and (2) modify the Interim Award to include alleged damages for the third trimester of 2020.

On September 28, 2021, Caremark filed a response to AHF's motion (the "Response"). *See* Caremark's 9/28/21 Resp. In relevant part, Caremark argued that (1) AHF's motion was untimely because it was filed outside the 20-day deadline set forth in AAA Rule 50, and (2) if the Arbitrator recalculates the damages awarded to AHF to include damages for the third trimester of 2020, then

the Arbitrator should use the methodology set forth in Caremark's posthearing brief, Caremark's response to AHF's posthearing brief, and Caremark's motion to recalculate damages.

On October 5, 2021, the Arbitrator held a telephonic hearing in which the Arbitrator instructed AHF to make a submission regarding the "final" 2020 damages figure, noting that the Arbitrator was "reopening . . . the evidence for the limited purpose of getting the total damages number for [the] 2020 plan year . . . ." *See* 10/5/21 Hearing Tr. at 13:1–4, 15:5–6.

The Statement submitted by AHF contains a total 2020 damages figure of $8,696,289.44. This figure consists of the amounts set forth on Exhibit C-71 for the first and second trimesters of 2020, plus an additional amount of $2,864,537.83 for the third trimester of 2020. *See* Claimant's 10/6/21 Statement.

For the reasons set forth in the Response, which is attached to this objection as **Exhibit A** and incorporated by reference, Caremark objects to modifying the Interim Award to include the alleged damages proposed by AHF for the third trimester of 2020. The proposed modification should be denied because AHF's request is untimely. Alternatively, if the Arbitrator recalculates the damages awarded to AHF to include damages for the third trimester of 2020, then the Arbitrator should either (1) award AHF the actual loss sustained by participating in the PNP, an amount of $0, given that AHF paid approximately $203,795 less during the third trimester of 2020 than it would have paid in a fixed-rate network, or (2) award AHF the amount of fees recouped by Caremark from AHF for the third trimester of 2020, less the amount of known, conscionable, and enforceable fees, a figure of approximately $259,285. *See* Ex. A, Caremark's 9/28/21 Resp. at Hutchins Decl., Ex. 1, Columns C & E.

By: */s/ Kevin P. Shea*

*Attorney for Respondents*

Kevin P. Shea
Jonathan M. Lively
Elizabeth Z. Meraz
Aon S. Hussain
NIXON PEABODY LLP
70 W. Madison Street, Suite 3500
Chicago, IL 60602-4224
Telephone: (312) 977-4400
Facsimile: (312) 977-4405
Dated: September 28, 2021

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused copy of the foregoing **Respondents' Objection to Claimant's Statement of Total 2020 Damages** was served upon the following:

Andrew Kim, akim@kimriley.com
Rebecca Riley, rriley@kimriley.com
Tom Myers, tom.myers@aidshealth.org

William J. "Zak" Taylor, wtaylor@tsaoyee.com, AAA Arbitrator

Jen Mora, jenmora@adr.org, AAA Case Manager

*via electronic mail on this 18th day of October, 2021.*

By: */s/ Elizabeth Meraz*

# EXHIBIT A

| | | |
|---|---|---|
| AIDS HEALTHCARE FOUNDATION, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | AAA Case No. 01–19–0004–0127 |
| | ) | |
| CVS CAREMARK, a subsidiary of CVS | ) | |
| HEALTH CORPORATION, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

### RESPONDENTS' OPPOSITION TO CLAIMANT'S MOTION TO CORRECT, CLARIFY, AND COMPLETE THE INTERIM AWARD

Respondents Caremark, L.L.C., and CaremarkPCS, L.L.C. (together, "Caremark"), submit the following response in opposition to Claimant AIDS Healthcare Foundation's ("AHF") motion to correct, clarify, and complete the Interim Final Award dated August 3, 2021, and transmitted on August 9, 2021 (the "Interim Award").

### INTRODUCTION

AHF's motion asks the Arbitrator to (1) correct the amount of AHF's alleged 2020 damages listed in paragraph 12(e) of page 59 of the Interim Award, (2) modify the Interim Award to include alleged damages for the third trimester of 2020, (3) modify the Interim Award to include alleged damages for the first trimester of 2021, and (4) modify the Interim Award to include prejudgment and postjudgment interest. In total, AHF seeks to add $8,754,571.33, plus accruing postjudgment interest, to the Interim Award. AHF's motion is flawed for several reasons and should be denied in its entirety.

*First*, the motion is untimely. AHF did not submit the motion until September 14, 2021, 22 days after the 20-day deadline in AAA Rule 50. The parties expressly consented to be bound by

this rule when they agreed to arbitrate their disputes under the Commercial Arbitration Rules of the American Arbitration Association.

All of AHF's requests for relief fall within the scope of AAA Rule 50. These requests should have been made, if at all, in a timely motion filed under that rule. AHF failed to file a motion within the 20-day time period allotted by AAA Rule 50. The Arbitrator should hold AHF to the choice it voluntarily made and deny AHF's motion as time-barred.

*Second*, if the Arbitrator recalculates the damages awarded to AHF for the time period after the second trimester of 2020, then the Arbitrator should use the methodology set forth in Caremark's posthearing brief, Caremark's response to AHF's posthearing brief, and Caremark's motion to recalculate damages.

AHF submitted an alleged damages amount for the third trimester of 2020 into evidence. That amount was not awarded. AHF did not submit an alleged damages amount for the first trimester of 2021 into evidence because, at the time of the arbitration hearing, no recoupment had occurred for that time period. If the Arbitrator decides to modify the Interim Award to include damages for the second trimester of 2020 and the first trimester of 2021, then the proper method for calculating those damages is either (1) the actual loss sustained, as directed by Arizona law, or (2) the total amount of fees recouped by Caremark from AHF for that time period, less the amount of known, conscionable, and enforceable fees.

Under the first approach, AHF suffered no harm by participating in the PNP. It continued to be a high-performing pharmacy in the third trimester of 2020 and the first trimester of 2021. As a result, it paid approximately $258,780 less in fees than it would have paid in a fixed-rate network. *See* Hutchins Decl., Ex. 1, Column E.

Under the second approach, AHF's damages were approximately $259,285 for the third trimester of 2020 and $401,359 for the first trimester of 2021, not, as AHF suggests, $2,864,537.83 for the former and $3,905,907.20 for the latter. *See* Hutchins Decl., Ex. 1, Column C.

*Third*, AHF's request for postjudgment interest has no merit. If a claim is not liquidated, then a claimant cannot recover interest on the claim because the person liable does not know the sum owed and cannot be in default for not paying. Here, the damages awarded based on AHF's claims were not capable of precise computation and thus were not liquidated.

Specifically, the Arbitrator had discretion to calculate the exact damages award. The percentage of the recoupments that qualified as damages was an open question until the Arbitrator issued the Interim Award. Over Caremark's objection, the Interim Award quantified those damages to encompass not just the lowest available DIR fees for 2016 through 2020, but *all* DIR fees for that time period.

## PROCEDURAL HISTORY

After a five-day evidentiary hearing, the Arbitrator issued the Interim Award. In pertinent part, the Interim Award made the following findings of fact and conclusions of law:

Caremark's network-enrollment forms ("NEFs") "attempt to disclose the rates and network rebates . . . to be charged, if any." Interim Award at 55, ¶ 1. "Rebates have been in place for some networks since 2006." *Id.*, ¶ 2. NEFs "are presented in the Spring before the next plan year." *Id.* "AHF was free to accept or reject participating in each particular network . . . ." *Id.*

"The movement from fixed rebates to variable range rebates was a result of some pharmacies' efforts to differentiate themselves based on superior performance." *Id.*, ¶ 3. "The rebate ranges resulted in high scoring pharmacies paying a rebate smaller than would have been

the case if there was just a fixed rebate." *Id.* "The variable rates were introduced for the 2016 plan year." *Id.* at 56, ¶ 3.

"For the years 2006 through 2015, the DIR fees were fixed rates and thus knowable at the outset and at the Point of Sale." *Id.*, ¶ 6. The Interim Award found that ***these contract terms were not unconscionable. Thus, the fixed rate DIRs are enforceable as agreed.*" *Id.* (emphasis added).

The Interim Award then determined that, starting in 2016, the DIR rates were variable and unconscionable as implemented because they "were unknowable when the NEF was entered into and at the Point of Sale." *Id.*, ¶ 7 & at 58, ¶ 11. The Interim Award found a number of flaws with Caremark's calculation of variable DIR fees, including that they "were not actuarially based" or "based on sound statistical methodologies." *Id.* at 57, ¶ 8. Further, "[s]mall variances had a disproportionate impact," and "statistically insignificant sample sizes . . . worked to AHF's disadvantages." *Id.* In addition, the Interim Award determined that Caremark's practice of imputing average scores when no data existed was "arbitrary" and not appropriate. *Id.*

Based on these flaws, which only affected AHF's scores within the variable range, the Interim Award found that Caremark breached the covenant of good faith and fair dealing and that the DIRs as implemented were unconscionable. *Id.* at 58, ¶¶ 10–11. While the noted flaws affected AHF's scoring, the Interim Award did not calculate the increase in DIR fees paid by AHF because of those flaws.

Instead, the Interim Award simply awarded AHF a return of 100% of its DIR fees from 2016 through 2020, including the portion of fees resulting from the application of the minimum DIR rate. *Id.*, ¶ 12. In other words, rather than award AHF damages based on the contractual floor of DIR fees derived from the lowest DIR rates known at the outset, this methodology eliminated all of AHF's DIR fees, resulting in an award of $19,276,611.

4

The evidence presented at the hearing regarding the minimum amount of DIR fees collectible from AHF was clear and unambiguous. The Interim Award cites to the annual NEFs, which clearly disclose the range of fees (the minimum and the maximum). *See id.* at 8–29, ¶¶ 26–37. Importantly, Dr. Brandon Patchett, AHF's pharmacist-in-charge, testified on cross-examination that AHF understood that, even with perfect scores, pharmacies participating in the PNP would be subject to the minimum DIR rates for a given network:

> Q: And, sir, your understanding [is] that AHF's performance determines where on that 3 to 5 percent range AHF will fall, correct?
>
> A: That's correct. And with 100 percent perfect performance, we will still get a 3 percent charge back.

Day 2 Tr. at 239:25–240:10.

On August 29, 2021, within 20 days after the Interim Award was transmitted, Caremark filed a motion asking the Arbitrator to modify the Interim Award's damages calculation to award AHF damages based on the contractual floor of DIR fees under the NEFs, not based on a full refund of those fees. AHF did not file a motion within this 20-day period. Nor did it file a cross-motion in responding to Caremark's motion. *See* AHF's 9/8/21 Resp.

On September 11, 2021, the Arbitrator issued an order denying Caremark's motion. The Arbitrator found that, "[a]s stated in the Interim Award, Claimant is entitled to damages in the amount of \$19,276,611. *See* 9/11/21 Order at 2.

Subsequently, on September 14, 2021, after Caremark's motion had been fully briefed and ruled upon, AHF filed its own motion to "correct, clarify, and complete" the Interim Award. *See* AHF's 9/14/21 Mot. That untimely motion is currently before the Arbitrator. For the reasons set forth below, it should be denied.

## LEGAL STANDARDS

AAA Rule 50 states as follows:

> Within 20 calendar days after the transmittal of an award, any party,
> upon notice to the other parties, may request the arbitrator, through
> the AAA, to correct any clerical, typographical, or computational
> errors in the award. The arbitrator is not empowered to redetermine
> the merits of any claim already decided. The other parties shall be
> given 10 calendar days to respond to the request. The arbitrator shall
> dispose of the request within 20 calendar days after transmittal by
> the AAA to the arbitrator of the request and any response thereto.

AAA Commercial R-50. "This rule essentially codifies the common law doctrine of *functus officio*,
which forbids an arbitrator to redetermine an issue which he has already decided." *Bosack v.
Soward*, 586 F.3d 1096, 1103 (9th Cir. 2009) (internal quotation marks omitted).

As the U.S. Supreme Court has recognized, "[t]he notion that a filing deadline can be
complied with by filing sometime after the deadline falls due is . . . a notion without limiting
principle." *See U.S. v. Locke*, 471 U.S. 84, 100–01 (1985). "If 1-day late filings are acceptable, 10-
day late filings might be equally acceptable, and so on in a cascade of exceptions that would engulf
the rule erected by the filing deadline . . . ." *Id.* at 101. It follows that, "if the concept of a filing
deadline is to have any content, the deadline must be enforced." *Id.; see also Gross v. Town of
Cicero, Ill.*, 528 F.3d 498, 499–500 (7th Cir. 2006) ("Courts cannot operate without setting and
enforcing deadlines.").

## ARGUMENT

### I.    All of AHF's Requests for Relief Should Be Denied Because They Are Untimely Under AAA Rule 50.

Caremark does not dispute that an arbitrator has the inherent authority to clarify and correct
an arbitration award. *Compare* Caremark's 8/29/21 Mot. at 2–3 *with* AHF's 9/14/21 Mot. at 5. But
where exercising that authority would require an arbitrator to disregard a mutually agreed-upon,
rule-based deadline for taking the requested action, the arbitrator must adhere to the deadline.

6

This is because, as one of the cases cited by AHF recognizes, the AAA rules become "part and parcel of the arbitration contract" when, as in this case, the parties "agree[] that the AAA rules w[ill] govern the arbitration process." *See E. Seaboard Constr. Co. v. Gray Constr., Inc.*, 553 F.3d 1, 4 (1st Cir. 2008) (reversing vacation of arbitration award clarified under variant of AAA Rule 50 for purposes of allocating damages where party timely filed motion under 20-day deadline set forth in the rule) (internal quotation marks omitted); *see also* AHF's 9/14/21 Mot. at 7.

To suggest, as AHF has, that an arbitrator has unlimited inherent authority to ignore a clear-cut procedural rule such as AAA Rule 50 is "too sweeping" an interpretation of that authority. *See Cent. W. Va. Energy v. Bayer Cropscience, LP*, 645 F. 3d 267, 276 (4th Cir. 2011). Indeed, "[i]f the arbitrator ignores the plainly stated procedural rules incorporated in the agreement to arbitrate while arriving at the arbitral award, the award is subject to a manifest disregard of the law challenge." *Kasher Davidson Secs. Corp. v. Mscisz*, 531 F.3d 68, 77 (1st Cir. 2008).

It is telling that *none* of the cases on which AHF relies to support its untimely request for relief involved a situation where an arbitrator exceeded the explicit deadline in AAA Rule 50, or one of its variants, in favor of exercising the arbitrator's inherent authority to clarify and correct an award. Four of the cases cited by AHF involved timely requests under the AAA rules. *See E. Seaboard Constr.*, 553 F.3d at 2, 4 (award was issued on September 21, 2007, and, as indicated by underlying docket, *see E. Seaboard Constr. Co. v. Gray Constr., Inc.*, No. 2:08–cv–00037–GZS (D. Me.), ECF No. 4 at 3, movant filed motion under variant of AAA Rule 50 on September 26, 2007, within 20-day period set forth in applicable rule); *Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, Local 182B v. Excelsior Foundry Co.*, 56 F.3d 844, 848–469 (7th Cir. 1995) (AAA labor-arbitration rules in effect at time did not contain time limit governing request to clarify arbitration award and request was made within time period contemplated by award itself); *Play*

*Star, S.A. de C.V. v. Haschel Export Corp.*, No. 02 Civ. 7364(LLS), 2003 WL 1961625, at *2 (S.D.N.Y. Apr. 28, 2003) (award was issued on June 28, 2002, and movant filed motion under variant of AAA Rule 50 on July 15, 2002, within 30-day period set forth in applicable rule); *A.P. Seating USA, LLC v. Circuit of the Americas LLC*, No. A–14–CA–058–SS, 2014 WL 3420805, at *1, 2 (W.D. Tex. Jul. 10, 2014) (award was issued on October 21, 2013, and, as indicated by underlying docket, *see A.P. Seating USA, LLC v. Circuit of the Americas LLC*, No. A–14–CA– 058–SS (W.D. Tex.), ECF No. 15, at 55, movant filed motion under variant of AAA Rule 50 on November 8, 2013, within 20-day period set forth in applicable rule).

The other cases cited by AHF did not involve the AAA rules at all and therefore did not present situations in which the arbitrator exceeded the explicit 20-day deadline of AAA Rule 50, which, again, is what AHF asks the Arbitrator to do here. *See Martel v. Ensco Offshore Co.*, 449 Fed. App'x 352, 356 (5th Cir. 2011) ("The parties in this case never entered into a written arbitration agreement adopting any formal rules of arbitration, such as those promulgated by the American Arbitration Association."); *Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1263–64, 1272 (10th Cir. 1999) (relying on common-law principles in labor arbitration, under collective-bargaining agreement, without reference to the rules of a particular arbitration association); *Int'l Bhd. of Teamsters, Local 631 v. Silver State Disposal Serv.*, 109 F.3d 1409, 1410–11 (9th Cir. 1997) (relying on common-law principles in labor arbitration where, "[p]ursuant to the collective bargaining agreement, the grievance was submitted to an arbitrator for resolution," without reference to the rules of a particular arbitration association); *Colonial Penn Ins. Co. Omaha Indem. Co.*, 943 F.2d 327, 329, 331 (3d Cir. 1991) (relying on common-law principles where "[a] panel of three arbitrators was formed, whereby each party appointed an arbitrator and the two arbitrators together selected an umpire," without reference to the rules of a particular

arbitration association); *Gen. re Life Corp. v. Lincoln Nat'l Life Ins. Co.*, 273 F. Supp. 3d 307, 319–20 (D. Conn. 2017) (relying on common-law principles where "[t]he dispute was submitted to a panel of three arbitrators," without reference to the rules of a particular arbitration association); *Waveform Telemedia, Inc. v. Panorama Weather N. Am., Inc.*, No. 06 Civ. 5270 CMMDF, 06 CIV. 5271 CMMDF, 2007 WL 678731, at *1 (S.D.N.Y. Mar. 2, 2007) (noting that "[t]he parties submitted to arbitration before National Arbitration and Mediation," not the AAA); *Clarendon Nat'l Ins. Co. v. TIG Reins. Co.*, 183 F.R.D. 112, 114, 115–17 (S.D.N.Y. 1998) (relying on common-law principles where the dispute was arbitrated without reference to the rules of a particular arbitration association).

In fact, multiple cases *not* cited by AHF further confirm that, when the AAA's rules apply, courts evaluate an arbitrator's decision to modify an arbitration award based on those rules and the deadlines imposed by them. *See Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 471, 472–73 (5th Cir. 2012) (affirming confirmation of arbitration award corrected under variant of AAA Rule 50 where award was issued on March 7, 2011, and movant filed motion on March 25, 2011, within 20-day period set forth in applicable rule); *Laclede Grp., Inc. v. NiSource Inc.*, No. 1:06–cv–1846–LJM–JMS, 2007 WL 9752730, at *1, 2–3 (S.D. Ind. July 24, 2007) (confirming arbitration award corrected under variant of AAA Rule 50 where award was issued on September 28, 2006, and movant filed motion on October 18, 2006, within 20-day period set forth in applicable rule); *Oakwood Labs. v. Howrey Simon Arnold & White, L.L.P.*, Nos. 1:04 CV 2270 & 1:05 CV 2070 (cons.), 2007 WL 1544577, at *1–3 (N.D. Ohio May 24, 2007) (confirming arbitration award clarified under variant of AAA Rule 50 where award was issued on February 27, 2007, and, as indicated by underlying docket, *see Oakwood Labs. v. Howrey Simon Arnold &*

*White, L.L.P.*, Nos. 1:04 CV 2270 & 1:05 CV 2070 (cons.) (N.D. Ohio), ECF No. 26-2 at 1, movant filed motion on March 19, 2007, within 20-day period set forth in applicable rule).

*Oakwood* is particularly instructive. There, when faced with arguments based both on a variant of AAA Rule 50 and on the arbitrator's inherent common-law authority, the court based its ruling solely on the former, noting that, "[u]pon review, . . . the arbitrator did not exceed his authority by issuing the 'clarification,'" since "[t]he AAA rules permit an arbitrator to correct 'any clerical, typographical, or computational errors in the award.'" *See Oakwood*, 2007 WL 1544577, at *3; *see also E. Seaboard Constr.*, 553 F.3d at 4–6 (discussing common-law principles for guidance where court had "not had occasion to consider the application of" variant of AAA Rule 50, but ultimately adjudicating propriety of decision clarifying arbitration award based solely on the provisions of a variant of AAA Rule 50).

Despite the existence of this well-established case law, the vast majority of which was addressed in Caremark's own timely motion to recalculate the damages award, AHF does not even mention AAA Rule 50 in its motion. Instead, AHF completely ignores this agreed-upon limitation on the Arbitrator's authority to correct the Interim Award.

To the extent AHF intends to suggest that the Interim Award is subject to ongoing, discretionary modification at any time until a final award is transmitted, *see, e.g.,* AHF's 9/14/21 Mot. at 1, 2, 5, 6, 8, 11, 13, 14, 15, this argument, which is not supported by any case law, has no merit. The Arbitrator characterized the Interim Award as an "Interim Final Award." Interim Award at 1. The only issue that was "deferred to determination through a subsequent process" was the issue of attorney's fees and costs. *Id.* at 2, 59, ¶ 14. All other issues were resolved. Those issues were thus subject to AAA Rule 50, which does not differentiate between interim awards and final awards. *See* AAA Commercial R-50 (stating that party may request correction under AAA Rule

50 "[w]ithin 20 calendar days after the transmittal of *an award*"); *see also Bosack*, 586 F.3d at 1103 (stating that "an interim award may be deemed final for *functus officio* purposes if the award states it is final, and if the arbitrator intended the award to be final").

In this case, Caremark timely submitted a motion for the Arbitrator to modify the damages calculation in this matter. *See* Caremark's 8/29/21 Mot. at 1. AHF could have done so as well. Instead, AHF waited until Caremark's motion was fully briefed and decided to submit its own motion. *See* AHF's 9/14/21 Mot. at 1. As set forth below, the requests for relief in AHF's motion all fall within the purview of AAA Rule 50. Because those requests were not made within the time frame mandated by AAA Rule 50, they are time-barred.

### A. AHF's Request to Correct the Paragraph of the Interim Award Listing $5,813,752, Rather than $5,831,752, as the Damages Purportedly Suffered by AHF in 2020 Is Untimely.

AHF improperly seeks to correct the paragraph of the Interim Award listing $5,813,752, rather than $5,831,752, as the damages purportedly suffered by AHF in 2020. *See* AHF's 9/14/21 Mot. at 14; *see also* Interim Award at 59, ¶ 12(e). AHF characterizes this as a "clerical error." *See id.* This type of purported error falls squarely within the scope of AAA Rule 50. *See* AAA Commercial R-50 (movant has 20 days seek "to correct any *clerical*, typographical, or computational errors in the award") (emphasis added). Because AHF did not request this relief until 36 days after the Interim Award was transmitted, the request was untimely and should be denied.

### B. AHF's Request to Modify the Interim Award to Include Damages for the Third Trimester of 2020 Is Untimely.

AHF's request to modify the Interim Award to include damages for the third trimester of 2020 is likewise untimely. *See* AHF's 9/14/21 Mot. at 10, 14, & Ex. 1.

The Arbitrator awarded AHF $19,276,611 in damages, which included $5,813,752 for 2020. Interim Award at 59, ¶¶ 12(e), (f). AHF presented evidence that the recouped amount totaled $20,593,439.81, which included $5,831,751.61 for 2020. *See* Ex. C-71. AHF then presented the testimony of Megan Englehart, who stated that the recouped amount for the third trimester of 2020 was $2,865,141, as set forth in a report for the third trimester of 2020. *See* Day 3 Tr. at 485:11–486:2; Ex. J-11A. Ms. Englehart's testimony was that the total recoupment was $23,458,580.81, which included the third trimester of 2020. *See* Day 3 Tr. at 489:15–19.

AHF now seeks $2,864,537.83 for the third trimester of 2020. *See* AHF's 9/14/21 Mot. at 10, 14, & Ex. 1. In doing so, AHF, seeks to recompute the damages award within the meaning of AAA Rule 50. *See* AAA Commercial R-50. Because AHF did not request this relief until 36 days after the Interim Award was transmitted, the request was untimely and should be denied.

## C.     AHF's Request to Modify the Interim Award to Include Damages for the First Trimester of 2021 Is Untimely.

AHF's request to modify the Interim Award to include damages for the first trimester of 2021 is also untimely. *See* AHF's 9/14/21 Mot. at 10, 14, & Ex. 1.

During the arbitration hearing, AHF did not present any evidence regarding the recouped amount for the first trimester of 2021 because no recoupment had occurred for that time period. Instead, AHF obtained injunctive relief addressing that trimester. *See* Interim Award at 59, ¶ 13.

AHF now states that it is seeking $3,905,907.20 for the first trimester of 2021. *See* AHF's 9/14/21 Mot. at 10, 14, & Ex. 1. In doing so, AHF, seeks to recompute the damages award within the meaning of AAA Rule 50. *See* AAA Commercial R-50.

Caremark will, of course, comply with the Arbitrator's injunction, subject to and without waiving its right to pursue judicial review of the Interim Award, including but not limited to under sections 10 and 11 of the Federal Arbitration Act. *See* 9 U.S.C. §§ 10, 11. But because AHF did

not request additional damages based on the first trimester of 2021 until 36 days after the Interim Award was transmitted, the request was untimely and should be denied. *See also McClatchy Newspapers v. Cent. Valley Typographical Union No. 46, Int'l Typographical Union*, 686 F.2d 731, 733 (9th Cir. 1982) ("Even assuming the availability of new evidence, it would not be appropriate for the arbitrator to consider such evidence and then redetermine the issues originally submitted to him.").

### D. AHF's Request to Modify the Interim Award to Include Interest Is Untimely.

AHF's request to modify the Interim Award to include prejudgment and postjudgment interest is also untimely. *See* AHF's 9/14/21 Mot. at 12, 15, & Ex. 1.

AHF did not seek prejudgment or postjudgment interest in its prehearing brief or its posthearing brief. *See* AHF's 4/1/21 Prehearing Br. at 27; AHF's 5/28/21 Posthearing Br. at 63. In addition, the Interim Award did not award prejudgment or postjudgment interest or leave the issue open for further deliberations. *See* Interim Award at 60.

AHF now seeks prejudgment interest of $1,966,126 and postjudgment interest at a daily rate of $3,034.97. *See* AHF's 9/14/21 Mot. at 12, 15, & Ex. 1. In doing so, AHF, seeks to recompute the damages award within the meaning of AAA Rule 50. *See* AAA Commercial R-50. Because AHF did not request this relief until 36 days after the Interim Award was transmitted, the request was untimely and should be denied.

### II. Alternatively, If the Arbitrator Recalculates the Damages Awarded to AHF, Then the Arbitrator Should Use the Method Proposed by Caremark.

Alternatively, if the Arbitrator recalculates the damages awarded to AHF for the time period after the second trimester of 2020, then the Arbitrator should use the method proposed by Caremark in its posthearing brief, its response to AHF's posthearing brief, and its motion to recalculate damages. As discussed in further detail below, the Arbitrator did not fully adopt either

Caremark's or AHF's damages theory when the Arbitrator issued the Interim Award. Now, AHF

asks the Arbitrator to consider additional evidence of damages. *See* AHF's 9/14/21 Mot. at 10, 14,

& Ex. 1. If the Arbitrator considers that evidence, the Arbitrator should do so in light of Caremark's

proposed method for computing damages.

It is well established that, in a breach-of-contract action, the plaintiff, not the defendant,

has the burden to prove and calculate damages. *See Gilmore v. Cohen*, 95 Ariz. 34, 36 (1963)

("The burden was on the plaintiffs to show the amount of their damages with reasonable

certainty."); *Chartone, Inc. v. Bernini*, 207 Ariz. 162, 172 (Ct. App. 2004) ("It is plaintiffs' burden

to establish adequate foundation for the documents that purportedly support their damages claim;

to present a precise amount of damages 'with reasonable certainty,' and to provide any additional

documentary or testimonial evidence that will assist a jury in determining the amount of damages."

(internal citation omitted)); *Walter v. F.J. Simmons & Others*, 169 Ariz. 229, 236 (Ct. App. 1991)

("In an action for breach of contract, the burden clearly is on the plaintiff to prove the amount of

his damages 'with reasonable certainty.'").

Once competent evidence of damages has been presented, the trier of fact—in this case,

the Arbitrator—is responsible for determining whether the plaintiff has met this burden and also

for calculating the damages according to the law. *See Rancho Pescado, Inc. v. Nw. Mut. Life Ins.

Co.*, 140 Ariz. 174, 184 (Ct. App. 1984) (stating that there "must be a reasonable basis in the

evidence for the trier of fact to fix computation when a dollar loss is claimed").

The proper measure of damages in a breach-of-contract dispute is the actual loss sustained.

*See Tech. Const., Inc. v. City of Kingman*, 229 Ariz. 564, 569 (Ct. App. 2012); *Edwards v. Stewart

Tit. & Trust. of Phoenix, Inc.*, 156 Ariz. 531, 535 (Ct. App. 1988). This is because "[t]he familiar

aim of compensatory contract damages . . . is to yield the net amount of the losses caused and the

gains prevented by the breach of contract"—*i.e.*, "[t]he expected additions to the plaintiff's wealth and the actually resulting subtractions therefrom." *A.R.A. Mfg. Co. v. Pierce*, 86 Ariz. 136, 141 (1959) (internal quotation marks omitted).

Despite not having the burden to calculate potential damages for AHF, Caremark presented evidence for a proper calculation of AHF's damages. Bill Wellman of Caremark testified that, when one compares overall reimbursement rates for PNP networks and non-PNP networks for Medicare Part D plans, those rates are roughly equivalent. Day 5 Tr. at 714:5–16. Practically speaking, networks without a post-point-of-sale rebate reimburse pharmacies for claims at a much lower rate at the point of sale than those with a post-point-of-sale rebate. *Id.* at 714:22–715:2.

Mr. Wellman performed precise calculations establishing this fact through three examples. Day 5 Tr. at 695:23–727:4. As the Interim Award correctly found, the PNP allows high-performing pharmacies to pay lower rates, like the lower rates enjoyed by AHF. Interim Award at 55, ¶ 3.

Based on this evidentiary record, Caremark argued for an alternative damages methodology if the Arbitrator chose to award damages. In the section of Caremark's posthearing brief titled "AHF Presented No Proof of Damages," Caremark argued that AHF failed to carry its burden on damages and stated the calculation AHF should have performed:

> Even if AHF had proven a breach—which it did not—it failed to present any evidence of damages. Instead, it demonstrated, through the testimony of Ms. Englehart, the total amount of PNR fees assessed against AHF pharmacies in the PNP from 2016 to the present. Day 3 Tr. 489:6–19. This calculation does not represent the proper calculation of damages.

> Breach of contract damages are the actual loss sustained. *See Tech. Const., Inc. v. City of Kingman,* 229 Ariz. 564, 569 (Ct. App. 2012). As Mr. Wellman testified, absent the PNP, reimbursement rates would not be equivalent to the point-of sale rate AHF claims it anticipated. Day 5 Tr. 721:2–13. Indeed, making this intuitive point explicit, newer NEFs expressly state: "In the event changes are made to the Medicare Part D rules that impact this Medicare Part D

Retail Network 73 Performance Network Program and Caremark determines in its sole discretion that such changes make the continuation of the Program infeasible, Caremark reserves the right to discontinue the Program" and deeper reimbursement rates will apply. *See, e.g.,* J642, NEF Network 73, eff. Jan. 1, 2020.

Therefore, if AHF were entitled to damages—which it is not—the true measure of its damages would be any difference between the rates they were paid in the PNP and the rates they would have been paid if there were no PNP at all. Furthermore, we know that any delta between those two numbers is likely negligible because the reimbursement rates for PNP versus non-PNP Medicare networks is roughly the same. Day 5 Tr. 714:5–16. Regardless, as stated above, AHF failed to provide any evidence to establish the amount of its actual damages.

*See* Caremark's 5/28/21 Posthearing Br. at 11–12.

After reviewing AHF's posthearing brief, Caremark submitted a response in which it again asserted that AHF had failed to properly demonstrate damages and again asserted the proper way to do so if damages were awarded:

Equally importantly, even if PNR fees were to disappear tomorrow, AHF pharmacies would not be reimbursed any more than they are now. They would still be paid in accordance with the plan sponsor's target rate. Day 5 Tr. 720:25–721:13 ("in the event CMS issued guidance that would make the—implementation of [Caremark's] performance program no longer feasible, that it would revert to the more historical and straight discount networks... where there is no network variable rate."). The law is clear that contract damages are the actual loss sustained. *See Tech. Const., Inc. v. City of Kingman,* 229 Ariz. 564, 569 (Ct. App. 2012). AHF presented no evidence to demonstrate that its actual loss is equal to the amount of PNR fees assessed in the PNP. Instead, as Mr. Kim put it during the Hearing, AHF presented a witness to "do [] some addition." Day 1 Tr. 56:1–2; Day 3 Tr. 489:6–19. This is again for strategic reasons: there is no evidence that AHF has sustained any damages as there is no plausible business scenario where there would be no PNR fees without a change to the fixed reimbursement rates.

*See* Caremark's 6/18/21 Resp. to Posthearing Br. at 5–6 (internal footnote omitted).

After the Interim Award was published, Caremark filed its motion to recalculate the damages award, arguing that the damages calculation used in the Interim Award was contrary to

law and inconsistent with the Interim Award's findings. *See* Caremark's 8/29/21 Mot. at 1–2. In its motion, as in its posthearing brief and its response to AHF's posthearing brief, Caremark argued that the proper damages calculation was what AHF would have paid in fees if the PNP did not exist. Referring to the exhibit submitted with its motion, Caremark noted that:

> Column E lists the amount of DIR fees if AHF had received a known fixed rate DIR fee equaling the midpoint of the DIR variable rates (*e.g.*, 4% in a network with 3%–5% variable rates). This methodology results in no damages to AHF and an overpayment by Caremark of $1,808,847. This last calculation graphically illustrates how AHF benefited from the PNP.

*Id.* at 9 n. 5; *see also id.* Ex. A. Consistent with the Interim Award's finding that high-performing pharmacies would pay lower fees under the PNP, AHF, a high-performing pharmacy, paid substantially lower fees than it would have within a fixed-rate network.

To calculate an award consistent with the Interim Award's findings, Caremark analyzed the amounts submitted into evidence in a manner consistent with those findings. Caremark stated as follows:

> Exhibit A outlines the different DIR calculations that the Interim Award found as conscionable and enforceable side by side to illustrate how the Interim Award's damage calculation is beyond the terms of the contract and inequitable. Column B lists the amount of DIR fees paid each year under the PNP (*i.e.*, the damages currently awarded). Column C lists the amount of DIR fees that AHF would have paid by assigning it the minimum DIR rates disclosed in the annual NEFs (*i.e.*, eliminating the unknown variable rates). This methodology results in damages of $2,710,305. Column D lists the amount of DIR fees if Caremark imputed perfect performance instead of the network averages when insufficient data existed, as the Interim Award suggested. *See* Interim Award at 57, ¶ 8 ("A neutral and fair practice would have treated lack of data situations as perfect performance."). This methodology results in damages of just over $4,000.

*Id.* at 8–9 n. 5.

The Interim Award's holding that "known" DIR fees were conscionable and valid was not a theory advanced by either party during the arbitration hearing. *See* Interim Award at 56, ¶ 6. AHF argued that all DIR fees—including the known fees charged between 2006 and 2015—were not proper. In the Interim Award, the Arbitrator disagreed. Caremark argued that all DIR fees—including the known fees, and the variable-rate fees, charged between 2006 and 2021—were proper. In the Interim Award, the Arbitrator disagreed. Thus, neither party submitted a damages calculation used by the Arbitrator in calculating the Interim Award.

Caremark submits that, if the Arbitrator decides to modify the Interim Award to include damages after the second trimester of 2020, then the proper method for calculating those damages is either (1) "the actual loss sustained," as directed by Arizona law, *see* Hutchins Decl., Ex. 1, Column E, or (2) the amount of fees recouped by Caremark from AHF for that time period, less the amount of known, conscionable, and enforceable fees, *see* Hutchins Decl., Ex. 1, Column C.

Under the first approach, AHF suffered no harm by participating in the PNP. It continued to be a high-performing pharmacy in the third trimester of 2020 and the first trimester of 2021. As a result, it paid approximately $258,780 less in fees than it would have paid in a fixed-rate network. *See* Hutchins Decl., Ex. 1, Column E.

Under the second approach, AHF's damages were approximately $259,285 for the third trimester of 2020 and $401,359 for the first trimester of 2021, not, as AHF suggests, $2,864,537.83 for the former and $3,905,907.20 for the latter. *See* Hutchins Decl., Ex. 1, Column C.

## III.    AHF Is Not Entitled to Prejudgment Interest Because the Claims at Issue Are Not Liquidated.

Although an award of prejudgment interest is allowed as a matter of right on a "liquidated" claim, *Creative Builders v. Avenue Dev.*, 148 Ariz. 452, 457 (Ct. App. 1986), a claim is "liquidated" only when the amount due can be computed with exactness, without reliance upon

opinion or discretion, *John C. Lincoln Hosp. & Health Corp. v. Maricopa Cnty.*, 208 Ariz. 532, 544 (Ct. App. 2004).

If the claim is unliquidated, then no interest is allowed because the person liable does not know the sum owed and cannot be in default for not paying. *Arizona E. R.R. Co. v. Head*, 26 Ariz. 259, 262 (Ariz. 1924); *see* A.R.S. § 44–1201(D) ("A court shall not award . . . Prejudgment interest for any unliquidated, future, punitive, or exemplary damages. . ."); *see also Am. Eagle Fire Ins. Co. v. Van Denburgh*, 76 Ariz. 1, 6 (Ariz. 1953) (holding that interest on an unliquidated claim is available only from the date of judgment). Prejudgment interest does not accrue when the amount of damages must still be determined by opinion or discretion. *Pueblo Santa Fe Townhomes Owners' Ass'n v Transcontinental Ins. Co.*, 218 Ariz. 13, 24 (Ct. App. 2008).

Here, the damages awarded based on AHF's claims were not capable of precise computation and thus were not liquidated. The Arbitrator had discretion to calculate the exact damages award. AHF incorrectly asserts that the damages were liquidated "the moment the claw backs took place." AHF's 9/14/21 Mot. at. 13–14. They were not. The percentage of the recoupments that qualified as damages was an open question until the Arbitrator issued the Interim Award, which, over Caremark's objection, quantified those damages to encompass not just the lowest available DIR fees for 2016 through 2020, but *all* DIR fees for that time period. *See* Caremark's 8/29/21 Mot. at 1.

Because the damages were unliquidated, interest could not be applied until after the Interim Award was issued. As a result, for this alternative reason, AHF is not entitled to prejudgment interest.

## CONCLUSION

For these reasons, Caremark respectfully requests that the Arbitrator (1) deny AHF's motion in its entirety or, alternatively, (2) apply the methodology proposed by Caremark's motion

in order to recalculate the additional damages requested by AHF and deny AHF's request for

prejudgment interest.

By: */s/ Kevin P. Shea*

*Attorney for Respondents*

Kevin P. Shea
Jonathan M. Lively
Elizabeth Z. Meraz
Aon S. Hussain
NIXON PEABODY LLP
70 W. Madison Street, Suite 3500
Chicago, IL 60602-4224
Telephone: (312) 977-4400
Facsimile: (312) 977-4405
Dated: September 28, 2021

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused copy of the foregoing **Respondents' Opposition to Claimant's Motion to Correct, Clarify, and Complete the Interim Award** was served upon the following:

Andrew Kim, akim@kimriley.com
Rebecca Riley, rriley@kimriley.com
Tom Myers, tom.myers@aidshealth.org

William J. "Zak" Taylor, wtaylor@tsaoyee.com, AAA Arbitrator

Jen Mora, jenmora@adr.org, AAA Case Manager

*via electronic mail on this 28th day of September, 2021.*

By: */s/ Elizabeth Meraz*